UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICIA HARAN,

*Plaintiff,*

- against -

ORANGE BUSINESS SERVICES INC.,

*Defendant.*

Case No. 21-cv-10585-VSB

**RESPONSE TO STATEMENT OF MATERIAL FACTS**

**(Local Rule 56.1(a))**

Plaintiff PATRICIA HARAN respectfully submits the following response to Defendants'
Statement of Material Facts, pursuant to this Court's Local Civil Rule 56.1(a):

1) Defendant is a telecommunications company and global integrator of communications
   products and services for multinational corporations. (Complaint [Dkt. No. 1] at ¶ 10)

   **Admit.**

2) Defendant maintains a Policy Against Unlawful Discrimination and Harassment, which
   strictly prohibits discrimination, harassment, and retaliation. (Exhibit A to the Declaration
   of Amy J. Traub, Esq., dated February 13, 2024 ("Traub Decl.") – Defendant's Policy
   Against Unlawful Discrimination and Harassment).

   **Admit.**

3) Defendant not only encourages, but requires, employees to report violations of its Policy
   Against Unlawful Discrimination and Harassment. (Id.).

   **Plaintiff does not have sufficient personal knowledge to admit or deny this statement.**

4) Adam Kimmick ("Kimmick") and Eddy Youkhanna ("Youkhanna") received anti-discrimination training while employed at Defendant. (Exhibit B to Traub Decl. – Excerpts from Transcript of October 5, 2023 Deposition of Adam Kimmick ("Kimmick Dep.") at 58:10-59:16; Exhibit C to Traub Decl. – Excerpts from Transcript of October 4, 2023 Deposition of Eddy Youkhanna ("Youkhanna Dep.") at 9:6-24).

**Plaintiff does not have sufficient personal knowledge to admit or deny this statement.**

5) Neither Defendant nor Kimmick tolerate discrimination in the workplace. (Kimmick Dep. at 59:17-23; Exhibit A to Traub Decl.).

**Plaintiff does not have sufficient personal knowledge to admit or deny this statement. Plaintiff denies that Defendant and Kimmick do not tolerate discrimination in the workplace to the extent that her claims in this action assert that they did so.**

6) Plaintiff commenced her employment at Defendant in May 2017. (Exhibit D to Traub Decl. – Excerpts from Transcript of April 26, 2023 Deposition of Plaintiff Patricia Haran ("Pl. Dep.") at 24:5-15).

**Admit.**

7) As part of the onboarding process, Defendant provided Plaintiff with its Employee Handbook, and Plaintiff signed an Employee Handbook Acknowledgement for Defendant's United States Employee Handbook on May 11, 2017. (Pl. Dep. at 28:3-23; Exhibit E to Traub Decl. – Plaintiff's Acknowledgement of Defendant's Employee Handbook).

**Admit.**

8) Defendant's Family and Medical Leave Act ("FMLA") policy contained within its Employee Handbook required Plaintiff to submit a request in writing to both her direct supervisor and to Human Resources on Defendant's FMLA form. (Exhibit F to Traub Decl. – Defendant's FMLA Policy).

**Admit.**

9) As part of the onboarding process, Defendant also provided Plaintiff with a copy of Employee Rights and Responsibilities under the FMLA, which Plaintiff acknowledged on May 18, 2017. (Exhibit G to Traub Decl. – Plaintiff's Acknowledgment of Employee Notice of FMLA Rights; Pl. Dep. at 28:24-29:16).

**Admit.**

10) Kimmick was Plaintiff's direct supervisor from the beginning of her employment until the termination thereof. (Pl. Dep. at 29:17-19; Kimmick Dep. at 26:8-11).

**Admit.**

11) Plaintiff reported exclusively to Kimmick and to no one else at Defendant during her employment. (Pl. Dep. at 30:7-8, 55:16-19; Kimmick Dep. at 26:12-19; Youkhanna Dep. at 12:5-6).

**Admit.**

12) Youkhanna was Kimmick's supervisor during the time Plaintiff was employed at Defendant. (Youkhanna Dep. at 7:21-25, 8:6-18).

**Admit.**

13) Kimmick hired Plaintiff. (Kimmick Dep. at 26:4-5).

    **Admit.**

14) Kimmick hired Plaintiff as a Senior Account Manager to manage "B-end" accounts, which are accounts that are headquartered outside of the United States. (Kimmick Dep. at 69:15-19, 70:14-71:11)

    **Admit.**

15) For the first and second halves of 2019, Plaintiff was fully successful in her role, which involved only "B-end" accounts that were being managed by a person outside of the United States and for which Plaintiff was Defendant's United States representative. (Kimmick Dep. at 74:4-22).

    **Admit.**

16) Plaintiff met only with Kimmick to discuss her performance evaluations during her employment with Defendant. (Pl. Dep. at 30:9-19).

    **Admit.**

17) Plaintiff began working with "A-end" accounts in or about January 2020. (Pl. Dep. at 26:24-27:23).

    **Admit.**

18) Plaintiff working with A-end accounts was not a promotion nor was it a more senior role. (Kimmick Dep. at 69:20-70:13).

**Admit.**

19) Plaintiff's first half 2020 performance evaluation was prepared by Kimmick and Plaintiff. (Pl. Dep. at 30:20-32:12; Kimmick Dep. at 88:8-17).

**Admit.**

20) Kimmick noted in Plaintiff's first half 2020 performance evaluation, inter alia, that "1H 2020 was a challenge for Patty in her new territory." (Exhibit H to Traub Decl. at p. 8 – Plaintiff's First Half 2020 Performance Evaluation; Pl. Dep. 30:20-31:16).

**Admit.**

21) Kimmick noted in Plaintiff's first half 2020 performance evaluation, inter alia, that her "qualified pipeline is not currently sufficient to meet her 2020 financial objectives, and the new opportunities created in 2019 with her B-end accounts exploring partnership and sell with opportunities to expand our portfolio, have not yet matured as ample opportunities." (Exhibit H to Traub Decl. at p. 8; Pl. Dep. at 33:7-16).

**Admit to the extent that Kimmick included this feedback in Plaintiff's review.**

22) Plaintiff understood Kimmick's statement regarding her qualified pipeline to mean that it was "not sufficient" and that Kimmick does not feel that she had "enough opportunities in [her] sales forecast to meet [the] target quota for 2020." (Pl. Dep. at 33:17-34:12)..

**Admit to the extent that Plaintiff speculated as to what Kimmick meant by this statement.**

23) Kimmick stated in Plaintiff's first half 2020 performance evaluation, inter alia, that Plaintiff "has not yet built an agreed consensus on strategy with her team in response to these difficult situations, and this has lead to some miscommunication." (Exhibit H to Traub Decl. at p. 8).

**Admit to the extent that Kimmick wrote this statement in Plaintiff's performance evaluation.**

24) Kimmick stated in Plaintiff's first half 2020 performance evaluation, inter alia, that, "There was also a miscommunication with a client. These episodes resulted [in] some concern that Patty may not be fully understanding [of] feedback, or has not had the time to 'read between the lines' regarding indirect or non-verbal cues which are critical for a sales leader." (Id.).

**Admit to the extent that Kimmick wrote this statement in Plaintiff's performance evaluation.**

25) The above issues are examples of Plaintiff's interpersonal shortcomings with Defendant's clients and employees that Kimmick noted in his performance evaluation for Plaintiff and were also addressed verbally with Plaintiff at other times. (Kimmick Dep. at 99:2-100:18, 77:2-24).

**Deny that Plaintiff had interpersonal shortcomings with clients and employees, or that any alleged issues were addressed with Plaintiff verbally.**

26) Plaintiff's second half 2020 Performance Evaluation was prepared by Kimmick and Plaintiff. (Pl. Dep. at 35:16-36:12; Kimmick Dep. at 90:4-21).

**Admit.**

27) Plaintiff received an "overall rating" of "2-Improvement Needed" for her second half 2020 job performance. (Exhibit I to Traub Decl. at p. 9 – Plaintiff's Second Half 2020 Performance Evaluation; Pl. Dep. at 36:13-18; Kimmick Dep. at 90:12-15).

**Admit.**

28) Kimmick stated in Plaintiff's second half 2020 Performance Evaluation, inter alia, that although Plaintiff had made progress in building an agreed consensus on her strategy with her team, "this strategy has not resulted in an increase[] in proposed services." (Exhibit I to Traub Decl. at p. 9; Kimmick Dep. at 75:5-12).

**Admit to the extent that Kimmick wrote this in Plaintiff's performance evaluation.**

29) Kimmick stated in Plaintiff's second half 2020 Performance Evaluation, inter alia, that "her pipeline velocity is not currently sufficient to meet her 2021 financial growth objectives." (Exhibit I to Traub Decl. at p. 9).

**Admit to the extent that Kimmick wrote this in Plaintiff's performance evaluation. Deny that Plaintiff's pipeline velocity was insufficient to meet her 2021 financial growth objectives, which had not yet even been set. (Pl. Dep. at 38-17:19, 55-12:15).**

30) Kimmick stated in Plaintiff's second half 2020 Performance Evaluation, inter alia, that "opportunities to expand our portfolio ... have not matured, and no new deals in this space have been moved through the funnel to negotiation." (Id.).

**Admit to the extent that Kimmick wrote this in Plaintiff's performance evaluation.**

31) Kimmick stated in Plaintiff's second half 2020 Performance Evaluation, inter alia, that "fragile prospects for stability and growth in Patty's business remain. Urgent focus needs

to be on identifying new opportunities and move these aggressively through the funnel." (Id.).

**Admit to the extent that Kimmick wrote this in Plaintiff's performance evaluation.**

32) Plaintiff herself admitted that she had a lack of focus on her job during this time. (Pl. Dep. at 43:12-23).

**Admit.**

33) Despite responding to Kimmick's comments and conclusions in her second half 2020 Performance Evaluation, Plaintiff did not claim that her "Improvement Needed" rating was in any way due to her having taken time off in connection with her daughter's illness. (Pl. Dep. at 36:19-37:17; Exhibit I to Traub Decl. at p. 9).

**Deny. Plaintiff testified that she and Kimmick spoke about her "lack of focus" being related to her daughter and mother's illnesses during her performance review. Plaintiff did claim that this "lack of focus," which contributed to her low rating, was partially attributable to "manag[ing her] daughter's illness." Pl. Dep. at 43-12:23.**

34) There is no mention of Plaintiff having taken days off in connection with her daughter's or mother's illnesses, or for any other reason, in Plaintiff's second half 2020 Performance Evaluation. (Exhibit I to Traub Decl.).

**Admit.**

35) Kimmick did not bring up Plaintiff having taken days off in connection with her daughter's or mother's illnesses during their meeting to discuss Plaintiff's second half 2020 Performance Evaluation. (Pl. Dep. at 42:16-23).

**Admit to the extent that Kimmick did not bring it up. However, Plaintiff's time off was discussed. Plaintiff's Dep. 42-2:22.**

36) One of Defendant's clients complained to Kimmick in 2020 about Plaintiff's communication, responsiveness, and ability to deliver timely responses to complaints. (Kimmick Dep. at 75:18-21, 77:19-78:7).

   **Plaintiff does not have knowledge sufficient to admit or deny this statement.**

37) Plaintiff's co-workers complained to Kimmick in 2020 about their dissatisfaction with how Plaintiff was requesting their help and the way in which Plaintiff pressured them. (Kimmick Dep. at 81:2-9, 82:5-12, 84:22-85:4).

   **Plaintiff does not have knowledge sufficient to admit or deny this statement.**

38) Plaintiff's employment was terminated effective February 24, 2021. (Exhibit J to Traub Decl.; Pl. Dep. at 53:13-54:2, 56:15-57:11).

   **Admit.**

39) Kimmick was the individual who made the decision to terminate Plaintiff's employment, and he conferred with Youkhanna and Defendant's Human Resources about his decision. (Kimmick Dep. at 144:21-145:14).

   **Admit.**

40) Because Kimmick was Plaintiff's direct supervisor, Kimmick is the best source of information regarding the reasons why Plaintiff's employment was terminated. (Youkhanna Dep. at 32:19-25).

   **Plaintiff does not have knowledge sufficient to admit or deny this statement.**

41) Kimmick made the decision to terminate Plaintiff's employment due to her lack of performance, specifically, her inability to produce enough sales pipeline for the business

to be healthy in the future, the insufficient velocity for opportunities already in the pipeline, and the interpersonal issues she had with Defendant's clients and employees. (Kimmick Dep. at 98:14-25, 150:18-151:7, 151:24-152:14).

**Deny. Plaintiff was terminated at least in part because of her need for leave to care for her mother and daughter, expressed by Kimmick as a "lack of focus." Plaintiff's Dep. 39-5:7. Kimmick and Defendants' claims about their reasons for terminating Plaintiff are pretextual.**

42) Plaintiff's pipeline and pipeline velocity were insufficient to support Defendant's business because Plaintiff's identified opportunities were not maturing, they were not being proposed, they were not being negotiated, and they were not moving towards closure. (Kimmick Dep. at 105:23-106:14).

**Deny. Plaintiff presented Kimmick with a forecast and plan to build a sufficient pipeline for 2021. Plaintiff Dep. 38-17:25.**

43) On February 10, 2021, prior to her termination, Plaintiff communicated to her co-worker, Peter Singh, that she was "starting to look around at what's next for [her]." (Exhibit K to Traub Decl. at p. 1 – Microsoft Teams Chats (1); Pl. Dep. at 65:2-21).
**Admit.**

44) Prior to her termination, Plaintiff thought that her employment at Defendant was in jeopardy because of her performance. (Pl. Dep. at 57:23-58:3).

Admit in part. Plaintiff believed that her job was in jeopardy not just because of performance reasons but also due to the time off she was taking. **Plaintiff Dep. 58-14:24.**

45) Prior to her termination, on February 1, 2021, Plaintiff communicated to her co-worker, Peter Singh, that "things are intense as far as pressure for more business quickly," that she was not sure how safe her job was, and that she was "hoping to hang in here for a bit longer." (Exhibit L to Traub Decl. at p. 2 – Microsoft Teams Chats (2); Pl. Dep. at 60:7-24).

**Admit.**

46) On February 24, 2021, following notification of the termination of her employment, Plaintiff communicated to her former co-worker, Xavier Pichon, that she should have taken family medical leave, but she did not want to let the company down. (Exhibit M to Traub Decl. at p. 2 – Microsoft Teams Chats (3); Pl. Dep. at 69:2-22).

**Admit.**

47) In addition to Plaintiff, Kimmick terminated several other employees from the time Plaintiff was hired in May 2017 until October 2023. (Kimmick Dep. at 54:6-19).

**Admit.**

48) Plaintiff's daughter was diagnosed with her illness in or around late September or early October of 2020. (Pl. Dep. at 74:14-75:2).

**Admit.**

49) Plaintiff only took 8.5 workdays off to care for her daughter from the onset of her illness in October 2020 through the end of Plaintiff's employment with Defendant. (Exhibit N to Traub Decl. at p. 3 – Excerpt from Plaintiff's Interrogatory Responses; Pl. Dep. at 109:8-110:2).

**Admit.**

50) Kimmick told Plaintiff to take off whatever time she needed to take care of her daughter, that he would be thinking of her, and to let him know if she needed anything. (Kimmick Dep. at 142:5-25, 143:6-25; Exhibit O to Traub Decl. – Microsoft Teams Chats (4); Pl. Dep. at 107:9-108:3).

**Admit. Plaintiff also testified that Kimmick was "cold and…unsympathetic." Pl. Dep. at 80:21-24.**

51) Plaintiff perceived increased pressure from Kimmick for her to get sales closed and move sales along quickly and believed this increased pressure was related to her daughter's condition because Kimmick was "cold" and "unsympathetic" and just wanted her "to close these sales." (Pl. Dep. at 80:6-81:8).

**Admit. Plaintiff also testified that Kimmick's pressure was related to her not being "as focused" as she had been in the past due to her daughter's and mother's illnesses. Pl. Dep. at 80:15-19.**

52) Despite feeling an increased pressure from Kimmick, Plaintiff's 2020 performance expectations did not change at any time. (Pl. Dep. at 82:19-25).

**Admit.**

53) No one at Defendant made disparaging comments about Plaintiff's daughter's illness. (Pl. Dep. at 114:3-6).

**Admit.**

54) No one at Defendant made negative or disparaging comments about Plaintiff's mother's illness. (Pl. Dep. at 114:22-25).

**Admit.**

55) No one at Defendant made disparaging or negative comments about Plaintiff having taken days off in connection with her daughter's illness. (Pl. Dep. at 114:15-21).

**Admit.**

56) No one at Defendant made disparaging or negative comments about Plaintiff having taken days off in connection with her mother's illness. (Pl. Dep. at 115:2-6).

**Admit.**

57) Defendant never prohibited Plaintiff from taking any time off due to her daughter's illness. (Pl. Dep. at 105:21-105:24; Kimmick Dep. at 63:10-17).

**Admit.**

58) Defendant never prohibited Plaintiff from taking any time off due to her mother's illness. (Pl. Dep. at 106:21-24).

**Admit.**

59) Plaintiff was paid for the days she took off to care for her daughter. (Pl. Dep. at 105:21-106:20).

**Admit.**

60) Plaintiff was paid for the days she took off to care for her mother. (Pl. Dep. at 106:25-107:8).

**Admit.**

61) The only basis for Plaintiff's FMLA interference claim is her belief that despite being given the time off to care for her daughter and mother, Defendant should have categorized the time off as FMLA leave. (Pl. Dep. at 105:5-20).

**Admit in part. Plaintiff does believe that she should have been offered FMLA leave and her leave should have been categorized as FMLA leave. (Pl. Dep. at 117:8-14,**

**105:5-20). Plaintiff's right to FMLA leave was also impeded when she expressed to an HR representative that her daughter may need another surgery, necessitating that Plaintiff may need to take additional leave, and Defendants terminated her before she could do so. Pl. Dep. at 117:8-14.**

62) The only basis for Plaintiff's FMLA retaliation claim is the fact that Defendant terminated her employment. (Pl. Dep. at 108:4-13).

**Admit.**

63) Plaintiff did not request FMLA leave while employed by Defendant. (Pl. Dep. at 108:17-19; Kimmick Dep. at 62:15-18).

**Admit to the extent that Plaintiff did not request leave categorized as FMLA leave.**

64) Plaintiff did not take FMLA leave while employed by Defendant. (Pl. Dep. at 108:14-16).

**Admit to the extent that Plaintiff did not take leave categorized as FMLA leave.**

65) The basis for Plaintiff's NYCHRL caregiver discrimination claim is the alleged fact that she was a caregiver to her daughter and mother, that she needed an accommodation to care for them, and that she was terminated for having taken time off. (Pl. Dep. at 110:20-112:10).

**Admit.**

66) Plaintiff never requested an accommodation while employed by Defendant. (Pl. Dep. at 111:17-20).

**Deny. Plaintiff did request leave.**

67) The only individuals Plaintiff claims subjected her to discrimination or retaliation are Kimmick and Youkhanna. (Pl. Dep. at 110:3-19, 112:11-113:3; Exhibit N to Traub Decl. at p. 2).

**Admit.**

68) Plaintiff never reported discrimination or retaliation to anyone at Defendant. (Pl. Dep. at 115:7-11).

**Admit.**

69) No employees working under Kimmick at Defendant complained about discrimination. (Kimmick Dep. at 153:19-22).

**Admit.**

70) No employees working under Kimmick at Defendant complained about violations of the FMLA. (Kimmick Dep. at 153:23-154:2).

**Admit.**

## PLAINTIFF'S RULE 56.1 COUNTERSTATEMENT

1. Plaintiff was employed by Defendant from May 2017 until February 2021, and reported directly to Adam Kimmick throughout that time. Exhibit A, Kimmick Dep. 26:4-14.

2. Plaintiff's title when she began working for Defendants was "senior account manager farmer." Kimmick Dep. 30:2-6.

3. In late September or early October 2020, Ms. Haran's 15-year-old daughter, Julia Haran, was diagnosed with a possible tumor in her femur bone. Exhibit B, Plaintiff's Dep. at 74:14-75:2; Plaintiff's Decl. ¶¶ 2,3,4.

4. In October 2020, Plaintiff informed her supervisor, Sales Director Adam Kimmick, about Julia's diagnosis and her anticipated need for time off work to care for her daughter. Kimmick Dep. 63:10-14. Plaintiff's Decl. ¶ 3,4.

5. Kimmick was sufficiently aware of the FMLA to know that "people should have the time and the ability to take time off from work if …required in order to support a family member." Kimmick Dep. 62:3-7.

6. In the coming months, Ms. Haran took intermittent days off work to take Julia to doctor's appointments and for treatment, including a half day on October 14, between October 15th and 19th for major surgery, November 11, December 18, December 28, December 30, and February 12, 2021 (for Plaintiff's mother's appointment). Plaintiff Dep. 109:8-25, Exhibit C, Plaintiff's Responses to Defendant's Interrogatories No. 15.

7. At all times, Ms. Haran apprised Mr. Kimmick of her need for leave and the status of Julia's condition. Plaintiff's Decl. ¶ 3,6.

8. Plaintiff provided notice of her need for family leave to care for her daughter to Adam Kimmick in clear terms, as he recalled in his deposition: "Q. Did she ever take any time off work to care for a family member? A. I believe so, yes. She asked for paid leave, paid time off. Q. Which family member did she take time off of work to care for? A. I believe it was her daughter." Kimmick deposition, 62:19-25 "Q. Did Patty come to you and ask you if she could take time off work to care for her daughter? A. As I said, yes. I believe she did, yes." Kimmick deposition, 63:10-17

9. Kimmick was aware that Plaintiff's daughter's condition was "severe," "significant," "beyond just a normal injury," and he was aware that she needed medical procedures to be done. Kimmick Dep. 138:18-142:4. However, Kimmick at that time failed to provide Plaintiff with any information regarding her FMLA rights, and did not refer her to the employees of the Company who were equipped to discuss family leave. Kimmick Dep., 64:12-13; Plaintiff's Decl. ¶ 6.

10. On October 23rd, Plaintiff met with Human Resources employee Michelle Rocco to receive an award for her participation in a fundraising event. Exhibit D, Rocco Dep. 16:15-21.

11. At that time, Plaintiff communicated her daughter's condition to Ms. Rocco along with the potential need for her to take further leave going forward. Plaintiff Dep. 48:17-52:4; Plaintiff's Decl. ¶4.

12. Ms. Haran explained that Julia might need another surgery, which remained to be determined by her surgeon. Plaintiff Dep. 48:17-52:4; Plaintiff's Decl. ¶4.

13. Plaintiff also explained that Julia was being homeschooled while she recovered from surgery for 6 weeks, and that Julia had ongoing doctor's appointments and treatment. Plaintiff Dep. 48:17-52:4; Plaintiff's Decl. ¶4.

14. At no time did Ms. Rocco inform Ms. Haran about her FMLA rights or provide her with FMLA paperwork. Plaintiff Dep. 48:17-52:4; Rocco Dep. 18:10-13; Plaintiff Decl. ¶6.

15. Plaintiff informed both Michelle Rocco and Mr. Kimmick that her daughter might need additional surgery in the future. Plaintiff Decl. ¶5.

16. Plaintiff's daughter, Julia, was home recovering from surgery from October 15, 2020 to November 18, 2020. Plaintiff Decl. ¶8.

17. Plaintiff returned to work on October 20, 2020, before her daughter was fully recovered. Plaintiff Decl. ¶8. Julia was on crutches with limited mobility during the period of her recovery. Plaintiff Decl. ¶9. She had a wound that required cleaning and dressing on a daily basis, and needed help with showering, going to the bathroom and other day-to-day activities. Plaintiff Decl. ¶9.

18. After Plaintiff informed Mr. Kimmick about Julia's condition and began taking intermittent leave to care for Julia, Mr. Kimmick suddenly began subjecting Plaintiff to heightened scrutiny and pressure. Plaintiff Decl. ¶10.

19. Plaintiff was intimidated by negative performance feedback she received from Mr. Kimmick, and avoided taking more time off work while her daughter continued to recuperate, receive treatment, and attend homeschooling. Plaintiff Decl. ¶11.

20. Mr. Kimmick constantly asked Plaintiff whether she was going to be able to maintain the schedule and pace of conversations with one of her accounts, Pfizer, given her caregiving obligations. Plaintiff Decl. ¶12.

21. After coming home from sleeping at the hospital with her daughter for five nights, Plaintiff received a call from a peer, Mr. Paul Reticker, late one evening; Mr. Reticker told Plaintiff that if she was unable to participate in the upcoming conversations with Pfizer, the account would be transferred to him, per Mr. Kimmick. Plaintiff Decl. ¶14.

22. During this time, Mr. Kimmick was constantly checking up on Plaintiff to ascertain the status of her deals, even when he was fully aware of the status. Plaintiff Decl. ¶15.

23. For example, with respect to a renewal of Plaintiff's account with Moody's, Mr. Kimmick repeatedly asked Plaintiff on a day-to-day basis when she was going to get the contract executed by the customer. Plaintiff Decl. ¶16.

24. He was aware that it took time for the deal to finalize, yet he persistently asked Plaintiff for updates. Plaintiff Decl. ¶16.

25. Mr. Kimmick was responsible for facilitating negotiations with clients by encouraging the Company internally to agree to contractual terms with clients. Plaintiff Decl. ¶17.

26. With respect to Plaintiff, Mr. Kimmick was unwilling to advocate internally to help Plaintiff finalize the terms of a Master Agreement with Pfizer; instead, he put pressure on Plaintiff to get Pfizer to change its position. Plaintiff Decl. ¶18.

27. Conversely, Mr. Kimmick helped Plaintiff's peers, Messrs. Reticker and Renassia, to secure deals by advocating internally on their behalf to get certain unusual contractual terms approved by Orange. Plaintiff Decl. ¶19.

28. If Mr. Kimmick had not subjected Plaintiff to increased pressure and scrutiny, Plaintiff would have taken off the time necessary to care for her daughter for the full duration of her recovery. Plaintiff Decl. ¶20.

29. Despite the personal difficulties Plaintiff was experiencing, she met her revenue quota for the year in 2020, and at the end of June 2020 she received a performance review rating her as "fully successful." Kimmick Dep. 111:19-22, 88:11-23.

30. In January 2021, Ms. Haran met with Mr. Kimmick to discuss her performance review for the second half of 2020. Kimmick Dep. 90:4-92:10.

31. In 2020, Plaintiff had achieved 100.58% of her revenue goal and managed both her old territory and new territory while a new employee was being onboarded. Kimmick Dep. 111:15-22, 115:4-7.

32. Mr. Kimmick recognized that Plaintiff "stepped up to take...a series of responsibilities that helped [him] and the business" over the course of [2020]. Kimmick Dep. 126:16-19.

33. During the review, Mr. Kimmick delivered positive feedback to her but also attributed two lost business opportunities to her, which he used as the basis for giving her an overall rating of "2" (Needs Improvement). See Exhibit E, Plaintiff's December 2020 Performance Review; Kimmick Dep. 90:12-15.

34. Mr. Kimmick had known and had discussed several times with Plaintiff that it would be highly unlikely that Defendant would successfully retain these two accounts. See Exhibit E, page 9, where Mr. Kimmick stated that "the largest A-end accounts…have made decisions to move away from Orange products and services. These decisions were being fomented before Patty took on responsibility for managing the accounts. And in the case of Pfizer, Orange was unable to accept some onerous contract terms." See Exhibit E.

35. In the same performance review meeting, Mr. Kimmick also told Ms. Haran that she had a "lack of focus" in general, which Plaintiff interpreted as referring to her absences and obligations due to her daughter's illness. Plaintiff's Dep. 39:17-41:20.

36. Plaintiff had never received this feedback from Mr. Kimmick before. Plaintiff Decl. ¶7. Plaintiff brought up the time she had taken off to support her daughter and the two spoke explicitly about the connection between Plaintiff taking time off and her lack of "focus" on work. Plaintiff's Dep. 38:6-43:23.

37. The "2" rating on Plaintiff's performance review did not reflect all the positive feedback she received, or the large renewal deal he had just congratulated her for making. See Exhibit F, Moody's Renewal Email; Plaintiff's Decl. ¶24.

38. This review left Plaintiff so uncertain of her future at the Company that she mentioned to a coworker that "things are intense" and that she was "not sure how safe I am." Exhibit G, Instant Messages with Peter Singh. In or around January or February of 2021, Plaintiff presented Mr. Kimmick with a proposed plan for improving her deal pipeline for the following year. Kimmick Dep. 92:23-93:6; Plaintiff's Decl. ¶27.

39. Plaintiff had a viable plan to increase her sales pipeline for 2021, which she presented to Mr. Kimmick on or about February 8, approximately two weeks prior to her termination. Plaintiff's Decl. ¶27.

40. During that presentation, Mr. Kimmick did not raise any concerns about Plaintiff being able to generate satisfactory revenue for the 2021 fiscal year. Plaintiff's Decl. ¶27.

41. On February 8, 2021, Ms. Haran informed Mr. Kimmick that she would need to take a half day off work to take her mother to the eye doctor. Plaintiff's Dep. 16:21-107:5.

42. On or about December 10, 2020, Plaintiff's mother was diagnosed with Macular degeneration, which limits her vision and requires ongoing care by an eye doctor, requiring regular treatment and visits. Plaintiff's Decl. ¶28-32.

43. Due to her Macular degeneration, Plaintiff's mother is unable to drive at night or navigate unfamiliar settings, such as hospitals and doctor's offices. Plaintiff's Decl. ¶28-32. Since her diagnosis, Plaintiff's mother has been following a regimen of treatment involving several follow-up appointments, including eye injections every 3 months to slow the progression of the disease. Plaintiff's Decl. ¶28-32.

44. Ms. Haran proceeded to take time off as scheduled on February 12. See Exhibit C, No. 15.

45. Less than two weeks later, on February 24, 2021, Mr. Kimmick and an HR representative, Jennifer Lawson, met with Ms. Haran virtually and summarily terminated her employment. Plaintiff Dep. 53:13-16.

46. Ms. Lawson told Ms. Haran that the reason for her termination was that she did not meet her "number" for 2020. Plaintiff Dep. 54:20-55:90.

47. However, Plaintiff had met her goal number for 2020. Kimmick Dep. 111:19-22, 88:11-23.

48. Mr. Kimmick jumped in and said, instead, that she was being terminated because she was not expected to meet her 2021 number. Plaintiff Dep. 55:9-15.

49. Ms. Haran protested that she had not yet been given her 2021 number. Plaintiff Dep. 55:13-15; Plaintiff's Decl. ¶26.

50. During Plaintiff's termination meeting, Mr. Kimmick never mentioned anything about alleged interpersonal issues with clients or coworkers. Plaintiff's Decl. ¶35.

51. After this termination meeting, Plaintiff instant messaged a coworker saying: "[I] feel that due to my daughter's illness in Q4 that I should have taken family medical leave off but I didn't want to let the company down." Exhibit H, Instant Messages with Xavier Pichon.

52. To Plaintiff's knowledge, she was the only employee terminated at that time. Plaintiff's Decl. ¶34.

Dated: March 26, 2024
      New York, NY

FISHER TAUBENFELD LLP

_____/s/_____
LIANE FISHER, ESQ.
225 Broadway, Suite 1700
New York, NY 10007
T: (212) 571-0700
F: (212) 505-2001

Attorneys for Plaintiff

## APPENDIX TO PLAINTIFF'S 56.1 STATEMENT

## TABLE OF CONTENTS

Exhibit A, Adam Kimmick Deposition Transcript

Exhibit B, Patricia Haran Deposition Transcript

Exhibit C, Plaintiff's Interrogatory Responses

Exhibit D, Michelle Rocco Deposition Transcript

Exhibit E, Plaintiff's 2020 Performance Review

Exhibit F, Emails Regarding Plaintiff's Accounts

Exhibit G, Instant Messages with Peter Singh

Exhibit H, Instant Messages with Xavier Pichon

Exhibit I, Instant Messages with Adam Kimmick

Exhibit A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

PATRICIA HARAN,

                Plaintiff,

      -against-

ORANGE BUSINESS SERVICES INC.,

                Defendant.

----------------------------------------X

                October 5th, 2023
                10:03 a.m.

      REMOTE DEPOSITION of ORANGE

BUSINESS SERVICES, INC., by ADAM OVERTON

KIMMICK, the Defendant in the

above-entitled action, taken on behalf of

the Plaintiff, held remotely via video

teleconference, taken before Stefanie

Calabria, a Reporter and Notary Public

within and for the State of New York.

```
1   A P P E A R A N C E S:

2


3   FISHER TAUBENFELD, LLP
         Attorney for Plaintiff
4        225 Broadway - Suite 1700
         New York, New York 10007
5        (646) 741-3490
    BY: LIANE FISHER, ESQ.
6   E-MAIL: liane@fishertaubenfeld.com

7

    BAKER HOSTETLER
8        Attorney for Defendant
         45 Rockefeller Plaza
9        New York, New York 10111
         (212) 589-4200
10  BY: JUSTIN GUIFOYLE, ESQ.
    E-MAIL: jguilfoyle@bakerlaw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              IT IS HEREBY STIPULATED AND

2       AGREED by and between the counsel for the

3       respective parties hereto, that the

4       filing, sealing, and certification of the

5       within deposition shall be and the same

6       are hereby waived;

7          IT IS FURTHER STIPULATED AND AGREED

8       that all objections, except as to the form

9       of the question, shall be reserved to the

10      time of trial.

11         IT IS FURTHER STIPULATED AND AGREED

12      that the within deposition may be signed

13      before any notary public with the same

14      force and effect as if signed and sworn to

15      before this court.

16

17

18

19

20

21

22

23

24

25

1            THE REPORTER:  The attorneys

2      participating in this deposition

3      acknowledge that I am not physically

4      present in the deposition room and

5      that I will be reporting this

6      deposition remotely.

7            They further acknowledge

8      that, in lieu of an oath administered

9      in person, the witness will verbally

10     declare his/her testimony in this

11     matter under penalty of perjury.

12           The parties and their counsel

13     consent to this arrangement and waive

14     any objections to this manner of

15     reporting.  Please indicate your

16     agreement by stating your name and

17     agreement on the record.

18           MS. FISHER:  Liane Fisher,

19     agreed.

20           MR. GUIFOYLE:  Justin Guifoyle,

21     agreed.

22           THE REPORTER:  Would you please

23     present your identification by holding

24     it up to the camera for verification?

25           THE WITNESS:  (Witness

1                    A. KIMMICK

2      complying.)

3    A D A M   O V E R T O N   K I M M I C K ,

4    the witness herein, having first been duly

5    sworn by a Notary Public of the State of

6    New York, was examined and testified as

7    follows:

8    BY THE REPORTER:

9      Q.    Please state your name for the

10   record.

11     A.    Adam Overton Kimmick.

12     Q.    Please state your address.

13     A.    20 Route 25A, Oyster Bay, New

14   York 11771.

15   EXAMINATION BY

16   MS. FISHER:

17     Q.    Good morning, Mr. Kimmick.  I

18   represent Patricia Haran.  I'm going to be

19   asking you a series of questions here

20   today to which you will respond under oath

21   subject to the penalty of perjury.

22          If there is any question that

23   you don't understand, let me know, and I

24   will rephrase it for you.  If there is any

25   question you didn't hear, either the court

1                    A. KIMMICK

2    reporter or I will repeat it for you.  If

3    you answer a question, it's going to be

4    presumed that you understood the question

5    and gave your best most truthful response.

6    If at any time you want to take a break,

7    let me know, I will be happy to

8    accommodate you, as long as there is no

9    question pending.

10           The court reporter cannot

11   transcribe two people talking at once so

12   please wait for me to finish asking my

13   question before you give your answer; and

14   the court reporter cannot transcribe a nod

15   or shake of the head so please give verbal

16   responses to my questions.

17           Do you understand these

18   procedures?

19       A.    Yes.

20       Q.    Okay.  Are you suffering from

21   any illness that would affect your ability

22   to testify today?

23       A.    No.

24       Q.    Have you taken any medications

25   that would affect your ability to testify

```
 1                    A. KIMMICK

 2   here today?

 3        A.    No.

 4        Q.    Did you prepare for your

 5   deposition here today?

 6        A.    Yes.

 7        Q.    How did you prepare for it?

 8        A.    I met with my attorneys.

 9        Q.    Who is that?

10        A.    Justin Guifoyle and Justin will

11   have to help me with the name of other

12   one.

13        Q.    Well, he can't testify for you.

14        A.    There was another attorney at

15   Baker Hostetler that met with me as well

16   and at the same time.  I believe the date

17   was May 4th.

18        Q.    Okay.  May 4th, you said?

19        A.    Yes.

20        Q.    That's when you met with your

21   attorneys to prepare for your deposition?

22        A.    Correct.  And I met yesterday

23   with Justin.

24        Q.    Was there anyone else present

25   for your meeting with Justin?
```

                    A. KIMMICK

1

2      A.    Yes.  There was one other

3   person.  I don't remember her name.

4      Q.    Okay.  But it was an attorney?

5      A.    It was an attorney, yes.

6      Q.    And how long did you meet with

7   Justin and the other attorney?

8      A.    A little over an hour and

9   yesterday it was about 10 minutes.

10      Q.    Did you review any documents in

11   preparation for your deposition?

12      A.    Yes.

13      Q.    Which documents did you review?

14      A.    I can't recall them all.  I

15   can't recall them all.

16      Q.    Can you recall any of them?

17      A.    Yes.

18      Q.    Which ones can you recall?

19      A.    Performance reviews.

20      Q.    Performance reviews for who?

21      A.    Patty Haran.

22      Q.    What years were the performance

23   reviews?

24      A.    I don't recall all of them.

25      Q.    Did you review any performance

```
 1                    A. KIMMICK

 2   reviews for the 2020 year?

 3        A.    Yes.

 4        Q.    Did you review any other

 5   documents that you recall?

 6        A.    Yes.

 7        Q.    Which ones?

 8        A.    They were instant messages from

 9   Teams.

10        Q.    Who were the instant messages

11   with?

12        A.    Eddi Youkhanna,

13   E-d-d-i-Y-o-u-k-h-a-n-n-a.

14        Q.    What did those instant messages

15   include?

16        A.    Comments about this case.

17        Q.    Have you produced those to your

18   attorney?

19        A.    The -- our HR department or our

20   IT department did.  I was unable to.

21        Q.    Do you know when your HR

22   department produced them to the attorneys?

23        A.    No.

24        Q.    And what did you talk about in

25   those instant messages with Eddi, what
```

1                    A. KIMMICK

2   specifically?

3       A.    You would have to show them to

4   me.  I would -- believe they are in

5   evidence or a part of the packet.  You

6   would have to show them to me.  I don't

7   recall them all.

8       Q.    Well, you just said you just

9   reviewed them yesterday, right?  If you

10  would give me --

11      A.    No, no, no.  I reviewed them on

12  May 4th or -- yeah, I believe it was May

13  4th.

14      Q.    So you don't recall anything

15  specific about the instant messages with

16  Eddi other than the fact that they were

17  comments about this case?

18      A.    No.  I mean, if you refresh my

19  memory, maybe I could pull it up.

20      Q.    Yeah, I'm not sure.  I --  I'm

21  not sure I have those, but I'm going to

22  look for them, and we can come back to

23  that.

24           Did you do anything else to

25  prepare for today?

                        A. KIMMICK

1

2       A.    My attorneys gave me some

3   instructions about --

4       Q.    I don't -- wait.  Let me just

5   stop you.  I don't want to know anything

6   that you and your attorneys spoke about.

7             Other than meeting and speaking

8   with your attorneys and reviewing some

9   documents in preparation for today, did

10  you do anything else?

11      A.    No.

12      Q.    Other than counsel -- well,

13  other than counsel, who have you spoken to

14  about this case?

15      A.    My HR department and management

16  senior management within our firm about,

17  you know, the case.

18      Q.    Who in HR did you speak with

19  about this case?

20      A.    Jennifer Lawson.

21      Q.    When did you speak with Jennifer

22  Lawson about this case?

23      A.    I can't recall all of the dates.

24      Q.    You spoke with Jennifer Lawson

25  about this case on more than one occasion?

1                    A. KIMMICK

2        A.    Yes.

3        Q.    When was the most recent time

4    you spoke with her about this case?

5        A.    Months ago.  I don't recall the

6    date.

7        Q.    Was it within the last six

8    months?

9        A.    Yes, probably.

10       Q.    What did you discuss with her?

11       A.    That we were engaging our

12   attorneys and that Patty was bringing a

13   case.

14       Q.    Did you discuss anything else

15   with her?

16       A.    I don't recall the full

17   conversation.  I don't recall the full

18   conversation.

19       Q.    Is there anything else that you

20   do recall?

21       A.    I mean, it seems like a pretty

22   wide question.  Can you clarify?

23       Q.    Well, you testified that you

24   spoke with her about engaging attorneys,

25   that Patty was bringing a case, I'm asking

1                          A. KIMMICK

2      you if there's anything else that you

3      recall from that conversation.  It's

4      actually a pretty narrow question.

5          A.    We discussed making an offer to

6      Patty.

7          Q.    An offer of what?

8          A.    Settlement.

9          Q.    Did you discuss how much you

10     were going to offer?

11         A.    Yes.

12              MR. GUIFOYLE:  To the extent

13         that this witness has this knowledge

14         relaid from counsel, whether inhouse

15         at Orange or outside counsel at Baker,

16         I'd advise the witness not to answer;

17         to the extent he has this knowledge

18         without learning it from counsel, he

19         can answer.

20              MS. FISHER:  This is a

21         conversation he had with HR that is

22         not privileged so I'm asking what he

23         discussed with Jennifer Lawson about

24         numbers.  There is no privilege that

25         applies to that.

```
 1                    A. KIMMICK

 2            MR. GUIFOYLE:  To the extent

 3       that it's relaying information from

 4       counsel, it remains privileged.

 5            MS. FISHER:  If you relay

 6       information that's privileged to

 7       someone that is no longer privileged

 8       with, you no longer have the

 9       privilege.  We can get the judge on

10       the phone if we have to.

11            MR. GUIFOYLE:  That's fine.

12            MS. FISHER:  All right.  Let's

13       do that.

14            MR. GUIFOYLE:  The witness

15       hasn't answered how he gathered the

16       information to begin with so I'm not

17       sure what the argument is.

18            MS. FISHER:  The source of the

19       information is irrelevant if he has a

20       conversation with someone that the

21       privilege does not extend to and I'm

22       asking about his conversation with

23       someone who's in HR, there is no

24       privilege that applies to that.

25            MR. GUIFOYLE:  All right, Adam,
```

```
 1                    A. KIMMICK

 2        we'll see.  You can answer it.

 3               MS. FISHER:  He can answer?

 4               MR. GUIFOYLE:  Sure.

 5        Q.    Okay.  Please, Mr. Kimmick, go

 6    ahead.

 7               How much did you discuss with

 8    Jennifer Lawson offering to Patricia

 9    Haran?

10        A.    I don't recall the number.

11        Q.    Is that number memorialized in

12    any document?

13        A.    Not to my knowledge.

14        Q.    And whose decision was it about

15    how much to offer Ms. Haran?

16        A.    It was a committee decision, and

17    I don't believe she accepted it.  I don't

18    know the number that was offered, I was

19    not privy to that.  I know that it came

20    from our attorneys and I'm almost positive

21    because I'm here that she did not accept

22    it.

23        Q.    When you say it was  "a

24    committee decision,"  can you explain what

25    you mean?
```

```
 1                    A. KIMMICK

 2      A.    HR and our attorneys and the

 3  head of region and Eddi Youkhanna at the

 4  time were reviewing a potential lawsuit

 5  and impact on the company and deciding

 6  whether an offer was more relevant than a

 7  proceeding.

 8      Q.    Who is the head of region?

 9      A.    At the time it was Rob Willcock.

10      Q.    Sorry, you said Rob --

11      A.    Rob Willcock.

12      Q.    And when was the decision made,

13  the committee decision?

14      A.    I don't recall.  I wasn't part

15  -- I wasn't part of that.  It was attorney

16  only.

17      Q.    And is it your understanding

18  that the number, the settlement offer, was

19  relaid to Ms. Haran?

20      A.    I have no way of validating

21  that, but I -- I assume it was.  I don't

22  know whether my assumption would be

23  correct or -- no, I have no way of

24  knowing.

25      Q.    Do you remember anything else
```

```
1                    A. KIMMICK

2    about your discussions with Jennifer

3    Lawson concerning this case?

4         A.    No, I mean, not specifics.  I'm

5    sure we must have talked about her

6    performance reviews, Patty's performance

7    reviews.

8         Q.    What about them?

9         A.    Contents.

10        Q.    What contents?

11        A.    You would have to pull them up.

12   I could go through, I mean, we could read

13   them, and I could tell you what potential

14   pieces of it.

15        Q.    Which performance reviews, from

16   what years, did you discuss with Jennifer

17   Lawson?

18        A.    I don't recall all of them.

19        Q.    Did you review 2020?

20        A.    I believe so, yes.

21        Q.    Did you review 2019?

22        A.    I don't recall.

23        Q.    And is there anything else that

24   you recall from your conversations with

25   Jennifer Lawson about this case other than
```

1                         A. KIMMICK

2    what you testified to?

3        A.    I can't recall specifics.  It's

4    too long ago.

5        Q.    You testified that you spoke

6    with senior management within Orange about

7    this case, who within senior management?

8        A.    Eddi Youkhanna.

9        Q.    When did you speak with Eddi

10   about this case?

11       A.    More than 18 months ago.  Yeah,

12   more than 18 months ago.

13       Q.    What did you speak with him

14   about?

15       A.    He left Orange so I have only

16   spoken to him once since he left Orange

17   and it wasn't about Patty.

18       Q.    What did you speak with Eddi

19   about more than 18 months ago?

20       A.    The fact that Patty was going to

21   sue.

22       Q.    What did you say to Eddi?

23       A.    I told him I thought it was

24   justified.

25       Q.    You told him you thought what

```
1                    A. KIMMICK

2   was justified?

3       A.    Patty's dismissal.

4       Q.    Why did you say that?

5       A.    There was adequate evidence,

6   performance didn't meet expectations, and

7   she had some relationship issues with her

8   piers and customers, but that was not part

9   of the conversation with Eddi, that was a

10  very simple message to Eddi.  He asked me

11  whether I thought that this was an issue

12  and I said, no, it was justified, that was

13  that.  It was a very matter-of-the-fact

14  call, if I recall correctly.

15      Q.    Was there anything else you

16  recall from that conversation?

17      A.    No.

18      Q.    Was this a telephone

19  conversation?

20      A.    Yes.

21      Q.    How long was the conversation?

22      A.    I don't recall the exact length

23  of the conversation.  There may have been

24  other topics that we had to talk about

25  other than this one so --
```

```
 1                    A. KIMMICK
 2      Q.    Was any -- sorry.  Go ahead.
 3      A.    (Indicating).
 4      Q.    Did anyone else participate in
 5  that conversation?
 6      A.    No.
 7      Q.    Did you speak with anyone else
 8  within senior management --
 9      A.    No.
10      Q.    -- about this case?
11      A.    No.
12      Q.    Did you speak with anyone else
13  other than who you testified to about this
14  case?
15      A.    Not that I recall.
16      Q.    Have you ever been a defendant
17  in a lawsuit?
18      A.    No.
19      Q.    Have you ever given sworn
20  testimony before?
21      A.    No.  Well, not in a deposition.
22  I'm a village official, and I have given
23  my testimony, and all of the things that I
24  say in my public hearings are recorded by
25  a court reporter, but not -- not in a
```

                         A. KIMMICK

 1   lawsuit like this.

 2        Q.    Okay.  What's the highest level

 3   of education that you have received?

 4        A.    Bachelors in arts.

 5        Q.    Where did you -- where did you

 6   get your bachelors in arts?

 7        A.    Trinity College in Hartford.

 8        Q.    When?

 9        A.    In 1986.

10        Q.    Where are you currently working?

11        A.    Orange Business.

12        Q.    When did you start working at

13   Orange?

14        A.    February of 1999.

15        Q.    What was your position at the

16   time?

17        A.    I don't recall my exact title.

18        Q.    How long did you hold that

19   title?

20        A.    I can't recall.  I need to go

21   back to records.  A year, a year or two.

22        Q.    And what was the next position

23   that you held at Orange?

24        A.    I been in sales or sales

1                    A. KIMMICK

2    management my entire career at Orange.

3        Q.    Okay.  What was the position you

4    held after the initial position you had at

5    Orange?

6        A.    I -- I don't recall the title, I

7    mean, they had so many different titles.

8    I was a manager of people.

9        Q.    Have you been a manager of

10   people throughout your tenure at Orange?

11       A.    Yes.

12       Q.    What is your current title?

13       A.    Senior -- I'm a senior manager

14   and my title is sales director, and I am

15   the head of sales for the East, South and

16   Central United States.

17       Q.    And how long have you held that

18   title?

19       A.    About 18 months.

20       Q.    What does your position entail?

21       A.    I'm responsible for client

22   relationships, profitable revenue growth,

23   and maintaining the future of the health

24   of the business in the area that I manage.

25       Q.    How many people do you have

                    A. KIMMICK

1    reporting to you?

2        A.    I currently have nine.

3        Q.    What title did you hold before

4    this?

5        A.    I was the head of global

6    accounts for the Americas.

7        Q.    During what time period?

8        A.    From 2004 to 2009.  This is an

9    estimate, I'm guessing.

10       Q.    Well, so I'm asking specifically

11   about your position you held right before

12   your current position.

13       A.    I was the head of sales for the

14   Eastern United States.

15       Q.    What was the time period --

16   sorry.  Go ahead.

17       A.    And that was maybe three months

18   before that I was interim head of sales

19   for the Americas, I had responsibility for

20   the entire sales force for the Americas

21   for about a year.

22       Q.    When?

23       A.    From when Eddi Youkhanna left

24   Orange, which was, I'm guessing, May of

```
 1                    A. KIMMICK
 2   2021, I don't remember the year, into the
 3   end of -- the beginning of that year, the
 4   beginning of the next -- the following
 5   year.
 6        Q.    And what position did you --
 7        A.    It could be 2021 or 2022.  I
 8   can't remember the date.  It was about a
 9   year that I held that title before my
10   current title.
11        Q.    Okay.  And what did you -- what
12   position did you have prior to that?
13        A.    I was the head of sales for the
14   Eastern U.S.
15        Q.    During what time period?
16        A.    Again, I would need
17   documentation from HR to give you the
18   exact dates, I've had quite a few jobs,
19   they have all been in sales and sales
20   management, and I have senior roles within
21   Orange.
22        Q.    What did you do as head of sales
23   for the Eastern U.S.?
24        A.    I believe I have already
25   answered that question.
```

```
 1                    A. KIMMICK

 2       Q.    Just remind me what you said

 3   then.

 4       A.    I'm responsible for managing

 5   client relationships, delivering revenue

 6   and I'm responsible for making sure that

 7   the future of the business is healthy.

 8       Q.    Do you have anyone reporting to

 9   you as head of sales for the Eastern U.S.?

10       A.    Yes.

11       Q.    How many people?

12       A.    It varied from nine to fourteen

13   at the time.

14       Q.    Was Patty Haran one of those

15   people?

16       A.    I don't recall the dates.  Patty

17   did report to me at one time.

18       Q.    Do you know what your position

19   was at the time she reported to you?

20       A.    I believe I was head of sales

21   for New York and the East.  I don't recall

22   the exact title, I mean, as I said, the

23   titles changed, the titles changed and the

24   territory changed slightly, but my

25   responsibilities were always the same in
```

```
1                    A. KIMMICK

2    managing clients and the future of the

3    business and revenue.

4         Q.    Did you hire Patty?

5         A.    Yes.

6         Q.    Did you set her rate of pay?

7         A.    Yes.

8         Q.    Did you assign her job duties?

9         A.    Yes.

10        Q.    Did you supervise her work?

11        A.    Yes.

12        Q.    Did she report to anyone else

13   other than you?

14        A.    Not that I recall.  And the

15   reason I say that is because I changed

16   jobs frequently and there were periods of

17   time where I had managers and managers and

18   so I don't believe so, but I wouldn't

19   testify under oath that that's the case.

20            MS. FISHER:  Just bear would me,

21       I'm going to put a document in the

22       chat.  Give me one second.  It's not

23       loading.  Give me one second.

24        Q.    Do you see a document posted to

25   the chat window?
```

```
 1                    A. KIMMICK

 2        A.    Yes.

 3        Q.    Will you take a minute to just

 4    review this document and let me know when

 5    you are done?

 6        A.    Sorry, it's just opening.

 7        Q.    No, that's okay.

 8        A.    Okay.

 9        Q.    Do you recognize this document?

10        A.    Vaguely, yes.

11        Q.    What do you recognize it to be?

12        A.    These are responses from

13    Orange's hired attorney to what looks like

14    Patty's case and what she is representing.

15        Q.    Okay.  Did you provide the

16    information to your attorneys that ended

17    up being the responses to this document --

18    or excuse me, let me rephrase that.

19            Did you provide responses to

20    your attorney to answer the questions that

21    Patricia Haran posed to Orange and you in

22    the form of interrogatories?

23            MR. GUIFOYLE:  Objection to

24        form.

25            You can answer.
```

```
 1                    A. KIMMICK

 2       A.    I'm sorry, I didn't understand

 3  that.

 4       Q.    Let me turn your attention to

 5  the last page of this document on Page 12.

 6       A.    Okay.

 7       Q.    Let me know when you are there.

 8       A.    Yes.

 9       Q.    Did you digitally sign this

10  document?

11       A.    Yes.

12       Q.    Did you review this document

13  before signing it?

14       A.    Yes, I did.

15       Q.    Are you the individual that

16  provided the responses that are

17  memorialized in this document?

18       A.    No, I'm the one who validated

19  that they are true.

20       Q.    Okay.  So the responses that are

21  memorialized in this document are all true

22  and accurate?

23       A.    To my knowledge, yes.

24       Q.    Let's go to Interrogatory 4 that

25  starts on Page 4.  Let me know when you're
```

1                    A. KIMMICK

2    there.

3         A.    Okay.

4         Q.    Interrogatory 4 asked:

5    "Identify all Global Account Managers who

6    have reported to Adam Kimmick from May

7    2017 to present," do you see that?

8         A.    Yes.

9         Q.    And the response that continues

10   on to Page 5 has a list of five people,

11   correct?

12        A.    Yes.

13        Q.    Is this the full list of global

14   account managers who reported to you

15   during this time period?

16        A.    When you define account

17   managers, the -- the -- the question, and

18   I think that the question you asked was

19   identify all global account managers who

20   reported to Adam Kimmick so the global

21   account manager is not a title, we -- we

22   -- we looked at this question and said,

23   well, this doesn't really apply because

24   global account managers, that wasn't the

25   title at the time, so we looked at account

```
 1                    A. KIMMICK

 2   manager farmer, Patty, I believe at the

 3   time, was a senior account manager farmer,

 4   which is the title that she held and these

 5   are the individuals that held the same

 6   title as Patty.

 7        Q.    Okay.

 8        A.    So in the answer it says that it

 9   seeks information outside the scope,

10   that's because the title of account

11   manager was incorrect or global account

12   manager didn't exist and, therefore, we

13   provided the information that was relevant

14   in this circumstance, which we said it

15   was, and these are the people that held

16   Patty's title at the time.

17        Q.    During that time period?

18        A.    Correct.

19        Q.    Okay.  And you had other

20   individuals reporting to you besides the

21   five people that you listed here?

22        A.    Yes.

23        Q.    How many other people did you

24   have reporting to you during that time

25   period?
```

                    A. KIMMICK

 1

 2     A.    I don't recall.  Somewhere

 3   between nine and fourteen at any given

 4   time.

 5     Q.    Okay.  And what other titles did

 6   those people hold?

 7     A.    Account manager farmer, account

 8   manager, senior account manager, account

 9   director, and I need to look -- I need to

10   review the HR documentation in order to

11   get all of them.  There are at least

12   three, maybe more, titles.

13     Q.    Okay.  Did you have any

14   integration service specialists reporting

15   to you?

16     A.    Yes.

17     Q.    Did you have any other titles

18   reporting to you that you haven't

19   testified to?

20     A.    Again, I -- I -- maybe.  I can't

21   -- I wouldn't know.  I wouldn't know

22   exactly.  I wouldn't testify to it unless

23   I saw it from HR, because the people are

24   reporting to me and titles change.

25     Q.    So you testified that you had

```
 1                    A. KIMMICK
 2   senior account manager farmers reporting
 3   to you; is that correct?
 4       A.    That is correct.  And some of
 5   those senior account manager farmers were
 6   integration specialists.
 7       Q.    During this time period, who
 8   were the senior account manager farmers
 9   reporting to you?
10       A.    They are listed here on 1 to 5.
11       Q.    There is no one else that was a
12   senior account manager farmer other than
13   these people listed here during that time
14   period?
15       A.    To my knowledge, no.
16       Q.    And another title that you said
17   reported to you were just account manager
18   farmers; is that right?
19       A.    Yes.  They weren't senior, they
20   were just account managers.
21       Q.    Who were the account managers
22   farmers who were reporting to you?
23       A.    I don't recall all of them, and
24   I need to have the -- HR validate before I
25   could verify.
```

1                           A. KIMMICK

2        Q.    Why is that?

3        A.    Because they -- I don't -- you

4    have asked for a certain period, and I

5    can't testify that during that exact time

6    period that all of the people who reported

7    to me, people change territories, they

8    come and go from Orange, I couldn't

9    testify to all of them.

10       Q.    Okay.  Approximately how many

11   account manager farmers reported to you

12   during this time period?

13       A.    More than five.  No, let me

14   clarify that question.  There are more

15   than five account managers, senior account

16   managers, and there were account managers

17   that were not senior, and I don't know how

18   many of them there were, I'm guessing it

19   was three or four; but, again, this is an

20   estimate, I'm not testifying to the exact

21   number.

22       Q.    That's fine.  I'm looking for an

23   estimate, that's why I said approximately.

24             Okay.  So you had senior account

25   manager farmers, account manager farmers

1                    A. KIMMICK

2    and what were -- can you give me one of

3    the other titles, please?

4         A.    Account directors.

5         Q.    Account directors?

6         A.    Yes.

7         Q.    Were there also senior account

8    directors?

9         A.    No, not to my knowledge.

10        Q.    Okay.  Who were the account

11   directors that were reporting to you

12   during this time period?

13        A.    I don't know if I -- I mean,

14   again, I mean, I -- I think that there

15   were at least five of them; but, again,

16   this is an estimate, and I don't -- I

17   couldn't recall all of their names here,

18   I'm afraid I would miss them or that one

19   of them might have transferred to a new

20   territory during that period, I -- I don't

21   know, but there was four or five as an

22   estimate.

23        Q.    Okay.  Who were the integration

24   service specialists reporting to you

25   during that time period?

                        A. KIMMICK

1

2       A.    Based on Interrogatory 4, there

3   would be Jennifer Rossdale, senior account

4   manager integration specialist. There was

5   an account manager integration specialist,

6   but I don't recall the name.  I think I

7   had two or three people who were

8   integration service specialists.

9       Q.    During this time period?

10      A.    Yes.

11      Q.    And you don't recall the name of

12  anybody else who was integration service

13  specialist?

14      A.    I -- no, I mean, I know Jennifer

15  was one of them, because I could see the

16  name here.  I don't want to guess.

17      Q.    Okay.

18            MS. FISHER:  For the record,

19      this document entitled defendant's

20      supplemental objections and responses

21      to plaintiff's first set of

22      interrogatories is Kimmick 1.

23            I'm going to put another

24      document in the chat.

25            MR. GUIFOYLE:  Exhibit 1 is not

```
 1                    A. KIMMICK
 2      the supplemental, Exhibit 1 looks like
 3      the original.
 4            MS. FISHER:  I'm sorry, you're
 5      right.  Let me reread that.
 6            So, Stefanie, for the record,
 7      Kimmick 1 is defendant's objections
 8      and responses to plaintiff's first set
 9      of interrogatories.
10            (Whereupon, the aforementioned
11      defendant's objections and responses
12      to plaintiff's first set of
13      interrogatories was marked as Kimmick
14      Exhibit 1 for identification as of
15      this date by the Reporter.)
16      Q.    I just put another document in
17  the chat, Mr. Kimmick.  Just let me know
18  when you are able to open that and review
19  it.
20      A.    Okay.
21      Q.    Do you recognize this document?
22      A.    Vaguely, yes.
23      Q.    What do you recognize this to
24  be?
25      A.    This is a supplemental document
```

```
 1                    A. KIMMICK
 2   that looks like there are additional names
 3   of people who reported to me and some
 4   clarifications on other interrogatories.
 5        Q.    Did you digitally sign this
 6   document on the last page?
 7        A.    I did.
 8        Q.    Did you review this document for
 9   accuracy before signing it?
10        A.    I did, yes.
11        Q.    According to you, everything in
12   this document is accurate and truthful?
13        A.    To my knowledge, yes.
14        Q.    Let's go to Interrogatory 3 on
15   Page 4.  Let me know when you are there.
16   I'm sorry, Interrogatory 4 on Page 4.
17        A.    Okay.
18        Q.    As you see, it continues on to
19   Page 5 and it looks like it mirrors the
20   responses in the initial interrogatories.
21             Is this the full list of
22   individuals who held the same title as
23   Patricia Haran?
24        A.    Interrogatory 4 are the people
25   who had the same title, it looks like.
```

```
 1                 A. KIMMICK

 2   Interrogatory 5 were --

 3        Q.    Well, let's take it one at a

 4   time.

 5             So Interrogatory 4 has the list

 6   of all people who had the same title as

 7   Patricia Haran, correct?

 8        A.    Some of them were integration

 9   specialists, but all had the same base

10   title, senior account manager.

11        Q.    Okay.  And then Interrogatory 5

12   has the list of the global account

13   directors that reported to you during the

14   time period of 2017 until when these

15   interrogatories were responded to,

16   correct?

17        A.    Yes.

18        Q.    And there is no one else that

19   was a global account director that

20   reported to you during this time period

21   other than the five people listed here?

22        A.    No, not to my knowledge.

23        Q.    Okay.  Interrogatory 6 asks for

24   integration service specialists and the

25   response has four people, are these the
```

```
 1                    A. KIMMICK

 2    only four people that were integration

 3    service specialists reporting to you

 4    during the time period of May 2017 to

 5    present?

 6         A.    Some of them were before that

 7    time period, but yes.

 8         Q.    What's the difference between an

 9    account manager and a senior account

10    manager?

11         A.    Experience in the job, salary,

12    obviously, and there is a difference in

13    expectation between somebody whose an

14    account manager and a senior account

15    manager.

16         Q.    Are the job duties the same?

17         A.    The job duties are similar, but

18    the expectations for senior person are

19    greater.

20         Q.    How are the job duties

21    different?

22         A.    In some ways because of the

23    volume and the expectations, the job

24    duties may be slightly different.

25         Q.    Can you explain what you mean by
```

```
 1                    A. KIMMICK

 2   that?

 3        A.    Because you are dealing with --

 4   senior account managers are dealing with

 5   larger customers, typically, the

 6   expectations on the amount of revenue and

 7   the kind of services that we're proposing

 8   to them, the depth of the relationship, it

 9   is a higher expectation.

10        Q.    Are both senior account managers

11   and account managers responsible for

12   sales?

13        A.    Yes.

14        Q.    Do both titles have quotas that

15   they have to maintain?

16        A.    Yes.

17        Q.    What about account directors,

18   what are they responsible for?

19        A.    Typically an account director

20   has only one account, that account has

21   cycles of business that may -- that may

22   transpire over a many year period and so

23   they are responsible for the relationship

24   and the revenue and the health of that

25   account and targets and revenue delivery,
```

                        A. KIMMICK

 1
 2    but the account director is the most

 3    senior person in our sales organization,

 4    and, as I said, they are responsible

 5    typically for one account, a very large

 6    account, and the typical difference

 7    between the senior account manager and

 8    account manager is the fact that the

 9    expectations are slightly different

10    because of the size and scope and the

11    cadence of the contracts and services that

12    we provide to those very large customers.

13        Q.    Do they maintain -- do account

14    directors also have quotas that they are

15    responsible for?

16        A.    Yes.

17        Q.    Are you familiar with someone by

18    the name of Paul Renassia?

19        A.    Yes.

20        Q.    Who is Paul Renassia?

21        A.    He is currently a senior account

22    manager.

23        Q.    Okay.  When did he become a

24    senior account manager?

25        A.    I can't recall the exact date.

                    A. KIMMICK

1

2       Q.    Did he report to you during the

3   time period of 2017 to 2020 -- excuse me,

4   to 2021?

5       A.    I believe so, yes.

6       Q.    What was his title during that

7   time period?

8       A.    I believe it was account manager

9   or senior account manager or both.

10      Q.    Did he have a quota that he was

11  responsible for?

12      A.    Yes.

13      Q.    What about Roxanne Tabool (ph),

14  are you familiar with her?

15      A.    Yes.

16      Q.    Who is Roxanne?

17      A.    She is an account manager who is

18  part of the Orange graduate program and an

19  expat from France.

20      Q.    Did she report to you from 2017

21  to 2021?

22      A.    Not that entire period, no.

23      Q.    For some part of that time

24  period did she report to you?

25      A.    Yes.

1                    A. KIMMICK

2       Q.    Okay.  What was her title at the

3    time?

4       A.    I don't recall exactly her

5    title, but I believe it was account

6    manager.

7       Q.    Did she have a quota she was

8    responsible for?

9       A.    Yes, but more loosely because

10   she is part of the Orange graduate

11   program.

12      Q.    Can you explain what that

13   program is?

14      A.    It is a program sponsored by our

15   corporate parent, which places promising

16   people in different jobs for fixed periods

17   of time so that they can experience

18   different parts of the organization.  She

19   --

20      Q.    And when you say she was

21   "loosely"  held to a quota, what do you

22   mean by that?

23      A.    She had different expectations

24   because of her role in the Orange graduate

25   program.  She was responsible for a quota,

                    A. KIMMICK

1   and I managed her as every other person in

2   the -- in my team; however, I -- I really

3   didn't have the ability to hire and fire

4   her, because she was part of a larger

5   program managed by corporate.

6       Q.    Did she meet her quota for 20 --

7   let's say for the -- was she there during

8   the 2020 calendar year?

9       A.    I don't recall whether she was

10  there for the whole 2020 calendar year,

11  because that was part of Covid and because

12  she was in France and couldn't move there

13  were -- there were extenuating

14  circumstances.  I don't recall whether she

15  made a quota or not.

16      Q.    What about Paul Renassia, was he

17  there during the 2020 calendar year?

18      A.    I believe so, yes.

19      Q.    Did he meet his quota for that

20  year?

21      A.    I don't recall.

22      Q.    Are you familiar with Lorna

23  Paine?

24      A.    Yes.

                          A. KIMMICK

1

2    Q.    Who is Lorna Paine?

3    A.    Lorna Paine, I -- I -- as I

4    recall, she was one of the integration

5    services account managers.  Her title

6    might have been account manager or senior

7    account manager.  I can't recall the exact

8    title she was in, but she was in

9    integration services specialist, I

10   believe.

11   Q.    And she had a quota that she had

12   to maintain?

13   A.    Yes.

14   Q.    Did she meet her quota?

15   A.    I don't recall.

16   Q.    In the -- let me just finish my

17   question.

18         Did she meet her quota in the

19   2020 calendar?

20   A.    I don't recall.

21   Q.    Is she still with Orange?

22   A.    No.

23   Q.    What were the circumstances of

24   her employment ending?

25   A.    We decided to discontinue the --

                        A. KIMMICK

1

2    the -- the account -- the title of

3    integration services account manager and

4    integration services senior account

5    manager because that role was

6    underperforming in general so we -- we

7    eliminated the title and unfortunately we

8    had to dismiss the people that were in

9    that title.

10        Q.    So Orange about dismissed Lorna

11   Paine?

12        A.    Correct.

13        Q.    When you say she was

14   underperforming or people in that role

15   were underperforming, what do you mean?

16        A.    So it wasn't about performance

17   of individual people in this case.  In

18   this case it was a -- we were defining the

19   direction of the firm and how we were

20   going to structure the business moving

21   forward, and we decided that the

22   profitability of that individual product

23   line did not warrant a specialist, and

24   unfortunately we, for business reasons,

25   needed to eliminate that role.

```
 1                    A. KIMMICK

 2       Q.     How many other people had that

 3  role?

 4       A.     I don't recall.

 5       Q.     How many other people were

 6  terminated at the time that Lorna Paine

 7  was terminated?

 8       A.     I don't recall.

 9       Q.     Was it more than two?

10       A.     Yes.

11       Q.     Was it more than five?

12       A.     Yes.

13       Q.     Was it more than ten?

14       A.     I don't recall.

15       Q.     When Lorna Paine was dismissed,

16  were some of the accounts that she handled

17  given to Patty Haran?

18       A.     The integration specialist role

19  is an overlay role, they were responsible

20  for selling only one or two product lines,

21  therefore, they weren't responsible for

22  the relationship on those accounts, they

23  were responsible for selling the products

24  associated with integration services; so

25  no, she was not responsible for managing
```

1              A. KIMMICK

2    an account.

3       Q.    Did any of Lorna Paine's

4    responsibilities get transferred over to

5    Patty Haran after Lorna was dismissed?

6       A.    I'm hesitating because it is not

7    a black-and-white answer.  She -- pat --

8    because the account managers were

9    responsible for the overall health of the

10   account and Lorna and the other

11   integration specialists were responsible

12   for selling in certain product lines,

13   there is an overlap between the account

14   manager and the integration services

15   account manager where the account manager

16   is responsible for the overall health of

17   the account and the revenue on the

18   account, there are some job

19   responsibilities that the integration

20   services people had that were transferred

21   to the account manager, meaning

22   administrative tasks were not part of the

23   responsibilities necessarily, it was about

24   maintaining and growing revenue, and since

25   the business had taken a different

```
 1                    A. KIMMICK

 2   direction and eliminated the -- that

 3   integration services specialist there is

 4   an expectation over time that business

 5   would erode and so that -- it's not a

 6   black-and-white answer to a question; so

 7   the answer is in some cases yes, but

 8   overall the role was eliminated and the

 9   responsibilities still remained with the

10   account manager.

11       Q.   And who was the account manager

12   for Pfizer at the time that Lorna Paine

13   worked there?

14       A.   I don't recall, but I believe

15   that it was Patty.

16       Q.   Was Patty the account manager

17   for Pfizer while Lorna worked there?

18       A.   I -- again, I don't recall.  It

19   was too long ago, but I believe so.

20       Q.   When Patty took over the Pfizer

21   account, at the time she took over the

22   Pfizer account, was the master service

23   agreement expired on the account?

24       A.   I don't recall.

25       Q.   If a master service agreement
```

```
1                    A. KIMMICK

2   was expired, how would that limit Patty's

3   ability to work on the account?

4       A.    She would be responsible for

5   either renewing that master services

6   agreement or finding other business to

7   replace it.

8       Q.    Did you ever speak with Eddi

9   Youkhanna about a dual role for Patty

10  where she would work on both new and

11  existing accounts?

12      A.    Yes.

13      Q.    When did you speak with Eddi

14  about that?

15      A.    I don't recall the date.

16      Q.    What was the outcome of your

17  conversation with Eddi?

18      A.    At Patty's request she assigned

19  her some new accounts.

20      Q.    Which accounts?

21      A.    I don't recall the -- the -- the

22  brands.  I believe IBM was one of them.

23      Q.    At the time Lorna Paine worked

24  at Orange, who was the account manager

25  from Moodys?
```

```
1                    A. KIMMICK

2        A.    Again, I don't know the overlap,

3    and I -- but I believe it was Patty.  I

4    wouldn't be able to testify to the dates,

5    but I believe it was Patty.

6        Q.    You believe Patty was the

7    account manager at the time that Lorna

8    worked there?

9        A.    Again, the -- the -- the exact

10   dates, I couldn't testify to that fact,

11   but I believe that that is the case.  They

12   worked together on the account at some

13   period.

14       Q.    Are you familiar with Jennifer

15   Rossdale?

16       A.    Yes.

17       Q.    Who was Jennifer Rossdale?

18       A.    She was one of the individuals

19   on my team.

20       Q.    What was her title?

21       A.    I don't recall.

22       Q.    Was she one of the individuals

23   on your team between 2017 and 2021?

24       A.    I don't believe she was there

25   for the entire period, perhaps a piece of
```

```
 1                    A. KIMMICK

 2    that period.

 3        Q.    Did she have a quota?

 4        A.    Yes.

 5        Q.    Did she meet her quota during

 6    the 2017 to 2021 time period?

 7        A.    I don't recall.

 8        Q.    Are you familiar with Patrick

 9    Barnes?

10        A.    Yes.

11        Q.    Who is Patrick Barnes?

12        A.    He was an individual who worked

13    on my team.

14        Q.    What was his title between 2017

15    and 2021?

16        A.    I don't recall.

17        Q.    Was he responsible for a quota?

18        A.    Yes.

19        Q.    Did he meet his quota during

20    that time period?

21        A.    I don't recall.

22        Q.    Are you familiar with Celeste

23    Daniel?

24        A.    Yes.

25        Q.    Who is Celeste Daniel?
```

                    A. KIMMICK

1

2       A.    She was an individual who worked

3  on my team.

4       Q.    What was her title between 2017

5  and 2021?

6       A.    I believe account manager, but,

7  again, I don't recall the exact title.

8       Q.    Did she have a quota?

9       A.    Yes.

10      Q.    Did she maintain that -- did she

11  meet her quota during that time period?

12      A.    I don't recall.

13      Q.    Are you familiar with Boyne Kim?

14      A.    Yes.

15      Q.    Who is Boyne Kim?

16      A.    He was an individual who worked

17  on my team.

18      Q.    Did he work on your team between

19  2017 and 2021?

20      A.    I believe so, yes.  Although I

21  couldn't testify to the date.

22      Q.    What was his title during that

23  time period?

24      A.    I don't recall.

25      Q.    Did he have a quota?

1                    A. KIMMICK

2        A.    Yes.

3        Q.    Did he meet his quota during

4   that time period?

5        A.    I don't recall.

6        Q.    Other than Ms. Haran, have you

7   terminated anyone else from your team from

8   2017 to present?

9        A.    Yes.

10       Q.    Who?

11       A.    I don't recall all of them.

12  Certainly the people that were integration

13  service specialists.  Jennifer Rossdale

14  was terminated for cause, I believe.

15  Boyne Kim was terminated for cause, I

16  believe.  There were others.

17       Q.    Do you recall the names of

18  anyone else?

19       A.    Not at this time.

20       Q.    Why was Jennifer Rossdale

21  terminated?

22       A.    Under performance, and she had

23  issues with her client relationships and

24  some relationships with her piers, her

25  work was inconsistent.

                    A. KIMMICK

1

2      Q.    What do you mean by  "under

3  performance"?

4      A.    Didn't meet the expectations of

5  the business.

6      Q.    Did she meet -- was her quota

7  one of those expectations?

8      A.    I don't recall.  Possibly.

9  That's one of the considerations.

10     Q.    When was she terminated?

11     A.    I don't recall.

12     Q.    Was it within the last year?

13     A.    No.

14     Q.    Was it within the last two

15  years?

16     A.    I don't recall.

17     Q.    Who made the decision to

18  terminate her?

19     A.    I did.

20     Q.    Had she taken any leave for any

21  personal reasons or medical reasons during

22  her employment at Orange?

23     A.    Not that I recall.  Possibly.

24     Q.    Are you aware of any medical

25  issues that she suffered from?

                    A. KIMMICK

1

2       A.      I'm hesitating here because this

3    is none of my business.

4       Q.      You can still answer.

5       A.      Not that I'm aware of.

6       Q.      Are you aware of anyone -- any

7    close family members of hers who suffered

8    from any medical conditions?

9       A.      Again, that's none of my

10   business.  She wouldn't need to tell me

11   that.

12      Q.      That's not the question.  The

13   question is not whether it was your

14   business.  The question is whether or not

15   you are aware of any.

16      A.      I'm not aware.

17      Q.      When was Boyne Kim terminated?

18      A.      I don't recall.

19      Q.      Was it in the last year?

20      A.      No.

21      Q.      Was it in the last two years?

22      A.      Not that I recall.

23      Q.      So it was earlier than that?

24      A.      I -- again, I -- I wouldn't be

25   able to tell you the exact date.  We would

```
 1                    A. KIMMICK
 2   have to validate that with HR.
 3        Q.    Who made the decision to
 4   terminate him?
 5        A.    I did.
 6        Q.    What was the decision based on?
 7        A.    His relationship with customers,
 8   his ability to generate new business and
 9   possibly quota payment, he wasn't meeting
10   the requirements of the job and the
11   expectations of the business.
12        Q.    When you say  "his ability to
13   generate business,"  what do you mean?
14        A.    All salespeople, whether account
15   director, account manager, senior account
16   manager, have the responsibility to ensure
17   the future health of our business, and,
18   therefore, generate new pipeline and new
19   activity to maintain future revenues for
20   Orange.
21        Q.    And Boyne Kim didn't demonstrate
22   that ability?
23        A.    I don't recall exactly the --
24   the circumstances, but he was terminated.
25        Q.    When making the decision to
```

```
 1                A. KIMMICK
 2   terminate Jennifer Rossdale, did you
 3   memorialize the basis for your decision in
 4   any document?
 5        A.    I don't recall.
 6        Q.    When terminating Boyne Kim, did
 7   you memorialize the basis for your
 8   decision in any document?
 9        A.    I don't recall.
10        Q.    Have you participated in any
11   training on discrimination in the
12   workplace at Orange?
13        A.    Yes.
14        Q.    How many times have you
15   participated in such training?
16        A.    Once a year.  I don't recall
17   when it started.
18        Q.    When was the most recent
19   training you had?
20        A.    October 7th of --
21        Q.    Of 2022?
22        A.    No, I did it yesterday or the
23   day before.
24        Q.    So October 3rd or 4th?
25        A.    What's the date today?  It's the
```

```
 1                    A. KIMMICK

 2   5th today?  So it would be -- it would be

 3   Tuesday or -- Tuesday or Wednesday this

 4   week.

 5        Q.    What did that training include?

 6        A.    A program on discriminatory

 7   behavior and sexual harassment in New York

 8   and New York City.

 9        Q.    How long is the training?

10        A.    About two hours.

11        Q.    Is it virtual or in person?

12        A.    Virtual.

13        Q.    Did you participate in a similar

14   training in 2020?

15        A.    I don't recall exactly, but most

16   likely, yes.

17        Q.    What is your understanding of

18   discrimination in the workplace?

19              MR. GUIFOYLE:  Objection.

20        A.    It is not tolerated by Orange.

21        Q.    I'm sorry?

22        A.    It is not tolerated by Orange or

23   me.

24        Q.    What is discrimination,

25   according to your understanding?
```

1                   A. KIMMICK

2      A.    I would have to look at the

3  definition.

4      Q.    Well, I'm asking for your own

5  understanding.  I'm not asking for a

6  definition.  I'm asking for your

7  understanding.

8      A.    Respect for individuals,

9  treating everyone equal, not to

10 discriminate against protected classes,

11 that we have sets of procedures around

12 maintaining and managing complaints, that

13 every individual and the company has a

14 right to put -- to open a complaint, that

15 my responsibility as a manager is to lead

16 by example, I could -- I think that's

17 enough.

18     Q.    Are you familiar with the Family

19 Medical Leave Act?

20     A.    Vaguely.

21     Q.    What is your understanding of

22 the Family Medical Leave Act?

23     A.    Again, I -- I don't know the

24 legal definition of it.  My responsibility

25 as a manager for this is to refer somebody

```
 1                    A. KIMMICK
 2   who comes to me to HR if they have a
 3   situation that arises with their family,
 4   and I would refer them immediately.  If I
 5   was requested or if somebody came to me on
 6   my team, I would refer them immediately to
 7   HR if they requested family medical leave.
 8       Q.    What is your understanding of
 9   the Family Medical Leave Act?
10       A.    Again, I mean, from my
11   perspective, if somebody felt that they
12   had a -- a claim to take off work to
13   support a family member, I wouldn't ask
14   them what it was about, I would refer them
15   directly to HR, I would immediately assume
16   that it was valid, support them as best I
17   could, and refer them to HR and their
18   policy.
19       Q.    So I'm not asking -- I
20   appreciate that, but I'm not asking what
21   you would do.  I'm asking what your
22   understanding is of the Family Medical
23   Leave Act.  If you don't have an
24   understanding of it, you could say that,
25   but I'm asking what your understanding is
```

A. KIMMICK

of the Family Medical Leave Act.

     A.    My understanding is people

should have the time and the ability to

take time off from work if they' required

in order to support a family member,

that's my general understanding.

     Q.    Anything else?

     A.    Only how I would act.

     Q.    What do you mean by that?

     A.    Like I said, if anybody came to

me and asked for it, I would immediately

assume it was valid without question and

refer them to HR.

     Q.    Did Patty ask you to take time

off work under the FMLA, under the Family

Medical Leave Act?

     A.    No, not to my knowledge.

     Q.    Did she ever take any time off

work to care for a family member?

     A.    I believe so, yes.  She asked

for paid leave, paid time off.

     Q.    Which family member did she take

time off of work to care for?

     A.    I believe it was her daughter.

1                    A. KIMMICK

2      Q.    Do you know the circumstances of

3   her daughter -- of her daughter's

4   sickness?

5      A.    It was quite some time ago, but

6   I believe it was an infection of some

7   kind.  I don't know all of details, I

8   don't recall, but -- but I believe it was

9   an infection of some kind.

10     Q.    Did Patty come to you and ask

11  you if she could take time off work to

12  care for her daughter?

13     A.    As I said, yes.  I believe she

14  did, yes.

15     Q.    What did you do?

16     A.    I gave her time off.  I told her

17  to take whatever time she needed.

18     Q.    Did you refer her to HR?

19     A.    I didn't know that the -- the --

20  the scale or what -- or how much time she

21  needed, I just assumed that she would

22  manage that if she needed to take more

23  time off, she would come to me, and I

24  would grant paid time off up to the limit,

25  and if she -- if she decided that she

```
 1                    A. KIMMICK

 2   needed family leave, that that's up to

 3   her.  I -- if she had asked me about that,

 4   I would have immediately said that it was

 5   -- it would have been fine for me, and I

 6   would have referred her to HR to manage

 7   the policy, but --

 8        Q.    Did you --

 9        A.    I -- I remember the

10   conversation.  I told her to take as much

11   time as she needed.

12        Q.    Did you refer her to HR?

13        A.    No, not to my recollection.

14        Q.    How much time did she take off

15   work to care for her daughter?

16        A.    I don't recall.

17        Q.    Do you believe that the time

18   that she took off work to care for her

19   daughter impacted her performance in any

20   way?

21        A.    No.

22             MR. GUIFOYLE:  Can we take 10

23        minutes or do you want to finish --

24             MS. FISHER:  Yeah, I -- let me

25        just finish this and then we can
```

```
 1                    A. KIMMICK

 2      definitely take a break.

 3              MR. GUIFOYLE:  Okay.  Thank you.

 4              MS. FISHER:  Yeah.  Just give me

 5      one second.

 6      Q.    Did you ever inform Ms. Haran

 7   about her rights under the Family Medical

 8   Leave Act?

 9      A.    Not to my knowledge, no.

10      Q.    Did you ever tell Ms. Haran that

11   she had a lack of focus?

12      A.    I don't recall that.

13              MS. FISHER:  Okay.  So let's

14      take a break, it's almost 11:30, you

15      want to just come back at 11:40?

16              MR. GUIFOYLE:  That works for

17      me.

18              MS. FISHER:  Okay.  Great.

19              MR. GUIFOYLE:  Thank you.

20              (Whereupon, a short recess was

21      taken.)

22      A.    Just to clarify, as I was in the

23   break, I had -- I may have misremembered

24   the -- the circumstances behind Boyne

25   Kim's release from Orange.  I don't know
```

1                  A. KIMMICK

2    whether it was termination for cause or

3    redundancy, either way his role and he

4    wasn't supporting the business in a proper

5    way, but -- and he was terminated from,

6    you know, his release from Orange, but I'm

7    not sure if it was a termination for cause

8    or redundancy, I don't recall the details.

9        Q.    Okay.

10       A.    Just to clarify.

11            MS. FISHER:  Stefanie, I just

12       want to make sure, for the record, you

13       have the supplemental -- OBS'

14       supplemental interrogatory responses

15       as Kimmick 2.

16            (Whereupon, the aforementioned

17       OBS' supplemental interrogatory

18       responses was marked as Kimmick

19       Exhibit 2 for identification as of

20       this date by the Reporter.)

21            MS. FISHER:  I'm going to put

22       another document in the chat.

23       Q.    Mr. Kimmick, do you see a

24   document in the chat labelled job

25   description?

                    A. KIMMICK

1

2        A.    Yes.

3        Q.    Could you open that, review it

4   and let me know when you're done?

5        A.    Okay.

6        Q.    Do you recognize this document?

7        A.    I don't know whether it's an

8   Orange document or not, but it appears to

9   be a job description.

10        Q.    Is this a job description for

11   Patty Haran?

12        A.    I don't know whether this is the

13   exact description for Patty Haran, no, I

14   mean, I -- it could be.

15        Q.    Does this reflect Patty Haran's

16   responsibilities?

17        A.    It appears to have most of her

18   responsibilities, but, again, I mean, it

19   -- this appears to be a job description

20   and it appears to have most of the

21   requirements for general sales.

22        Q.    Okay.  Is there anything that

23   Ms. Haran was responsible for that was --

24   that is not reflected in this document?

25        A.    It seems to be generally

```
 1              A. KIMMICK
 2   covering the responsibilities.  I might
 3   have been more specific around order
 4   targets.
 5        Q.    Around what?
 6        A.    Order targets.  It does say,
 7   "Financial - This position has revenue,
 8   margin, and order targets,"  I may have
 9   been more specific around order targets, I
10   believe --
11        Q.    How would you --
12              (Indiscernible crosstalk.)
13        Q.    Go ahead.
14        A.    I believe I was, in some of my
15   reviews with Patty, about what was
16   required in terms of her orders and future
17   business.
18        Q.    Can you explain that some more,
19   please?
20        A.    This appears to be an account
21   manager job description, it appears to
22   have an OBS date on it, but I can't
23   guarantee that this is the job description
24   that she read when she took the job.  I
25   gave her expectations based on her
```

1                    A. KIMMICK

2    territory, and we sat on an annual basis

3    goals and objectives that she needed to

4    achieve, some of those were discussed in a

5    semiannual review and more detail might

6    have been provided at the time.

7              MS. FISHER:  This document is

8         being marked as Kimmick 3 and it's

9         bates stamped OBS_00406 to 00407.

10             (Whereupon, a job description

11        bates stamped OBS_00406 to 00407 was

12        marked as Kimmick Exhibit 3 for

13        identification as of this date by the

14        Reporter.)

15        Q.    What was Ms. Haran's title at

16   the time she was hired?

17        A.    I don't recall.  I believe it

18   was senior account manager farmer, but I

19   would need to validate that with HR.

20        Q.    Did you ever promote her?

21        A.    Not to my knowledge.

22        Q.    Did you ever recommend that she

23   be given additional job responsibilities?

24        A.    No.

25        Q.    Did you ever recommend that she

```
 1                    A. KIMMICK
 2   have responsibilities taken away?
 3       A.    She asked for more
 4   responsibilities in a different role or a
 5   different type of a role and at her
 6   request I tried to make that happen.  It
 7   wasn't a more senior role, it -- just a
 8   different set of accounts with a different
 9   set of responsibilities, I did this at her
10   request, but it was not a more senior
11   role, it did not have any less or more
12   responsibility, and it was not a
13   promotion.
14       Q.    How did the accounts differ?
15       A.    She was hired to manage what we
16   call B-end accounts, these are accounts
17   that are headquartered outside of the
18   United States and her initial territory it
19   was typically French-based multinationals
20   who made some of their decisions in the
21   United States, those accounts were managed
22   by an account director for the most part
23   or an account manager that was outside the
24   United States who had overall
25   responsibility for the global account, her
```

                        A. KIMMICK

1   responsibilities were to deliver and drive

2   new business and maintain revenue streams

3   and the relationship within the United

4   States for those accounts, she requested

5   to be on accounts that allowed her to be

6   more in control of the overall

7   relationship of those accounts, she wanted

8   to be an A-end account manager on accounts

9   that she managed globally herself and so I

10  attempted to make that change for her.

11      Q.    What A-end accounts were

12  assigned to her?

13      A.    I don't recall all of them.

14      Q.    And when did you make the

15  change?

16      A.    I don't recall the exact date.

17      Q.    Do you remember the year?

18      A.    I believe that it was -- it was

19  -- it was the year that she departed.  I

20  am not -- again, I mean, I'm not -- I'm

21  not entirely sure of the dates and the

22  reason I'm not sure of the dates is

23  because Covid played a major part in that

24  transition.  She was managing a territory,

1                         A. KIMMICK

2    but the person that I had to step in to

3    manage the other territory was -- was not

4    able to be in the U.S. or cover the

5    territory appropriately and therefore

6    there was an interim period where she was

7    managing some other accounts while she was

8    trying to figure out how to manage those

9    B-end accounts; and, yeah, this wasn't an

10   easy period for anyone because Covid threw

11   our business into bit of a, as everyone,

12   it was a difficult time to manage through,

13   and I believe that during that period I

14   recognized what was going on with Patty,

15   and I made adjustments to her territory

16   and her quota and to make sure she was

17   paid out for that double work.

18        Q.    When you say during that period

19   you recognized what was going on with her,

20   what do you mean?

21        A.    She was managing the accounts

22   that she had in her old territory, and she

23   was also managing some of the A-end

24   accounts that she had requested.

25             MS. FISHER:  I'm going to put a

1           A. KIMMICK

2       document, another document, in the

3       chat.

4       Q.    Just open that document and let

5   me know when you have reviewed it.

6       A.    I don't know if it's just me,

7   but the document is coming up with only --

8   a lot of it is redacted.

9       Q.    Yeah.  If you scroll through it,

10  though, there is some verbiage on Page 2.

11      A.    Okay.  It's a very small blurb,

12  but yes.

13      Q.    Do you recognize this?

14      A.    Yes.  It appears to be one

15  section of Patty's performance review from

16  the first half of 2019.

17          MS. FISHER:  Okay.  For the

18      record, this is document bates stamped

19      OBS_00708 to 00710.

20          (Whereupon, a performance review

21      bates stamped OBS_00708 to 00710 was

22      marked as Kimmick Exhibit 4 for

23      identification as of this date by the

24      Reporter.)

25      Q.    Do you know who wrote this on --

                        A. KIMMICK

1

2    the blurb on Page 2?

3        A.    I believe I did.

4        Q.    So as of the first half of 2019,

5    Patty Haran was fully successful in her

6    job duties?

7        A.    In her current territory at that

8    time she was showing appropriate results

9    for those accounts.  These accounts were

10   -- were traditionally B-end accounts that

11   were being managed by a person outside of

12   the United States and Patty was the U.S.

13   representative.

14       Q.    Do you see where it says  "fully

15   successful"?

16       A.    Yes.

17       Q.    Did you write that?

18       A.    Yes.

19       Q.    Okay.  So she was fully

20   successful in managing her accounts at

21   that time, correct?

22       A.    Correct.

23           MS. FISHER:  I'm going to put

24       another document in the chat.

25       Q.    Just let me know when you have

```
 1                   A. KIMMICK

 2    had a chance to review this other

 3    document.

 4        A.    Okay.

 5        Q.    Okay.  Do you recognize this

 6    document?

 7        A.    Yes.

 8        Q.    What do you recognize it to be?

 9        A.    This appears to be Patty's

10    second half 2020 performance review.

11        Q.    Did you write this?

12        A.    Yes.

13        Q.    Okay.  And did this memorialize

14    all of the issues in her performance at

15    the time?

16        A.    That's a very broad statement.

17    Can you clarify?

18        Q.    Were there any other performance

19    issues that Patty exhibited that are not

20    memorialized in this blurb?

21        A.    Yes.

22        Q.    What were the other performance

23    issues?

24        A.    There were some other behaviors

25    that I talked to her about about client
```

```
 1                    A. KIMMICK
 2    relationships and relationships with her
 3    piers that weren't appropriate to write in
 4    a review.
 5        Q.    Why is that not appropriate to
 6    write that in the review?
 7        A.    It was hearsay.
 8        Q.    Can you specify what client
 9    issues there were?
10        A.    Her clients had complaints about
11    their relationship with them.
12        Q.    Which clients?
13        A.    I don't recall.
14        Q.    How did you learn about those
15    issues?
16        A.    From the customer.
17        Q.    Did the customers write anything
18    to you, was anything memorialized in
19    writing?
20        A.    No.
21        Q.    Was it more than one customer?
22        A.    I don't recall.
23        Q.    Was there more than one issue
24    with any given customer?
25        A.    I don't recall.
```

```
 1                    A. KIMMICK

 2       Q.    Did you address the issues with

 3  Patty?

 4       A.    I did.

 5       Q.    When?

 6       A.    I had -- during the review

 7  process and part of our weekly and monthly

 8  cadences; in fact, I typically have

 9  30-minute sessions with my account

10  managers, I had ended up scheduling an

11  hour or even an hour-and-a-half with Patty

12  to make sure that she understood the

13  requirements and what was going on with

14  her piers and the customers.

15       Q.    What did you tell her

16  specifically about these issues?

17       A.    I tried to give guidance about

18  what I thought needed to happen.

19       Q.    Well, what was the issue that

20  the customer complained about?

21       A.    Clarity of communication,

22  responsiveness, the ability to deliver

23  timely responses to their complaints,

24  again, all of this was hearsay.

25       Q.    What do you mean by  "hearsay"?
```

1                    A. KIMMICK

2       A.     This was a dialogue that was

3   between the customer and myself and that

4   needed to be shared with Patty, and I was

5   under the impression that she could

6   hopefully correct some of those issues,

7   and she didn't.

8       Q.     How didn't she -- why do you say

9   she did not correct the issue?

10      A.     The customer did not sign on for

11  more business, and they were -- and they

12  were, as I said in this review, hasn't

13  resulted in increased proposed services,

14  the pipeline isn't currently sufficient to

15  meet her budgets, customers were unwilling

16  to talk about new opportunities with her

17  because she was unable to address the

18  things that were their issues.

19      Q.     Which customer are you talking

20  about?

21      A.     I don't recall.

22      Q.     We can leave a blank in the

23  record so that you can fill that in later.

24  (INSERT):_____.

25      Q.     Did you speak with Patty again

```
 1                      A. KIMMICK
 2   when she failed to correct the issue?
 3        A.    As I said, we had weekly calls.
 4        Q.    Did you speak with Patty again
 5   about this particular issue when she
 6   failed to rectify it?
 7        A.    We had weekly calls.
 8        Q.    You are not answering my
 9   question.
10              Did you speak with her when she
11   failed to rectify this issue?
12        A.    Yes.
13        Q.    And what was her response?
14        A.    Defiance.
15        Q.    What do you mean by that?
16        A.    She didn't take feedback
17   positively.
18        Q.    What do you mean by that?
19        A.    She was defensive.
20        Q.    What did she say?
21        A.    She wanted to know all of the
22   details in excruciating detail and it was
23   not a comfortable conversation for her or
24   for me.
25        Q.    Her asking for details about
```

1                    A. KIMMICK

2    this issue represented her being defensive

3    to you?

4        A.    Yes.

5        Q.    Did she do anything else that

6    showed she was being defensive?

7        A.    No.

8        Q.    Did she do anything else that

9    showed that she wasn't taking the feedback

10   positively?

11       A.    I measured that in the result.

12       Q.    So what do you mean by that?

13       A.    The opportunities that she was

14   uncovering were not sufficient to maintain

15   the health of the business long term.

16       Q.    Did she say to you that she

17   would not make an effort to fix the

18   issues?

19       A.    No.

20       Q.    Did she tell you that she would

21   make an effort to try to fix the issues?

22       A.    As I recall, yes.

23       Q.    Are there any other customer

24   issues that you recall regarding Patty?

25       A.    Not that I recall.

1                   A. KIMMICK

2       Q.    What were the issues with her

3   piers that you discussed with her?

4       A.    Again, this was hearsay.  I

5   don't have anything in writing.  These

6   were individuals who came to me to express

7   dissatisfactions about how Patty was

8   asking for their help and the way in which

9   she pressured them to be part of the team.

10      Q.    Who were the individuals who

11  expressed this to you?

12      A.    I don't recall.

13      Q.    Okay.  We can leave a blank in

14  the record for the names of those

15  individuals as well.

16  (INSERT):_____.

17      Q.    So how was it -- what was it

18  that they told you about how Patty was

19  asking for her help that was problematic?

20      A.    I don't recall all of the

21  detail.

22      Q.    Do you remember any of the

23  details?

24      A.    These were conversations that I

25  had with them either in person or on the

A. KIMMICK

1                   A. KIMMICK

2    phone and it was about the way that she

3    was communicating with them that made it

4    an uncomfortable work environment.

5        Q.    What about the way she was

6    communicating with them made it

7    uncomfortable?

8        A.    I can't speak for them.

9        Q.    Well, what did they tell you?

10       A.    They were uncomfortable and that

11   I needed to speak to Patty about her

12   behavior.

13       Q.    Well, what did they tell you

14   made them uncomfortable?

15       A.    I can't recall the detail.

16       Q.    You don't have anything in

17   writing about this issue?

18       A.    No.

19       Q.    And you don't have anything in

20   writing about the issues that the customer

21   had brought to you about Patty's

22   performance, correct?

23       A.    No.

24       Q.    Is it typically your practice to

25   memorialize in writing performance issues?

```
 1                    A. KIMMICK

 2       A.    Yes, but they have to be factual

 3   and from my perspective the result would

 4   -- would in some cases overrule behaviors,

 5   but in this case there were neither, the

 6   behaviors supported -- didn't support a

 7   better result and, therefore, from my

 8   perspective this was all about performance

 9   and the future health of the business.

10       Q.    So the issues with the piers,

11   was that something that you deemed

12   factual?

13       A.    If it had risen to a level of a

14   hostile work environment, I would have

15   reported it to HR, it was just discomfort

16   and, therefore, it was something that I

17   thought would be better managed by me, and

18   I made the attempt and Patty's results

19   were not sufficient to support a healthy

20   business going forward.

21       Q.    So I'm speaking specifically

22   about her issues with her piers.  What

23   about her results demonstrated -- well,

24   let me rephrase this.

25             So the issue you had with her
```

1                    A. KIMMICK

2    piers, did you deem those to be factual,

3    yes or no?

4         A.    It didn't matter.

5         Q.    What do you mean?

6         A.    When somebody comes to me with

7    an issue that says that somebody on the

8    team is uncomfortable and it's reported to

9    me, as her manager, leading by example, I

10   want to make sure that everybody on the

11   team has a mission that understands the

12   direction and the goals associated with

13   what needs to happen on the team and if

14   that is being distracted in any way by the

15   way that somebody is asking for work to be

16   done or how these things are being

17   approached then I want to make sure that

18   everyone on the team has a common

19   direction and is a productive employee,

20   and I would love to have everybody on the

21   team be happy and productive.

22        Q.    Okay.  Were issues from her

23   piers reported to you on more than one

24   occasion?

25        A.    Yes.

                    A. KIMMICK

  1

  2     Q.    Were they reported to you by

  3   more than one person?

  4     A.    Yes.

  5     Q.    And yet you didn't see it fit to

  6   document any of that?

  7     A.    It was not a hostile work

  8   environment, these were behaviors.

  9     Q.    All right.  So something would

 10   have to be a hostile work environment for

 11   you to document it, yes or no?

 12     A.    Yes.

 13     Q.    Okay.

 14     A.    Well, I did document this in her

 15   review.

 16     Q.    That she was having problems

 17   with her piers?

 18     A.    I believe in one of her reviews

 19   I made a comment with customers and piers,

 20   yes, I did.  I would imagine that it came

 21   up, it had to have.  If it didn't come up

 22   in writing it would certainly come up as a

 23   verbal discussion.

 24     Q.    But you didn't document it in

 25   this -- in this document that's here --

1                   A. KIMMICK

2      A.    It doesn't appear that I have

3  recorded it in the second half performance

4  for -- what is this?  This is the second

5  half performance --

6      Q.    -- for 2020, correct?

7      A.    -- for 2020.  I believe here I

8  was focussing on results, and I --

9      Q.    Okay.

10          MS. FISHER:  All right.  I'm

11      going to put another document in the

12      chat.

13          And, Stefanie, you have this

14      last document as, I think, Kimmick 5.

15          (Whereupon, a performance review

16      bates stamped OBS_00714 to 00718 was

17      marked as Kimmick Exhibit 5 for

18      identification as of this date by the

19      Reporter.)

20      A.    I don't have anything in there

21  yet.

22      Q.    No, no, no.  I didn't put

23  anything there yet.  Sorry, just give me

24  one second.

25          Before we move on, I just want

```
 1                    A. KIMMICK
 2   to go back to the document we were just
 3   reviewing and that's Kimmick 5, do you see
 4   in the second sentence of this review it
 5   states,  "She has met her objectives
 6   related to her B-end accounts, but the
 7   largest A-end accounts (Moodys and Pfizer)
 8   have made decisions to move away,"  do you
 9   see that?
10        A.    Yes.
11        Q.    And you see where it says
12   "These decisions were being fermented
13   before Patty took on responsibility for
14   managing the accounts"?
15        A.    M-hm.
16        Q.    Is that, in fact, true?
17        A.    Yes.
18             MS. FISHER:  Just give me one
19        second.
20             Okay.  I just put another
21        document in the chat which will be
22        marked as Kimmick 6; and, for the
23        record, that's a performance review
24        for Patty Haran for what looks like
25        the time period of January 1st, 2020
```

1              A. KIMMICK

2      to June 30th, 2020.

3              (Whereupon, a performance review

4      bates stamped OBS_00334 and 00343 was

5      marked as Kimmick Exhibit 6 for

6      identification as of this date by the

7      Reporter.)

8      Q.    Could you review this and let me

9  know when you are done, please?

10     A.    Okay.

11     Q.    What was -- is this Patty's

12  performance review for the time period of

13  January 1st, 2020 to June 30th, 2020?

14     A.    Yes.

15     Q.    Did you write this performance

16  review for her?

17     A.    Yes.

18     Q.    Did you discuss this performance

19  review with her?

20     A.    Yes, I did.

21     Q.    Okay.  And what was her overall

22  rating for this performance review?

23     A.    Fully successful.

24              MS. FISHER:  And this document

25      is bates stamped OBS_335 through 343.

```
 1                    A. KIMMICK

 2             I'm going to put another

 3      document in the chat.

 4      Q.    Just let me know when you have

 5  had a chance to open and review it.

 6             MS. FISHER:  This document will

 7      be Kimmick 7 and it is bates stamped

 8      OBS_00344 to 00353.

 9             (Whereupon, a performance review

10      bates stamped OBS_00344 to 00353 was

11      marked as Kimmick Exhibit 7 for

12      identification as of this date by the

13      Reporter.)

14      A.    This appears to be the same

15  document without the information taken

16  out, redacted.

17      Q.    Let me make sure I put the right

18  thing in there.

19             Well, it looks like this is for

20  a different time period so am I correct

21  that this is the Patty Haran for the time

22  period of July 1st, 2020 to December 31st,

23  2020, Mr. Kimmick?

24      A.    I'm looking at it, because I'm

25  just trying to determine what's different
```

1                    A. KIMMICK

2    between what I said in the redacted

3    document and this one.

4        Q.    Let me just ask you:  Is this

5    the performance review for the time period

6    of July 1st, 2020 to December 31st, 2020?

7        A.    It appears so, yes; however, the

8    manager's comments look to be the same as

9    the ones on the redacted document.

10       Q.    Are you done reviewing this?

11       A.    Yes.

12       Q.    Okay.  What is the overall

13   rating that Patty received on this

14   performance review?

15       A.    Improvement needed.

16       Q.    All right.  And did you

17   determine that improvement was needed?

18       A.    Yes.

19       Q.    Is this a performance review

20   that you filled out for Patty?

21       A.    Yes.

22       Q.    Did you discuss it with her?

23       A.    Yes.

24       Q.    When did you discuss it with

25   her?

1                    A. KIMMICK

2       A.    During her annual review.

3       Q.    Which was when?

4       A.    I don't recall the date.

5       Q.    When are annual reviews

6  typically held?

7       A.    So a document like this is a

8  formal document, she, as you can see, puts

9  her input in, into each one of the

10  categories, and she -- these comments are

11  labelled as employee, I then fill in

12  manager's comments and there's a period of

13  time in between when Patty has put in her

14  feedback, and I populate mine that it

15  needs to be formally acknowledged and

16  during that open time period I spoke to

17  Patty.

18       Q.    When about did you speak to

19  Patty, approximately?

20       A.    I can't -- I don't know the

21  date.

22       Q.    Do you know a month?

23       A.    I don't know the month.

24       Q.    Okay.  If you look at the top of

25  the document, it says date of review

```
 1                    A. KIMMICK

 2   meeting, January 28th, 2021, do you see

 3   that?

 4        A.    Yes.

 5        Q.    Would that have been the date

 6   that you met with Patty to discuss the

 7   review?

 8        A.    There may have been more than

 9   one time; and, yes, I probably met with

10   her at that time.

11        Q.    What was Patty's response to

12   this performance review?

13        A.    She has made her comments on the

14   document.

15        Q.    Other than what she wrote on the

16   document, what was her response?

17        A.    She was disappointed.

18        Q.    How do you know she was

19   disappointed?

20        A.    We talked for a considerable

21   about of time and more than once about

22   this review.

23        Q.    Did Patty present to you a plan

24   to improve her pipeline in or about

25   January or February of 2021?
```

```
 1                    A. KIMMICK
 2      A.    Yes.
 3      Q.    Was that a plan that she put in
 4  writing?
 5      A.    I don't recall specifically, but
 6  I would imagine yes.
 7           MS. FISHER:  Okay.  We're going
 8      to call for the production of that
 9      document.
10           MR. GUIFOYLE:  Put it in
11      writing.  We will take it under
12      advisement.
13      Q.    What do you recall about that
14  plan that she presented to you?
15      A.    It was ineffective.
16      Q.    Why?
17      A.    She didn't make a -- she didn't
18  achieve the business objectives that were
19  part of her targets and objectives.
20      Q.    When did she present that plan
21  to you -- withdrawn.  You already
22  testified it was January or February of
23  2021.
24      A.    I don't think I said that.  I
25  believe that I said I don't recall.
```

```
 1                    A. KIMMICK

 2      Q.    Well, we can get a reading from

 3   the court reporter.

 4            MS. FISHER:  Stefanie, can you

 5        just read it back?  I think my

 6        question was did she present a plan to

 7        you in January or February of 2021

 8        regarding her plan -- regarding

 9        improving her pipeline.

10            (Whereupon, the referred

11        question and answer was read back by

12        the Reporter.)

13      A.    Okay.  I -- to clarify, it is

14   likely she submitted a plan, but I don't

15   know the dates.

16      Q.    Would it have been after this

17   review?

18      A.    It could have been before.  We

19   have weekly meetings.  We had weekly

20   scheduled sessions one on one so we can

21   talk about the accounts and coverage.

22      Q.    Was anyone else present when she

23   presented that plan to you?

24      A.    Not to my knowledge.

25      Q.    And why do you say the plan was
```

```
 1                    A. KIMMICK

 2   ineffective?

 3       A.    She didn't achieve the results

 4   that were intended.

 5       Q.    Meaning that she wasn't able to

 6   follow through on the plan?

 7       A.    I specified this in the

 8   manager's comments, and you can read them

 9   and if you clarify that along with that

10   comments that I made in the -- in the

11   prior review that specifies her issues

12   with the team and her clients, it's all in

13   my document -- it's all documented here in

14   her review.

15       Q.    Okay.  But upon asking about the

16   plan that she presented to you, you

17   believe that the plan she presented to you

18   was ineffective, I'm representing to you

19   that the plan was presented in January or

20   February of 2021, which would have been

21   after the review so my question is:   Why

22   was the plan ineffective?  Did she even

23   have a chance --

24       A.    I'm not accepting that the plan

25   was delivered in January or February, I
```

```
 1                     A. KIMMICK

 2   don't know; and, secondly, the plan was

 3   her plan, the fact that I reviewed it

 4   doesn't take off the fact that this is her

 5   plan and that plan needed to deliver

 6   results.  It may or may not have feedback,

 7   but the results were that the new

 8   opportunities that she created had not

 9   matured, no new deals in the space have

10   moved through the funnel to negotiation,

11   and she had challenges building and

12   growing a healthy business.

13       Q.   Did you --

14       A.   This was fact.

15       Q.   Did you tell her that you

16   thought her plan was ineffective?

17       A.   I don't recall.

18            MS. FISHER:  I'm putting another

19       document in the chat.

20       Q.   Let just me know when you have

21   had a chance to review it.

22       A.   This appears to be a termination

23   letter from HR to Patty.

24       Q.   Right.

25            MS. FISHER:  So this is
```

```
 1              A. KIMMICK

 2      Youkhanna 8 bates stamped P00016 to

 3      P00019.

 4          MR. GUIFOYLE:  Just for the

 5      record it's Youkhanna 1, I believe.

 6          MS. FISHER:  Sorry?

 7          MR. GUIFOYLE:  Youkhanna 1.

 8          MS. FISHER:  I'm sorry.  Sorry,

 9      not Youkhanna.  It's labeled

10      Youkhanna, because I plucked it from

11      the folder for Youkhanna, but this is

12      --

13          MR. GUIFOYLE:  -- Kimmick 8.

14          MS. FISHER:  -- Kimmick 8, yes.

15      This is Kimmick 8.

16          MR. GUIFOYLE:  Thank you.

17          (Whereupon, a termination letter

18      bates stamped P00016 through 00019 was

19      marked as Kimmick Exhibit 8 for

20      identification as of this date by the

21      Reporter.)

22      Q.    So, Mr. KimmicK, is it correct

23   that Haran's termination date was February

24   24th, 2021?

25      A.    That's what is represented in
```

```
 1                      A. KIMMICK

 2    this document.  I couldn't personally

 3    testify to that, no, but this is what it

 4    says in the document.  I'm assuming that

 5    that is the date.

 6         Q.    Did you memorialize the reasons

 7    form Ms. Haran's termination in any

 8    document?

 9         A.    Not that I recall.

10         Q.    What were the reasons for her

11    termination?

12         A.    That's a very broad question.

13    Can you be more specific?

14         Q.    Why did you decide to terminate

15    Ms. Haran?

16         A.    Nonperformance.

17         Q.    What specifically?

18         A.    As documented in her review, she

19    was unable to produce enough business for

20    the -- enough new pipeline for the

21    business to be healthy in the future, the

22    opportunities were not moving through the

23    -- the pipeline in a sufficient velocity,

24    and she had issues with her piers and

25    customers.
```

1                     A. KIMMICK

2      Q.    The issues with her piers and

3  customers are the issues that you don't

4  recall that you testified to earlier?

5      A.    That is correct, and I believe

6  in one of the documents that you had sent,

7  I believe this is the performance review

8  from -- sorry, I have to go back to look

9  at the actual performance review again.

10  One of the reviews I said she had issues

11  with her piers and that that was feedback

12  from her customers.  I am looking for it

13  in the documents.

14      Q.    Well, I can make it easy, so the

15  --

16      A.    So I said,  "She has not yet

17  built an agreed consensus on strategy with

18  her team in response to these difficult

19  situations, and this has lead to some

20  miscommunication.  There was also a

21  miscommunication with a client"  --

22      Q.    Are those the issues --

23      A.    --  "These episodes results some

24  concern that Patty may not be fully

25  understanding feedback, or has not had the

1                    A. KIMMICK

2    time to  'read between the lines'

3    regarding indirect or nonverbal cues which

4    are critical for a sales leader."

5         Q.    So are these the issues that are

6    referring to when you made the decision to

7    terminate her?

8         A.    This is one of the many.

9         Q.    Okay.  Are there any other pier

10   and customer issues that you considered

11   when making the decision to terminate her

12   that are not reflected on that performance

13   review?

14        A.    This performance review is a

15   generalization of performance overall and

16   there was -- those situations were

17   addressed as they came up; and, no, there

18   is no documentation.

19        Q.    Did you give Patty a quota for

20   2021?

21        A.    Yes.

22        Q.    When did you give her a quota

23   for 2021?

24        A.    So I believe for 2021 she had --

25   she had at least two territories so she

1               A. KIMMICK

2    would have been assigned a target at the

3    beginning of 2021 which was revised at

4    least once during the year.

5        Q.    Did you give her a quota in

6    writing?

7        A.    Yes.

8             MS. FISHER:  We are going to

9        call for the production of that

10        document.

11        Q.    Isn't it true that --

12        A.    Actually, this is for 2021,

13    right?

14        Q.    Yes.

15        A.    So I may have been mistaken

16    about the year.  Certainly for 2020 she

17    would have had a target and during 2020

18    she would have had multiple targets.  I

19    don't know whether for 2021 that target

20    was communicated or not.  Since she was

21    terminated in February of 2021, it is

22    possible she did not yet have a full

23    target for 2021.

24        Q.    Did you give full targets to any

25    other employees that reported to you for

```
 1                    A. KIMMICK

 2   2021?

 3       A.    I don't recall.  Sorry, I was

 4   mistaken about the dates.

 5       Q.    That's okay.

 6             So you don't recall whether or

 7   not she was given a target for 2021, just

 8   to clarify for the record?

 9       A.    No, I don't.  Since she was

10   terminated in February of 2021, it's

11   unlikely that she was communicated her

12   full target by then; however, I don't

13   know, I can't -- I can't validate it.  I

14   don't know.

15       Q.    Did you -- and you don't recall

16   whether or not you gave anyone else their

17   targets at that time?  By February of

18   2021, had you given anyone else their

19   targets?

20       A.    I don't recall.

21       Q.    When do you typically give

22   targets to employees reporting to you?

23       A.    We begin talking about budgets

24   in August, we talk about requirements and

25   the need for additional pipeline, what's
```

```
 1                   A. KIMMICK

 2    going to be required in order to achieve

 3    business goals, those are discussed, and

 4    budgets are then agreed in the

 5    October/November timeline; however, the

 6    compensation plan is not usually

 7    formalized until March or even sometimes

 8    April when the compensation guidelines

 9    against the actual targets can be measured

10    against compensation and so the actual

11    written targets are formally placed

12    against the budget, and we -- and we

13    provide that as a formal document in a --

14    in a goal sheet, but that goal sheet

15    usually isn't produced until after the

16    compensation plan is agreed and since the

17    compensation plan is not likely agreed

18    until March, but people don't have their

19    full targets formally presented until

20    March or even sometimes April.

21             However, budgets are discussed

22    and pipeline is discussed and future

23    business is discussed as part of an

24    ongoing health of the business.

25        Q.    If she didn't have a quota as of
```

```
 1                    A. KIMMICK

 2   February 2021, how was it that you

 3   determined that her pipeline was

 4   insufficient to meet her quota?

 5        A.    We wouldn't have made the budget

 6   with the current pipeline that she had.

 7   She had a history of not closing the deals

 8   that she had in her pipeline.

 9        Q.    Which deals?

10        A.    I don't recall them all.

11        Q.    And why -- when you say she had

12   a history of not closing deals, you are

13   saying this happened multiple times?

14        A.    I would say that the pipeline

15   and the pipeline velocity and how the

16   opportunities were being managed was not

17   effective for producing the results

18   required for the business.

19        Q.    Did the -- did she fail to close

20   deals multiple times?

21        A.    I would have to go back and look

22   at the detail, but yes.

23        Q.    Are you talking about B-end

24   accounts or A-end accounts?

25        A.    Certainly her performance as an
```

1                    A. KIMMICK

2    B-end account manager because she had less

3    responsibility, and she was -- it was a

4    slightly different kind of a territory

5    from a communication requirements

6    perspective that her performance clearly

7    was more ineffective as an A-end account

8    manager.

9        Q.    So let's take her B-end

10   performance, how was her performance on

11   her B-end accounts as of February of 2021?

12       A.    I believe in February of 2021

13   she had responsibilities for both.

14       Q.    How was her performance on her

15   B-end accounts as of February of 2021?

16       A.    I can't recall.

17       Q.    Were there any deals she failed

18   to close on her B-end accounts?

19       A.    I can't recall.

20       Q.    Were there any deals on her

21   A-end accounts that she failed to close?

22       A.    I can't recall that detail.

23       Q.    When you testified earlier that

24   based on her pipeline she would not have

25   made the budget, what do you mean by that?

1                    A. KIMMICK

2      A.    She identified pipeline, and she

3  had identified opportunities with some

4  customers, but those opportunities were

5  not maturing, they weren't moving through

6  the pipeline, they weren't being proposed

7  or negotiating, they weren't moving

8  towards closure and, therefore, there was

9  a low expectation that she would make her

10  target and, therefore, make the needs of

11  the business and, yeah, I mean, these --

12  the projects she was working on were long

13  shots, and she wasn't doing what was

14  necessary to move them forward.

15      Q.    Did she have a chance to do that

16  before she was terminated?

17      A.    That's the job.

18      Q.    Well, when she --

19      A.    That's what an account manager

20  is hired to do.

21      Q.    When she presented her plan to

22  you to increase her pipeline from that

23  time until the time she was terminated,

24  did she have an opportunity to pursue the

25  opportunities she outlined?

1                    A. KIMMICK

2      A.    Yes.

3      Q.    How much time?

4      A.    I don't recall.

5            MS. FISHER:  I'm just going to

6      put another document in the chat.  One

7      second.

8      Q.    Let me know when you are able to

9  review that.

10     A.    Okay.  This appears to be a

11  first half 2020 review with large pieces

12  redacted.

13           MS. FISHER:  Okay.  So this is

14     Kimmick 9, I believe, and it is bates

15     stamped OBS_00711 through 00713.

16           (Whereupon, a performance report

17     bates stamped OBS_00711 through 00713

18     was marked as Kimmick Exhibit 9 for

19     identification as of this date by the

20     Reporter.)

21     Q.    The section that is not redacted

22  regarding Patty Haran, did you write this?

23     A.    Yes.

24           MS. FISHER:  Okay.  I'm putting

25     yet another document in chat.

                         A. KIMMICK

 1

 2       Q.    Let me know when you have had

 3   the opportunity to review the latest

 4   document.

 5            Actually, this is not -- this is

 6   a repeat of a document that I introduced

 7   earlier.

 8       A.    Yes.  I already have this one

 9   opened.

10       Q.    Yeah.  We're not going to mark

11   this document.

12       A.    We already did.

13            MS. FISHER:  Okay.  I'm going to

14       put another document in the chat.

15       Q.    Let me know when you have had an

16   opportunity to review the latest.

17       A.    Okay.

18       Q.    Do you recognize this document?

19       A.    It appears to be a sales

20   compensation summary from December 31st of

21   2020.

22       Q.    What time period did this cover?

23       A.    It appears to be January 1st,

24   2020 to January the 31st of 2020.

25       Q.    This is a sales compensation

```
 1                    A. KIMMICK

 2  summary for Patty Haran?

 3      A.    It is.

 4           MR. GUIFOYLE:  I will just note

 5      my objection as to this document being

 6      introduced as an exhibit.  It does not

 7      bear any bates label so there's no way

 8      of knowing where it came from.

 9           MS. FISHER:  Okay.

10      Q.    Do you recognize this document

11  as an accurate sales compensation summary

12  for Patty Haran?

13           MR. GUIFOYLE:  Objection to

14      form.

15           You can answer, if you know.

16      A.    It appears to have the right

17  format.  I can't testify to the numbers.

18           MS. FISHER:  Okay.  Give me one

19      second.

20           (Whereupon, a short recess was

21      taken.)

22      Q.    If you can open that and let me

23  know when you are done reviewing it.

24      A.    Okay.

25           MS. FISHER:  This is Kimmick 10
```

```
 1                    A. KIMMICK

 2         marked OBS_00233 to 234.

 3                 (Whereupon, a 2020 sales

 4         compensation payment summary for Patty

 5         Haran bates stamped OBS_00233 to 00234

 6         was marked as Kimmick Exhibit 10 for

 7         identification as of this date by the

 8         Reporter.)

 9         Q.    Do you recognize this document?

10         A.    It appears to be a sales

11    compensation, what we call workbook.  Yes,

12    I recognize the format and -- yeah.

13         Q.    Okay.  And is this the 2020

14    sales compensation payment summary for

15    Patty Haran?

16         A.    That's what the document says,

17    yes.

18         Q.    Do you see the third box down

19    from the left where it says YTD

20    achievement and annual achievement?

21         A.    Yes.

22         Q.    What does YTD achievement

23    represent?

24         A.    Year to date.

25         Q.    Okay.  Achievement meaning how
```

```
 1                      A. KIMMICK
 2   Patty Haran paired against her quota?
 3        A.    Correct.
 4        Q.    And annual achievement, what
 5   does that represent?
 6        A.    That means the achievement
 7   against her target or quota for the year.
 8        Q.    Well, how does year to date
 9   versus annual achievement, how do they
10   differ?
11        A.    Well, they don't in this case
12   because the statement is from December the
13   31st, 2020.
14        Q.    Okay.  What does revenue mean?
15        A.    Revenue is the total revenue
16   target and what the accounts in her
17   territory delivered during that time
18   period.
19        Q.    And according to this it says
20   that Patty achieved 100.58 percent of her
21   revenue goal?
22        A.    That is correct.  What I would
23   say, though, is that during 2020 Patty had
24   multiple territories, this is a summary
25   for the year, so this doesn't reflect
```

1                    A. KIMMICK

2    simply what was going on with one set of

3    accounts or in one territory.

4              As I recall, Patty was managing

5    B-end accounts at the beginning of the

6    year, midyear there was a new person that

7    came in to manage the B-end accounts, but

8    Patty had been managing them for the

9    beginning of the year, and I felt it

10   appropriate at the time to make sure that

11   Patty was compensated appropriately for

12   the work that she was doing not only on

13   her new territory, but also on her old

14   territory, and because of that I made an

15   adjustment mid year to Patty's quota that

16   lowered her quota so that she would be

17   paid close to 100 percent.

18             Therefore, I would say that for

19   the -- for this particular year, because

20   it was a year that was fraught with Covid,

21   that the result on revenue was a

22   manipulated number so I could compensate

23   Patty for the work that she was doing;

24   also, I would say that it doesn't

25   represent the future and what the future

                    A. KIMMICK

1

2   held in her new territory, which is much

3   more compelling from a review perspective

4   than what she was made or whether she made

5   her target in the past.

6       Q.    So this sales compensation

7   payment summary is only reflective of one

8   set of accounts that Patty managed; is

9   that accurate?

10      A.    No.

11      Q.    So this does this reflect all of

12  the accounts that she managed?

13      A.    Yes, in multiple territories.

14      Q.    Okay.  Did you change the quota

15  for anyone else during 2020?

16      A.    I don't recall.

17      Q.    What does orders N&G core mean?

18      A.    So orders new & get, these are

19  core products and services, meaning, these

20  are what -- what produce the vast majority

21  of our revenues for the future; and,

22  again, this number was manipulated based

23  on mid-year results and her covering

24  multiple territories; new & get strategic

25  are new sets of business around strategic

```
 1                    A. KIMMICK

 2   products; and keep business is business

 3   that we expect would renew so she had a

 4   number of accounts in her territory that

 5   she was assigned that did not renew that

 6   would affect future revenue and that --

 7   and that revenue we can't expect to keep

 8   for the next year because those customers

 9   were not reviewed.

10       Q.    Okay.

11       A.    So this would indicate that --

12   that she made a revenue number, she was

13   close on her new & get core and strategic

14   numbers, but she was unable to keep the

15   current business, and she needed to make

16   up for that by overachieving in seven

17   other areas; and, again, what I would say

18   here is that this is not necessarily a

19   representation of the future performance

20   that's expected, but it's a representation

21   of a manipulation, because she was

22   managing a B-end and an A-end territory

23   for half of the year, and we were trying

24   to make sure -- I was trying to make sure

25   that Patty was compensated appropriately
```

```
 1                    A. KIMMICK

 2    for what I considered to be a favor that I

 3    had asked her to do.

 4        Q.    What was the favor?

 5        A.    She was managing her old

 6    territory and her new territory while the

 7    new person was coming in during Covid.

 8        Q.    And that was -- you asked her to

 9    do that?

10        A.    I asked for her to do that, yes,

11    I did.

12        Q.    When did you ask her to do that?

13        A.    Early in the year, and I told

14    her that I would make up for it, which I

15    did.

16        Q.    Did anyone else reporting to you

17    have a similar percentage or not achieve

18    their goal for orders keep in 2020?

19        A.    I don't recall.  I would say

20    that the expectation for renewals is 100

21    percent.  We target 100 percent of

22    renewals, meaning that if we a have

23    customer whose a current customer the

24    expectation is that customer would

25    continue with Orange and that is an
```

```
 1                    A. KIMMICK
 2   expectation is of the business, right, and
 3   so a target accomplishment of 11 percent
 4   would be low; but on the other hand, I
 5   can't say that -- that I recall any other
 6   person in that -- in that -- that would
 7   have had a category like that, but I would
 8   say that the expectation was that -- that
 9   we would renew 100 percent of the time.
10   Of course, that doesn't always happen,
11   which is all the time which is why we are
12   in sales.  It's a tough job.
13       Q.    So is the failure to meet the
14   renewal quota a reason alone to terminate
15   someone?
16       A.    No.
17       Q.    Did you discuss this sales
18   compensation summary with her?
19       A.    I don't recall.  I know I did
20   talk to her about the target reset that I
21   did mid year to make sure that she
22   understood what I -- the promise that I
23   had made early in the year I was keeping
24   good on.
25       Q.    Was the target reset presented
```

```
 1              A. KIMMICK
 2   to her as a new goal sheet?
 3       A.    Yes.
 4       Q.    And you saying that it
 5   represented or reflected a lower quota
 6   than the goal you presented to her in the
 7   beginning of the year in 2020?
 8       A.    I would not say that it was
 9   lower.  I would say it was adjusted to
10   reflect a higher payout.
11       Q.    Did she still have the same
12   target?
13       A.    She had the same
14   responsibilities to the business.
15       Q.    Okay.  So did she have the same
16   quota?  Did the quota change at all during
17   2020?
18       A.    Yes.
19       Q.    So was she expected to meet the
20   same target numbers?
21       A.    I don't understand the question.
22       Q.    When you say that her quota was
23   changed midyear, what specifically about
24   the quota was changed?
25       A.    It was manipulated to make sure
```

```
 1                    A. KIMMICK

 2   that she was compensated in -- compensated

 3   more.

 4        Q.    Okay.  But --

 5        A.    Because I had asked her to do me

 6   a favor and manage some of these accounts

 7   during a difficult period of Covid, and I

 8   didn't have -- I couldn't hire another

 9   person quickly enough to get them into the

10   role that she was vacating so she managed

11   some of those accounts, she did me a favor

12   in managing those accounts, and I paid her

13   for it.

14        Q.    But was her target, the number

15   she was supposed to achieve for revenue

16   and all the four categories on her

17   compensation summary, were the target

18   numbers lower?

19        A.    I can't say that for a fact,

20   because I -- I can only say that we tried

21   to adjust the numbers to achieve a result

22   and higher pay.

23            MS. FISHER:  I'm going to put

24        another document in the chat.

25        Q.    Specifically to the fourth tab
```

1                    A. KIMMICK

2    on the bottom of this spreadsheet.

3        A.    Okay.

4            MS. FISHER:  For the record,

5        this is Kimmick 11 and it's an Excel

6        spreadsheet marked OBS_001006.

7            (Whereupon, an Excel spreadsheet

8        bates stamped OBS_001006 was marked as

9        Kimmick Exhibit 11 for identification

10       as of this date by the Reporter.)

11       Q.    Okay.  Do you see Column D where

12   it says salesperson?

13       A.    Yes.

14       Q.    Do you see Patricia Haran's name

15   twice in Rows 10 and 15?

16       A.    Yes.

17       Q.    Why do you have her -- why is

18   she listed twice here?

19       A.    I don't know.  I would be

20   speculating.

21       Q.    Okay.  If you could scroll over

22   to Column Z, let me know when are you

23   there.  Are you in -- looking at Column Z

24   now?

25       A.    Yes.  It appears to be a revenue

1                        A. KIMMICK

2     annual attainment.

3          Q.    Right.  Okay.

4                So for Ms. Haran it looks like

5     one cell which is for Row Z so Cell Z10

6     says 101 percent and then Z 15 has her at

7     0 percent, do you know why?

8          A.    I don't.  I would be

9     speculating.  A possible possibly, she had

10    two goal sheets, meaning that she had two

11    sets of targets and the reason I would

12    have separated these is to have one set of

13    territory results separated for another so

14    that I could end up at the compensation

15    goal that I had intended.

16                Again, this has to do with her

17    carrying responsibilities as a favor for

18    me and, again, I was trying to achieve a

19    compensation result for Patty for the year

20    which -- which was achieved.  I made a

21    promise, and I kept it.

22         Q.    Okay.  If you could scroll over

23    to Column A  "L" as in Larry, let me know

24    when you are there.

25         A.    New & get annual achievement.

```
1                    A. KIMMICK

2       Q.    Yes, exactly.  So there are --

3  the beginning, one, two, three, four,

4  five, six, seven, eight, nine, the

5  beginning nine cells in that column for

6  various salespeople is not populated, do

7  you know why?

8       A.    Again, I would be speculating,

9  but the three individuals that are listed

10 on the bottom are integration services

11 specialist, and they had -- they had

12 targets that were slightly different

13 because they were, as I described earlier,

14 overlay roles so their roles were reliant

15 on only one product line and probably what

16 happened in this case is that the

17 compensation tool pulled out the results

18 only for that product associated with new

19 & get annual achievement for that product.

20      Q.    Is this spreadsheet a document

21 that you have ever seen before today?

22      A.    No.

23      Q.    Do you know where the --

24      A.    Again, I'm speculating on why I

25 would have -- yeah, I never seen this.
```

```
 1                    A. KIMMICK

 2       Q.    Do you know where the

 3   information came from that populated the

 4   spreadsheet?

 5       A.    No, I don't.

 6       Q.    Is there a document that lists

 7   all of the accounts in Ms. Haran's book?

 8       A.    Yes, it's called a goal sheet.

 9       Q.    And it has all the different

10   accounts or theoretically it should have

11   the different accounts that she was

12   responsible for?

13       A.    Yes.

14            MS. FISHER:  Okay.  I'm putting

15       another document in the chat.

16            (Whereupon, a 2020 goal sheet

17       was marked as Kimmick Exhibit 12 for

18       identification as of this date by the

19       Reporter.)

20       Q.    Let me know when you have had a

21   chance to review that.

22       A.    This appears to be her original

23   goal sheet from January of 2020 largely

24   with accounts in her new territory.  There

25   are two accounts that she requested to
```

```
 1                    A. KIMMICK

 2   keep, because they had ongoing opportunity

 3   and revenue that she felt she would be

 4   compensated on during the era, and I

 5   allowed her to keep those, LVMH and Cap

 6   Gemini, but this appears to be her goal

 7   sheet as of January 1st, 2020.

 8       Q.    Does this reflect as of that

 9   date all of the accounts -- all the

10   customers she had in her book?

11       A.    As of that date, it -- it does.

12       Q.    And you said there was another

13   goal sheet subsequent to this in 2020?

14       A.    I'm speculating.  I don't know

15   whether or a new goal sheet was produced

16   or not for a fact, because I don't have it

17   in front of me, but I do know that the

18   process in which the change in

19   compensation would happen requires both of

20   -- a goal sheet to be produced and that

21   goal sheet to be approved by me so I would

22   imagine there is another goal sheet in

23   2020 that Patty is associated with, and I

24   would also imagine that those accounts

25   would be listed in that goal sheet.
```

```
 1              A. KIMMICK

 2         Now, it's possible that I used

 3    the -- the existing accounts in order to

 4    come up with the result and didn't change

 5    the accounts and just changed the goal

 6    sheet itself in order to come up with a

 7    compensation that I had -- I had indicated

 8    to Patty in the beginning of the year that

 9    I would try to do as part of my promise to

10    her.

11       Q.    So is it accurate to say that

12    Ms. Haran met her quota in 2020 for three

13    of the four categories meaning revenue,

14    orders new and get core and orders new and

15    get strategic, is it accurate to say that?

16       A.    No.

17       Q.    Why is it not accurate?

18       A.    Because the results were

19    manipulated in order to produce her result

20    in higher compensation.  What I would say

21    was accurate was that if that -- that

22    manipulation did not happen, she would not

23    have made her target.

24       Q.    And what would her percentages

25    have been?
```

1                    A. KIMMICK

2        A.    It is impossible to tell.

3        Q.    How do you know she would not

4   have made her target?

5        A.    Because she wasn't assigned the

6   accounts that she was working on.

7        Q.    What do you mean by that?

8        A.    I mean, I asked her as a favor

9   to cover some other accounts that she was

10  working on, largely administrative tasks

11  and some other account management relation

12  management kind of things and those

13  accounts needed attention, therefore, it's

14  unlikely that she would have made her

15  target on any of those accounts given the

16  status of them, that changed in July, I

17  paid her in -- I paid her based on full

18  achievement of her compensation in return

19  for that favor that she covered those

20  accounts and for the second half of the

21  year largely Covid was over, she had her

22  new territory and in that new territory

23  she was also not performing.

24       Q.    So are there any documents that

25  reflect how she was actually performing

1                   A. KIMMICK

2    versus the manipulation?

3        A.    Her reviews that I provided.

4        Q.    The reviews don't have numbers,

5    right, and they don't provide percentages

6    of her quota; am I right?

7        A.    Not complete, and they would

8    reflect only what was in workbook.

9        Q.    Okay.  So are there any

10   documents that show how she was actually

11   performing, what her percentages were?

12       A.    Again, I think, you know, from a

13   -- from a territory perspective Covid was

14   a difficult time.  As a manager, I was

15   trying to make sure that I was taking care

16   of my employees.  Patty had stepped up to

17   take only a series of responsibilities

18   that helped me and the business, and I

19   paid her for that.

20       Q.    My question is whether or not

21   there is any documents that reflect how

22   she was actually performing?

23       A.    The only documents that you

24   could look at were the documents that you

25   have.

```
 1                    A. KIMMICK

 2       Q.    Which document are you referring

 3   to?  Are you talking about the 2020 sales

 4   compensation summary?

 5       A.    Yes.

 6       Q.    That document you said is --

 7   shows manipulated numbers, I'm asking if

 8   there is any document that shows how she

 9   was actually performing that was not

10   manipulated?

11       A.    Those are real numbers, and she

12   was paid against those numbers and I'm

13   telling you they were manipulated.

14       Q.    They were -- okay.

15             So these numbers you're saying

16   are real, but you're also saying they were

17   manipulated so I'm trying to understand

18   the difference, I'm trying to understand.

19       A.    There is no difference.

20       Q.    Well, had she --

21       A.    That was her performance at the

22   end of year, that was what she was paid

23   for.

24             (Indiscernible crosstalk.)

25       Q.    Hold on.  Hold on.  Hold on.
```

```
1                    A. KIMMICK
2    Hold on.  Hold on.  Hold on.  The court
3    reporter can't type us talking at the same
4    time.  Let me clarify what I'm asking,
5    okay?
6                 If you had not manipulated the
7    numbers that you manipulated, is there a
8    document that reflects how these
9    percentages would have been different?
10        A.    Not to my knowledge.
11        Q.    So we don't know from any
12   documentation what her percentages would
13   have been had you not manipulated the
14   numbers?
15        A.    Not to my knowledge.
16        Q.    Was Ms. Haran's orders keep
17   percentage, the 11.33 percent, a factor
18   that you considered when terminating her?
19        A.    Yes.
20        Q.    And did anyone else have an
21   orders keep percentage that you deemed
22   unacceptable for the 2020 year?
23        A.    I can't recall.
24             MS. FISHER:  Okay.  I'm going to
25        put another document in the chat.
```

```
 1                    A. KIMMICK

 2       Q.    Let me know when you are able to

 3   review that.

 4       A.    Okay.

 5       Q.    Do you recognize this document?

 6       A.    It appears to be the sales

 7   compensation workbook for Angela Arias for

 8   --

 9       Q.    And that's for the --

10       A.    Sorry.

11       Q.    Sorry.  Go ahead.

12       A.    For the year 2020.

13       Q.    Okay.

14             MS. FISHER:  This is Kimmick 13

15       and it's bates stamped OBS_01271 to

16       01272.

17             (Whereupon, the aforementioned

18       sales compensation workbook for Angela

19       Arias bates stamped OBS_01271 to 01272

20       was marked as Kimmick Exhibit 13 for

21       identification as of this date by the

22       Reporter.)

23       Q.    Do you know why there is only

24   two categories, revenue and order new &

25   get, for Angela Arias?
```

```
 1                  A. KIMMICK

 2        A.     Angela was an overlay, she had

 3    the title of integration services

 4    specialist and only had targets based on

 5    integration services, products and

 6    services and as such they were no renewals

 7    because those products are all sold new.

 8        Q.     Got it.

 9               What is the percentage that you

10    look for for orders keep?  Typically I

11    know that ideally you would have it at 100

12    percent, but is there a percentage that

13    you deem to be unacceptable?

14        A.     So it is a -- typically we try

15    to guess at when the renewal will happen,

16    we like to do it exactly when the contract

17    expires so that we don't give price

18    advantage too early, and we don't want to

19    do it after the contract expires, because

20    then it's not enforced and so when the end

21    of the contract term comes, we assign a

22    quota for the end of that contract period

23    for the customer; so, for example, if the

24    contract is up on July the 31st, we will

25    have that target within the year of -- of
```

                        A. KIMMICK

1

2    that July -- that particular July fell.

3        Q.    Okay.

4        A.    So if the contract gets renewed

5    early then the -- the target might not hit

6    that -- that calendar year.  If it does

7    not get renewed then the -- typically the

8    account manager would pay the penalty for

9    not renewing it on time by not getting

10   compensated for that, but they would carry

11   the full target the next year.

12       Q.    Okay.  Is there a percentage

13   that you look for for orders keep that is

14   satisfactory or?

15       A.    Typically we look for expansion

16   and so when a contract renews the

17   expectation is it would be renewed at 100

18   percent and typically with a successful

19   account person the keep number would be

20   larger than in prior renewals and so the

21   expectation is that it would be at least

22   100 percent of the existing.

23            Now, that -- again, that -- that

24   is somewhat subjective, because certain

25   products mature at different times, there

1                     A. KIMMICK

2    can be a ragged edge products and services

3    that are associated with that and all that

4    needs to be taken into account during the

5    budget process, which is why I explained

6    that it's difficult to set a target before

7    the compensation plan is set which is why

8    most people don't have their target fully

9    baked out until March or April because the

10   budget is set based on the expectation of

11   the existing contract and all its

12   complexities, the larger the deal, the

13   more complex it gets and the more

14   expectation that the account leader on

15   that account would know the account and be

16   able to budget effectively and then plan

17   ahead to make sure that they are doing

18   enough work in order to expand the revenue

19   on the accounts.

20        Q.    But so 11 percent of renewals is

21   -- that's a number that you deem to be

22   low, correct?

23        A.    Absolutely.

24        Q.    Okay.  What percentage do you

25   deem to be low for renewals?

                    A. KIMMICK

      A.    The compensation plan does not

pay below 50 percent so I personally would

think that below 100 percent would not be

acceptable because I have high

expectations, but I know that that's

unreasonable.  The compensation plan does

not pay below the 50 percent so that --

the company has decided that is

unacceptable, and we wouldn't even pay for

amounts below that number.

      Q.    Is that 50 percent the same for

the other categories as well, for the

revenue and the orders new & get?

      A.    No.

      Q.    What is the percentage according

to the compensation plan, what's the

minimum percentage that needs to be

acquired on revenue?

      A.    I would have to check for that

compensation year.  It changes every year.

      Q.    Do you know what the minimum

percentage is for orders new & get for the

2020 year?

      A.    I don't.

                          A. KIMMICK

1

2      Q.    And what about --

3      A.    But it, you know, the

4  expectation is that a salesperson will

5  achieve 100 percent.  If they don't

6  achieve 100 percent then you have to look

7  at what the mitigating factors were and

8  are there other things involved in what's

9  going on like customer relationships and

10  piers and all kind of other factors,

11  right, so yeah.

12      Q.    Do you know what the minimum

13  percentage was for orders new & get

14  strategic in 2020?

15      A.    I don't.

16          MS. FISHER:  Okay.  I'm going to

17      put a document in the chat, which will

18      be Kimmick 14.

19          (Whereupon, a sales compensation

20      workbook for Danielle Willins bates

21      stamped OBS_01088 to 01089 was marked

22      as Kimmick Exhibit 14 for

23      identification as of this date by the

24      Reporter.)

25      Q.    Let me know when you have had a

```
1                    A. KIMMICK

2    chance to review it.

3         A.    Okay.

4               MS. FISHER:  This document is

5         stamped OBS_01088 to 01089.

6         Q.    Do you recognize this?

7         A.    This appears to be the

8    compensation workbook for Danielle Willins

9    to the year January to December of 2020.

10        Q.    And, again, there is only two

11   categories for Danielle Willins, was she

12   also an integration service specialist?

13        A.    Yes.

14        Q.    You see her revenue is 61.87

15   percent?

16        A.    Yes.

17        Q.    Is that something you deem to be

18   low?

19        A.    All of the integration

20   specialists were removed from the business

21   because they were nonperforming, it was a

22   class issue.  All of them were made

23   redundant.

24        Q.    Okay.

25        A.    So, yes, this was unacceptable.
```

1           A. KIMMICK

2           MS. FISHER:  Okay.  I'm putting

3       another document in the chat.  This is

4       Kimmick 15.  It's bates stamped

5       OBS_00659.

6              (Whereupon, an e-mail bates

7       stamped OBS_00659 was marked as

8       Kimmick Exhibit 15 for identification

9       as of this date by the Reporter.)

10          Q.    Could you take a look at this

11   and let know me know when you are done,

12   please?

13          A.    Okay.

14          Q.    Do you recognize this?

15          A.    Yes.

16          Q.    What do you recognize it to be?

17          A.    It appears to be an e-mail that

18   I send sent to Moodys announcing the

19   change from Lorna to Patty.

20          Q.    You wrote that Lorna had decided

21   to leave the Orange family; is that true?

22          A.    Correct.

23          Q.    Did you -- did she not get

24   terminated?

25          A.    No.  She left on her own.

1                    A. KIMMICK

2      Q.    And you represent in this e-mail

3  that Patty would be taking on Lorna's

4  responsibilities, correct?

5      A.    That's correct.

6      Q.    And that was all the

7  responsibilities for the Moodys account?

8      A.    Yes.

9      Q.    Okay.  And Moodys was an A-end

10 account?

11     A.    Correct.  This is part of her

12 new territory.

13     Q.    And was this e-mail sent at the

14 time that the change happened in January

15 of 2020?

16     A.    It appears so, yes.

17     Q.    When did you first learn that

18 Ms. Haran's daughter had a health

19 condition?

20     A.    I can't recall the date.

21     Q.    Do you recall an approximate

22 timeframe?

23     A.    No.  I remember the call.  She

24 had -- she described the -- an event that

25 was not pleasant and that she had needed

```
 1                    A. KIMMICK

 2    to take some time to take care of her and

 3    go to the hospital and do whatever she

 4    needed to do and, yeah, I felt sorry for

 5    her.

 6         Q.    Do you have children?

 7         A.    I do.

 8         Q.    Have you ever had to take time

 9    off work to care for a child due to

10    illness?

11         A.    Thank God I have not.

12         Q.    Has anyone else that reported to

13    you had to take off work to care for a

14    child with a health condition?

15         A.    Not that I recall, but I been a

16    manager for nearly 40 years.  I don't

17    remember everything.

18         Q.    What was it that Patty told you

19    that was the unpleasant event?

20         A.    She said that her daughter was

21    having some pain in her leg and that she

22    was -- was on a trampoline and that

23    something had happened to her, that she

24    had injured herself, and she went to check

25    it out and the doctor had diagnosed
```

```
 1                   A. KIMMICK

 2   something more severe, which was

 3   concerning and obviously horrible.

 4       Q.    Are you aware that her daughter

 5   had to have a surgery?

 6       A.    I was aware that there were

 7   procedures done, I was not aware of the

 8   detail behind, yeah, so, I mean, I wasn't

 9   aware of the depth or nature of the

10   surgery.  I knew that there were

11   procedures being done, and I didn't know

12   how severe it was, I just assumed that it

13   was because it was her daughter, I mean, I

14   would have been horrified so I assumed

15   that she needed to take whatever time she

16   needed.

17       Q.    Did you inform Eddi Youkhanna

18   about Ms. Haran's daughter's illness?

19       A.    Not that I can recall.

20       Q.    Did you inform Eddi Youkhanna

21   that Patty had to take time off of work

22   because of her daughter's medical

23   condition?

24       A.    Not that I can recall.  It may

25   have been possibly a topic of, I mean, I
```

```
 1                    A. KIMMICK
 2   may have announced it as part of -- if
 3   Patty have allowed me to I would have
 4   asked Patty because I want to share with
 5   my team the concerns going on with other
 6   team members because we are a team, I
 7   would have shared with the team what was
 8   happening, but I would have asked Patty's
 9   okay to release that information, I don't
10   recall the detail behind it.  I don't
11   recall whether I had conversations
12   specifically with the team or other team
13   members, but that is something I might
14   have done because obviously I wanted
15   everyone to support Patty at a time of
16   need.
17       Q.    Did Patty ever inform you that
18   her daughter needed surgery?
19       A.    As I said, I was -- I was aware
20   of a procedure, I was aware that there was
21   an issue going on that was beyond just a
22   normal injury, but I was not aware of the
23   details of the surgery, no.
24       Q.    I'm not asking you whether you
25   were aware of the details of the surgery,
```

```
 1                    A. KIMMICK
 2    did Patty ever inform you that her
 3    daughter needed surgery?
 4        A.    I was aware that there were
 5    procedures happening and that it was
 6    beyond a simple injury that happened on a
 7    trampoline, there was a diagnosis that was
 8    made that was beyond typical injury, I
 9    don't know what actions needed to happen
10    beyond that and --
11        Q.    So just to answer --
12        A.    I know that Patty didn't tell me
13    that there was anything going on, I mean,
14    it was enough so that I was very
15    concerned, but I didn't know all of the
16    details of -- of everything that was going
17    on, no.
18        Q.    Okay.  So my question is very
19    specific, it's not about procedures, it's
20    about -- specifically about surgery.  Did
21    she ever inform you that her daughter
22    needed surgery?
23        A.    I can't recall that conversation
24    in particular, no; but, again, I mean, I
25    knew it was significant, I knew that it
```

                    A. KIMMICK

 1   was beyond a normal injury, right, but

 2   there was no way for me to know what those

 3   procedures might be or how severe it was.

 4        Q.    Were you -- did Patty tell you

 5   she needed to take time off work on an

 6   ongoing basis for her daughter?

 7        A.    She said she needed to take some

 8   time off, and I told her take whatever

 9   time she needed.

10        Q.    Okay.  In 2021, during the

11   months of January and February while she

12   was still employed, did she inform you

13   that she needed to take any more time off

14   work for her daughter?

15        A.    I can't recall the dates.  I

16   don't believe that she sent me anything in

17   writing.

18        Q.    Did you ask her to send you

19   anything in writing?

20        A.    No.  I told her to take whatever

21   time she needed.  She was -- she was

22   having difficulty with her daughter, and I

23   wanted her to be doing what she needed to

24   do for her family.

1                    A. KIMMICK

2          MS. FISHER:   Okay.  I just put

3     another document in the chat.  This

4     will be Kimmick 16 and bates stamped

5     OBS_0575 to 576.

6              (Whereupon, a chat bates stamped

7     OBS_00575 to 00576 was marked as

8     Kimmick Exhibit 16 for identification

9     as of this date by the Reporter.)

10     Q.    Just let me know when you have

11 had a chance to review this.

12     A.    Okay.  So this looks like I -- I

13 more than likely called Eddi to tell her

14 what's happening based on the training

15 class.

16     Q.    Okay.  Hold on.  Let me just ask

17 some specific questions.  You recognize

18 this?

19     A.    No, but it -- it appears to be a

20 text conversation between me and Patty.

21     Q.    Okay.  And the date of the

22 conversation is October 8th, 2020 as

23 reflected on this document; is that

24 correct?

25     A.    Yes.

1                    A. KIMMICK

2        Q.    And in this conversation you

3    state at 3:06 p.m.,  "I'll let Eddy know"

4    in response to Patty telling you that she

5    needs to take time off work for her

6    daughter's surgery, correct?

7        A.    She says her daughter's

8    situation, she doesn't say surgery, and

9    she asked me whether she -- she should let

10   Eddi know about whether somebody else

11   should fill the spot, and I told her at

12   time that I haven't told Eddi or anyone

13   about her daughter yet, and I told her

14   obviously, here, I said, that if you can't

15   join, I will let him know, and he would

16   understand, I'm sure he did, and I told

17   her to take the time.

18       Q.    Right.  Do you see the --

19       A.    And I --

20       Q.    Sorry.  Go ahead.

21       A.    Okay.

22       Q.    Do you see at 3:06 where she

23   wrote,  "me either.  he just needed to

24   fill some training spots so he asked and

25   at that time I thought I could participate

```
1                    A. KIMMICK
2    but today we found out she will need
3    surgery and it will likely be on wed,"  do
4    you see that?
5        A.    I do.
6        Q.    Okay.  So she did inform you
7    that her daughter would need surgery?
8        A.    It appears so, yes.
9        Q.    And then in response you wrote,
10   "just take the time Patty I'll let Eddy
11   know;"  and then after that you wrote,
12   "just called Eddy,"  do you see that?
13       A.    Yes.
14       Q.    So, in fact, you spoke to Eddi
15   about Patty taking time off work for her
16   daughter's illness?
17       A.    This seems all in line.  I don't
18   -- I mean, I didn't recall it at the time,
19   but this sounds like something I would do,
20   absolutely.
21       Q.    When -- actually, who
22   participated in the decision to terminate
23   Ms. Haran?
24       A.    It was me, and I conferred with
25   Eddi and Jen Lawson and it had to be
```

```
 1                    A. KIMMICK
 2   approved by the head of HR would be Jenny.
 3        Q.    Jen Lawson?
 4        A.    Jen Lawson is our HR business
 5   partner, but her boss Jenny Adams or
 6   there's two Jenny's, I believe Jenny
 7   Sledge, one of those individuals would
 8   have had to approve it from an HR
 9   perspective, I don't know who was the head
10   of HR at the time, but I believe it was --
11   it could have been Jenny Sledge.
12        Q.    Did you make the recommendation
13   that Patty be terminated?
14        A.    Yes.
15        Q.    When did you discuss Patty's
16   termination with Eddi?
17        A.    We were discussing -- it
18   occurred a number of times.  As part of a
19   normal cadence with Eddi he wanted to know
20   who the top performers were and who the
21   poor performers were and Patty showed up a
22   few times as a poor performer, and he, as
23   part of his responsibilities in managing
24   the business, wanted to make sure that
25   poor performers are either put on a
```

1                    A. KIMMICK

2     pathway to good performance or leave the

3     business and so I had a couple of

4     conversations with him probably mid year

5     the year before so maybe 2020 and

6     subsequently more than likely October so I

7     would say those conversations began during

8     the summer of 2020, if not before, when I

9     was discussing essentially rating and

10    ranking my employees and looking at the

11    full picture of everything that was

12    happening with everything that was

13    happening in the accounts, including

14    performance, but also interactions with

15    the team, interactions with the client and

16    who had the best pipeline, who was

17    struggling to have a pipeline for the

18    future.

19         Q.    And when was the decision --

20    when was the recommendation to terminate

21    her made?

22         A.    I don't know.  I don't recall

23    the date.

24         Q.    She was terminated on February

25    --

```
 1                  A. KIMMICK

 2       A.    According to the document you

 3   showed it was February the 24th.

 4       Q.    Right.  February 24th, 2021.

 5             So vis-a-vie her actual

 6   termination, when was the recommendation

 7   to terminate her made?

 8       A.    I don't recall.

 9       Q.    Would it have been within the

10   same month, meaning in February of 2021?

11       A.    I don't recall.  I doubt it.

12   These things don't happen immediately, and

13   they take time to -- to justify.  There is

14   quite a lot of administration and

15   validation required.  HR wants to be aware

16   of -- of -- of the remediation efforts.

17   There is quite a lot of effort that goes

18   into this.

19             I would say that, you know, it

20   likely began in the summer and -- and --

21   and there were a number of conversations,

22   and I don't know when the decision was

23   made.

24       Q.    So it would have taken eight

25   months to terminate her if it started in
```

1                    A. KIMMICK

2    the summer?

3        A.    It would have begun with a look

4    at the top performers and people who are

5    struggling and then it -- it continued --

6    if that, sort of, ranking continued, it

7    would have been a follow-up decision.  It

8    doesn't happen all at once, I mean, this

9    is something that that -- the business

10   takes very seriously.

11       Q.    So I'm not --

12       A.    We want to make sure we grow the

13   business in the future.

14       Q.    So I'm talking specifically

15   about when you arrived at the decision

16   that she would be terminated.  When was

17   that -- when did you first arrive at the

18   decision or when did you first make the

19   recommendation she would be terminated?

20            MR. GUIFOYLE:  Objection to

21       form.

22       A.    I don't recall.

23       Q.    Would that have been within two

24   months of her termination?

25            MR. GUIFOYLE:  Objection to

1                    A. KIMMICK

2     form.  The recommendation or the

3     decision?  You asked for both in that

4     question.

5          MS. FISHER:  Okay.  Well, let me

6     break it down.

7     Q.    So when did you make the

8  recommendation that she be terminated?

9     A.    I don't recall the date.

10     Q.    When was the decision made to

11  terminate her?

12     A.    I don't recall the actual date.

13     Q.    Did you have a meeting jointly

14  with Eddi and Jen Lawson about Ms. Haran's

15  termination?

16     A.    I don't recall if we were all on

17  the same call at once.

18     Q.    What did you tell Eddi were the

19  reasons why you recommended Ms. Haran's

20  termination?

21     A.    She was a -- a person who is not

22  creating enough volume for the future

23  business, that she had issues with her

24  team and with her clients, and that she

25  was continually on the bottom of the list

1                     A. KIMMICK

2    for people who are having difficulty and

3    having performance issues, not just

4    meeting the target, but also making sure

5    that the business is healthy and were

6    maintaining good relationships and leading

7    a global team.

8        Q.    What list are you referring to?

9        A.    All of the people on my team.

10       Q.    Is there an actual list that you

11   have that she was on the bottom of?

12       A.    No.

13       Q.    And when you say she was on the

14   bottom of the list, is that in terms of

15   her quota, meeting her quota?

16       A.    No, not that alone.

17       Q.    What else are you talking about?

18       A.    I believe I already answered

19   that question.

20       Q.    Well, let me ask it again.

21            MR. GUIFOYLE:  I will object to

22       the extent it has been asked and

23       answered.

24       Q.    What -- how else was she on the

25   bottom of the list?

                          A. KIMMICK

1

2       A.      Her interactions with her piers

3   and her customers, the issues that she had

4   had with her piers and her customers, and

5   the impact that her work was having on the

6   act to deliver the results that the

7   business expected in the future.

8       Q.      What impact was her work having

9   on the ability to deliver the results that

10  the business expected in the future?

11      A.      Insufficient.

12      Q.      Was there anything else that put

13  her on the bottom of the list?

14      A.      No.

15      Q.      In 2019 when she was fully

16  successful, was she at the bottom of the

17  list?

18      A.      If not at the bottom, it was

19  close, and I would say that this is a --

20  this is a discussion between me and my

21  manager that was referring to personnel

22  issues, not a formal process.

23      Q.      What do you mean?

24      A.      He asked on a regular basis are

25  these the right people to achieve our

```
 1                    A. KIMMICK

 2   results, do you have the right people to

 3   achieve the results and, of course, it

 4   takes time and effort to replace

 5   individuals and that can be very difficult

 6   to choose to let somebody go; but in this

 7   case, she continually appeared at the

 8   bottom and Eddi and I came to the

 9   conclusion that we should probably try to

10   manage her out of the business.  This

11   discussion happened, as I said, it

12   probably began earlier than the Summer of

13   2020, and I don't know when the decision

14   was made in fact.

15       Q.    Did anyone replace Patty?

16       A.    Her territory was split up into

17   pieces and so nobody took exactly the same

18   territory that she had, no.

19       Q.    Had any other employees who have

20   reported to you at Orange complained about

21   discrimination?

22       A.    No, not to my knowledge.

23       Q.    Have any employees who report to

24   you complain about violations with the

25   Family Medical Leave Act?
```

1                    A. KIMMICK

2    A.    No, not to my knowledge.

3          MS. FISHER:  All right.  Let's

4    take a quick break.  I'm going to

5    review my outline.  I might be done.

6    If not, we're close.  Let's come back

7    in, I think, five minutes should be

8    fine so 2:20.

9          MR. GUIFOYLE:  Okay.

10          (Whereupon, a short recess was

11    taken.)

12          MS. FISHER:  I have put another

13    document in the chat.  I think this is

14    Kimmick 17 and it's marked OBS_00982

15    to 938.

16          (Whereupon, handwritten notes

17    bates stamped OBS_00982 to 00938 were

18    marked as Kimmick Exhibit 17 for

19    identification as of this date by the

20    Reporter.)

21    Q.    Would you take a look at this

22    document and let me know when you are

23    done?

24    A.    Okay.

25    Q.    Do you recognize this?

1                     A. KIMMICK

2      A.    No.

3      Q.    Is this your handwriting on this

4  document?

5      A.    No.

6      Q.    Do you know whose handwriting it

7  is?

8      A.    No.

9      Q.    Do you have any handwritten

10 notes regarding Patricia Haran?

11     A.    Not to my knowledge, no.

12     Q.    Have you ever seen this document

13 before today?

14     A.    No.

15          MS. FISHER:  I have no further

16     questions.

17          MR. GUIFOYLE:  I have nothing

18     for this witness.

19          MS. FISHER:  Okay.  Great.

20

21

22

23

24          (Continued on next page

25     to include jurat.)

1                    A. KIMMICK

2       Q.    Mr. Kimmick, thank you for your

3    time here today.

4       A.    Okay.

5             THE REPORTER:  Counsel, are you

6       ordering a copy of the transcript?

7             MR. GUIFOYLE:  I'll take an

8       electronic copy.

9             (Whereupon, at 2:22 p.m., the

10      examination of this witness was

11      concluded.)

12

13          _____

                 ADAM OVERTON KIMMICK
14

15

16    Subscribed and sworn to before me

17    this _____ day of _____, 2023.

18

    _____
19            NOTARY PUBLIC

20

21

22

23

24

25

1                     A. KIMMICK

2                       I N D E X

3


4    WITNESS              EXAMINATION BY        PAGE

5    Adam Overton     Ms. Fisher           5
     Kimmick

6


7                    E X H I B I T S

8    PLAINTIFF'S       DESCRIPTION          PAGE

9    Exhibit 1         Defendant's          39
                       objections and
10                     responses to
                       plaintiff's first
11                     set of
                       interrogatories
12
     Exhibit 2         OBS' supplemental   69
13                     interrogatory
                       responses
14
     Exhibit 3         Job description     72
15                     bates stamped
                       OBS_00406 to 00407
16
     Exhibit 4         Performance review 76
17                     bates stamped
                       OBS_00708 to 00710
18
     Exhibit 5         Performance review 89
19                     bates stamped
                       OBS_00714 to 00718
20
     Exhibit 6         Performance review 91
21                     bates stamped
                       OBS_00334 and 00343
22
     Exhibit 7         Performance review 92
23                     bates stamped
                       OBS_00344 to 00353
24


25

```
 1              A. KIMMICK

 2               I N D E X

 3
               E X H I B I T S
 4
     PLAINTIFF'S    DESCRIPTION        PAGE
 5
     Exhibit 8      Termination letter 100
 6                  bates stamped
                    P00016 through
 7                  00019

 8   Exhibit 9      Performance report 110
                    bates stamped
 9                  OBS_00711 through
                    00713
10
     Exhibit 10     2020 sales         113
11                  compensation
                    summary for Patty
12                  Haran bates
                    stamped OBS_00233
13                  to 00234

14   Exhibit 11     Excel spreadsheet  122
                    bates stamped
15                  OBS_001006

16   Exhibit 12     2020 goal sheet    125

17   Exhibit 13     Sales              132
                    compensation
18                  workbook for
                    Angela Arias bates
19                  stamped OBS_01271
                    to 01272
20
     Exhibit 14     Sales              137
21                  compensation
                    workbook for
22                  Danielle Willins
                    bates stamped
23                  OBS_01088 to 01089

24   Exhibit 15     E-mail bates       139
                    stamped OBS_00659
25
```

1                    A. KIMMICK

2                    I N D E X

3

                   E X H I B I T S

4
    PLAINTIFF'S       DESCRIPTION          PAGE

5
    Exhibit 16       Chat bates stamped 146

6                    OBS_00575 to 00576

7   Exhibit 17       Handwritten notes  157
                     bates stamped

8                    OBS_00982 to 00938

9
       (Exhibits retained by the Reporter.)

10

11                   I N S E R T S

12  DESCRIPTION                    PAGE/LINE

13  Name of customer                81/24

14  Names of individuals            84/16

15

16    R E Q U E S T S   F O R   P R O D U C T I O N

17  DESCRIPTION                      PAGE

18  Patty's plan to improve pipeline   96
    Description

19
    Quota for 2021                    104

20

21

22

23

24

25

1            C E R T I F I C A T E

2

3   STATE OF NEW YORK        )
                    ss.:
4   COUNTY OF NEW YORK       )

5

6

7           I, STEFANIE CALABRIA, a Notary

8   Public for and within the State of New

9   York, do hereby certify:

10          That the witness whose

11  examination is hereinbefore set forth was

12  duly sworn and that such examination is a

13  true record of the testimony given by that

14  witness.

15          I further certify that I am not

16  related to any of the parties to this

17  action by blood or by marriage and that I

18  am in no way interested in the outcome of

19  this matter.

20          IN WITNESS WHEREOF, I have

21  hereunto set my hand this 5th day of

22  October, 2023.

23

24  _____
                STEFANIE CALABRIA

25

```
 1   STATE OF NEW YORK        )
                         ss.:
 2   COUNTY OF NEW YORK       )

 3       I wish to make the following changes,
     for the following reasons:

 4

 5   PAGE LINE

 6   _____      _____     CHANGE:

 7   _____

 8      REASON:

 9   _____

10   _____      _____     CHANGE:

11   _____

12      REASON:

13   _____

14   _____      _____     CHANGE:

15   _____

16      REASON:

17   _____

18   _____      _____     CHANGE:

19   _____

20      REASON:

21   _____

22   _____      _____     CHANGE:

23   _____

24      REASON:

25   _____
```

## Exhibits

EX PLF-
0001 Adam Kim
mick 010523
  35:25 36:2,
14 157:9
EX PLF-
0002 Adam Kim
mick 010523 (
1)
  66:19 157:12
EX PLF-
0003 Adam Kim
mick 010523
  69:12 157:14
EX PLF-
0004 Adam Kim
mick 010523
  73:22 157:16
EX PLF-
0005 Adam Kim
mick 010523
  86:17 157:18
EX PLF-
0006 Adam Kim
mick 010523
  88:5 157:20
EX PLF-
0007 Adam Kim
mick 010523
  89:11 157:22
EX PLF-
0008 Adam Kim
mick 010523
  97:19 158:5
EX PLF-
0009 Adam Kim
mick 010523
  107:18 158:8
EX PLF-
0010 Adam Kim
mick 010523
  110:6 158:10

EX PLF-
0011 Adam Kim
mick 010523
  119:9 158:14
EX PLF-
0012 Adam Kim
mick 010523
  122:17
158:16
EX PLF-
0013 Adam Kim
mick 010523
  129:20
158:17
EX PLF-
0014 Adam Kim
mick 010523 (
1)
  134:22
158:20
EX PLF-
0015 Adam Kim
mick 010523
  136:8 158:24
EX PLF-
0016 Adam Kim
mick 010523
  143:8 159:5
EX PLF-
0017 Adam Kim
mick 010523
  154:18 159:7

## 0

0
  120:7
00019
  97:18
00234
  110:5
00343
  88:4
00353
  89:8,10
00407
  69:9,11

00576
  143:7
00710
  73:19,21
00713
  107:15,17
00718
  86:16
00938
  154:17
01089
  134:21 135:5
01272
  129:16,19

## 1

1
  32:10 35:22,
25 36:2,7,14
97:5,7
10
  8:9 64:22
109:25 110:6
119:15
100
  112:17
115:20,21
116:9 130:11
131:17,22
133:4 134:5,
6
100.58
  111:20
101
  120:6
11
  116:3 119:5,
9 132:20
11.33
  128:17
11771
  5:14
11:30
  65:14
11:40
  65:15

12
  28:5 122:17
13
  129:14,20
14
  134:18,22
15
  119:15 120:6
136:4,8
16
  143:4,8
17
  154:14,18
18
  18:11,12,19
22:19
1986
  21:10
1999
  21:15
1st
  87:25 88:13
89:22 90:6
108:23 123:7

## 2

2
  66:15,19
73:10 74:2
20
  5:13 44:7
2004
  23:9
2009
  23:9
2017
  29:7 38:14
39:4 42:3,20
51:23 52:6,
14 53:4,19
54:8
2019
  17:21 73:16
74:4 152:15
2020
  9:2 17:19

42:3 44:9,
11,18 45:19
59:14 75:10
86:6,7 87:25
88:2,13
89:22,23
90:6 101:16,
17 107:11
108:21,24
110:3,13
111:13,23
113:15
115:18
117:7,17
122:16,23
123:7,13,23
124:12 127:3
128:22
129:12
133:24
134:14 135:9
137:15
143:22
147:5,8
153:13
**2021**
24:2,7 42:4,
21 51:23
52:6,15
53:5,19
92:2,25
93:23 94:7
95:20 97:24
100:20,23,24
101:3,12,19,
21,23 102:2,
7,10,18
104:2
105:11,12,15
142:11
148:4,10
**2022**
24:7 58:21
**2023**
156:17
**234**
110:2

**24th**
97:24 148:3,
4
**25A**
5:13
**28th**
92:2
**2:20**
154:8
**2:22**
156:9

---

**3**

**3**
37:14 69:8,
12
**30-minute**
77:9
**30th**
88:2,13
**31st**
89:22 90:6
108:20,24
111:13
130:24
**343**
88:25
**3:06**
144:3,22
**3rd**
58:24

---

**4**

**4**
28:24,25
29:4 35:2
37:15,16,24
38:5 73:22
**40**
138:16
**4th**
7:17,18
10:12,13
58:24

---

**5**

**5**
29:10 32:10
37:19 38:2,
11 86:14,17
87:3
**50**
133:3,8,12
**576**
143:5
**5th**
59:2

---

**6**

**6**
38:23 87:22
88:5
**61.87**
135:14

---

**7**

**7**
89:7,11
**7th**
58:20

---

**8**

**8**
97:2,13,14,
15,19
**8th**
143:22

---

**9**

**9**
107:14,18
**938**
154:15

---

**A**

**A-END**
71:9,12
72:23 87:7
104:24
105:7,21
114:22 137:9
**ability**
6:21,25 44:4
50:3 57:8,
12,22 62:4
77:22 152:9
**able**
36:18 51:4
56:25 72:4
95:5 107:8
129:2 132:16
**absolutely**
132:23
145:20
**accept**
15:21
**acceptable**
133:5
**accepted**
15:17
**accepting**
95:24
**accommodate**
6:8
**accomplishmen
t**
116:3
**account**
29:5,14,16,
19,21,24,25
30:3,10,11
31:7,8 32:2,
5,8,12,17,
20,21 33:11,
15,16,24,25
34:4,5,7,10
35:3,5
38:10,12,19
39:9,14

40:4,10,11,
17,19,20,25
41:2,5,6,7,
8,13,21,24
42:8,9,17
43:5 45:5,6,
7 46:2,3,4
48:2,8,10,
13,15,17,18,
21 49:10,11,
16,21,22,23
50:3,24
51:7,12 53:6
57:14,15
68:20 69:18
70:22,23,25
71:9 77:9
105:2,7
106:19
125:11
131:8,19
132:4,14,15
137:7,10

**accounts**
23:7 47:16,
22 50:11,19,
20 70:8,14,
16,21 71:5,
6,8,9,12
72:7,9,21,24
74:9,10,20
87:6,7,14
94:21 104:24
105:11,15,
18,21 111:16
112:3,5,7
113:8,12
114:4 118:6,
11,12 122:7,
10,11,24,25
123:9,24
124:3,5
125:6,9,13,
15,20 132:19
147:13

**accuracy**
37:9

**accurate**
28:22 37:12
109:11 113:9
124:11,15,
17,21

**achieve**
69:4 93:18
95:3 103:2
115:17
118:15,21
120:18
134:5,6
152:25 153:3

**achieved**
111:20
120:20

**achievement**
110:20,22,25
111:4,6,9
120:25
121:19
125:18

**acknowledged**
91:15

**acquired**
133:19

**act**
60:19,22
61:9,23
62:2,9,17
65:8 152:6
153:25

**actions**
141:9

**activity**
57:19

**actual**
99:9 103:9,
10 148:5
150:12
151:10

**Adam**
5:11 14:25
29:6,20
156:13

**Adams**
146:5

**additional**
37:2 69:23
102:25

**address**
5:12 77:2
78:17

**addressed**
100:17

**adequate**
19:5

**adjust**
118:21

**adjusted**
117:9

**adjustment**
112:15

**adjustments**
72:15

**administration**
148:14

**administrative**
48:22 125:10

**advantage**
130:18

**advise**
13:16

**advisement**
93:12

**affect**
6:21,25
114:6

**aforementioned**
36:10 66:16
129:17

**afraid**
34:18

**ago**
12:5 18:4,
11,12,19
49:19 63:5

**agreed**
99:17 103:4,
16,17

**agreement**
49:23,25
50:6

**ahead**
15:6 20:2
23:17 68:13
129:11
132:17
144:20

**allowed**
71:6 123:5
140:3

**Americas**
23:7,20,21

**amount**
40:6

**amounts**
133:11

**Angela**
129:7,18,25
130:2

**announced**
140:2

**announcing**
136:18

**annual**
69:2 91:2,5
110:20
111:4,9
120:2,25
121:19

**answer**
6:3,13
13:16,19
15:2,3
27:20,25
30:8 48:7
49:6,7 56:4
94:11 109:15
141:11

**answered**
14:15 24:25
151:18,23

**answering**
79:8

**anybody**
35:12 62:11

**anyone**
7:24 20:4,7,
12 25:8
26:12 54:7,
18 56:6
72:10 94:22
102:16,18
113:15
115:16
128:20
138:12
144:12
153:15
**appeared**
153:7
**appears**
67:8,17,19,
20 68:20,21
73:14 75:9
89:14 90:7
96:22 107:10
108:19,23
109:16
110:10
119:25
122:22 123:6
129:6 135:7
136:17
137:16
143:19 145:8
**applies**
13:25 14:24
**apply**
29:23
**appreciate**
61:20
**approached**
84:17
**appropriate**
74:8 76:3,5
112:10
**appropriately**
72:5 112:11
114:25
**approve**
146:8
**approved**
123:21 146:2

**approximate**
137:21
**approximately**
33:10,23
91:19
**April**
103:8,20
132:9
**area**
22:24
**areas**
114:17
**argument**
14:17
**Arias**
129:7,19,25
**arises**
61:3
**around**
60:11 68:3,
5,9 113:25
**arrive**
149:17
**arrived**
149:15
**arts**
21:5,7
**asked**
19:10 29:4,
18 33:4
62:12,21
64:3 70:3
115:3,8,10
118:5 125:8
140:4,8
144:9,24
150:3 151:22
152:24
**asking**
5:19 6:12
12:25 13:22
14:22 23:11
60:4,5,6
61:19,20,21,
25 79:25
81:8,19
84:15 95:15

127:7 128:4
140:24
**asks**
38:23
**assign**
26:8 130:21
**assigned**
50:18 71:13
101:2 114:5
125:5
**associated**
47:24 84:12
121:18
123:23 132:3
**assume**
16:21 61:15
62:13
**assumed**
63:21
139:12,14
**assuming**
98:4
**assumption**
16:22
**attainment**
120:2
**attempt**
83:18
**attempted**
71:11
**attention**
28:4 125:13
**attorney**
7:14 8:4,5,7
9:18 16:15
27:13,20
**attorneys**
7:8,21 9:22
11:2,6,8
12:12,24
15:20 16:2
27:16
**August**
102:24
**aware**
55:24 56:5,
6,15,16

139:4,6,7,9
140:19,20,
22,25 141:4
148:15

---

**B**

**B-END**
70:16 72:9
74:10 87:6
104:23
105:2,9,11,
15,18 112:5,
7 114:22
**bachelors**
21:5,7
**back**
10:22 21:22
65:15 87:2
94:5,11 99:8
104:21 154:6
**baked**
132:9
**Baker**
7:15 13:15
**Barnes**
52:9,11
**base**
38:9
**based**
35:2 57:6
68:25 105:24
113:22
125:17 130:4
132:10
143:14
**basis**
58:3,7 69:2
142:7 152:24
**bates**
69:9,11
73:18,21
86:16 88:4,
25 89:7,10
97:2,18
107:14,17
109:7 110:5

119:8
129:15,19
134:20
136:4,6
143:4,6
154:17

**Bay**
5:13

**bear**
26:20 109:7

**began**
147:7 148:20
153:12

**begin**
14:16 102:23

**beginning**
24:3,4 101:3
112:5,9
117:7 121:3,
5 124:8

**begun**
149:3

**behavior**
59:7 82:12

**behaviors**
75:24 83:4,6
85:8

**behind**
65:24 139:8
140:10

**believe**
7:16 10:4,12
15:17 17:20
24:24 25:20
26:18 30:2
42:5,8 43:5
44:19 45:10
49:14,19
50:22 51:3,
5,6,11,24
53:6,20
54:14,16
62:21,25
63:6,8,13
64:17 68:10,
14 69:17
71:19 72:13
74:3 85:18

86:7 93:25
95:17 97:5
99:5,7
100:24
105:12
107:14
142:17
146:6,10
151:18

**below**
133:3,4,8,11

**besides**
30:20

**best**
6:5 61:16
147:16

**better**
83:7,17

**bit**
72:11

**black-and-
white**
48:7 49:6

**blank**
78:22 81:13

**blurb**
73:11 74:2
75:20

**book**
122:7 123:10

**boss**
146:5

**bottom**
119:2 121:10
150:25
151:11,14,25
152:13,16,18
153:8

**box**
110:18

**Boyne**
53:13,15
54:15 56:17
57:21 58:6
65:24

**brands**
50:22

**break**
6:6 65:2,14,
23 150:6
154:4

**bringing**
12:12,25

**broad**
75:16 98:12

**brought**
82:21

**budget**
103:12 104:5
105:25
132:5,10,16

**budgets**
78:15 102:23
103:4,21

**building**
96:11

**built**
99:17

**business**
21:12 22:24
25:7 26:3
40:21 46:20,
24 48:25
49:4 50:6
55:5 56:3,
10,14 57:8,
11,13,17
66:4 68:17
71:3 72:11
78:11 80:15
83:9,20
93:18 96:12
98:19,21
103:3,23,24
104:18
106:11
113:25
114:2,15
116:2 117:14
126:18
135:20
146:4,24
147:3 149:9,
13 150:23
151:5 152:7,

10 153:10

---

**C**

---

**cadence**
41:11 146:19

**cadences**
77:8

**calendar**
44:9,11,18
45:19 131:6

**call**
19:14 70:16
93:8 101:9
110:11
137:23
150:17

**called**
122:8 143:13
145:12

**calls**
79:3,7

**Cap**
123:5

**care**
62:20,24
63:12 64:15,
18 126:15
138:2,9,13

**career**
22:2

**carry**
131:10

**carrying**
120:17

**case**
9:16 10:17
11:14,17,19,
22,25 12:4,
13,25 17:3,
25 18:7,10
20:10,14
26:19 27:14
46:17,18
51:11 83:5
111:11
121:16 153:7

cases
 49:7 83:4
categories
 91:10 118:16
 124:13
 129:24
 133:13
 135:11
category
 116:7
Celeste
 52:22,25
cell
 120:5
cells
 121:5
Central
 22:16
certain
 33:4 48:12
 131:24
certainly
 54:12 85:22
 101:16
 104:25
challenges
 96:11
chance
 75:2 89:5
 95:23 96:21
 106:15
 122:21 135:2
 143:11
change
 31:24 33:7
 71:11,16
 113:14
 117:16
 123:18 124:4
 136:19
 137:14
changed
 25:23,24
 26:15
 117:23,24
 124:5 125:16

changes
 133:21
chat
 26:22,25
 35:24 36:17
 66:22,24
 73:3 74:24
 86:12 87:21
 89:3 96:19
 107:6,25
 108:14
 118:24
 122:15
 128:25
 134:17 136:3
 143:3,6
 154:13
check
 133:20
 138:24
child
 138:9,14
children
 138:6
choose
 153:6
circumstance
 30:14
circumstances
 44:15 45:23
 57:24 63:2
 65:24
City
 59:8
claim
 61:12
clarification
s
 37:4
clarify
 12:22 33:14
 65:22 66:10
 75:17 94:13
 95:9 102:8
 128:4
Clarity
 77:21

class
 135:22
 143:15
classes
 60:10
clearly
 105:6
client
 22:21 25:5
 54:23 75:25
 76:8 99:21
 147:15
clients
 26:2 76:10,
 12 95:12
 150:24
close
 56:7 104:19
 105:18,21
 112:17
 114:13
 152:19 154:6
closing
 104:7,12
closure
 106:8
College
 21:8
column
 119:11,22,23
 120:23 121:5
come
 10:22 33:8
 63:10,23
 65:15 85:21,
 22 124:4,6
 154:6
comes
 61:2 84:6
 130:21
comfortable
 79:23
comment
 85:19
comments
 9:16 10:17
 90:8 91:10,

 12 92:13
 95:8,10
committee
 15:16,24
 16:13
common
 84:18
communicated
 101:20
 102:11
communicating
 82:3,6
communication
 77:21 105:5
company
 16:5 60:13
 133:9
compelling
 113:3
compensate
 112:22
compensated
 112:11
 114:25 118:2
 123:4 131:10
compensation
 103:6,8,10,
 16,17
 108:20,25
 109:11
 110:4,11,14
 113:6 116:18
 118:17
 120:14,19
 121:17
 123:19
 124:7,20
 125:18 127:4
 129:7,18
 132:7 133:2,
 7,17,21
 134:19 135:8
complain
 153:24
complained
 77:20 153:20

complaint
  60:14
complaints
  60:12 76:10
  77:23
complete
  126:7
complex
  132:13
complexities
  132:12
complying
  5:2
concern
  99:24
concerned
  141:15
concerns
  140:5
concluded
  156:11
conclusion
  153:9
condition
  137:19
  138:14
  139:23
conditions
  56:8
conferred
  145:24
consensus
  99:17
considerable
  92:20
considerations
  55:9
considered
  100:10 115:2
  128:18
contents
  17:9,10
continually
  150:25 153:7
continue
  115:25

continued
  149:5,6
  155:24
continues
  29:9 37:18
contract
  130:16,19,
  21,22,24
  131:4,16
  132:11
contracts
  41:11
control
  71:7
conversation
  12:17,18
  13:3,21
  14:20,22
  19:9,16,19,
  21,23 20:5
  50:17 64:10
  79:23 141:23
  143:20,22
  144:2
conversations
  17:24 81:24
  140:11
  147:4,7
  148:21
copy
  156:6,8
core
  113:17,19
  114:13
  124:14
corporate
  43:15 44:6
correct
  7:22 16:23
  29:11 30:18
  32:3,4 38:7,
  16 46:12
  74:21,22
  78:6,9 79:2
  82:22 86:6
  89:20 97:22
  99:5 111:3,
  22 132:22

136:22
  137:4,5,11
  143:24 144:6
correctly
  19:14
counsel
  11:12,13
  13:14,15,18
  14:4 156:5
couple
  147:3
course
  116:10 153:3
court
  5:25 6:10,14
  20:25 94:3
  128:2
cover
  72:4 108:22
  125:9
coverage
  94:21
covered
  125:19
covering
  68:2 113:23
Covid
  44:12 71:24
  72:10 112:20
  115:7 118:7
  125:21
  126:13
created
  96:8
creating
  150:22
critical
  100:4
crosstalk
  68:12 127:24
cues
  100:3
current
  22:12 23:13
  24:10 74:7
  104:6 114:15
  115:23

customer
  76:16,21,24
  77:20 78:3,
  10,19 80:23
  82:20 100:10
  115:23,24
  130:23 134:9
customers
  19:8 40:5
  41:12 57:7
  76:17 77:14
  78:15 85:19
  98:25 99:3,
  12 106:4
  114:8 123:10
  152:3,4
cycles
  40:21

---

### D

Daniel
  52:23,25
Danielle
  134:20
  135:8,11
date
  7:16 12:6
  24:8 36:15
  41:25 50:15
  53:21 56:25
  58:25 66:20
  68:22 69:13
  71:17 73:23
  86:18 88:6
  89:12 91:4,
  21,25 92:5
  97:20,23
  98:5 107:19
  110:7,24
  111:8 119:10
  122:18
  123:9,11
  129:21
  134:23 136:9
  137:20
  143:9,21
  147:23

150:9,12
154:19

**dates**
11:23 24:18
25:16 51:4,
10 71:22,23
94:15 102:4
142:16

**daughter**
62:25 63:3,
12 64:15,19
137:18
138:20
139:4,13
140:18
141:3,21
142:7,15,23
144:13 145:7

**daughter's**
63:3 139:18,
22 144:6,7
145:16

**day**
58:23 156:17

**deal**
132:12

**dealing**
40:3,4

**deals**
96:9 104:7,
9,12,20
105:17,20

**December**
89:22 90:6
108:20
111:12 135:9

**decide**
98:14

**decided**
45:25 46:21
63:25 133:9
136:20

**deciding**
16:5

**decision**
15:14,16,24
16:12,13

55:17 57:3,
6,25 58:3,8
100:6,11
145:22
147:19
148:22
149:7,15,18
150:3,10
153:13

**decisions**
70:20 87:8,
12

**deem**
84:2 130:13
132:21,25
135:17

**deemed**
83:11 128:21

**defendant**
20:16

**defendant's**
35:19 36:7,
11

**defensive**
79:19 80:2,6

**Defiance**
79:14

**define**
29:16

**defining**
46:18

**definitely**
65:2

**definition**
60:3,6,24

**deliver**
71:2 77:22
96:5 152:6,9

**delivered**
95:25 111:17

**delivering**
25:5

**delivery**
40:25

**demonstrate**
57:21

**demonstrated**
83:23

**departed**
71:20

**department**
9:19,20,22
11:15

**deposition**
7:5,21 8:11
20:21

**depth**
40:8 139:9

**described**
121:13
137:24

**description**
66:25 67:9,
10,13,19
68:21,23
69:10

**detail**
69:5 79:22
81:21 82:15
104:22
105:22 139:8
140:10

**details**
63:7 66:8
79:22,25
81:23
140:23,25
141:16

**determine**
89:25 90:17

**determined**
104:3

**diagnosed**
138:25

**diagnosis**
141:7

**dialogue**
78:2

**differ**
70:14 111:10

**difference**
39:8,12 41:6
127:18,19

**different**
22:7 39:21,
24 41:9
43:16,18,23
48:25 70:4,
5,8 89:20,25
105:4 121:12
122:9,11
128:9 131:25

**difficult**
72:12 99:18
118:7 126:14
132:6 153:5

**difficulty**
142:23 151:2

**digitally**
28:9 37:5

**direction**
46:19 49:2
84:12,19

**directly**
61:15

**director**
22:14 31:9
38:19 40:19
41:2 57:15
70:22

**directors**
34:4,5,8,11
38:13 40:17
41:14

**disappointed**
92:17,19

**discomfort**
83:15

**discontinue**
45:25

**discriminate**
60:10

**discrimination**
58:11 59:18,
24 153:21

**discriminatory**
59:6

discuss
12:10,14
13:9 15:7
17:16 88:18
90:22,24
92:6 116:17
146:15
discussed
13:5,23 69:4
81:3 103:3,
21,22,23
discussing
146:17 147:9
discussion
85:23 152:20
153:11
discussions
17:2
dismiss
46:8
dismissal
19:3
dismissed
46:10 47:15
48:5
dissatisfacti
ons
81:7
distracted
84:14
doctor
138:25
document
15:12 26:21,
24 27:4,9,17
28:5,10,12,
17,21 35:19,
24 36:16,21,
25 37:6,8,12
58:4,8
66:22,24
67:6,8,24
69:7 73:2,4,
7,18 74:24
75:3,6 85:6,
11,14,24,25
86:11,14

87:2,21
88:24 89:3,
6,15 90:3,9
91:7,8,25
92:14,16
93:9 95:13
96:19 98:2,
4,8 101:10
103:13
107:6,25
108:4,6,11,
14,18 109:5,
10 110:9,16
118:24
121:20
122:6,15
127:2,6,8
128:8,25
129:5 134:17
135:4 136:3
143:3,23
148:2
154:13,22
155:4,12
documentation
24:17 31:10
100:18
128:12
documented
95:13 98:18
documents
8:10,13 9:5
11:9 99:6,13
125:24
126:10,21,
23,24
doing
106:13
112:12,23
132:17
142:24
double
72:17
doubt
148:11
drive
71:2

dual
50:9
due
138:9
duly
5:4
duties
26:8 39:16,
17,20,24
74:6

---

**E**

E-D-D-I-Y-O-
U-K-H-A-N-N-A
9:13
e-mail
136:6,17
137:2,13
earlier
56:23 99:4
105:23 108:7
121:13
153:12
early
115:13
116:23
130:18 131:5
East
22:15 25:21
Eastern
23:15 24:14,
23 25:9
easy
72:10 99:14
Eddi
9:12,25
10:16 16:3
18:8,9,18,22
19:9,10
23:24 50:8,
13,17
139:17,20
143:13
144:10,12
145:14,25
146:16,19

150:14,18
153:8
Eddy
144:3
145:10,12
edge
132:2
education
21:4
effective
104:17
effectively
132:16
effort
80:17,21
148:17 153:4
efforts
148:16
eight
121:4 148:24
either
5:25 50:5
66:3 81:25
144:23
146:25
electronic
156:8
eliminate
46:25
eliminated
46:7 49:2,8
employed
142:13
employee
84:19 91:11
employees
101:25
102:22
126:16
147:10
153:19,23
employment
45:24 55:22
end
24:3 120:14
127:22
130:20,22

**ended**
27:16 77:10
**ending**
45:24
**enforced**
130:20
**engaging**
12:11,24
**ensure**
57:16
**entail**
22:20
**entire**
22:2 23:21
42:22 51:25
**entirely**
71:22
**entitled**
35:19
**environment**
82:4 83:14
85:8,10
**episodes**
99:23
**equal**
60:9
**era**
123:4
**erode**
49:5
**essentially**
147:9
**estimate**
23:10 33:20,
23 34:16,22
**event**
137:24
138:19
**everybody**
84:10,20
**everyone**
60:9 72:11
84:18 140:15
**evidence**
10:5 19:5
**exact**
19:22 21:18

24:18 25:22
33:5,20
41:25 45:7
51:9 53:7
56:25 67:13
71:17
**exactly**
31:22 43:4
57:23 59:15
121:2 130:16
153:17
**examination**
5:15 156:10
**examined**
5:6
**Excel**
119:5,7
**excruciating**
79:22
**excuse**
27:18 42:3
**exhibit**
35:25 36:2,
14 66:19
69:12 73:22
86:17 88:5
89:11 97:19
107:18 109:6
110:6 119:9
122:17
129:20
134:22 136:8
143:8 154:18
**exhibited**
75:19
**exist**
30:12
**existing**
50:11 124:3
131:22
132:11
**expand**
132:18
**expansion**
131:15
**expat**
42:19

**expect**
114:3,7
**expectation**
39:13 40:9
49:4 106:9
115:20,24
116:2,8
131:17,21
132:10,14
134:4
**expectations**
19:6 39:18,
23 40:6 41:9
43:23 55:4,7
57:11 68:25
133:6
**expected**
114:20
117:19
152:7,10
**experience**
39:11 43:17
**expired**
49:23 50:2
**expires**
130:17,19
**explain**
15:24 39:25
43:12 68:18
**explained**
132:5
**express**
81:6
**expressed**
81:11
**extend**
14:21
**extent**
13:12,17
14:2 151:22
**extenuating**
44:14

**F**

**fact**
10:16 18:20

41:8 51:10
77:8 87:16
96:3,4,14
118:19
123:16
145:14
153:14
**factor**
128:17
**factors**
134:7,10
**factual**
83:2,12 84:2
**fail**
104:19
**failed**
79:2,6,11
105:17,21
**failure**
116:13
**familiar**
41:17 42:14
44:23 51:14
52:8,22
53:13 60:18
**family**
56:7 60:18,
22 61:3,7,9,
13,22 62:2,
6,16,20,23
64:2 65:7
136:21
142:25
153:25
**farmer**
30:2,3 31:7
32:12 69:18
**farmers**
32:2,5,8,18,
22 33:11,25
**favor**
115:2,4
118:6,11
120:17
125:8,19
**February**
21:15 92:25

93:22 94:7
95:20,25
97:23 101:21
102:10,17
104:2
105:11,12,15
142:12
147:24
148:3,4,10

**feedback**
79:16 80:9
91:14 96:6
99:11,25

**fell**
131:2

**felt**
61:11 112:9
123:3 138:4

**fermented**
87:12

**figure**
72:8

**fill**
78:23 91:11
144:11,24

**filled**
90:20

**Financial**
68:7

**finding**
50:6

**fine**
14:11 33:22
64:5 154:8

**finish**
6:12 45:16
64:23,25

**fire**
44:4

**firm**
11:16 46:19

**first**
5:4 35:21
36:8,12
73:16 74:4
107:11
137:17

149:17,18

**FISHER**
5:16 13:20
14:5,12,18
15:3 26:20
35:18 36:4
64:24 65:4,
13,18 66:11,
21 69:7
72:25 73:17
74:23 86:10
87:18 88:24
89:6 93:7
94:4 96:18,
25 97:6,8,14
101:8 107:5,
13,24 108:13
109:9,18,25
118:23 119:4
122:14
128:24
129:14
134:16 135:4
136:2 143:2
150:5 154:3,
12 155:15,19

**fit**
85:5

**five**
29:10 30:21
33:13,15
34:15,21
38:21 47:11
121:4 154:7

**fix**
80:17,21

**fixed**
43:16

**FMLA**
62:16

**focus**
65:11

**focussing**
86:8

**folder**
97:11

**follow**
95:6

**follow-up**
149:7

**following**
24:4

**follows**
5:7

**force**
23:21

**form**
27:22,24
98:7 109:14
149:21 150:2

**formal**
91:8 103:13
152:22

**formalized**
103:7

**formally**
91:15
103:11,19

**format**
109:17
110:12

**forward**
46:21 83:20
106:14

**found**
145:2

**four**
33:19 34:21
38:25 39:2
118:16 121:3
124:13

**fourteen**
25:12 31:3

**fourth**
118:25

**France**
42:19 44:13

**fraught**
112:20

**French-based**
70:19

**frequently**
26:16

**front**
123:17

**full**
12:16,17
29:13 37:21
101:22,24
102:12
103:19
125:17
131:11
147:11

**fully**
74:5,14,19
88:23 99:24
132:8 152:15

**funnel**
96:10

**future**
22:23 25:7
26:2 57:17,
19 68:16
83:9 98:21
103:22
112:25
113:21
114:6,19
147:18
149:13
150:22
152:7,10

---

**G**

**gathered**
14:15

**gave**
6:5 11:2
63:16 68:25
102:16

**Gemini**
123:6

**general**
46:6 62:7
67:21

**generalizatio
n**
100:15

**generally**
67:25

**generate**
57:8,13,18
**get all**
31:11
**getting**
131:9
**give**
6:13,15
10:10 24:17
26:22,23
34:2 65:4
77:17 86:23
87:18
100:19,22
101:5,24
102:21
109:18
130:17
**given**
20:19,22
31:3 47:17
69:23 76:24
102:7,18
125:15
**global**
23:6 29:5,
13,19,20,24
30:11 38:12,
19 70:25
151:7
**globally**
71:10
**goal**
103:14
111:21
115:18
117:2,6
120:10,15
122:8,16,23
123:6,13,15,
20,21,22,25
124:5
**goals**
69:3 84:12
103:3
**God**
138:11

**goes**
148:17
**going**
5:18 6:3
10:21 13:10
18:20 26:21
35:23 46:20
66:21 72:14,
19,25 74:23
77:13 83:20
86:11 89:2
93:7 101:8
103:2 107:5
108:10,13
112:2 118:23
128:24
134:9,16
140:5,21
141:13,16
154:4
**good**
5:17 116:24
147:2 151:6
**graduate**
42:18 43:10,
24
**grant**
63:24
**Great**
65:18 155:19
**greater**
39:19
**grow**
149:12
**growing**
48:24 96:12
**growth**
22:22
**guarantee**
68:23
**guess**
35:16 130:15
**guessing**
23:10,25
33:18
**guidance**
77:17

**guidelines**
103:8
**Guifoyle**
7:10 13:12
14:2,11,14,
25 15:4
27:23 35:25
59:19 64:22
65:3,16,19
93:10 97:4,
7,13,16
109:4,13
149:20,25
151:21 154:9
155:17 156:7

## H

**half**
73:16 74:4
75:10 86:3,5
107:11
114:23
125:20
**hand**
116:4
**handled**
47:16
**handwriting**
155:3,6
**handwritten**
154:16 155:9
**happen**
70:6 77:18
84:13 116:10
123:19
124:22
130:15 141:9
148:12 149:8
**happened**
104:13
121:16
137:14
138:23 141:6
153:11
**happening**
140:8 141:5

143:14
147:12,13
**happy**
6:7 84:21
**Haran**
5:18 8:21
15:9,15
16:19 25:14
27:21 37:23
38:7 47:17
48:5 54:6
65:6,10
67:11,13,23
74:5 87:24
89:21 98:15
107:22
109:2,12
110:5,15
111:2 120:4
124:12
145:23
155:10
**Haran's**
67:15 69:15
97:23 98:7
119:14 122:7
128:16
137:18
139:18
150:14,19
**harassment**
59:7
**Hartford**
21:8
**head**
6:15 16:3,8
22:15 23:6,
14,19 24:13,
22 25:9,20
146:2,9
**headquartered**
70:17
**health**
22:23 40:24
48:9,16
57:17 80:15
83:9 103:24
137:18

138:14
**healthy**
  25:7 83:19
  96:12 98:21
  151:5
**hear**
  5:25
**hearings**
  20:24
**hearsay**
  76:7 77:24,
  25 81:4
**held**
  21:24 22:4,
  17 23:12
  24:9 30:4,5,
  15 37:22
  43:21 91:6
  113:2
**help**
  7:11 81:8,19
**helped**
  126:18
**hesitating**
  48:6 56:2
**high**
  133:5
**higher**
  40:9 117:10
  118:22
  124:20
**highest**
  21:3
**hire**
  26:4 44:4
  118:8
**hired**
  27:13 69:16
  70:15 106:20
**history**
  104:7,12
**hit**
  131:5
**hold**
  21:19 23:4
  31:6 127:25
  128:2 143:16

**horrible**
  139:3
**horrified**
  139:14
**hospital**
  138:3
**Hostetler**
  7:15
**hostile**
  83:14 85:7,
  10
**hour**
  8:8 77:11
**hour-and-a-
half**
  77:11
**hours**
  59:10
**HR**
  9:19,21
  11:15,18
  13:21 14:23
  16:2 24:17
  31:10,23
  32:24 57:2
  61:2,7,15,17
  62:14 63:18
  64:6,12
  69:19 83:15
  96:23 146:2,
  4,8,10
  148:15

---

**I**

---

**IBM**
  50:22
**ideally**
  130:11
**identification**
  36:14 66:19
  69:13 73:23
  86:18 88:6
  89:12 97:20
  107:19 110:7
  119:9 122:18

129:21
  134:23 136:8
  143:8 154:19
**identified**
  106:2,3
**identify**
  29:5,19
**illness**
  6:21 138:10
  139:18
  145:16
**imagine**
  85:20 93:6
  123:22,24
**immediately**
  61:4,6,15
  62:12 64:4
  148:12
**impact**
  16:5 152:5,8
**impacted**
  64:19
**impossible**
  125:2
**impression**
  78:5
**improve**
  92:24
**improvement**
  90:15,17
**improving**
  94:9
**include**
  9:15 59:5
  155:25
**including**
  147:13
**inconsistent**
  54:25
**incorrect**
  30:11
**increase**
  106:22
**increased**
  78:13
**indicate**
  114:11

**indicated**
  124:7
**Indicating**
  20:3
**indirect**
  100:3
**indiscernible**
  68:12 127:24
**individual**
  28:15 46:17,
  22 52:12
  53:2,16
  60:13
**individuals**
  30:5,20
  37:22 51:18,
  22 60:8
  81:6,10,15
  121:9 146:7
  153:5
**ineffective**
  93:15 95:2,
  18,22 96:16
  105:7
**infection**
  63:6,9
**inform**
  65:6 139:17,
  20 140:17
  141:2,21
  142:13 145:6
**information**
  14:3,6,16,19
  27:16 30:9,
  13 89:15
  122:3 140:9
**inhouse**
  13:14
**initial**
  22:4 37:20
  70:18
**injured**
  138:24
**injury**
  140:22
  141:6,8
  142:2

input
  91:9
INSERT
  78:24 81:16
instant
  9:8,10,14,25
  10:15
instructions
  11:3
insufficient
  104:4 152:11
integration
  31:14 32:6
  34:23 35:4,
  5,8,12 38:8,
  24 39:2
  45:4,9 46:3,
  4 47:18,24
  48:11,14,19
  49:3 54:12
  121:10
  130:3,5
  135:12,19
intended
  95:4 120:15
interactions
  147:14,15
  152:2
interim
  23:19 72:6
interrogatori
es
  27:22 35:22
  36:9,13
  37:4,20
  38:15
interrogatory
  28:24 29:4
  35:2 37:14,
  16,24 38:2,
  5,11,23
  66:14,17
introduced
  108:6 109:6
involved
  134:8

irrelevant
  14:19
issue
  19:11 76:23
  77:19 78:9
  79:2,5,11
  80:2 82:17
  83:25 84:7
  135:22
  140:21
issues
  19:7 54:23
  55:25 75:14,
  19,23 76:9,
  15 77:2,16
  78:6,18
  80:18,21,24
  81:2 82:20,
  25 83:10,22
  84:22 95:11
  98:24 99:2,
  3,10,22
  100:5,10
  150:23 151:3
  152:3,22

_____

J

_____

January
  87:25 88:13
  92:2,25
  93:22 94:7
  95:19,25
  108:23,24
  122:23 123:7
  135:9 137:14
  142:12
Jen
  145:25
  146:3,4
  150:14
Jennifer
  11:20,21,24
  13:23 15:8
  17:2,16,25
  35:3,14
  51:14,17
  54:13,20

58:2
Jenny
  146:2,5,6,11
Jenny's
  146:6
job
  26:8 39:11,
  16,17,20,23
  48:18 57:10
  66:24 67:9,
  10,19 68:21,
  23 74:6
  106:17
  116:12
jobs
  24:18 26:16
  43:16
join
  144:15
jointly
  150:13
judge
  14:9
July
  89:22 90:6
  125:16
  130:24 131:2
June
  88:2,13
jurat
  155:25
justified
  18:24 19:2,
  12
justify
  148:13
Justin
  7:10,23,25
  8:7

_____

K

_____

keep
  114:2,7,14
  115:18
  123:2,5

128:16,21
  130:10
  131:13,19
keeping
  116:23
kept
  120:21
Kim
  53:13,15
  54:15 56:17
  57:21 58:6
Kim's
  65:25
Kimmick
  5:1,11,17
  6:1 7:1 8:1
  9:1 10:1
  11:1 12:1
  13:1 14:1
  15:1,5 16:1
  17:1 18:1
  19:1 20:1
  21:1 22:1
  23:1 24:1
  25:1 26:1
  27:1 28:1
  29:1,6,20
  30:1 31:1
  32:1 33:1
  34:1 35:1,22
  36:1,7,13,17
  37:1 38:1
  39:1 40:1
  41:1 42:1
  43:1 44:1
  45:1 46:1
  47:1 48:1
  49:1 50:1
  51:1 52:1
  53:1 54:1
  55:1 56:1
  57:1 58:1
  59:1 60:1
  61:1 62:1
  63:1 64:1
  65:1 66:1,
  15,18,23
  67:1 68:1

69:1,8,12
70:1 71:1
72:1 73:1,22
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1,14,17
87:1,3,22
88:1,5 89:1,
7,11,23 90:1
91:1 92:1
93:1 94:1
95:1 96:1
97:1,13,14,
15,19,22
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1,
14,18 108:1
109:1,25
110:1,6
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1,5,9
120:1 121:1
122:1,17
123:1 124:1
125:1 126:1
127:1 128:1
129:1,14,20
130:1 131:1
132:1 133:1
134:1,18,22
135:1 136:1,
4,8 137:1
138:1 139:1
140:1 141:1
142:1 143:1,
4,8 144:1
145:1 146:1
147:1 148:1
149:1 150:1

151:1 152:1
153:1 154:1,
14,18 155:1
156:1,2,13
**kind**
40:7 63:7,9
105:4 125:12
134:10
**knew**
139:10
141:25
**know**
5:23 6:7
9:21 11:5,17
15:18,19
16:22 25:18
27:4 28:7,25
31:21 33:17
34:13,21
35:14 36:17
37:15 51:2
60:23 63:2,
7,19 65:25
66:6 67:4,7,
12 73:5,6,25
74:25 79:21
88:9 89:4
91:20,22,23
92:18 94:15
96:2,20
101:19
102:13,14
107:8 108:2,
15 109:15,23
116:19
119:19,22
120:7,23
121:7,23
122:2,20
123:14,17
125:3 126:12
128:11
129:2,23
130:11
132:15
133:6,22
134:3,12,25
136:11

139:11
141:9,12,15
142:3 143:10
144:3,10,15
145:11
146:9,19
147:22
148:19,22
153:13
154:22 155:6
**knowing**
16:24 109:8
**knowledge**
13:13,17
15:13 28:23
32:15 34:9
37:13 38:22
62:18 65:9
69:21 94:24
128:10,15
153:22 154:2
155:11

---

**L**

**label**
109:7
**labeled**
97:9
**labelled**
66:24 91:11
**lack**
65:11
**large**
41:5,12
107:11
**largely**
122:23
125:10,21
**larger**
40:5 44:5
131:20
132:12
**largest**
87:7
**Larry**
120:23

**latest**
108:3,16
**Lawson**
11:20,22,24
13:23 15:8
17:3,17,25
145:25
146:3,4
150:14
**lawsuit**
16:4 20:17
21:2
**lead**
60:15 99:19
**leader**
100:4 132:14
**leading**
84:9 151:6
**learn**
76:14 137:17
**learning**
13:18
**leave**
55:20 60:19,
22 61:7,9,23
62:2,17,22
64:2 65:8
78:22 81:13
136:21 147:2
153:25
**left**
18:15,16
23:24 110:19
136:25
**leg**
138:21
**legal**
60:24
**length**
19:22
**letter**
96:23 97:17
**level**
21:3 83:13
**limit**
50:2 63:24

**line**
  46:23 121:15
  145:17
**lines**
  47:20 48:12
  100:2
**list**
  29:10,13
  37:21 38:5,
  12 150:25
  151:8,10,14,
  25 152:13,17
**listed**
  30:21 32:10,
  13 38:21
  119:18 121:9
  123:25
**lists**
  122:6
**little**
  8:8
**loading**
  26:23
**long**
  6:8 8:6 18:4
  19:21 21:19
  22:17 49:19
  59:9 80:15
  106:12
**longer**
  14:7,8
**look**
  10:22 31:9
  60:2 90:8
  91:24 99:8
  104:21
  126:24
  130:10
  131:13,15
  134:6 136:10
  149:3 154:21
**looked**
  29:22,25
**looking**
  33:22 89:24
  99:12 119:23
  147:10

**looks**
  27:13 36:2
  37:2,19,25
  87:24 89:19
  120:4 143:12
**loosely**
  43:9,21
**Lorna**
  44:23 45:2,3
  46:10 47:6,
  15 48:3,5,10
  49:12,17
  50:23 51:7
  136:19,20
**Lorna's**
  137:3
**lot**
  73:8 148:14,
  17
**love**
  84:20
**low**
  106:9 116:4
  132:22,25
  135:18
**lower**
  117:5,9
  118:18
**lowered**
  112:16
**LVMH**
  123:5

---

**M**

**M-HM**
  87:15
**made**
  16:12 44:16
  55:17 57:3
  70:20 72:15
  82:3,6,14
  83:18 85:19
  87:8 92:13
  95:10 100:6
  104:5 105:25
  112:14 113:4

  114:12
  116:23
  120:20
  124:23
  125:4,14
  135:22 141:8
  147:21
  148:7,23
  150:10
  153:14
**maintain**
  40:15 41:13
  45:12 53:10
  57:19 71:3
  80:14
**maintaining**
  22:23 48:24
  60:12 151:6
**major**
  71:24
**majority**
  113:20
**make**
  66:12 70:6
  71:11,15
  72:16 77:12
  80:17,21
  84:10,17
  89:17 93:17
  99:14 106:9,
  10 112:10
  114:15,24
  115:14
  116:21
  117:25
  126:15
  132:17
  146:12,24
  149:12,18
  150:7
**making**
  13:5 25:6
  57:25 100:11
  151:4
**manage**
  22:24 63:22
  64:6 70:15
  72:3,8,12

  112:7 118:6
  153:10
**managed**
  44:2,6 70:21
  71:10 74:11
  83:17 104:16
  113:8,12
  118:10
**management**
  11:15,16
  18:6,7 20:8
  22:2 24:20
  125:11,12
**manager**
  22:8,9,13
  29:21 30:2,
  3,11,12
  31:7,8 32:2,
  5,8,12,17
  33:11,25
  35:4,5 38:10
  39:9,10,14,
  15 41:7,8,
  22,24 42:8,
  9,17 43:6
  45:6,7 46:3,
  5 48:14,15,
  21 49:10,11,
  16 50:24
  51:7 53:6
  57:15,16
  60:15,25
  68:21 69:18
  70:23 71:9
  84:9 105:2,8
  106:19
  126:14 131:8
  138:16
  152:21
**manager's**
  90:8 91:12
  95:8
**managers**
  26:17 29:5,
  14,17,19,24
  32:20,21
  33:15,16
  40:4,10,11

45:5 48:8
77:10
**managing**
25:4 26:2
47:25 60:12
71:25 72:7,
21,23 74:20
87:14 112:4,
8 114:22
115:5 118:12
146:23
**manipulated**
112:22
113:22
117:25
124:19
127:7,10,13,
17 128:6,7,
13
**manipulation**
114:21
124:22 126:2
**March**
103:7,18,20
132:9
**margin**
68:8
**mark**
108:10
**marked**
36:13 66:18
69:8,12
73:22 86:17
87:22 88:5
89:11 97:19
107:18
110:2,6
119:6,8
122:17
129:20
134:21 136:7
143:7
154:14,18
**master**
49:22,25
50:5
**matter**
84:4

**matter-of-the-fact**
19:13
**mature**
131:25
**matured**
96:9
**maturing**
106:5
**mean**
10:18 12:21
15:25 17:4,
12 22:7
25:22 34:13,
14 35:14
39:25 43:22
46:15 55:2
57:13 61:10
62:10 67:14,
18 71:21
72:20 77:25
79:15,18
80:12 84:5
105:25
106:11
111:14
113:17
125:7,8
139:8,13,25
141:13,24
145:18 149:8
152:23
**meaning**
48:21 95:5
110:25
113:19
115:22
120:10
124:13
148:10
**means**
111:6
**measured**
80:11 103:9
**medical**
55:21,24
56:8 60:19,
22 61:7,9,22

62:2,17 65:7
139:22
153:25
**medications**
6:24
**meet**
8:6 19:6
44:7,20
45:14,18
52:5,19
53:11 54:3
55:4,6 78:15
104:4 116:13
117:19
**meeting**
7:25 11:7
57:9 92:2
150:13
151:4,15
**meetings**
94:19
**member**
61:13 62:6,
20,23
**members**
56:7 140:6,
13
**memorialize**
58:3,7 75:13
82:25 98:6
**memorialized**
15:11 28:17,
21 75:20
76:18
**memory**
10:19
**message**
19:10
**messages**
9:8,10,14,25
10:15
**met**
7:8,15,20,22
87:5 92:6,9
124:12
**mid**
112:15

116:21 147:4
**mid-year**
113:23
**midyear**
112:6 117:23
**mine**
91:14
**minimum**
133:18,22
134:12
**minute**
27:3
**minutes**
8:9 64:23
154:7
**mirrors**
37:19
**miscommunication**
99:20,21
**misremembered**
65:23
**mission**
84:11
**mistaken**
101:15 102:4
**mitigating**
134:7
**month**
91:22,23
148:10
**monthly**
77:7
**months**
12:5,8
18:11,12,19
22:19 23:18
142:12
148:25
149:24
**moodys**
50:25 87:7
136:18
137:7,9
**morning**
5:17

move
44:13 86:25
87:8 106:14

moved
96:10

moving
46:20 98:22
106:5,7

multinationals
70:19

multiple
101:18
104:13,20
111:24
113:13,24

---

**N**

N&g
113:17

name
5:9 7:11 8:3
35:6,11,16
41:18 119:14

names
34:17 37:2
54:17 81:14

narrow
13:4

nature
139:9

necessarily
48:23 114:18

necessary
106:14

need
21:21 24:16
31:9 32:24
56:10 69:19
102:25
140:16
145:2,7

needed
46:25 63:17,
21,22 64:2,
11 69:3

77:18 78:4
82:11 90:15,
17 96:5
114:15
125:13
137:25 138:4
139:15,16
140:18
141:3,9,22
142:6,8,10,
14,22,24
144:23

needs
84:13 91:15
106:10 132:4
133:18 144:5

negotiating
106:7

negotiation
96:10

never
121:25

nine
23:3 25:12
31:3 121:4,5

nod
6:14

Nonperformance
98:16

nonperforming
135:21

nonverbal
100:3

normal
140:22 142:2
146:19

Notary
5:5 156:19

note
109:4

notes
154:16
155:10

number
15:10,11,18
16:18 33:21

112:22
113:22
114:4,12
118:14
131:19
132:21
133:11
146:18
148:21

numbers
13:24 109:17
114:14
117:20
118:18,21
126:4 127:7,
11,12,15
128:7,14

---

**O**

oath
5:20 26:19

object
151:21

objection
27:23 59:19
109:5,13
149:20,25

objections
35:20 36:7,
11

objectives
69:3 87:5
93:18,19

OBS
68:22

OBS'
66:13,17

OBS_001006
119:6,8

OBS_00233
110:2,5

OBS_00334
88:4

OBS_00344
89:8,10

OBS_00406
69:9,11

OBS_00575
143:7

OBS_00659
136:5,7

OBS_00708
73:19,21

OBS_00711
107:15,17

OBS_00714
86:16

OBS_00982
154:14,17

OBS_01088
134:21 135:5

OBS_01271
129:15,19

OBS_0575
143:5

OBS_335
88:25

obviously
39:12 139:3
140:14
144:14

occasion
11:25 84:24

occurred
146:18

October
58:20,24
143:22 147:6

October/
november
103:5

offer
13:5,7,10
15:15 16:6,
18

offered
15:18

offering
15:8

official
20:22

**okay**
6:20 7:18
8:4 15:5
21:3 22:3
24:11 27:7,
8,15 28:6,20
29:3 30:7,19
31:5,13
33:10,24
34:10,23
35:17 36:20
37:17 38:11,
23 41:23
43:2 65:3,
13,18 66:9
67:5,22
73:11,17
74:19 75:4,
5,13 81:13
84:22 85:13
86:9 87:20
88:10,21
90:12 91:24
93:7 94:13
95:15 100:9
102:5
107:10,13,24
108:13,17
109:9,18,24
110:13,25
111:14
113:14
114:10
117:15 118:4
119:3,11,21
120:3,22
122:14 126:9
127:14
128:5,24
129:4,13
131:3,12
132:24
134:16
135:3,24
136:2,13
137:9 140:9
141:18
142:11
143:2,12,16,

21 144:21
145:6 150:5
154:9,24
155:19 156:4
**once**
6:11 18:16
58:16 92:21
101:4 149:8
150:17
**one**
7:12 8:2
11:25 19:25
25:14,17
26:22,23
28:18 32:11
34:2,18
35:15 38:3,
18 40:20
41:5 45:4
47:20 50:22
51:18,22
55:7,9 65:5
73:14 76:21,
23 84:23
85:3,18
86:24 87:18
90:3 91:9
92:9 94:20
99:6,10
100:8 107:6
108:8 109:18
112:2,3
113:7 120:5,
12 121:3,15
146:7
**ones**
8:18 9:7
90:9
**ongoing**
103:24 123:2
142:7
**open**
36:18 60:14
67:3 73:4
89:5 91:16
109:22
**opened**
108:9

**opening**
27:6
**opportunities**
78:16 80:13
96:8 98:22
104:16
106:3,4,25
**opportunity**
106:24
108:3,16
123:2
**Orange**
13:15 18:6,
15,16 21:12,
14,24 22:2,
5,10 23:25
24:21 27:21
33:8 42:18
43:10,24
45:21 46:10
50:24 55:22
57:20 58:12
59:20,22
65:25 66:6
67:8 115:25
136:21
153:20
**Orange's**
27:13
**order**
31:10 62:6
68:3,6,8,9
103:2 124:3,
6,19 129:24
132:18
**ordering**
156:6
**orders**
68:16
113:17,18
115:18
124:14
128:16,21
130:10
131:13
133:14,23
134:13

**organization**
41:3 43:18
**original**
36:3 122:22
**outcome**
50:16
**outline**
154:5
**outlined**
106:25
**outside**
13:15 30:9
70:17,23
74:11
**overachieving**
114:16
**overlap**
48:13 51:2
**overlay**
47:19 121:14
130:2
**overrule**
83:4
**Overton**
5:11 156:13
**Oyster**
5:13

---

**P**

---

**p.m.**
144:3 156:9
**P00016**
97:2,18
**P00019**
97:3
**packet**
10:5
**page**
28:5,25
29:10 37:6,
15,16,19
73:10 74:2
155:24
**paid**
62:22 63:24
72:17 112:17

118:12
125:17
126:19
127:12,22
**pain**
138:21
**Paine**
44:24 45:2,3
46:11 47:6,
15 49:12
50:23
**Paine's**
48:3
**paired**
111:2
**parent**
43:15
**part**
10:5 16:14,
15 19:8
42:18,23
43:10 44:5,
12 48:22
70:22 71:24
77:7 81:9
93:19 103:23
124:9 137:11
140:2
146:18,23
**participate**
20:4 59:13
144:25
**participated**
58:10,15
145:22
**particular**
79:5 112:19
131:2 141:24
**partner**
146:5
**parts**
43:18
**past**
113:5
**pat**
48:7

**pathway**
147:2
**Patricia**
5:18 15:8
27:21 37:23
38:7 119:14
155:10
**Patrick**
52:8,11
**Patty**
8:21 12:12,
25 13:6
18:17,20
25:14,16
26:4 30:2,6
47:17 48:5
49:15,16,20
50:9 51:3,5,
6 62:15
63:10 67:11,
13,15 68:15
72:14 74:5,
12 75:19
77:3,11
78:4,25 79:4
80:24 81:7,
18 82:11
87:13,24
89:21 90:13,
20 91:13,17,
19 92:6,23
96:23 99:24
100:19
107:22
109:2,12
110:4,15
111:2,20,23
112:4,8,11,
23 113:8
114:25
120:19
123:23 124:8
126:16
136:19 137:3
138:18
139:21
140:3,4,15,
17 141:2,12

142:5 143:20
144:4
145:10,15
146:13,21
153:15
**Patty's**
17:6 19:3
27:14 30:16
50:2,18
73:15 75:9
82:21 83:18
88:11 92:11
112:15 140:8
146:15
**Paul**
41:18,20
44:17
**pay**
26:6 118:22
131:8 133:3,
8,10
**payment**
57:9 110:4,
14 113:7
**payout**
117:10
**penalty**
5:21 131:8
**pending**
6:9
**people**
6:11 22:8,
10,25 25:11,
15 29:10
30:15,21,23
31:6,23
32:13 33:6,7
35:7 37:3,24
38:6,21,25
39:2 43:16
46:8,14,17
47:2,5 48:20
54:12 62:3
103:18 132:8
149:4 151:2,
9 152:25
153:2

**percent**
111:20
112:17
115:21
116:3,9
120:6,7
128:17
130:12
131:18,22
132:20
133:3,4,8,12
134:5,6
135:15
**percentage**
115:17
128:17,21
130:9,12
131:12
132:24
133:16,18,23
134:13
**percentages**
124:24
126:5,11
128:9,12
**performance**
8:19,20,22,
25 17:6,15
19:6 46:16
54:22 55:3
64:19 73:15,
20 75:10,14,
18,22 82:22,
25 83:8
86:3,5,15
87:23 88:3,
12,15,18,22
89:9 90:5,
14,19 92:12
99:7,9
100:12,14,15
104:25
105:6,10,14
107:16
114:19
127:21
147:2,14
151:3

performer
  146:22
performers
  146:20,21,25
  149:4
performing
  125:23,25
  126:11,22
  127:9
period
  23:8,16
  24:15 29:15
  30:17,25
  32:7,14
  33:4,6,12
  34:12,20,25
  35:9 38:14,
  20 39:4,7
  40:22 42:3,
  7,22,24
  51:13,25
  52:2,6,20
  53:11,23
  54:4 72:6,
  10,13,18
  87:25 88:12
  89:20,22
  90:5 91:12,
  16 108:22
  111:18 118:7
  130:22
periods
  26:16 43:16
perjury
  5:21
person
  8:3 39:18
  41:3 44:2
  59:11 72:2
  74:11 81:25
  85:3 112:6
  115:7 116:6
  118:9 131:19
  150:21
personal
  55:21
personally
  98:2 133:3

personnel
  152:21
perspective
  61:11 83:3,8
  105:6 113:3
  126:13 146:9
Pfizer
  49:12,17,20,
  22 87:7
ph
  42:13
phone
  14:10 82:2
picture
  147:11
piece
  51:25
pieces
  17:14 107:11
  153:17
pier
  100:9
piers
  19:8 54:24
  76:3 77:14
  81:3 83:10,
  22 84:2,23
  85:17,19
  98:24 99:2,
  11 134:10
  152:2,4
pipeline
  57:18 78:14
  92:24 94:9
  98:20,23
  102:25
  103:22
  104:3,6,8,
  14,15 105:24
  106:2,6,22
  147:16,17
places
  43:15
plaintiff's
  35:21 36:8,
  12

plan
  92:23 93:3,
  14,20 94:6,
  8,14,23,25
  95:6,16,17,
  19,22,24
  96:2,3,5,16
  103:6,16,17
  106:21
  132:7,16
  133:2,7,17
played
  71:24
pleasant
  137:25
please
  5:9,12 6:12,
  15 15:5 34:3
  68:19 88:9
  136:12
plucked
  97:10
policy
  61:18 64:7
poor
  146:21,22,25
populate
  91:14
populated
  121:6 122:3
posed
  27:21
position
  21:16,23
  22:3,4,20
  23:12,13
  24:6,12
  25:18 68:7
positive
  15:20
positively
  79:17 80:10
possible
  101:22 120:9
  124:2
possibly
  55:8,23 57:9

  120:9 139:25
posted
  26:24
potential
  16:4 17:13
practice
  82:24
preparation
  8:11 11:9
prepare
  7:4,7,21
  10:25
present
  7:24 29:7
  39:5 54:8
  92:23 93:20
  94:6,22
presented
  93:14 94:23
  95:16,17,19
  103:19
  106:21
  116:25 117:6
pressured
  81:9
presumed
  6:4
pretty
  12:21 13:4
price
  130:17
prior
  24:12 95:11
  131:20
privilege
  13:24 14:9,
  21,24
privileged
  13:22 14:4,
  6,7
privy
  15:19
probably
  12:9 92:9
  121:15 147:4
  153:9,12

**problematic**
  81:19
**problems**
  85:16
**procedure**
  140:20
**procedures**
  6:18 60:11
  139:7,11
  141:5,19
  142:4
**proceeding**
  16:7
**process**
  77:7 123:18
  132:5 152:22
**produce**
  98:19 113:20
  124:19
**produced**
  9:17,22
  103:15
  123:15,20
**producing**
  104:17
**product**
  46:22 47:20
  48:12
  121:15,18,19
**production**
  93:8 101:9
**productive**
  84:19,21
**products**
  47:23 113:19
  114:2 130:5,
  7 131:25
  132:2
**profitability**
  46:22
**profitable**
  22:22
**program**
  42:18 43:11,
  13,14,25
  44:6 59:6

**projects**
  106:12
**promise**
  116:22
  120:21 124:9
**promising**
  43:15
**promote**
  69:20
**promotion**
  70:13
**proper**
  66:4
**proposed**
  78:13 106:6
**proposing**
  40:7
**protected**
  60:10
**provide**
  27:15,19
  41:12 103:13
  126:5
**provided**
  28:16 30:13
  69:6 126:3
**public**
  5:5 20:24
  156:19
**pull**
  10:19 17:11
**pulled**
  121:17
**pursue**
  106:24
**put**
  26:21 35:23
  36:16 60:14
  66:21 72:25
  74:23 86:11,
  22 87:20
  89:2,17
  91:13 93:3,
  10 107:6
  108:14
  118:23
  128:25

  134:17 143:2
  146:25
  152:12
  154:12
**puts**
  91:8
**putting**
  96:18 107:24
  122:14 136:2

---

### Q

**question**
  5:22,25 6:3,
  4,9,13 12:22
  13:4 24:25
  29:17,18,22
  33:14 45:17
  49:6 56:12,
  13,14 62:13
  79:9 94:6,11
  95:21 98:12
  117:21
  126:20
  141:18 150:4
  151:19
**questions**
  5:19 6:16
  27:20 143:17
  155:16
**quick**
  154:4
**quickly**
  118:9
**quite**
  24:18 63:5
  148:14,17
**quota**
  42:10 43:7,
  21,25 44:7,
  16,20 45:11,
  14,18 52:3,
  5,17,19
  53:8,11,25
  54:3 55:6
  57:9 72:16
  100:19,22

  101:5 103:25
  104:4 111:2,
  7 112:15,16
  113:14
  116:14
  117:5,16,22,
  24 124:12
  126:6 130:22
  151:15
**quotas**
  40:14 41:14

---

### R

**ragged**
  132:2
**ranking**
  147:10 149:6
**rate**
  26:6
**rating**
  88:22 90:13
  147:9
**read**
  17:12 68:24
  94:5,11 95:8
  100:2
**reading**
  94:2
**real**
  127:11,16
**reason**
  26:15 71:23
  116:14
  120:11
**reasons**
  46:24 55:21
  98:6,10
  150:19
**recall**
  8:14,15,16,
  18,24 9:5
  10:7,14
  11:23 12:5,
  16,17,20
  13:3 15:10
  16:14 17:18,

22,24 18:3
19:14,16,22
20:15 21:18,
21 22:6
25:16,21
26:14 31:2
32:23 34:17
35:6,11
41:25 43:4
44:10,15,22
45:4,7,15,20
47:4,8,14
49:14,18,24
50:15,21
51:21 52:7,
16,21 53:7,
12,24 54:5,
11,17 55:8,
11,16,23
56:18,22
57:23 58:5,
9,16 59:15
63:8 64:16
65:12 66:8
69:17 71:14,
17 76:13,22,
25 78:21
80:22,24,25
81:12,20
82:15 91:4
93:5,13,25
96:17 98:9
99:4 102:3,
6,15,20
104:10
105:16,19,22
107:4 112:4
113:16
115:19
116:5,19
128:23
137:20,21
138:15
139:19,24
140:10,11
141:23
142:16
145:18
147:22

148:8,11
149:22
150:9,12,16
**received**
21:4 90:13
**recent**
12:3 58:18
**recess**
65:20 109:20
154:10
**recognize**
27:9,11
36:21,23
67:6 73:13
75:5,8
108:18
109:10
110:9,12
129:5 135:6
136:14,16
143:17
154:25
**recognized**
72:14,19
**recollection**
64:13
**recommend**
69:22,25
**recommendatio
n**
146:12
147:20 148:6
149:19
150:2,8
**recommended**
150:19
**record**
5:10 35:18
36:6 66:12
73:18 78:23
81:14 87:23
97:5 102:8
119:4
**recorded**
20:24 86:3
**records**
21:22

**rectify**
79:6,11
**redacted**
73:8 89:16
90:2,9
107:12,21
**redundancy**
66:3,8
**redundant**
135:23
**refer**
60:25 61:4,
6,14,17
62:14 63:18
64:12
**referred**
64:6 94:10
**referring**
100:6 127:2
151:8 152:21
**reflect**
67:15 111:25
113:11
117:10 123:8
125:25
126:8,21
**reflected**
67:24 100:12
117:5 143:23
**reflective**
113:7
**reflects**
128:8
**refresh**
10:18
**regarding**
80:24 94:8
100:3 107:22
155:10
**region**
16:3,8
**regular**
152:24
**relaid**
13:14 16:19
**related**
87:6

**relation**
125:11
**relationship**
19:7 40:8,23
47:22 57:7
71:4,8 76:11
**relationships**
22:22 25:5
54:23,24
76:2 134:9
151:6
**relay**
14:5
**relaying**
14:3
**release**
65:25 66:6
140:9
**relevant**
16:6 30:13
**reliant**
121:14
**remained**
49:9
**remains**
14:4
**remediation**
148:16
**remember**
8:3 16:25
24:2,8 64:9
71:18 81:22
137:23
138:17
**remind**
25:2
**removed**
135:20
**Renassia**
41:18,20
44:17
**renew**
114:3,5
116:9
**renewal**
116:14
130:15

renewals
115:20,22
130:6 131:20
132:20,25
renewed
131:4,7,17
renewing
50:5 131:9
renews
131:16
repeat
6:2 108:6
rephrase
5:24 27:18
83:24
replace
50:7 153:4,
15
report
25:17 26:12
42:2,20,24
107:16
153:23
reported
25:19 29:6,
14,20 32:17
33:6,11 37:3
38:13,20
83:15 84:8,
23 85:2
101:25
138:12
153:20
reporter
5:8 6:2,10,
14 20:25
36:15 66:20
69:14 73:24
86:19 88:7
89:13 94:3,
12 97:21
107:20 110:8
119:10
122:19 128:3
129:22
134:24 136:9
143:9 154:20
156:5

reporting
23:2 25:8
30:20,24
31:14,18,24
32:2,9,22
34:11,24
39:3 102:22
115:16
represent
5:18 110:23
111:5 112:25
137:2
representatio
n
114:19,20
representativ
e
74:13
represented
80:2 97:25
117:5
representing
27:14 95:18
request
50:18 70:6,
10
requested
61:5,7 71:5
72:24 122:25
required
62:5 68:16
103:2 104:18
148:15
requirements
57:10 67:21
77:13 102:24
105:5
requires
123:19
reread
36:5
reset
116:20,25
Respect
60:8
respond
5:20

responded
38:15
response
6:5 29:9
38:25 79:13
92:11,16
99:18 144:4
145:9
responses
6:16 27:12,
17,19 28:16,
20 35:20
36:8,11
37:20 66:14,
18 77:23
responsibilit
ies
25:25 48:4,
19,23 49:9
67:16,18
68:2 69:23
70:2,4,9
71:2 105:13
117:14
120:17
126:17
137:4,7
146:23
responsibilit
y
23:20 57:16
60:15,24
70:12,25
87:13 105:3
responsible
22:21 25:4,6
40:11,18,23
41:4,15
42:11 43:8,
25 47:19,21,
23,25 48:9,
11,16 50:4
52:17 67:23
122:12
responsivenes
s
77:22

result
80:11 83:3,7
112:21
118:21
120:19
124:4,19
resulted
78:13
results
74:8 83:18,
23 86:8 95:3
96:6,7 99:23
104:17
113:23
120:13
121:17
124:18
152:6,9
153:2,3
return
125:18
revenue
22:22 25:5
26:3 40:6,
24,25 48:17,
24 68:7 71:3
111:14,15,21
112:23
114:6,7,12
118:15
119:25 123:3
124:13
129:24
132:18
133:14,19
135:14
revenues
57:19 113:21
review
8:10,13,25
9:4 17:19,21
27:4 28:12
31:10 36:18
37:8 67:3
69:5 73:15,
20 75:2,10
76:4,6 77:6
78:12 85:15

86:15 87:4,
23 88:3,8,
12,16,19,22
89:5,9 90:5,
14,19 91:2,
25 92:7,12,
22 94:17
95:11,14,21
96:21 98:18
99:7,9
100:13,14
107:9,11
108:3,16
113:3 122:21
129:3 135:2
143:11 154:5

**reviewed**
10:9,11 73:5
96:3 114:9

**reviewing**
11:8 16:4
87:3 90:10
109:23

**reviews**
8:19,20,23
9:2 17:6,7,
15 68:15
85:18 91:5
99:10 126:3,
4

**revised**
101:3

**right**
10:9 14:12,
25 23:12
32:18 36:5
60:14 85:9
86:10 89:17
90:16 96:24
101:13
109:16 116:2
120:3 126:5,
6 134:11
142:2 144:18
148:4 152:25
153:2 154:3

**rights**
65:7

**risen**
83:13

**Rob**
16:9,10,11

**role**
43:24 46:5,
14,25 47:3,
18,19 49:8
50:9 66:3
70:4,5,7,11
118:10

**roles**
24:20 121:14

**Rossdale**
35:3 51:15,
17 54:13,20
58:2

**Route**
5:13

**Row**
120:5

**Rows**
119:15

**Roxanne**
42:13,16

---

## S

**salary**
39:11

**sales**
21:25 22:14,
15 23:14,19,
21 24:13,19,
22 25:9,20
40:12 41:3
67:21 100:4
108:19,25
109:11
110:3,10,14
113:6
116:12,17
127:3 129:6,
18 134:19

**salespeople**
57:14 121:6

**salesperson**
119:12 134:4

**sat**
69:2

**satisfactory**
131:14

**saying**
104:13 117:4
127:15,16

**says**
30:8 74:14
84:7 87:11
91:25 98:4
110:16,19
111:19
119:12 120:6
144:7

**scale**
63:20

**scheduled**
94:20

**scheduling**
77:10

**scope**
30:9 41:10

**scroll**
73:9 119:21
120:22

**second**
26:22,23
65:5 75:10
86:3,4,24
87:4,19
107:7 109:19
125:20

**section**
73:15 107:21

**see**
15:2 26:24
29:7 35:15
37:18 66:23
74:14 85:5
87:3,9,11
91:8 92:2
110:18
119:11,14
135:14

**salesperson**
144:18,22
145:4,12

**seeks**
30:9

**selling**
47:20,23
48:12

**semiannual**
69:5

**send**
136:18
142:19

**senior**
11:16 18:6,7
20:8 22:13
24:20 30:3
31:8 32:2,5,
8,12,19
33:15,17,24
34:7 35:3
38:10 39:9,
14,18 40:4,
10 41:3,7,
21,24 42:9
45:6 46:4
57:15 69:18
70:7,10

**sentence**
87:4

**separated**
120:12,13

**series**
5:19 126:17

**seriously**
149:10

**service**
31:14 34:24
35:8,12
38:24 39:3
49:22,25
54:13 135:12

**services**
40:7 41:11
45:5,9 46:3,
4 47:24
48:14,20
49:3 50:5

78:13 113:19
121:10
130:3,5,6
132:2
**sessions**
77:9 94:20
**set**
26:6 35:21
36:8,12
70:8,9 112:2
113:8 120:12
132:6,7,10
**sets**
60:11 113:25
120:11
**settlement**
13:8 16:18
**seven**
114:16 121:4
**severe**
139:2,12
142:4
**sexual**
59:7
**shake**
6:15
**share**
140:4
**shared**
78:4 140:7
**sheet**
103:14 117:2
122:8,16,23
123:7,13,15,
20,21,22,25
124:6
**sheets**
120:10
**short**
65:20 109:20
154:10
**shots**
106:13
**show**
10:3,6
126:10

**showed**
80:6,9
146:21 148:3
**showing**
74:8
**shows**
127:7,8
**sickness**
63:4
**sign**
28:9 37:5
78:10
**significant**
141:25
**signing**
28:13 37:9
**similar**
39:17 59:13
115:17
**simple**
19:10 141:6
**simply**
112:2
**situation**
61:3 144:8
**situations**
99:19 100:16
**size**
41:10
**Sledge**
146:7,11
**slightly**
25:24 39:24
41:9 105:4
121:12
**small**
73:11
**sold**
130:7
**sort**
149:6
**sounds**
145:19
**source**
14:18
**South**
22:15

**space**
96:9
**speak**
11:18,21
18:9,13,18
20:7,12
50:8,13
78:25 79:4,
10 82:8,11
91:18
**speaking**
11:7 83:21
**specialist**
35:4,5,13
45:9 46:23
47:18 49:3
121:11 130:4
135:12
**specialists**
31:14 32:6
34:24 35:8
38:9,24 39:3
48:11 54:13
135:20
**specific**
10:15 68:3,9
98:13 141:19
143:17
**specifically**
10:2 23:11
77:16 83:21
93:5 98:17
117:23
118:25
140:12
141:20
149:14
**specifics**
17:4 18:3
**specified**
95:7
**specifies**
95:11
**specify**
76:8
**speculating**
119:20 120:9

121:8,24
123:14
**split**
153:16
**spoke**
11:6,24
12:4,24 18:5
91:16 145:14
**spoken**
11:13 18:16
**sponsored**
43:14
**spot**
144:11
**spots**
144:24
**spreadsheet**
119:2,6,7
121:20 122:4
**stamped**
69:9,11
73:18,21
86:16 88:4,
25 89:7,10
97:2,18
107:15,17
110:5 119:8
129:15,19
134:21 135:5
136:4,7
143:4,6
154:17
**start**
21:13
**started**
58:17 148:25
**starts**
28:25
**state**
5:5,9,12
144:3
**statement**
75:16 111:12
**states**
22:16 23:15
70:18,21,24
71:5 74:12

87:5

**status**
125:16

**Stefanie**
36:6 66:11
86:13 94:4

**step**
72:2

**stepped**
126:16

**stop**
11:5

**strategic**
113:24,25
114:13
124:15
134:14

**strategy**
99:17

**streams**
71:3

**structure**
46:20

**struggling**
147:17 149:5

**subject**
5:21

**subjective**
131:24

**submitted**
94:14

**Subscribed**
156:16

**subsequent**
123:13

**subsequently**
147:6

**successful**
74:5,15,20
88:23 131:18
152:16

**sue**
18:21

**suffered**
55:25 56:7

**suffering**
6:20

**sufficient**
78:14 80:14
83:19 98:23

**summary**
108:20
109:2,11
110:4,14
111:24 113:7
116:18
118:17 127:4

**summer**
147:8 148:20
149:2 153:12

**supervise**
26:10

**supplemental**
35:20 36:2,
25 66:13,14,
17

**support**
61:13,16
62:6 83:6,19
140:15

**supported**
83:6

**supporting**
66:4

**supposed**
118:15

**sure**
10:20,21
14:17 15:4
17:5 25:6
66:7,12
71:22,23
72:16 77:12
84:10,17
89:17 112:10
114:24
116:21
117:25
126:15
132:17
144:16
146:24
149:12 151:4

**surgery**
139:5,10

140:18,23,25
141:3,20,22
144:6,8
145:3,7

**sworn**
5:5 20:19
156:16

---

**T**

---

**tab**
118:25

**Tabool**
42:13

**take**
6:6 27:3
38:3 61:12
62:5,15,19,
23 63:11,17,
22 64:10,14,
22 65:2,14
79:16 93:11
96:4 105:9
126:17
136:10
138:2,8,13
139:15,21
142:6,8,9,
14,21 144:5,
17 145:10
148:13
154:4,21
156:7

**taken**
6:24 48:25
55:20 65:21
70:2 89:15
109:21 132:4
148:24
154:11

**takes**
149:10 153:4

**taking**
80:9 126:15
137:3 145:15

**talk**
9:24 19:24

78:16 94:21
102:24
116:20

**talked**
17:5 75:25
92:20

**talking**
6:11 78:19
102:23
104:23 127:3
128:3 149:14
151:17

**target**
101:2,17,19,
23 102:7,12
106:10
111:7,16
113:5 115:21
116:3,20,25
117:12,20
118:14,17
124:23
125:4,15
130:25
131:5,11
132:6,8
151:4

**targets**
40:25 68:4,
6,8,9 93:19
101:18,24
102:17,19,22
103:9,11,19
120:11
121:12 130:4

**tasks**
48:22 125:10

**team**
44:3 51:19,
23 52:13
53:3,17,18
54:7 61:6
81:9 84:8,
11,13,18,21
95:12 99:18
140:5,6,7,12
147:15
150:24

151:7,9
**Teams**
  9:9
**telephone**
  19:18
**tell**
  17:13 56:10,
  25 65:10
  77:15 80:20
  82:9,13
  96:15 125:2
  141:12 142:5
  143:13
  150:18
**telling**
  127:13 144:4
**ten**
  47:13
**tenure**
  22:10
**term**
  80:15 130:21
**terminate**
  55:18 57:4
  58:2 98:14
  100:7,11
  116:14
  145:22
  147:20
  148:7,25
  150:11
**terminated**
  47:6,7 54:7,
  14,15,21
  55:10 56:17
  57:24 66:5
  101:21
  102:10
  106:16,23
  136:24
  146:13
  147:24
  149:16,19
  150:8
**terminating**
  58:6 128:18
**termination**

66:2,7 96:22
97:17,23
98:7,11
146:16 148:6
149:24
150:15,20
**terms**
  68:16 151:14
**territories**
  33:7 100:25
  111:24
  113:13,24
**territory**
  25:24 34:20
  69:2 70:18
  71:25 72:3,
  5,15,22 74:7
  105:4 111:17
  112:3,13,14
  113:2 114:4,
  22 115:6
  120:13
  122:24
  125:22
  126:13
  137:12
  153:16,18
**testified**
  5:6 12:23
  18:2,5 20:13
  31:19,25
  93:22 99:4
  105:23
**testify**
  6:22,25 7:13
  26:19 31:22
  33:5,9 51:4,
  10 53:21
  98:3 109:17
**testifying**
  33:20
**testimony**
  20:20,23
**text**
  143:20
**thank**
  65:3,19
  97:16 138:11

156:2
**theoretically**
  122:10
**they'**
  62:5
**thing**
  89:18
**things**
  20:23 78:18
  84:16 125:12
  134:8 148:12
**think**
  29:18 34:14
  35:6 60:16
  86:14 93:24
  94:5 126:12
  133:4 154:7,
  13
**third**
  110:18
**thought**
  18:23,25
  19:11 77:18
  83:17 96:16
  144:25
**three**
  23:18 31:12
  33:19 35:7
  121:3,9
  124:12
**threw**
  72:10
**time**
  6:6 7:16
  12:3 16:4,9
  21:17 23:8,
  16 24:15
  25:13,17,19
  26:17 29:15,
  25 30:3,16,
  17,24 31:4
  32:7,13
  33:5,12
  34:12,25
  35:9 38:4,
  14,20 39:4,7
  42:3,7,23
  43:3,17 47:6

49:4,12,21
50:23 51:7
52:6,20
53:11,23
54:4,19
62:4,5,15,
19,22,24
63:5,11,16,
17,20,23,24
64:11,14,17
69:6,16
72:12 74:8,
21 75:15
87:25 88:12
89:20,21
90:5 91:13,
16 92:9,10,
21 100:2
102:17
106:23 107:3
108:22
111:17
112:10
116:9,11
126:14 128:4
131:9 137:14
138:2,8
139:15,21
140:15
142:6,9,10,
14,22 144:5,
12,17,25
145:10,15,18
146:10
148:13 153:4
156:3
**timeframe**
  137:22
**timeline**
  103:5
**timely**
  77:23
**times**
  58:14
  104:13,20
  131:25
  146:18,22

**title**
  21:18,20
  22:6,12,14,
  18 23:4
  24:9,10
  25:22 29:21,
  25 30:4,6,
  10,16 32:16
  37:22,25
  38:6,10 42:6
  43:2,5 45:5,
  8 46:2,7,9
  51:20 52:14
  53:4,7,22
  69:15 130:3
**titles**
  22:7 25:23
  31:5,12,17,
  24 34:3
  40:14
**today**
  5:20 6:22
  7:2,5 10:25
  11:9 58:25
  59:2 121:21
  145:2 155:13
  156:3
**told**
  18:23,25
  63:16 64:10
  81:18 115:13
  138:18
  142:9,21
  144:11,12,
  13,16
**tolerated**
  59:20,22
**tool**
  121:17
**top**
  91:24 146:20
  149:4
**topic**
  139:25
**topics**
  19:24
**total**
  111:15

**tough**
  116:12
**traditionally**
  74:10
**training**
  58:11,15,19
  59:5,9,14
  143:14
  144:24
**trampoline**
  138:22 141:7
**transcribe**
  6:11,14
**transcript**
  156:6
**transferred**
  34:19 48:4,
  20
**transition**
  71:25
**transpire**
  40:22
**treating**
  60:9
**Trinity**
  21:8
**true**
  28:19,21
  87:16 101:11
  136:21
**truthful**
  6:5 37:12
**try**
  80:21 124:9
  130:14 153:9
**trying**
  72:8 89:25
  114:23,24
  120:18
  126:15
  127:17,18
**Tuesday**
  59:3
**turn**
  28:4
**twice**
  119:15,18

**two**
  6:11 21:22
  35:7 47:9,20
  55:14 56:21
  59:10 100:25
  120:10 121:3
  122:25
  129:24
  135:10 146:6
  149:23
**type**
  70:5 128:3
**typical**
  41:6 141:8
**typically**
  40:5,19 41:5
  70:19 77:8
  82:24 91:6
  102:21
  130:10,14
  131:7,15,18

———————

**U**

**U.S.**
  24:14,23
  25:9 72:4
  74:12
**unable**
  9:20 78:17
  98:19 114:14
**unacceptable**
  128:22
  130:13
  133:10
  135:25
**uncomfortable**
  82:4,7,10,14
  84:8
**uncovering**
  80:14
**underperformi
ng**
  46:6,14,15
**understand**
  5:23 6:17
  28:2 117:21

  127:17,18
  144:16
**understanding**
  16:17 59:17,
  25 60:5,7,21
  61:8,22,24,
  25 62:3,7
  99:25
**understands**
  84:11
**understood**
  6:4 77:12
  116:22
**United**
  22:16 23:15
  70:18,21,24
  71:4 74:12
**unpleasant**
  138:19
**unreasonable**
  133:7
**unwilling**
  78:15

———————

**V**

**vacating**
  118:10
**Vaguely**
  27:10 36:22
  60:20
**valid**
  61:16 62:13
**validate**
  32:24 57:2
  69:19 102:13
**validated**
  28:18
**validating**
  16:20
**validation**
  148:15
**varied**
  25:12
**various**
  121:6

**vast**
113:20

**velocity**
98:23 104:15

**verbal**
6:15 85:23

**verbiage**
73:10

**verify**
32:25

**versus**
111:9 126:2

**village**
20:22

**violations**
153:24

**virtual**
59:11,12

**vis-a-vie**
148:5

**volume**
39:23 150:22

---

**W**

**wait**
6:12 11:4

**want**
6:6 11:5
35:16 64:23
65:15 66:12
84:10,17
86:25 130:18
140:4 149:12

**wanted**
71:8 79:21
140:14
142:24
146:19,24

**warrant**
46:23

**way**
16:20,23
64:20 66:3,5
81:8 82:2,5
84:14,15
109:7 142:3

**ways**
39:22

**wed**
145:3

**Wednesday**
59:3

**week**
59:4

**weekly**
77:7 79:3,7
94:19

**went**
138:24

**wide**
12:22

**Willcock**
16:9,11

**Willins**
134:20
135:8,11

**window**
26:25

**withdrawn**
93:21

**witness**
5:4 13:13,16
14:14 155:18
156:10

**work**
26:10 50:3,
10 53:18
54:25 61:12
62:5,16,20,
24 63:11
64:15,18
72:17 82:4
83:14 84:15
85:7,10
112:12,23
132:18
138:9,13
139:21
142:6,15
144:5 145:15
152:5,8

**workbook**
110:11 126:8

129:7,18
134:20 135:8

**worked**
49:13,17
50:23 51:8,
12 52:12
53:2,16

**working**
21:11,13
106:12
125:6,10

**workplace**
58:12 59:18

**works**
65:16

**write**
74:17 75:11
76:3,6,17
88:15 107:22

**writing**
76:19 81:5
82:17,20,25
85:22 93:4,
11 101:6
142:18,20

**written**
103:11

**wrote**
73:25 92:15
136:20
144:23
145:9,11

---

**Y**

**yeah**
10:12,20
18:11 64:24
65:4 72:9
73:9 106:11
108:10
110:12
121:25
134:11 138:4
139:8

**year**
9:2 21:22

23:22 24:2,
3,5,9 40:22
44:9,11,18,
21 55:12
56:19 58:16
71:18,20
101:4,16
110:24
111:7,8,25
112:6,9,15,
19,20 114:8,
23 115:13
116:21,23
117:7 120:19
124:8 125:21
127:22
128:22
129:12
130:25
131:6,11
133:21,24
135:9 147:4,
5

**years**
8:22 17:16
55:15 56:21
138:16

**yesterday**
7:22 8:9
10:9 58:22

**York**
5:6,14 25:21
59:7,8

**Youkhanna**
9:12 16:3
18:8 23:24
50:9 97:2,5,
7,9,10,11
139:17,20

**YTD**
110:19,22

---

**Z**

**Z10**
120:5

Exhibit B

**In the Matter Of:**

*Haran vs*

*Orange Business Services Inc.*

---

*PATRICIA HARAN*

*April 26, 2023*

---



2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   - - - - - - - - - - - - - - - - - - - - - - - -x
    PATRICIA HARAN,
4

5                              Plaintiff,

6
                               Index No.:
7                              1:21-CV-10585-VSB

8
                    -against-
9

10
    ORANGE BUSINESS SERVICES INC.,
11

12
                               Defendant.
13  - - - - - - - - - - - - - - - - - - - - - - - -x

14      IN-PERSON DEPOSITION

15                     OF

16

17      TAKEN ON:  April 26, 2023

18  - - - - - - - - - - -- - - - - - - - - - - - - -x

19

20

21

22

23

24

25

2

```
 1                    I N D E X

 2   WITNESS              EXAMINATION BY        PAGE

 3   PATRICIA HARAN    MR. GUILFOYLE              9

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              I N D E X

 2          MARKED FOR IDENTIFICATION

 3   EXHIBIT          DESCRIPTION              PAGE

 4   Exhibit 1        Bates OBS5 - OBS11        25

 5

 6   Exhibit 2        Bates OBS13               28

 7

 8   Exhibit 3        a document                29

 9

10   Exhibit 4        BATES OBS334 - 343        30

11

12   Exhibit 5        BATES OBS344 - 353        35

13

14   Exhibit 6        a document                44

15

16   Exhibit 7        a document                45

17

18   Exhibit 8        a document                52

19

20   Exhibit 9        Bates OBS381 - 383        56

21

22   Exhibit 10       a document                60

23

24   Exhibit 11       Bates OBS926 - 927        65

25
```

```
 1                  I N D E X

 2           MARKED FOR IDENTIFICATION

 3    EXHIBIT           DESCRIPTION              PAGE

 4    Exhibit 12       Bates OBS930 - 931        69

 5

 6    Exhibit 13       Bates OBS575 - 576       107

 7

 8    Exhibit 14       Bates OBS910 - 911       143

 9

10    Exhibit 15       Bates OBS821 - 919       147

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                  I N D E X

2            REQUESTS FOR PRODUCTION

3   DESCRIPTION                    PAGE

4   timeline                       129

5   2022 W-2                       141

6   Unemployment documents         142

7   documents                      155

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1

2  ****************************************************

3  IN-PERSON DEPOSITION  of  PATRICIA  HARAN,  held  on

4  April  26,  2023,  at  10:00  a.m.,  at  Baker  &

5  Hostetler, 45 Rockefeller  Plaza,  14th  Floor,  New

6  York,  New  York  10111,  was  reported  by  AMBRIA

7  IANAZZI,  a  Registered  Professional  Reporter,

8  Certified  Realtime  Reporter,  and  Certified

9  Shorthand Reporter.

10  ****************************************************

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S:

 2   FISHER TAUBENFELD LLP
          Attorneys for Plaintiff
 3        225 Broadway, Suite 1700
          New York, New York 10007
 4
       BY:  LIANE FISHER, ESQ.
 5            liane@fischertaubenfeld.com

 6

 7   BAKER HOSTETLER
          Attorneys for Defendant
 8        45 Rockefeller Plaza, 14th Floor
          New York, New York 10111
 9

10   BY:  JUSTIN A. GUILFOYLE, ESQ.
          jguilfoyle@bakerlaw.com
11
          AMY I TRAUB, ESQ.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                        - o 0 o -

3

4              P A T R I C I A    H A R A N,

5         having been first duly sworn by a Notary

6    Public of the State of New York was examined and

7                    testified herein:

8

9                        - o 0 o -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9

1              P. HARAN

2              THE COURT REPORTER:  State

3    your first and last name for the record,

4    please.

5              THE WITNES:  Patricia Haran.

6              THE COURT REPORTER:  And what

7    is your address?

8              THE WITNESS:  53 Cirrus Road,

9    Holbrook, New York, 11741.

10   EXAMINATION BY

11   MR. GUILFOYLE:

12   BY MR. GUILFOYLE:

13         Q.   Good morning, Ms. Haran.

14         A.   Good morning.

15         Q.   My name is Justin Guilfoyle.

16    I'm attorney here at Baker Hostetler.

17    We represent the defendant Orange

18    Business Services, NA in this matter.

19    Just so that we have an understanding

20    for the record, I'm going to take a

21    moment to go over some ground rules, the

22    purpose of this deposition, and the

23    rules that govern it; okay?

24         A.   Sure.

25         Q.   Have you ever had your

1                   P. HARAN

2    deposition taken before?

3         A.    No.

4         Q.    Okay.  So this deposition

5    gives me the opportunity to ask you

6    questions and have you answer those

7    questions under oath.  The court

8    reporter to your left, to my right, who

9    had just administered that oath to you,

10   will be writing down everything that is

11   said during today's session; okay?

12        A.    Mh-hm.

13        Q.    You've been placed under oath.

14   That oath is the same as it would be if

15   you were in a court before a judge and a

16   jury; do you understand that?

17        A.    Yes.

18        Q.    The same rules that govern

19   your testimony, including the law

20   regarding perjury, apply here today just

21   as they would in front of a judge and

22   jury as if you were in court; do you

23   understand that?

24        A.    Yes.

25        Q.    Just some basic ground rules

1                    P. HARAN

2     that we both need to follow for purposes

3     of this deposition.  First is that your

4     response, it must be audible.  So no

5     head nods or uh-huhs because the court

6     reporter can only take down the things

7     that we say; do you understand that?

8          A.   Yes.

9          Q.   And it's human nature to kind

10    of want to jump in and interrupt if you

11    know where my question is going, but I

12    ask that you let me finish the question

13    and then answer and I'll give you that

14    same courtesy; okay?

15         A.   Yes.

16         Q.   And if I ask a question that

17    you don't understand, please just let me

18    know, I'll rephrase it or I'll ask it

19    again because if you answer one of my

20    questions, I'll presume that you

21    understood it and answered it properly;

22    okay?

23         A.   Yes.

24         Q.   Okay.  And during the

25    deposition while I'm asking you

1              P. HARAN

2    questions, you're not allowed to

3    communicate or speak with your attorney

4    in any way; okay?

5         A.   Yes.

6         Q.   And if you need a break at any

7    time just let me know, breaks are freely

8    given.  I just ask that if I have a

9    question pending, you answer that

10   question and then we could take that

11   break; okay?

12        A.   Yes.

13        Q.   All right.  Did you take any

14   drugs or medication in the last 24 hours

15   that would in any way affect your

16   ability to give your best testimony

17   today?

18        A.   No.

19        Q.   Okay.  Do you know of any

20   reason why you can't give your best

21   testimony today?

22        A.   No.

23        Q.   Do you know of any reason why

24   you can't accurately and honestly

25   testify here today?

```
 1                    P. HARAN
 2        A.   No.
 3        Q.   Okay.  Have you done anything
 4   to prepare for today's deposition?
 5        A.   Yes, my attorney and I had a
 6   preparation session for last week, I
 7   think.
 8        Q.   Without disclosing anything
 9   you discussed with your attorney, when
10   did you talk to her?
11        A.   I don't recall exactly.  I
12   think it was last Thursday or Wednesday.
13        Q.   And how long did you speak
14   with your attorney for?
15        A.   Maybe about three-and-a-half
16   hours.
17        Q.   And another ground rule here
18   for the deposition, is I'm never asking
19   for any information or conversations
20   that you've had with your attorney as
21   those are privileged; okay?
22        A.   Yes.
23        Q.   Okay.  Did you review any
24   documents in preparation for today's
25   deposition?
```

1                        P. HARAN

2          A.   Yes.

3          Q.   And what documents did you

4     take a look at?

5          A.   I reviewed my timeline that I

6     had put together, and I had looked at

7     some of the Complaint documents that

8     were filed.  So, yeah, that was pretty

9     much just some of the previous court

10    filings to just refresh on what was in

11    there.

12         Q.   Okay.  Did you review any

13    emails or anything like that?

14         A.   No.

15         Q.   And then other than your

16    attorney, have you discussed today's

17    deposition with anyone?

18         A.   Yes.

19         Q.   And who is that?

20         A.   My husband, my therapist, my

21    mother.

22         Q.   And when did you speak with

23    your husband about today's deposition?

24         A.   Sort of ongoing discussion.

25         Q.   And what about your mother?

1                    P. HARAN

2        A.   Same.  Ongoing -- I mean, you

3   know, it's weekly call conversation type

4   thing.

5        Q.   Okay.  What about your

6   therapist?

7        A.   So, I spoke with her about it

8   at some point during my almost two years

9   that I would see -- in therapy.  It was

10  probably, maybe, midway in the sessions

11  that I talked to her about it.

12       Q.   Okay.  What were these

13  conversations about with your therapist

14  regarding the deposition?

15       A.   I just let her know that --

16  that it was underway and that I wanted

17  her to know that she was going to

18  probably be requested to release some of

19  the documents that we had shared, so

20  that she knew what it was about.  And,

21  you know, I just shared some of my

22  thoughts about, you know, the whole --

23  the whole kind of stress and things that

24  were associated with making the decision

25  to go through with the lawsuit.

1              P. HARAN

2        Q.    Anyone else you can recall

3    talking about today's deposition to?

4        A.    No.

5        Q.    Okay.  Have you gone by any

6    other names other than Patricia Haran?

7        A.    My maiden name.

8        Q.    What is that?

9        A.    Patricia -- excuse me,

10   Matejovic.  It's M-A-T-E-J-O-V-I-C.

11       Q.    I believe you stated you still

12   lived at that 53 Cirrus Road in Holbrook

13   address?

14       A.    Correct.

15       Q.    How long have you lived there?

16       A.    About -- I think since 1999 --

17   '98.  So it's like over 20 years.

18       Q.    Okay.  And where did you live

19   before that?

20       A.    Various addresses.  I don't

21   know if you want me to go over all of

22   them.

23       Q.    What's the one immediately

24   preceding that address?

25       A.    I lived on Blue Point Road.  I

```
 1                    P. HARAN

 2   forgot the exact address.  It's an

 3   apartment on Blue Point Road in

 4   Holtsville, New York.

 5        Q.   What year were you born?

 6        A.   1972.

 7        Q.   Okay.  And where were you

 8   born.

 9        A.   I was born in Brookhaven, New

10   York?

11        Q.   Are you currently married?

12        A.   Yes.

13        Q.   What is your husband's name?

14        A.   Patrick.

15        Q.   Do you have any children?

16        A.   Yes.

17        Q.   How many children?

18        A.   Two.

19        Q.   And what are their names?

20        A.   Liam and Julia.

21        Q.   And how old is Liam?

22        A.   He's 19.

23        Q.   How old is Julia?

24        A.   Eighteen.

25        Q.   What is the highest level of
```

```
 1                    P. HARAN

 2    formal education that you've completed?

 3         A.    Bachelor's degree.

 4         Q.    And did you graduate high

 5    school?

 6         A.    Yes.

 7         Q.    When did you graduate high

 8    school?

 9         A.    1990.

10         Q.    Okay.  And for your BA where

11    did you obtain that from?

12         A.    Stony Brook University.

13         Q.    And what year did you get that

14    degree?

15         A.    1994.

16         Q.    Did you attend any secondary

17    educational institutions?

18         A.    Since then?

19         Q.    (Nodding.)

20         A.    I'm currently pursuing my MBA

21    at Purdue University Global.

22         Q.    Is that an online program?

23         A.    Yes.

24         Q.    Why did you decide to seek

25    your MBA?
```

                    P. HARAN

1

2        A.    Why?

3        Q.    Yes.

4        A.    I wanted to further my

5   education and just kind of be more

6   educated, you know, in the space of IT

7   and business.

8        Q.    After you graduated from

9   college, what was the first job that you

10  held?

11       A.    I worked for Car Business

12  Machines.

13       Q.    Okay.  And do you know the

14  dates of employment there?

15       A.    Yeah, I think I started in --

16  must have been, you know, some time

17  in -- I forget the month exactly, but it

18  was in 1994.

19       Q.    Okay.  What was your position

20  at Core?

21       A.    Car, C-A-R.  I was a sales

22  rep.

23       Q.    What were your

24  responsibilities in that position?

25       A.    Selling copiers and fax

1                    P. HARAN

2    machines.

3        Q.   Were those direct sales to

4    individual customers or to companies?

5        A.   No, to companies.

6        Q.   How long did you hold that

7    position?

8        A.   I was there probably about a

9    year.

10       Q.   And why did that employment

11   end?

12       A.   I resigned for another

13   opportunity.

14       Q.   Were you ever disciplined

15   during your employment at Car?

16       A.   No.

17       Q.   What was the company that you

18   joined following Car?

19       A.   MFS Intelenet.

20       Q.   And do you remember the years

21   that you were employed there?

22       A.   Roughly I was there from, I

23   guess it was probably '90 -- I graduated

24   in '94, '95.  It's going back a long

25   time, so I think I was there from like

```
 1                    P. HARAN

 2    '95 to '97, 1995 to 1997.

 3         Q.   What was your position there?

 4         A.   Sales rep.

 5         Q.   What your responsibilities as

 6    a sales rep at MFS?

 7         A.   Selling telecommunication

 8    services to business.

 9         Q.   Why did that employment end?

10         A.   I resigned.

11         Q.   Was that for another job?

12         A.   Yes.

13         Q.   Were you disciplined at any

14    time during your employment?

15         A.   No.

16         Q.   At MFS?  What was your next

17    job after MFS?

18         A.   My next job was Teleport

19    Communications Group.

20         Q.   And what was your role there?

21         A.   Sales rep, titles, you know,

22    it varied, but essentially that's it.

23         Q.   How long were you at Teleport?

24         A.   I was at Teleport from 1997

25    until -- I was there -- there was an
```

1                    P. HARAN

2   acquisition, so they were acquired by

3   AT&T, so I was there throughout that

4   acquisition and I stayed until 2004.

5        Q.   Were you ever disciplined

6   during your time there?

7        A.   No.

8        Q.   And what was your next job?

9        A.   So, after that job, then I

10  worked for a customer for a short time

11  from 2005 to 2006.  I worked at Simal

12  Technologies, they were a former client

13  of mine.

14       Q.   What did you do for them?

15       A.   I was a -- in like marketing

16  in their executive briefing center.

17       Q.   Okay.  And what made you step

18  out of that sales rep role to take on

19  this new job for them, for that client?

20       A.   I had two small children at

21  home and it was kind of close to home,

22  and so it was something that I thought

23  maybe would be a good way for me to

24  balance things with two small children.

25       Q.   And were you ever disciplined

```
 1                    P. HARAN
 2   during your employment there?
 3        A.    No.
 4        Q.    Okay.  And what was your next
 5   job?
 6        A.    So then I went to TW -- TW
 7   Telecom.
 8        Q.    Okay.  And what was your role
 9   there?
10        A.    Sales rep, essentially.
11        Q.    And what years did you hold
12   that position?
13        A.    So, I was at TW through the
14   acquisition of Level -- they were
15   acquired by Level 3 Communications,
16   which is now known as Lumen
17   Technologies.  And I was there until
18   2017, so like 11 years between the two,
19   you know, the acquisition.
20        Q.    Why did you leave at that
21   time, I guess, ultimately Level 3 or
22   Lumen?
23        A.    I was recruited to work at
24   Orange Business Services.
25        Q.    Were you ever disciplined
```

1                    P. HARAN

2    during your employment of Level 3 or

3    Lumen?

4         A.   No.

5         Q.   When were you hired by Orange

6    Business Services -- and just for the

7    record, I'm going to be referring to

8    Orange Business Services NA, Inc. as

9    Orange or OBS throughout the deposition;

10   is that okay?

11        A.   Yes.

12        Q.   So when were you hired by

13   Orange?

14        A.   I was hired -- I believe it

15   was May of 2017.

16        Q.   And what was the position for

17   which you were hired?

18        A.   Account manager.

19        Q.   Does it have a specific title

20   at Orange?

21        A.   I believe it was account

22   manager --

23        Q.   Okay.

24        A.   -- was the technical title.

25        Q.   Do you recall if you signed

1              P. HARAN

2      any agreements, when you started working

3      at Orange?

4          A.   Yes, I did.

5          Q.   Okay.  I'm going to show you a

6      document that we'll have marked as

7      Defendant's A.

8      (Whereupon,  Bates  OBS5  -   OBS11    was

9      marked as Exhibit  1  for  identification,

10     as of April 26th, 2023.)

11         Q.   And it bears OBS 5 through OBS

12     11.  You could take a look at that

13     document.

14         A.   Thank you.

15 BY MR. GUILFOYLE:

16         Q.   Ms. Haran, do you recognize

17     this document?

18         A.   Yes.

19         Q.   Okay.  And is this the

20     Confidentiality Proprietary Rights and

21     Non-solicitation Agreement U.S. that you

22     signed at Orange when you started?

23         A.   Yes.

24         Q.   Okay.  We turn to the last

25     page.  Is that your signature on May 11,

1                    P. HARAN

2    2017?

3         A.   Yes.

4         Q.   Did you always have the same

5    role throughout your entire tenure at

6    Orange?

7         A.   Yes.

8         Q.   So you never changed roles?

9         A.   No.  As far as titles, you

10   know, if that's what you mean -- titles

11   is -- has -- did not change.

12        Q.   Did your responsibilities

13   change at any time while at Orange?

14        A.   Just accounts that I was

15   working on would have changed.

16        Q.   When did that change?

17        A.   Probably several times over my

18   tenure there.  You know, just sort of

19   like somebody resigned, so we need you

20   to take on these accounts, and also work

21   on your other accounts, we're going to

22   move that account to somebody else, that

23   kind of thing.

24        Q.   Did there ever come a time

25   where you started taking on more

1                    P. HARAN

2    responsibilities for A-end accounts?

3         A.   Yeah.  Yeah.  That was part

4    of -- somebody left, somebody resigned.

5    And I was asked to handle some of her

6    A-end accounts during -- because she had

7    left the company.

8         Q.   So that's not something that

9    you requested to take on?

10         A.   Well, at that time it was

11    brought to me.  I mean, over the years I

12    had spoken about the potential of

13    working on A-end accounts, yes, but

14    these particular accounts, you know, I

15    was asked to work on them because the

16    person who had them had resigned from

17    the company.

18         Q.   Do you recall about when that

19    was?

20         A.   I recall not exactly sure, but

21    I want to say it was in the January

22    of 20 -- I guess it would have been

23    January of 2020 timeframe, I believe.

24         Q.   And who is the person that

25    left that you're referring to?

1                    P. HARAN

2        A.   Lorna Paine.

3        Q.   I'm going to show you the

4    documenter.  Mark this as Haran 2.

5    (Whereupon,  Bates  OBS13  was  marked  as

6    Exhibit  2  for  identification,  as   of

7    April 26th, 2023.)

8              MR. GUILFOYLE:  For the

9    record, this is a one-page document

10   bearing Bates OBS 13.

11       Q.   Ms. Haran, do you recognize

12   this document?

13       A.   Vaguely, I recognize it.  I

14   mean, it says Employee Handbook

15   acknowledgment for the United States.

16   So, I mean, I think there was a big pile

17   of paper that I signed when I went on

18   board and I'm sure this was one of them.

19   I don't specifically recall it, but it's

20   my signature.

21       Q.   Okay.  That's dated May 11,

22   2017?

23       A.   Yes.

24       Q.   I'm going to show you another

25   document that will be marked as Haran 3.

```
 1                    P. HARAN

 2   (Whereupon,  a  document  was  marked   as

 3   Exhibit  3  for  identification,  as    of

 4   April 26th, 2023.)

 5        Q.   And do you recognize this

 6   document as one of those documents you

 7   mentioned that you signed when you were

 8   onboarding?

 9        A.   I don't recognize it in

10   particular, but it is my signature and

11   like I said there was a big pile of

12   papers that I was asked to sign when I

13   was onboarded.

14        Q.   Okay.  That signature is dated

15   May 18, 2017?

16        A.   Yes.

17        Q.   Who did you report to during

18   your employment with Orange?

19        A.   I reported to Adam Kimmick.

20        Q.   Do you know Adam Kimmick's

21   title?

22        A.   Sales director.  Head of

23   sales, I think.  I'm not sure.

24        Q.   Okay.  What.

25   (Simultaneous speaking.)
```

```
 1                    P. HARAN

 2        A.   Sales director.

 3        Q.   Was that for a specific region

 4   of the United States?

 5        A.   He was responsible for the

 6   northeast and the midwest regions.

 7        Q.   Did you report to anyone else?

 8        A.   No.

 9        Q.   During your employment at

10   Orange, did you receive performance

11   evaluations?

12        A.   Yes.

13        Q.   Did you meet with anyone to

14   discuss those performance evaluations?

15        A.   Yes.

16        Q.   And who was that?

17        A.   Adam Kimmick.

18        Q.   Anyone else?

19        A.   No.

20        Q.   I'm going to show you a

21   document that will be marked as Haran 4.

22   (Whereupon, BATES OBS334 -  343   was

23   marked as Exhibit  4  for  identification,

24   as of April 26th, 2023.)

25             MR. GUILFOYLE:  And for the
```

1                    P. HARAN

2   record this is a document bearing Bates

3   OBS334 through 343.

4        Q.   Ms. Haran, do you recognize

5    this document?

6        A.   Let me just take a look here.

7        Q.   Take your time.

8        A.   Okay.

9        Q.   Okay.  And do you recognize

10    this document?

11        A.   I do.

12        Q.   And what is this document?

13        A.   A performance review.

14        Q.   And is this for the first half

15    of 2020?

16        A.   Yes.  It appears to be.

17        Q.   Do you know who created this

18    performance review?

19        A.   It was created by Adam Kimmick

20    and myself.

21        Q.   Okay.  And if I could just

22    bring your attention --

23        A.   I mean it was filled in, I

24    would say, by us.  It wasn't created by

25    us.  It was created by a company, I

1                     P. HARAN

2   assume.  It's a performance review plan

3   that I think everybody fills in, but it

4   was populated by myself and Adam.

5        Q.   So the templates for the

6   performance review was created by

7   Orange?

8        A.   Correct.

9        Q.   And then the contents of what

10  went in there specific to you were

11  inputted by Adam and yourself?

12       A.   Correct, yes.

13       Q.   Okay.  If I can bring your

14  attention to page 8 of 10, if you look

15  on the lower right corner.

16       A.   Lower right corner.

17       Q.   Yes, so now if I bring your

18  attention to where it says manager's

19  comments, do you see that at the top of

20  the page?

21       A.   Yes.

22       Q.   Okay.  Could you read the

23  first two sentences under manager's

24  comments for me?

25       A.   Yes.  "First half 2020 was a

1                     P. HARAN

2   challenge for Patty in her new

3   territory.  Results on revenue were in

4   line with the expectations that fell

5   short of target in both keep and new and

6   get orders."

7         Q.   What is the next sentence

8   there?

9         A.   "Her qualified pipeline is not

10  currently sufficient to meet her 2020

11  financial objectives, and the new

12  opportunities created in 2019 with her

13  B-end accounts exploring partnership and

14  sell with opportunities to expand our

15  portfolio, have not yet matured as ample

16  opportunities."

17        Q.   Okay.  What does it mean that

18  your qualified pipe library is not

19  currently sufficient to meet 2020

20  financial objectives?

21        A.   Well, I mean I'd be

22  speculating on what Adam means there; is

23  that what would you like for me to do?

24        Q.   Sure.  What is your

25  understanding of what that means?

1                    P. HARAN

2          A.   My understanding is that

3     pipeline is a sales forecast and

4     typically sales forecasts, you know, are

5     larger than what the quota is that's

6     assigned.  And so when he's saying that

7     he thinks that my pipeline is not, you

8     know, his words here, my pipeline is not

9     sufficient, then he doesn't feel that I

10    have enough opportunities in my sales

11    forecast to meet my target quota for

12    2020.

13         Q.   If we could turn to the next

14    page, please?

15    (Witness complies.)

16         Q.   And do you see where it says

17    acknowledgment by the employee the 30th

18    of July 2020?

19         A.   Yes.

20         Q.   Okay.  Do you recall having

21    completed the performance review on or

22    about July 30, 2020?

23         A.   Yes.

24         Q.   And is that typical for

25    first-half performance reviews to be

1                     P. HARAN

2       done towards the end of July, in your

3       experience?

4            A.   I don't know.  I'd have to --

5       you know, I really don't know.  I mean

6       typically they'd be done somewhere

7       around the end of the first half, so it

8       seems a little late, but that's just,

9       you know, it's probably -- it's

10      probably, you know, it could be done

11      earlier in June or something, so, but,

12      you know, it's not -- it seems to be at

13      the end of July, so.

14           Q.   Okay.  I'm going to show you

15      another document.

16                MR. GUILFOYLE:  For the

17     record, this will be Haran 5.

18      (Whereupon, BATES  OBS344  -   353    was

19      marked as Exhibit  5  for  identification,

20      as of April 26th, 2023.)

21           Q.   I just ask that you take a

22      moment and look through that document,

23      please.

24                MR. GUILFOYLE:  For the

25     record, it's OBS344 through 353.

1              P. HARAN

2        Q.   Do you recognize this

3    document?

4        A.   Yes.

5        Q.   What do you recognize it to

6    be?

7        A.   A performance review.

8        Q.   Do you know who input the

9    substance of text within this review?

10       A.   Yes.

11       Q.   Who was that?

12       A.   Adam Kimmick and myself.

13       Q.   If I could bring your

14   attention to the page identified by nine

15   out of ten.  Can you tell me what the

16   overall rating is there?

17       A.   Yes.  The rating is two,

18   improvement needed.

19       Q.   Okay.  And with the evaluation

20   process at Orange, you were given the

21   opportunity to respond to your manager's

22   comments and conclusions in here, right?

23       A.   Correct.

24       Q.   Okay.  And it looks like you

25   did so below the manager's comments here

1                    P. HARAN

2      on this page?

3           A.   Yes.

4           Q.   Okay.  Did you note anywhere

5      in this performance review that you

6      believed your improvement needed rating

7      was due to you having taken time off in

8      connection with your daughter's or your

9      mother's illness?

10          A.   Could you repeat the question?

11          Q.   Sure.

12               MR. GUILFOYLE:  Could you read

13   that back for me?

14      (Whereupon,  the  requested  portion  was

15      read back by the reporter.)

16          A.   No, it's -- I don't see that

17      in here.

18   BY MR. GUILFOYLE:

19          Q.   Do you see anything on this

20      page about your lack of focus?

21          A.   There's just a comment that

22      says, "urgent focus, it needs to be on

23      identifying new opportunities and moving

24      these progressively through the

25      pipeline."  It's the last sentence.

1                    P. HARAN

2        Q.   Okay.  But you see anything

3   regarding specifically the phrase lack

4   of focus?

5        A.   I do not.

6        Q.   As part of this case, you

7   claim that Mr. Kimmick informed you as

8   part of this evaluation that you had a

9   lack of focus; when did he say that to

10  you?

11       A.   So, when we went over this

12  review in conversation, he said that to

13  me.  He also mentioned it to me on

14  several other occasions.  We had weekly

15  calls.  And we also -- during one of

16  those weekly calls, I presented to him a

17  plan for the forecast.  Even though I

18  didn't have a quota assigned to me for

19  2021, it was never given to me, I took

20  the initiative to try to create a

21  forecast assumption based on what my

22  quota the previous year was.  And I

23  presented a plan to him about how I was

24  going to build -- funnel that was

25  sufficient to -- or pipeline as he

1                    P. HARAN

2      termed it, to be sufficient to make that

3      number that I was guessing at because I

4      hadn't been given a number yet.

5                    And, you know, again the lack

6      of focus feedback was given to me by

7      Adam.

8                    MR. GUILFOYLE:  Okay.  I would

9      move to strike the nonresponsive portion

10     of that answer.

11          Q.   The question was about when

12     Adam mentioned a lack of focus to you?

13                    MS. FISHER:  I think that's

14     what she just said.  During that latter

15     conversation he also mentioned it.

16  BY MR. GUILFOYLE:

17          Q.   What did you say in response

18     when Adam mentioned a lack of focus

19     during this performance review?

20          A.   So, during this performance

21     review when he talked to me about the

22     lack of focus, my response was that I

23     disagreed, you know, with that

24     assumption or that assessment and that,

25     you know, I was dealing with my

1                    P. HARAN

2   daughter's illness.  I was dealing with

3   all of those activities that were

4   related to it and I was doing my best to

5   focus on the job and the

6   responsibilities that I had while I was

7   managing all of the appointments and

8   diagnosis, and aftermath of her illness,

9   and surgery, and recovery, and

10  investigation of everything that was

11  wrong.

12          So, I was -- you know, I was

13  offended because I thought, you know,

14  well I'm trying here to do what I can to

15  keep my focus, given all of these

16  factors that are mitigating, you know,

17  for me, in my -- related to the -- all

18  of those activities with her, my

19  daughter.

20      Q.  And did Mr. Kimmick elaborate

21  on what he meant by, "lack of focus"?

22      A.  Well, yes, he did.  And his --

23  one of his comments was about how I had

24  not been successful with creating

25  coaches within my accounts that would

1          P. HARAN

2   have enabled me to get past certain

3   obstacles that we had in the sales

4   cycle.  And so what he mentioned in

5   particular was that we had a legal -- a

6   legal impasse with an account, Pfizer,

7   and due to that legal impasse we were

8   not able to sign a contract.  And he

9   said that had I been more focused on

10  developing a relationship with somebody

11  at that account that could have helped

12  navigate us past that obstacle, then we

13  would have closed that business.

14          And so that was sort of one of

15  the examples, that he felt that I was

16  not focused enough to make that -- to

17  make that connection that would have

18  given somebody a pass on these -- these

19  very onerous, legal issues that were,

20  you know, outside of my control.

21       Q.  Did Mr. Kimmick say anything

22  about you taking time off in connection

23  with your daughter's or your mother's

24  illnesses during this performance

25  evaluation?

1                    P. HARAN

2         A.   It was -- we did discuss it,

3    yes.  I brought it up to him and said

4    you know again like I've mentioned in my

5    earlier statement, you know, I was

6    dealing with the -- my mother -- my

7    daughter's illness.  I was dealing with

8    all of the events that were preceding

9    that and that it was difficult for me

10   to, you know, juggle that along with

11   everything else that my responsibilities

12   were for the job.

13              MR. GUILFOYLE:  Okay.  I'm

14   going to move to strike the nonresponsive

15   answer.

16         Q.   The question was:  Did

17   Mr. Kimmick say anything about you

18   taking time off in connection with your

19   daughter's or mother's illness; not if

20   you said anything?

21         A.   He did not bring it up, but he

22   responded to my bringing it up, did

23   that --

24         Q.   Makes sense?

25         A.   Makes sense.

1                    P. HARAN

2        Q.   So what makes you think that

3   your two rating here has anything to do

4   with the days you take off in connection

5   with your daughter's illness in October?

6        A.   Well, the focus commentary

7   that we had, and in the conversation

8   that the lack of focus was his

9   assessment around why he thought that I

10  was not able to -- to meet the objective

11  in this -- in this overall rating.

12       Q.   And do you believe you had

13  a -- you did indeed have a lack of focus

14  during this time?

15       A.   Yeah, I mean, it was something

16  that was -- it was something that I was

17  trying to work through, and, you know,

18  balance as best as I could to do the

19  right thing for the company, to do the

20  right thing to advance all of my sales,

21  and also, you know, manage my daughter's

22  illness and all -- everything that was

23  associated with that, so yeah.

24       Q.   Let me show you another

25  document.

1              P. HARAN

2         And this will be Haran 6.

3    (Whereupon,  a  document  was  marked  as

4    Exhibit  6  for  identification,  as   of

5    April 26th, 2023.)

6         Q.   Okay.  I just ask you to take

7    a moment and review that document.

8         A.   (Perusing.)

9         Q.   Do you recognize this

10   document, Ms. Haran?

11        A.   Yes.

12        Q.   What do you understand this

13   document to be?

14        A.   This is the formal complaint

15   that was filed with the court for my

16   lawsuit.

17        Q.   Did you review this document

18   prior to it being filed?

19        A.   Yes.

20        Q.   Is the information contained

21   in this document accurate?

22        A.   Yes.

23        Q.   I'm going to show you another

24   document.

25             MR. GUILFOYLE:  And this will

```
1                    P. HARAN

2   be Haran 7.

3       (Whereupon,  a  document  was  marked  as

4       Exhibit  7  for  identification,  as   of

5       April 26th, 2023.)

6           Q.   I ask that you take a moment

7       and review that document for me, please.

8           A.   (Perusing.)

9               Okay.

10          Q.   Do you recognize this

11      document?

12          A.   Yes.

13          Q.   What do you recognize it to

14      be?

15          A.   It is the Interrogatories, I

16      believe, for all of the people that I

17      listed as having knowledge of -- related

18      to the case.

19          Q.   So these were your Responses

20      to Interrogatories that were sent over

21      to you by Orange; is that correct?

22          A.   Yes.

23          Q.   Did you review this document

24      prior to it being served in this case?

25          A.   Yes.
```

1              P. HARAN

2        Q.    Okay.  And do you see your

3     signature anywhere on this document?

4        A.    I would have to look through

5     it again.

6        Q.    If you don't mind, please.

7        A.    I do not see it.

8        Q.    Is there a reason why you

9     didn't sign this document?

10        A.    I believe I did sign it.

11        Q.    Okay.  Is there any reason why

12     Orange wouldn't be in possession of

13     these responses with your signature?

14        A.    I don't know.

15        Q.    Okay.  Well, I'll ask that you

16     sign a copy here and date and then we

17     can have that for our records and

18     introduce it as an exhibit in this

19     deposition.

20             MS. FISHER:  That won't be

21     necessary.  I think she sent me a

22     verification and I think it was my neglect

23     in not sending it to you.

24             MR. GUILFOYLE:  Could we have

25     that during a break and avoid having to do

1                    P. HARAN

2     this here?

3               MS. FISHER:  Let me see if I

4     have it right now.  I might be able to --

5     go ahead.

6               MR. GUILFOYLE:  Okay.

7    BY MR. GUILFOYLE:

8          Q.   Switching gears a little bit.

9     Do you know an employee at Orange named

10    Michelle Rocco?

11         A.   Yes.

12         Q.   Okay.  How do you know

13    Michelle?

14         A.   Michelle is in human

15    resources.  She was part of the

16    recruited -- she recruited me.  She was

17    part of the hiring team that brought me

18    onboard, and then I also knew her from

19    seeing her in the office, speaking with

20    her over the years.

21         Q.   Okay.  Was there some sort of

22    charity event contest that Michelle was

23    involved in where you won a prize?

24         A.   Yes.

25         Q.   At some point in time did you

1                    P. HARAN

2   arrange to meet up with Michelle Rocco

3   at a pizzeria to get your prize?

4        A.   Yes.

5        Q.   Okay.  And do you know when

6   you ultimately met up with Ms. Rocco to

7   get your prize?

8        A.   I -- it was around

9   October 18th, if my memory serves me,

10  but I'm not -- I would have to look at

11  the -- you know, the appointment

12  confirmation, but I believe it was on or

13  around October 18, 2020.

14       Q.   And when you met Michelle at

15  the pizzeria, what did you two talk

16  about?

17       A.   Well, we met for about 40

18  minutes, so we spoke about several

19  things.  I mean, we spoke about -- I

20  told her about my daughter's illness.  I

21  told her about the ongoing -- the

22  ongoing issues that I was having with

23  the school and getting her homeschooling

24  situated because she was not allowed to

25  go back to school.  She was -- the

P. HARAN

1

2  doctor recommended that she not return

3  to class until January.  So she was

4  being homeschooled and I needed to go

5  through the social worker at the

6  hospital to help with getting all of the

7  paperwork established so that her

8  homeschooling would be approved and

9  done.  So I told her all about that.

10          And she talked a little bit

11  about, you know, just school, dealing

12  with schools in general and how that can

13  be frustrating and difficult at times.

14  And then we also spoke about -- I told

15  her that, you know, my daughter's

16  surgery had -- had happened and that she

17  was recovering at home, and I said that

18  we were hopeful but that -- at that

19  time, her diagnosis was -- the doctor

20  said that she might have to have another

21  surgery.  And so I told her that we were

22  hoping and praying that she was not

23  going to need another surgery.

24          And I told her that she also

25  had, when they did all of the, you know,

1                    P. HARAN

2    the diagnosis, they found other

3    potential areas in her bones that had

4    infection, and so there was ongoing, you

5    know, infectious disease doctor visits

6    that I was doing in order to have me --

7    to try to make sure that there was

8    nothing there with that -- with other

9    parts of her bones that might be

10   affected.

11            And so I, you know, told her

12   about everything that, you know, was

13   happening in relation to the, you know,

14   what was to come, what had happened,

15   and, you know, the day-by-day sort of.

16   We talked about -- I talked about the

17   struggle that I was having related to

18   working and, you know, taking time off

19   and I had -- I apologized because I was

20   supposed to meet with her on a different

21   date and I wasn't able to meet with her

22   because I couldn't get there because of

23   my daughter having -- I think she was

24   just coming home from the hospital at

25   that point, somewhere around that time.

1          P. HARAN

2    So I had to reschedule.

3          So we talked about the ongoing

4    challenge, you know, of juggling the

5    demands that I had.  I talked about the

6    increase pressure that I was

7    experiencing in terms of the sales

8    environment and the challenges that, you

9    know, I had in trying to close the deals

10   and that, you know, it was -- these were

11   all, you know, ongoing competing

12   priorities that were a struggle for me.

13          We also talked about the

14   social worker that I -- I told her, you

15   know, that the social worker that helped

16   me with the school, that she also had

17   given me some advice about the future

18   with my son, who was a little closer to

19   becoming college age, and she had a

20   daughter who was in the same boat.  So

21   we talked about the scholarship process

22   and how that's something that could

23   be -- so I told her that I would share

24   with her some information.  And I

25   believe I shared that with her after our

```
 1              P. HARAN

 2    conversation.

 3              So it was like a 40-minute

 4    kind of back and forth discussion.

 5              MR. GUILFOYLE:  Thank you.

 6    That was efficient.

 7         Would you have a problem if I

 8    amended this to the exhibit currently in

 9    evidence?

10              MS. FISHER:  No, of course

11    not.

12              MR. GUILFOYLE:  And that'll be

13    Exhibit 7.

14         Q.   I'm going to show you a

15    document that will be marked as Haran 8.

16    (Whereupon, a document was marked as

17    Exhibit 8 for identification, as of

18    April 26th, 2023.)

19         Q.   I just ask that you take a

20    look at this document.

21         A.   (Perusing.)

22              Okay.

23         Q.   Do you recognize this

24    document?

25         A.   I do.
```

1                    P. HARAN

2       Q.   What do you recognize it to

3   be?

4       A.   I actually -- I mean, I

5   recognize it now.  I hadn't -- it's been

6   a while since, you know, I wrote this,

7   so I recognize it to be a correspondence

8   between Michelle Rocco and myself.

9       Q.   Okay.  And in these emails did

10  you request any sort of leave for any

11  time off from Michelle Rocco?

12      A.   No.

13      Q.   Okay.  How did you come to

14  learn that your employment at Orange had

15  been terminated?

16      A.   I was invited to a call, I

17  believe it might have even been my

18  weekly -- I don't know, it was a call

19  that I was invited to by Adam Kimmick,

20  WebEx.

21      Q.   A virtual meeting type thing?

22      A.   Yes.

23      Q.   And do you recall when that

24  was?

25      A.   It was -- I believe, it was

1                    P. HARAN

2     February 24, 2021.

3          Q.   And do you know where Adam was

4     during this meeting?

5          A.   Physically?

6          Q.   Yes.

7          A.   I don't recall.

8          Q.   Okay.  Was anyone else present

9     at this meeting?

10         A.   Yes.

11         Q.   Who was that?

12         A.   Jennifer Lawson.

13         Q.   And who is Jennifer Lawson?

14         A.   She's a human resources

15    manager or associate.  I don't know her

16    title exactly.

17         Q.   And did they provide a reason

18    for your termination during that

19    meeting?

20         A.   There were two reasons

21    provided.

22         Q.   And what were those two

23    reasons?

24         A.   The reason number one, I

25    believe it was Adam who said -- well,

1                    P. HARAN

2    Jennifer first said, as I recall, when I

3    asked her why I was terminated, she said

4    it was because you didn't make your 2020

5    quota or something along those lines.

6    Don't quote me exactly, but it was that

7    I didn't -- maybe it was my sales

8    achievement I don't know how she said

9    it, but it was my 2020 quota.  And then

10   Adam jumped in and said no, it's because

11   you don't have an adequate forecast for

12   2021.  But as I had mentioned earlier I

13   did not get a quota, and I said this to

14   him in that conversation, I was never

15   given a quota for 2021.

16        Q.   Okay.  And I believe you had

17   testified before that you only reported

18   to Adam Kimmick; is that correct?

19        A.   Correct.

20        Q.   And Ms. Lawson was not your

21   supervisor, correct?

22        A.   Correct.

23        Q.   Do you know who made the

24   decision to terminate your employment

25   from Orange?

1                    P. HARAN

2          A.   I could speculate, but I don't

3     know if that makes sense to guess, you

4     know, I mean -- I -- I'm not a hundred

5     percent sure who made the decision, but

6     I believe it was Adam Kimmick who made

7     the decision.

8              And I believe that he -- Eddy

9     Youkhanna was also part of that decision

10    process.  He was a sales director that

11    Adam reported to.

12         Q.   Okay.  So he was one level

13    higher than Mr. Kimmick?

14         A.   Correct.

15         Q.   All right.  I'm going to show

16    you a document that will be marked as

17    Haran 9.

18    (Whereupon,  Bates  OBS381  -  383   was

19    marked  as  Exhibit  9  for  identification,

20    as of April 26th, 2023.)

21              MR. GUILFOYLE:  And for the

22    record, this is a document bearing Bates

23    OBS381 through 383.

24         Q.   And Ms. Haran, I just ask that

25    you take a moment and review this

1                    P. HARAN

2   document.

3        A.   Okay.

4        Q.   Do you recognize this

5   document?

6        A.   Yes.

7        Q.   What do you recognize it to

8   be?

9        A.   It's a termination letter that

10  I received after -- after I was

11  terminated.

12       Q.   Do you recall on what date you

13  received this letter?

14       A.   I do not recall exactly what

15  date.  It was -- it has the 24th in the

16  letter.  I don't know if that's what --

17  it was emailed to me.  I don't remember

18  the day that it was emailed to me.

19       Q.   And did you receive this

20  letter after your meeting with

21  Mr. Kimmick and Ms. Lawson?

22       A.   Yes.

23       Q.   Prior to your termination, did

24  you ever feel that your employment could

25  be in jeopardy because of your

1                    P. HARAN

2    performance?

3         A.   Yes.

4         Q.   Okay.  Did you discuss that

5    with anyone?

6         A.   Yes.

7         Q.   Who did you discuss that with?

8         A.   Well, the question is who did

9    I discuss the concerns that I had about

10   it being in jeopardy about my

11   employment?

12        Q.   Because of your performance.

13        A.   Because of my performance.

14             Well, I mean, when we say it

15   was because of my performance, it was

16   also because of the time off, you know,

17   that I was taking and the lack of focus,

18   and the perception that was there.  So

19   it wasn't just one thing, you know, it

20   was -- but performance was part of that.

21   So I just want to be careful about how

22   to answer that so that -- because

23   usually it was like a combined

24   conversation.  It was sort of like, Hey,

25   the performance is, you know, always an

1                    P. HARAN

2    increasing pressure that I'm receiving

3    and then it's tied into the fact that I

4    have these pressing caregiving

5    responsibilities that I'm juggling.

6              So I just want to make sure

7    that we're, you know, because it was --

8    the conversation was twofold.

9        Q.   Okay.  Do you -- my question

10   is:  Do you recall, prior to being

11   terminated, any conversations you had

12   with someone about feeling your

13   employment was in jeopardy?

14       A.   Yes.

15       Q.   Because of your performance?

16            And who is that?

17       A.   Well, I talked to -- let me

18   look back.  A list, right, to help here.

19   I talked to Michelle Rocco as I shared

20   with you earlier.  I talked to Adam

21   Kimmick about as well.  I talked to

22   Peter Singh about it.  I talked to Lou

23   Boudreau about it.  I talked to Danielle

24   Willins about it.  I talked to German

25   Romero about it.

```
1              P. HARAN

2         I talked to Marie-Cecile

3   Deraedt about it.  I talked to Paul

4   Reticker about it.  I talked to Phillipe

5   Melegrito did about it, and I talked to

6   M.J. Hubert about it.

7         Q.   Let me show you a document

8   that's going to be marked as Haran 10.

9   (Whereupon,  a  document  was  marked  as

10  Exhibit  10  for  identification,  as  of

11  April 26th, 2023.)

12        A.   Okay.

13        Q.   Do you recognize this

14  document?

15        A.   I -- yeah, I mean, it's --

16  I've not seen it before, so -- but I

17  recognize, you know, the -- that it's --

18  looks like a Teams chat.

19        Q.   Okay.  Who is that Teams chat

20  between?

21        A.   Myself and Peter Singh.

22        Q.   Your email address while at

23  Orange was Patty.Haran@Orange.com?

24        A.   Yes.

25        Q.   Prior to your termination from
```

1               P. HARAN

2    Orange, were you ever looking for a new

3    job?

4        A.   Well, when you're in sales

5    there's always new job opportunities,

6    you know, that are -- that you're

7    looking at, and that are, you know,

8    coming to you from recruiters and

9    things.  So it's kind of a constant

10   thought of, you know, is this -- what

11   else is out there, so, yeah, I mean.

12       Q.   Were you using a recruiter at

13   any time while you were employed at

14   Orange to look for other employment?

15       A.   Was I using a recruiter?  I

16   had recruiters contacting me over the

17   course of my employment several times,

18   you know, so yeah.  I mean, there wasn't

19   a particular recruiter.  They would call

20   and say, Hey I might have a job that

21   would be a good fit for you, do you want

22   to talk about it?  That was a common

23   occurrence with salespeople.

24       Q.   Were there any instances where

25   you took the recruiter up on the offer

                    P. HARAN

1

2    to discuss the potential new role?

3         A.   Yes.

4         Q.   Okay.  When was that?  When

5    was the first time you did that while

6    employed at Orange?

7         A.   I don't recall all the exact

8    times that I did that.  I mean,

9    sometimes somebody would call or send a

10   message or something, you know, and

11   you'd say -- so I really don't recall

12   every one.  I don't want to, you know,

13   guess incorrectly, so, you know, because

14   it's not something that was like, Let me

15   make a note of this.

16             You know, it's such a common

17   occurrence that you would have a

18   recruiter reaching out or having

19   conversations, that I can't specify

20   exactly which -- every time that it

21   happened, you know, if that makes sense.

22        Q.   That's fair.  How often would

23   you say that you engaged with a

24   recruiter who had reached out to you

25   regarding a new position while you were

1                    P. HARAN

2    employed at Orange?

3         A.   I don't -- I can't guess.  I

4    don't know.  I don't recall exactly,

5    like I said, every time.  I mean, you

6    know, it was -- I don't -- I can't

7    venture a guess.  I don't want to state

8    inaccurately, because I don't really

9    remember every time.

10        Q.   Would you say that it was more

11   than five times?

12        A.   Over my entire tenure there?

13        Q.   Yes.

14        A.   I really don't recall.  I

15   don't recall how many times.  I don't

16   know if it was three times or seven

17   times or I don't -- I'm not really sure,

18   but it's a common occurrence like I

19   said.  You know, it's any salesperson

20   will tell you the same thing.  It's, you

21   know, you get calls, sometimes you talk,

22   sometimes you don't.  It's just part of

23   the nature of the job.

24        Q.   Prior to your termination from

25   Orange did you ever speak with anyone at

1                    P. HARAN

2      Orange regarding looking for a new job?

3           A.   Yes.

4           Q.   Who would those people at

5      Orange be?

6           A.   Well, again, you know, trying

7      to recall every instance is difficult,

8      you know, of -- because it's banter

9      sometimes, you know, around

10     conversation.  Hey, you know, how long

11     you gonna stay here for?  Things are

12     challenged.  These are just, you know,

13     so -- I mean, it's hard to say.  It's

14     just one of those things that is, again,

15     part of the sales, you know, DNA is that

16     you know you're looking at what, you

17     know, is the grass greener, you know, do

18     I stay, what's happening, what changes,

19     what's the quota this year?  So it was

20     just an ongoing sort of conversation

21     that happens.

22          Q.   Do you have a recollection of

23     specific individuals that you had these

24     kind of conversations with?

25          A.   I don't recall the specifics.

```
1                    P. HARAN

2            MR. GUILFOYLE:  I'm going to

3    show you what'll be marked as Haran 11.

4            For the record, it's a document

5    bearing Bates OBS926 through 927.

6       (Whereupon,  Bates  OBS926  -   927   was

7        marked as Exhibit 11  for  identification,

8        as of April 26th, 2023.)

9            Q.   I just ask that you take a

10       moment and review that document for me.

11           A.   Okay.

12           Q.   Do you recognize this

13       document?

14           A.   I have not seen this document

15       before, but it appears to be a -- a

16       Teams chat, again, between Peter Singh

17       and myself.

18           Q.   And it appears that these were

19       dated February 10, 2021; is that

20       correct?

21           A.   Yes.

22           Q.   Following being notified of

23       your termination from Orange, did you

24       speak about that termination with any

25       Orange employees?
```

1                        P. HARAN

2        A.    Yes.

3        Q.    Who were those Orange

4    employees?

5        A.    Again, I'd have to look at the

6    list here of the people that --

7              So your question is did I talk

8    to people about the fact that I was

9    terminated?  Did I tell people who

10   worked at Orange that I had been

11   terminated?

12       Q.    Did you discuss your

13   termination?

14       A.    Okay.

15       Q.    With any Orange employees?

16       A.    Well, yeah.  I mean, I

17   discussed it with Adam Kimmick during my

18   exit.  I discussed it with Peter Singh.

19   I discussed it with Lou Boudreau.

20              I discussed it with German

21   Romero.  I discussed it with Danielle

22   Willins.  Obviously, I discussed it with

23   Jennifer Lawson.  I discussed it with

24   Xavier Pichon.  I discussed it with

25   Marie-Cecile Deraedt.  I mean, people

1          P. HARAN

2    called me, so -- you know, and said,

3    Hey, I heard you got terminated.  And so

4    Peter, Paul Reticker.  I mean, so yeah,

5    I mean, it was -- I spoke to Phillipe

6    Melegrito.  I spoke to Michel.  I forgot

7    his last name.  I spoke to Christophe

8    Robert.  I spoke to Natalie Theron.  I

9    spoke to M.J. Hubert.

10        Q.   Were these conversations

11   taking place on February 24th or on some

12   date later?

13        A.   I don't recall all the exact

14   dates of when I spoke to everybody, but,

15   yeah, I mean it was -- I don't recall

16   the exact dates of when I spoke to

17   everybody.

18        Q.   Did they take place while you

19   were still employed on February 24th or

20   at some time after you were notified of

21   your termination?

22        A.   I don't recall the exact

23   dates, you know, it was -- I don't think

24   every single one of them happened on the

25   24th.  I don't recall the exact dates,

1                    P. HARAN

2       though.

3           Q.   What was the purpose of these

4       conversations?

5           A.   So, they were different

6       conversations with different people.

7       And so they were transition

8       conversations around accounts in some

9       cases, as far as, you know, handing over

10      activities that were underway to people

11      who had a -- you know, a -- that was I

12      was teaming with on these specific

13      different customer activities and

14      accounts and things.  So some of them

15      were, you know, friends -- friendship

16      sort of lamenting type conversations

17      about, you know, they heard or, you

18      know.

19               I was told that Adam made an

20      announcement on a call to several people

21      that I was terminated against my wish,

22      you know, against -- that I was

23      involuntary termination.  So, you know,

24      it was -- some of it was also that sort

25      of lamenting type of conversation.

1          P. HARAN

2          Q.   I'll show you what will be

3     marked as Haran 12.

4     (Whereupon,  Bates  OBS930  -   931    was

5     marked as Exhibit 12  for  identification,

6     as of April 26th, 2023.)

7               MR. GUILFOYLE:  For the

8     record, it's a two-page document bearing

9     Bates OBS930 through 931.

10         A.   Yes.

11         Q.   I just ask that you take a

12    moment and review that document and let

13    me know when you've had the opportunity

14    to do so.

15         A.   Okay.

16         Q.   Do you recognize this

17    document?

18         A.   This is the first time I'm

19    seeing this document, but it looks like

20    a text exchange that were a Teams

21    exchange I believe between Xavier Pichon

22    and myself.

23         Q.   Okay.  And who is Xavier

24    Pichon?

25         A.   Global account director at

1                     P. HARAN

2       Orange.

3              Q.   And that's Orange NA?

4              A.   No, Orange Business Services.

5       To my knowledge, I believe that's the

6       employer that he was also --

7       (Simultaneous speaking.)

8              A.   I'm just wondering -- I think

9       he's also with Orange Business Services.

10      I don't know, you know, on the France

11      side, if it's Orange or -- Orange

12      France, you know, or what his exact

13      employer, you know, company list is,

14      but he's with Orange.

15             Q.   But he worked out of France?

16             A.   Correct.

17             MR. GUILFOYLE:  We've been

18      going for well over an hour.  Take ten

19      minutes and.

20             MS. FISHER:  Sure, yeah.

21             MR. GUILFOYLE:  Okay.  I

22      appreciate that.

23      (Whereupon, a short recess was taken.)

24  BY MR. GUILFOYLE:

25             Q.   Ms. Haran, do you understand

                    P. HARAN

1    you're still under oath?

3       A.   Yes.

4       Q.   Okay.  If I could bring your

5    attention back to what's been marked as

6    Exhibit 7, which are your responses to

7    Interrogatories.

8       A.   Exhibit 7?

9       Q.   Yes.

10      A.   That's 12.  Okay.

11      Q.   In these responses you list

12   several individuals who you believe may

13   have knowledge or information concerning

14   the subject matter of your federal

15   complaint; could you please review

16   those?  They're in the response to

17   interrogatory number one.

18      A.   Do you want me to read the

19   names?

20      Q.   Just review them to yourself,

21   please.

22      A.   Okay.

23      Q.   Is your Response to

24   Interrogatory Number 1 accurate?

25      A.   Yes.

1                    P. HARAN

2        Q.   Does Michelle Rocco have any

3    additional information regarding your

4    complaint other than what we've

5    discussed so far today?

6        A.   I don't know what Ms. Rocco is

7    in possession of.  I don't know --

8        Q.   Okay?

9        A.   So, I would guess what she has

10   possession of.

11       Q.   So the question here for

12   Interrogatory Number 1 asks you to

13   identify persons who you believe may

14   have knowledge or information concerning

15   the subject matter of your complaint.

16       A.   Mh-hm.

17       Q.   Defendant's defenses,

18   defendant's counterclaims and your

19   defenses to defendant's counterclaims;

20   do you see that?

21       A.   Yes.

22       Q.   Okay.  So my question is, what

23   knowledge or information does Ms. Rocco

24   have regarding your complaint other than

25   what we've discussed so far today?

1                     P. HARAN

2          A.   I don't -- I don't think -- as

3   we talked about earlier, I told her all

4   about it.  I'm, you know, when we met at

5   the pizza place, I don't think -- I

6   don't know what else -- what other

7   information she might have outside of

8   that.

9          Q.   And does Mr. Kimmick have any

10  additional information regarding your

11  complaint other than what we've

12  discussed so far today?

13         A.   I think that we haven't really

14  talked a lot about, you know, all of the

15  conversations about her -- you know, the

16  health conditions that I've had with

17  him, but that's the knowledge that he

18  has, is everything that I told him about

19  the health conditions of my daughter and

20  my mother.

21         Q.   And what information does Eddy

22  Youkhanna have regarding your complaint?

23         A.   Well, as I -- as it referenced

24  in here, I had communicated with him

25  about my daughter's surgery and my

1                   P. HARAN

2    inability to attend a training that he

3    had wanted me to be apart of.  So he was

4    aware of my daughter's condition, and he

5    was aware of, you know, the time off

6    that I needed to care for her.

7         Q.   And when did you have that

8    conversation with Mr. Youkhanna?

9         A.   So I had a -- I don't remember

10   the exact date of the conversation, but

11   it was at some point in between --

12   between September and October before her

13   surgery.

14        Q.   And when was your daughter

15   diagnosed with her illness?

16        A.   Well, the diagnosis exact

17   date, I don't recall, but it was

18   somewhere in the late-September,

19   early-October timeframe.  And it was in

20   a series of discoveries, the diagnosis.

21   It was several different appointments

22   and things, you know, where we got bits

23   of information that added to the

24   diagnosis.

25        Q.   And that was in 2020?

P. HARAN

1

2       A.   Correct.

3       Q.   And who is Peter Singh?

4       A.   He's a technical director at

5   Orange.

6       Q.   Okay.  And what information do

7   you believe Mr. Singh has with regard to

8   your complaint?

9       A.   So, he was aware of the

10  increased pressure and stress and

11  scrutiny that I was under about

12  developing my quota and making my

13  numbers.  He was aware of -- that -- my

14  daughter's illness, and that -- my

15  belief that there was a connection and

16  that that was something that was, you

17  know, causing the increased pressure.

18  So, yeah, he was aware of all that.

19      Q.   Okay.  When did you have these

20  conversations with Mr. Singh?

21      A.   So, we had the Teams

22  conversations.  We also met in person

23  in -- in February.  I don't know the

24  exact date, but it was some time in

25  February.  We had coffee in New York

1                     P. HARAN

2   City.

3          Q.   Was that the date you took

4   some time off to take your mother to a

5   doctor in New York City?

6          A.   Yes.

7          Q.   Who is Lou Boudreau?

8          A.   He is a collaboration manager

9   at Orange.

10         Q.   And what information do you

11  believe Mr. Boudreau has with regard to

12  your complaint?

13         A.   So, I -- he has the

14  information about my daughter's illness,

15  about the increased pressure that I was

16  under to perform and to bring in numbers

17  very quickly.  He knew quite well what I

18  was going through because his daughter

19  and -- at one point in time had

20  similar -- similar scare medically.  But

21  yeah, I mean, he was aware of all of

22  that.

23         Q.   Okay.  Daniel Willins; who is

24  that?

25         A.   It's a typo.  It should be

1                    P. HARAN

2   Danielle Willins.  It's a woman.  She's

3   an integration services account manager.

4        Q.   Okay.  What information do you

5   believe Ms. Willins has with regard to

6   your complaint?

7        A.   She was same as everybody

8   else.  She was aware of -- her and I

9   spoke regularly about Adam and the

10  increased pressure that I was under and

11  he -- she was well aware of my

12  daughter's medical situation.  She and I

13  worked together on several accounts and

14  we had -- she was overlay to me as an

15  integration services manager, so she was

16  responsible for a subset of services in

17  my accounts that we both were -- would

18  be compensated for when we sold.  So,

19  she had Pfizer, she had Moody's, and she

20  had other accounts as well that she

21  was -- her and I worked together on.

22       Q.   And who is German Romero?

23       A.   A presales engineer.

24       Q.   What information do you

25  believe Mr. Romero has with regard to

1                    P. HARAN

2    your complaint?

3         A.   So he was a sales engineer

4    that supported me on some of my

5    accounts, and he and I had regular

6    weekly conversations and we talked about

7    the increased pressure for getting sales

8    closed, and we talked about the

9    responsibilities and, you know, the

10   medical condition of my daughter, and,

11   you know, the juggling that was

12   associated with all of that.

13        Q.   Okay.  And we previously

14   talked a little bit about Jennifer

15   Lawson.  What information do you believe

16   that Ms. Lawson has with regard to your

17   complaint other than things we've

18   discussed so far today?

19        A.   I don't think -- I don't know

20   what else she has other than what's

21   written in here, what she, you know,

22   what we've discussed.

23        Q.   And when you say written in

24   here, what do you mean by that?

25        A.   Just in the Interrogatory

P. HARAN

1

2          that -- that -- I mean, she was -- she

3          was part of the termination

4          conversation.  I told her, you know,

5          I -- but prior to that, I don't think

6          that she had any awareness of anything.

7          She was just really there as a

8          spokesperson to, I think, do the

9          termination.

10              Q.   And she was a member of HR?

11              A.   Correct.

12              Q.   And we say the situation, do

13         you mean your daughter's illness what

14         she was unaware of?

15              A.   I don't know what she was

16         aware, you know, I hadn't told her

17         before -- before my termination date

18         about it.

19              Q.   We previously discussed a

20         little bit about Xavier Pichon.  What

21         information do you believe he has

22         regarding your complaint?

23              A.   We spoke regularly.  He had

24         information about the increased pressure

25         that I was receiving Adam to move sales

1                    P. HARAN

2    more quickly through the funnel and

3    close things, you know that coincided

4    with my daughter's, you know, medical

5    activities.

6         Q.   Why do you believe the

7    increased pressure that you've mentioned

8    a few times regarding getting sales

9    closed and moving sales quickly, had

10   anything to do with your daughter's

11   condition?

12        A.   So, Adam felt that, as I

13   mentioned to your earlier, that I lacked

14   focus and so he'd think -- he thought --

15   his commentary was around the fact that

16   I wasn't as focused on developing, you

17   know, these accounts more quickly, and

18   that I could take off if I needed to

19   take off, but I needed to get this --

20   sales completed.  And so, you know, it

21   was just a real lack of -- a lack of,

22   you know, it was kind of just cold and,

23   you know, and unsympathetic like, you

24   know, you've got to get this done.

25             And, you know, I don't

1                    P. HARAN

2    really -- it was like stonewalling, you

3    know, any time I talked about, you know,

4    needing time off.  It was kind of like,

5    I don't want to hear about that, I just

6    want you to close these sales.  And so

7    that's why -- that was the situation

8    that I was experiencing.

9        Q.   Okay.  Did you believe that

10   your performance expectation should be

11   changed as a result of you needing to

12   take time off to care for your daughter?

13       A.   Did I believe that?  I thought

14   that I should be -- yeah, I mean given

15   some accommodation to account for, you

16   know, what I was -- what I -- trying to

17   juggle it all.  But it was also -- I

18   think that, you know, the expectations

19   were -- the expectations there were --

20   were heightened, you know, during the --

21   all of the episodes around my daughter's

22   condition.  It was kind of like, you

23   know, it changed at that time and became

24   more, you know, focused and more, you

25   know, persistent around, you know, the

1                      P. HARAN

2         need for me to close those sales.

3              Q.   Did those expectations

4         actually change because of your

5         daughter's illness?  I'm just trying to

6         understand.

7                   MS. FISHER:  Objection.

8    BY MR. GUILFOYLE:

9              Q.   You can answer.

10             A.   I -- you know, it's hard to

11        speculate on what, you know, whether or

12        not -- I just know that it was like, you

13        know --

14             Q.   I'm not asking you to

15        speculate, I'm only asking what you

16        know.

17             A.   Make sure I understand, repeat

18        the question again.

19             Q.   Sure.  You had mentioned that

20        you believed expectations changed, and I

21        was asking if you were ever informed

22        that your sales or quota or your numbers

23        changed at any point in 2020?

24             A.   No, my numbers didn't --

25        weren't changed in 2020.

1                    P. HARAN

2        Q.   And at some point in 2020 did

3    you take on more responsibilities for

4    A-end accounts?

5        A.   As I mentioned earlier, Lorna

6    Paine had resigned in January 2020 and I

7    was asked to take on responsibility for

8    her accounts while I was also

9    maintaining the module of accounts that

10   I had been previously responsible for.

11       Q.   When in 2020 did she resign?

12       A.   Some time in January.

13       Q.   So the beginning of the year?

14       A.   Some time in January -- I, you

15   know, of 20 -- 2020.  I -- as you

16   recall, it was, you know, I don't know

17   the exact date.

18       Q.   Sure.  That's fair.  So just

19   so I understand it, you had your set of

20   responsibilities prior to January 2020?

21       A.   Mh-hm.

22       Q.   And then this woman resigned

23   then you took on additional

24   responsibilities that were previously

25   hers?

```
1                 P. HARAN

2        A.    Correct.

3        Q.    Todd Hames, who is that?

4        A.    Todd was a sales director on

5   the Hunter team at Orange.

6        Q.    What information do you

7   believe he has with regard to your

8   complaint?

9        A.    I mean, he was just aware

10  of -- he and I work talked together

11  about, you know, we -- I don't know that

12  he knew about my complaint in

13  particular.  I don't think I had him

14  listed in -- you know, he's just

15  somebody that was kind of like a

16  reference for me as far as my work and

17  everything that -- that, you know, I did

18  with him.  We -- in his role there.

19       Q.    Who is Marie-Cecile Deraedt?

20       A.    She was a global account

21  manager in France, and she and I worked

22  together very closely on one account in

23  particular, so her and I talked

24  regularly.  And, you know, she -- she

25  knew as well that -- that, you know,
```

1                    P. HARAN

2   that there was a lot of pressure on

3   bringing sales in.

4        Q.   What account did she work on

5   with you?

6        A.   Capgemini.

7        Q.   Who is Paul Reticker?

8        A.   A global account director at

9   OBS.

10       Q.   And what information do you

11   believe he has with regard to your

12   complaint?

13       A.   Well, he -- he was aware of my

14   daughter's illness, and he was aware of

15   the increased pressure that I was

16   receiving to close sales and move

17   things.  He called me on the day that my

18   daughter was released from the hospital

19   and his call was made to me at the

20   request of Adam Kimmick.  Adam told him

21   to call me to say that if I couldn't

22   come back to work that, you know,

23   that -- that week that, you know, he was

24   able to step in and to handle some of my

25   accounts.

1                    P. HARAN

2       Q.   Who is Nadine

3  Foulon-Belkacemi?

4       A.   She was a executive VP of the

5  major clients OBS France.

6       Q.   What information do you

7  believe she has with regard to your

8  complaint?

9       A.   She's a -- kind of a reference

10 for somebody who is aware of my positive

11 work performance.  She had recognized me

12 in January of 2020 for positive

13 performance that I had done with the

14 conjunction with the -- they call it --

15 DGC, the France led accounts in terms

16 of, you know, sales efforts with her --

17 her team.  She was the leader of that

18 group.  So she recognized me like a

19 sales kickoff for my -- my work --

20 working with her team.

21      Q.   Is that with respect with

22 B-end accounts or A-end accounts?

23      A.   That was B-end accounts.

24      Q.   And then Laurie Saint Gal de

25 Pons?

1                     P. HARAN

2              MR. GUILFOYLE:  And I'll get

3      you all the names.

4              Q.    Who is she?

5              A.    Global account manager and she

6      was promoted to sales director in France

7      of major accounts within this DGC group.

8              Q.    Okay.  What information do you

9      believe she has with regard to your

10     complaint?

11             A.    She's, again, a reference for

12     my positive work performance.

13             Q.    And Phillipe Melegrito, who is

14     that?

15             A.    He's a presales engineer at

16     Orange.

17             Q.    What information do you

18     believe he has with regard to your

19     complaint?

20             A.    So, he was aware of -- so he

21     was an overlay sales engineer that

22     supported me on my accounts.  He was

23     aware of my daughter's condition.  He

24     was aware of the increased pressure at

25     that time that I was receiving from Adam

1                      P. HARAN

2    for, you know, bringing in results and

3    performance.  And, you know, he -- he

4    was aware of the -- and that's it, stop

5    with that.

6          Q.   Who is Michel Lacosto?

7          A.   A cloud architect at Orange.

8          Q.   What is a cloud architect?

9          A.   Technical overlay, like a

10   technical support person for designing

11   network cloud solutions.

12         Q.   And what does this person --

13   do you believe he has knowledge of

14   regarding your complaint?

15         A.   I believe that he is a

16   positive work performance reference for

17   me.  That's, you know -- so he was aware

18   of -- but he was -- I wasn't working

19   with him at that time as extensively.

20   So he's a positive work performance

21   reference.

22         Q.   Okay.  Who is Christophe

23   Robert?

24         A.   A global key account manager

25   on -- in Orange France.

1                    P. HARAN

2        Q.   And what information do you

3    believe Mr. Robert has with regard to

4    your complaint?

5        A.   He would be aware of my

6    positive work performance and on working

7    the -- with him.

8        Q.   Who is Natalie Theron?

9        A.   A major account manager at

10   Orange France.

11       Q.   What information do you

12   believe she has with regard to your

13   complaint?

14       A.   She was aware that I was

15   working to build my funnel for 2021, my

16   sales funnel, and she and I negotiated

17   together to add a new account to my

18   module that would not have more quota

19   assigned to it, but that would help me

20   to build my funnel up.

21       Q.   What account was that?

22       A.   IBM.

23       Q.   Who is M.J. Hubert?

24       A.   She is a international

25   client-partner at Orange.

1                P. HARAN

2        Q.   What information do you

3   believe she has with regard to your

4   complaint?

5        A.   She was aware of the -- of the

6   increased pressure that I was under.

7   She was aware of my daughter's illness,

8   and she was aware that I was working to

9   juggle all the responsibilities and try

10  to -- she was helping as well with

11  adding like the IBM account into my

12  module in order to give me a larger

13  funnel.

14       Q.   How did those discussions come

15  about regarding adding IBM to your sales

16  funnel?

17       A.   With who?

18       Q.   With Ms. Hubert.

19       A.   I had regular calls with her.

20  She was -- part of her job

21  responsibility was to manage and oversee

22  the relations between Orange U.S. and

23  Orange France.  So, she and I talked

24  about how we could -- it was, you know,

25  constant conversation around the

```
1              P. HARAN

2   accounts that were in my module and then

3   accounts like this that had potential to

4   bring more business to the region.

5         Q.   When did you first start

6   discussing the prospect of bringing IBM

7   into your sales funnel with Ms. Hubert?

8         A.   I don't recall the exact date.

9   I don't recall the exact date.  I would

10  have to refer to my, you know, emails

11  and things that were probably -- but it

12  was at some point in -- I don't know the

13  exact date.

14        Q.   Was it in 2020?

15        A.   I don't recall if it was --

16  what -- exactly when it was, but it

17  was -- it could have been -- but I would

18  have to check, you know.  I'm sure it's

19  in the records of my emails and things.

20        Q.   And how did it come about

21  discussing the sales funnel and bringing

22  IBM into that with Ms. Theron?

23        A.   Ms. Theron?

24        Q.   Yes.

25        A.   Oh, Natalie.
```

1                    P. HARAN

2         Q.   Yes.

3         A.   So, I believe I met her when I

4    went to France some point prior to that,

5    and there was some conversation about

6    the possibility of doing it, and then I

7    don't know -- I think M.J. probably put

8    us together.  I don't recall the

9    specifics, though, of how it came about.

10         Q.   And when did you travel to

11   France?

12         A.   I think it was 2019.

13         Q.   Okay.  Also in these responses

14   to Oranges's Interrogatories which is

15   Exhibit 7 here.  In response Number 10

16   you list several individuals who you

17   claim to have given notice and/or

18   complained or otherwise informed of the

19   fact that you believed you were

20   discriminated and/or retaliated against;

21   can you please read through those names

22   for us?

23         A.   Sure.  So a response here is

24   number one, family members; number two,

25   Cassandra Hernandez, LMHC; three, Peter

P. HARAN

1

2    Singh; four, Lou Boudreau; five,

3    Danielle Willins; six, Xavier Pichon;

4    seven, Marie-Cecile Deraedt; eight Paul

5    Reticker; nine, M.J. Hubert.

6         Q.   And is that answer correct?

7         A.   Yes.

8         Q.   Okay.  What exactly did you

9    discuss with Peter Singh in this regard?

10        A.   I discussed the increased

11   pressure that I was receiving from Adam

12   at that time, and I discussed how I was

13   not able to -- that conversations that I

14   tried have with Adam about, you know,

15   the -- my daughter were met with kind of

16   just no -- like a stonewalled response.

17   And, you know, I talked about how I was

18   concerned, you know, about my job.

19        Q.   This interrogatory asked about

20   people who you informed or otherwise

21   made aware of the fact that you believed

22   you were discriminated and/or retaliated

23   against, so what conversation did you

24   have with Peter Singh in that context?

25        A.   Well, I mean the retaliation,

```
1                    P. HARAN
2   you know, was termination of my
3   employment, right?  That's -- so I
4   talked to him about my termination and
5   how that was -- that's the retaliation.
6   I talked to him about the discrimination
7   around the, you know, the increased
8   pressure and scrutiny that was being --
9   that I was being subject to during the
10  time of taking these -- this time off to
11  care for my daughter and my mother.
12        Q.   Are these conversations with
13  Mr. Singh in writing?
14        A.   I don't recall the specifics
15  of them.  Phone calls is -- but I don't
16  recall the specifics of all the method
17  of communication.
18        Q.   What was Mr. Singh's response
19  when you told him this?
20        A.   You know, he was sympathetic
21  to my situation and, you know, he
22  talked -- he talked about, you know,
23  alternatives that I'd have, like looking
24  for another job or taking time off.
25        Q.   Was anyone else present during
```

1                    P. HARAN

2    your conversations with Mr. Singh?

3         A.    No.

4         Q.    What did you discuss

5    specifically with Lou Boudreau with

6    regard Interrogatory Number 10?

7         A.    So, again, same thing.  We

8    talked about the increased pressure,

9    talked about the termination and the --

10   the increased scrutiny around, you know,

11   me having to -- not having the focus

12   because I was taking time off for my

13   daughter, and Adam's, you know,

14   commentary to me in that regard.

15        Q.    Okay.  When did these

16   conversations take place?

17        A.    I had regular calls with Lou.

18   We were working together on several

19   sales opportunities, so it was regular

20   conversations related to -- that, you

21   know, we had on the phone.

22        Q.    Okay.  And you said you

23   discussed your termination with Lou, so

24   you had to have spoken sometime after

25   you were terminated, correct?

1                    P. HARAN

2          A.    Yes.

3          Q.    And do you recall when those

4    conversations took place?

5          A.    I don't.

6          Q.    Do you know who contacted who?

7          A.    I don't.

8          Q.    Were those conversations in

9    writing?

10         A.    I don't think so, but I -- I

11   don't recall exactly.  They were mostly,

12   I believe, phone calls.

13         Q.    What was Mr. Boudreau's

14   response, when you had these discussions

15   with him?

16         A.    That he was sympathetic to my

17   situation and that he didn't think it

18   was fair, and that, you know, I would --

19   I should go look for another job, and

20   that he wasn't sure himself, you know.

21   That he felt that, you know, the

22   environment, you know, that I

23   experienced was disheartening.

24         Q.    Was anyone else present for

25   these conversations?

1                    P. HARAN

2        A.   No.

3        Q.   What did you discuss with

4   Danielle Willins in this regard?

5        A.   So Danielle Willins, the same

6   conversation.  You know, the same

7   conversation that I just explained, you

8   know, around the discussion of, you

9   know, the time off and the increased

10  pressure.  And she, you know, she said

11  she wasn't seeing the same pressure.

12            She had a lot of the same

13  accounts that I did.  She was involved

14  in some of the same, you know, losses

15  that we experienced and she -- she

16  wasn't experiencing the same pressure

17  from Adam as -- was her commentary at

18  that time.  And so it was, again,

19  sympathetic and, you know, I hope it all

20  works out.

21       Q.   And what was Ms. Willins title

22  at Orange?

23       A.   Integration services manager,

24  I believe, is the title.  Let me just

25  look back.

1              P. HARAN

2        Q.   And that's not a title that

3   you held?

4        A.   No.

5        Q.   Do you know when you had these

6   conversations with Ms. Willins?

7        A.   Leading up to and after the

8   termination.

9        Q.   Do you recall any specific

10  dates of these conversations?

11       A.   No.

12       Q.   Were these conversations in

13  writing?

14       A.   No.  I don't think.  I mean,

15  there were text with Danielle prior to,

16  but I don't remember the specifics of,

17  you know -- after it was definitely not

18  in writing.

19       Q.   Have you produced those text

20  messages as part of this case?

21       A.   No, no, the Teams -- anything

22  that would have been on the Teams

23  conversations.  That's what it was.

24       Q.   Okay.  So you didn't mean to

25  use the word text there?

1                    P. HARAN

2        A.   No, I didn't.  I say that

3    as -- but Teams is the term, sorry, that

4    I meant.

5        Q.   And was anyone else present

6    for these conversations with

7    Ms. Willins?

8        A.   No.

9        Q.   Okay.  And what did you

10   discuss with Xavier Pichon in this

11   regard?

12       A.   We discussed the, you know, we

13   didn't talk -- we talked about the

14   increased pressure, we talked about the

15   time off for my daughter, and the, you

16   know, the treatment that I was getting

17   from Adam and how, you know, it was --

18   it was unfair.  And that was, you know,

19   on the phone and then I believe there's

20   another document here, but the -- there

21   was also Teams conversations.

22       Q.   Okay.  You've said that you

23   believe the treatment from Adam was

24   unfair.  Unfair in what respect?

25       A.   So it was a stonewalling

P. HARAN

1

2  around, you know, anything that was just

3  kind of unfair, that unrealistic

4  expectations, you know, for things, and

5  things like the example I gave earlier

6  with the Pfizer legal issue where, you

7  know, the feedback and the scrutiny was,

8  Well, you know, you didn't manage to

9  overcome this legal obstacle by finding

10 a friend at this company that was going

11 to get that removed as an obstacle.  It

12 was unfair expectation, you know, that's

13 just one example.

14     Q.   Did Adam in fact give you

15 credit on your quota numbers for the

16 Pfizer deal?

17     A.   Did he give me credit on my

18 quota numbers?  What do you mean by

19 credit?

20     Q.   As if you had signed the deal

21 with Pfizer for purposes of new metrics?

22     A.   I never got a final statement.

23 I have, you know, I think in evidence

24 there's like a -- but I don't believe

25 so; not that I know of.

1                    P. HARAN

2        Q.    Was anyone else present for

3    your conversations with Mr. Pichon?

4        A.    No.

5        Q.    What did you discuss with

6    Marie-Cecile Deraedt?

7        A.    We discussed the, you know, in

8    terms of the unfair, we talked about

9    the -- the, you know, the scrutiny and

10   the increased pressure.  We talked about

11   my daughter's, you know, illness, and we

12   talked about, you know, the expectation

13   that these deals were going to advance

14   more quickly, you know, was not fair,

15   and not realistic, and not, you know,

16   something that was -- that was realistic

17   to do given the complexities of what we

18   were dealing with.

19       Q.    Were these conversations in

20   writing?

21       A.    There were conversations on

22   the phone, so I don't know if there were

23   any Teams conversations.

24       Q.    And what did Marie-Cecile

25   Deraedt say in response?

1                    P. HARAN

2         A.   She said, you know, that she

3    was sympathetic, you know, to my

4    situation.  And you know, she didn't

5    think that it was fair, and, you know,

6    she was sorry to see it happening.

7         Q.   Was anyone else present for

8    these conversations?

9         A.   No.

10        Q.   What did you discuss with Paul

11   Reticker in this regard?

12        A.   Well, with Paul Reticker, you

13   know, I discussed the -- the treatment

14   from Adam, the increased pressure and

15   scrutiny, the time off with my daughter,

16   and, yeah -- I mean, discussed all of

17   those things and, again -- but go ahead

18   and ask the question.

19        Q.   Were these discussions in

20   writing?

21        A.   No.

22        Q.   What was Paul's response?

23        A.   Paul's response was, you know,

24   go look for another job, leave.  You

25   know, you'll find another job and just

1                    P. HARAN

2  sorry that it's happening, but yeah.

3        Q.   You had mentioned a

4  conversation that Paul told you he had

5  with Adam regarding coverage if you

6  needed to take more time off?

7        A.   Mh-hm.

8        Q.   When did that conversation

9  take place?

10       A.   It was -- I don't have the --

11  I don't recall the exact date, but it

12  was on the day that my daughter came

13  back from surgery.  I don't recall the

14  exact date.  I would have to look

15  through the records to find it.  It was

16  in that timeframe.

17       Q.   So that would be some time in

18  October of 2020?

19       A.   Yeah.

20       Q.   Was anyone else present for

21  your conversations with Paul?

22       A.   No.

23       Q.   What did you discuss with M.J.

24  Hubert in this regard?

25       A.   The same things that, you

1                    P. HARAN

2    know, I discussed with the others, you

3    know, around the -- the treatment and

4    the increased pressure and the time off

5    from my daughter and, you know, the --

6    yeah, all that stuff.

7         Q.   Were these conversations in

8    writing?

9         A.   Unless there were any Teams

10   conversations that I don't recall what

11   they would have been, they were phone

12   calls.

13        Q.   What was M.J.'s response?

14        A.   Her response was, you know,

15   just, Hang in there kid, you know, kind

16   of thing and, you know, it'll all work

17   out.

18        Q.   Was anyone else present for

19   that conversations?

20        A.   No.

21        Q.   For these phone conversations

22   with the individuals we just discussed,

23   were those taking place during working

24   hours?

25        A.   Sometimes, yeah, I would, you

1          P. HARAN

2    know, it was -- I don't know the all the

3    exact times of the conversations, but I

4    would say for the most part, yes.

5          Q.   All right.  And in this

6    lawsuit you have a claim of FMLA

7    interference, how do you contend that

8    Orange interfered with your FMLA rights?

9          A.   So, I believe that when I took

10   the time off to care for my mother and

11   my daughter, that that time should have

12   been counted as FMLA.  It should have

13   been offered to me as an option at that

14   time and it was not, and it was held

15   against me and, you know, then I was

16   retaliated against by being terminated.

17         Q.   Is that all the ways that you

18   believe Orange interfered with your FMLA

19   rights?

20         A.   Yeah, I believe so.

21         Q.   Did Orange prohibit you from

22   taking any time off for your daughter's

23   procedure and recovery?

24         A.   No.

25         Q.   Okay.  For the days you took

1                  P. HARAN

2    off, you used paid time off or PTO; is

3    that right?

4         A.   Yeah, sometimes and then

5    sometimes it was just, Just go do what

6    you need to do, you know.  So, it was

7    sometimes half days and partial days and

8    things like that.  Because I was trying

9    to, you know, juggle it all.

10        Q.   You were paid for those days

11   that you took off or the half days you

12   took off as well?

13        A.   Yeah, the system doesn't -- I

14   don't think has a way to pay for half

15   days.

16        Q.   So you were --

17        A.   It was salary not hourly.

18        Q.   So for all the days you took

19   off, you were paid for those days?

20        A.   Yes.

21        Q.   Did Orange prohibit you from

22   taking any time off to take your mother

23   to the eye doctor?

24        A.   No.

25        Q.   And for the days that you took

```
1                    P. HARAN

2    off or half days that you took off as

3    well to take your mom to the eye doctor,

4    did you use PTO for that?

5         A.   Yes.

6         Q.   So you were paid for those

7    days off?

8         A.   Yes.

9              MR. GUILFOYLE:  I'm going to

10   show you what will be marked as Haran 13.

11   (Whereupon,  Bates  OBS575  -   576   was

12   marked as Exhibit 13  for  identification,

13   as of April 26th, 2023.)

14             MR. GUILFOYLE:  And for the

15   record, it's Bates OBS575 to 576.

16        Q.   I ask that you take a moment

17   and review that document and let me know

18   when you've had the opportunity to do

19   so?

20        A.   Okay.

21        Q.   Do you recognize that

22   document?

23        A.   It looks like a Teams exchange

24   between Adam and I.

25        Q.   It appears to be on
```

1                    P. HARAN

2  October 8th of 2020?

3       A.   Mh-hm.

4       Q.   Okay.  And you also have a

5  claim of FMLA retaliation in this case;

6  how do you contend that Orange

7  retaliated against you in violation of

8  the FMLA?

9       A.   By firing me.

10      Q.   Okay.  Is that all the ways

11 that you believe Orange retaliated

12 against you in violation of the FMLA?

13      A.   Yes.

14      Q.   Did you ever take FMLA leave

15 while at Orange?

16      A.   No.

17      Q.   Did you ever request FMLA

18 leave while employed at Orange --

19      A.   No.

20      Q.   -- so if we turn back to

21 Exhibit 7, your Interrogatory Responses

22 --

23      A.   Okay.

24      Q.   -- so Number 15 there.

25      A.   Fifteen?

1                    P. HARAN

2         Q.    Correct.

3         A.    The person --

4         Q.    Interrogatory Number 15.

5    There's no page numbers it's a little

6    difficult I appreciate that.

7         A.    Number 15 --

8         Q.    Do you see that this

9    interrogatory asks you identify each day

10   off work you took to take your daughter

11   to doctor's appointments and for

12   treatment as alleged in the Paragraph 19

13   of the complaint.  Do you see that?

14        A.    Yes.

15        Q.    Do you see your response that

16   identifies October 14th half day,

17   October 15th through the 19th --

18        A.    Mh-hm.

19        Q.    November 11, December 18,

20   December 28th, December 30, and

21   February 12th; do you see that?

22        A.    Yes.

23        Q.    Okay.  Is that answer

24   accurate?

25        A.    I believe so; yeah, to the

```
1                    P. HARAN

2    best of my knowledge.

3         Q.   If you turn to response

4    Interrogatory Number 8 within this

5    document.

6              And this interrogatory asks

7    you to identify each employee, agent or

8    representative of defendant who you

9    purport subjected you to discrimination

10   or retaliation; do you see that?

11        A.   Mh-hm, yes.

12        Q.   And you identified Adam

13   Kimmick and Eddy Youhanna (sic), which I

14   believe should be Youkhanna; is that

15   correct?

16        A.   Yes.

17        Q.   Okay.  Is that answer

18   accurate?

19        A.   Yes.

20        Q.   Okay.  You also have a claim

21   for discrimination under the New York

22   City Human Rights Law; how do you

23   contend that Orange discriminated

24   against you in violation of the New York

25   City Human Rights Law?
```

1                    P. HARAN

2          A.   So, my lawyer filed, you know,

3     the details.  You know, in summary

4     it's -- it's because of being a

5     caregiver to my mother and my daughter,

6     then needing to have accommodation to

7     take care of them.  And I believe that

8     that -- that's -- the contention is the

9     fact that I was terminated in

10    retaliation for taking that time off.

11    It's related to that New York State law

12    that you're referring to.

13         Q.   That claim is only for

14    discrimination and not retaliation; are

15    you aware of that?

16         A.   Okay.

17         Q.   And you mentioned an

18    accommodation; did you ever request an

19    accommodation from Orange?

20         A.   So, I didn't.  No, I didn't.

21         Q.   And when you were hired by

22    Orange, you were already a mother of two

23    children, correct?

24         A.   Yes.

25         Q.   At the time you were hired by

1           P. HARAN

2   Orange, you were also a daughter to your

3   mother, correct?

4           A.   Yes.

5           Q.   Other than what you just

6   mentioned, are you there any other ways

7   you believe that Orange discriminated

8   against you based upon your status as a

9   mother?

10          A.   No.

11          Q.   If you could go back to

12  Exhibit 7, the Interrogatory Responses,

13  specifically Interrogatory Number 8?

14          A.   Okay.

15          Q.   And do you see that this

16  interrogatory asked you to identify each

17  employee, agent, representative of

18  defendant who you purport subjected you

19  to discrimination or retaliation; do you

20  see that?

21          A.   Yes.

22          Q.   You identified Mr. Kimmick and

23  Mr. Youkhanna?

24          A.   Yes.

25          Q.   Is that answer accurate and

1                    P. HARAN

2    complete?

3         A.   Yes.

4         Q.   If you could turn to the next

5    page, Interrogatory Number 9.  It asks

6    to you identify each and every

7    discriminatory and/or retaliatory

8    comment, behavior or action that you

9    contend defendant or defendant's agents,

10   representatives and/or employees made

11   two or concerning you; do you see that?

12        A.   Yes.

13        Q.   And do you see your response

14   below?

15        A.   Yes.

16        Q.   Okay.  And is your response --

17   your response to this interrogatory

18   accurate?

19        A.   Yes.

20        Q.   Is this response complete?

21        A.   Yes.

22        Q.   Did anyone at Orange ever make

23   any negative comments about your

24   daughter's illness?

25        A.   Can you explain what you mean

```
 1                   P. HARAN

 2   by negative comments?

 3        Q.   Did anyone at Orange make any

 4   disparaging comments about your

 5   daughter's illness?

 6        A.   No.

 7        Q.   Did anyone at Orange ever make

 8   any negative or disparaging comments

 9   about you taking days off in connection

10   with your daughter's illness?

11        A.   Not specifically about taking

12   days off.  It was about the lack of

13   focus.

14        Q.   Move to strike.

15             My question was did anyone at

16   Orange ever make any negative or

17   disparaging comments about you taking

18   days off --

19        A.   No.

20        Q.    -- in connection with --

21   okay.

22             Did anyone at Orange ever make

23   any negative or disparaging comments

24   about your mother's illness?

25        A.   No.
```

1                    P. HARAN

2        Q.   Did anyone at Orange ever make

3    any negative or disparaging comments

4    about you taking days off in connection

5    with your mother's illness?

6        A.   No.

7        Q.   During your employment with

8    Orange, did you ever report

9    discrimination or retaliation to anyone

10   at Orange?

11       A.   No.

12       Q.   Why not?

13       A.   I was afraid that I would

14   ruffle feathers if I went and took up my

15   request to human resources, or to higher

16   up the leadership chain.  I just thought

17   that it was -- I was already feeling --

18   yeah, so I -- I was afraid to.

19       Q.   And you're aware that as part

20   of this lawsuit you're seeking damages

21   in this case?

22       A.   Yes.

23       Q.   And are you aware of what

24   damages you're seeking here?

25       A.   Yes.

1                       P. HARAN

2           Q.   And what are those?

3           A.   So the damages being the

4      monetary damages, the -- I'm not sure I

5      understand the question.

6           Q.   Sure.  If I could bring your

7      attention to Exhibit 6.  It's the

8      Complaint in this matter?

9           A.   Okay.

10          Q.   If you turn to page seven --

11          A.   Okay.

12          Q.   -- do you see the -- the

13      paragraph in the middle of the page?

14          A.   Yes.

15          Q.   Are those the damages you're

16      seeking in this case?

17          A.   Yes.

18          Q.   And what is the basis for

19      those damages?

20               MS. FISHER:  Objection.

21   BY MR. GUILFOYLE:

22          Q.   You can answer.

23          A.   The basis for those damages, I

24      mean, the -- I'm not sure I know how to

25      answer that question.  I don't know if I

```
 1                  P. HARAN

 2   really understand it.

 3        Q.   Sure.  Why do you believe

 4   you're entitled to the damages

 5   identified here?

 6        A.   Well, I believe that.

 7             MS. FISHER:  Objection.

 8        A.   I believe that I took time off

 9   to care for my daughter and my mother,

10   and that that was, you know, held

11   against me; and that it should have been

12   categorized as, you know, FMLA time and

13   it was not; and then, you know, I was

14   terminated.

15             So, you know, it caused me,

16   you know, emotional distress during that

17   time and I -- I don't want to answer too

18   far in advance, but, I mean, that's what

19   all of these damages are associated

20   with, are the repercussions of that --

21   of that situation.

22        Q.   Are you seeking any money more

23   lost pay?

24        A.   I believe so.

25        Q.   And how much you seeking in
```

```
 1                    P. HARAN

 2    lost pay?

 3         A.   I would have to look through

 4    the documents.  I don't recall off the

 5    top of my head exactly how much of it is

 6    that.

 7         Q.   What documents are you

 8    referring to?

 9         A.   I'm assuming that -- the

10    documents that were filed would have

11    maybe had that in there.  I don't know

12    if they are.

13         Q.   Have you done any calculations

14    as to what you believe you're entitled

15    to for purposes of backpay?

16         A.   I had discussed it with my

17    lawyer, so.

18         Q.   I'm not asking -- I just don't

19    want to make sure that we don't get into

20    any conversations you had your attorney?

21         A.   Okay.

22         Q.   Other than that, did you take

23    any other steps to calculate your

24    backpay?

25         A.   No.
```

P. HARAN

1

2      Q.   And are you claiming any

3   emotional distress damages in this

4   lawsuit?

5      A.   Yes.

6      Q.   And could you describe the

7   nature of your emotional distress?

8      A.   Sure.  So, I mean, I was in --

9   I've been in therapy for -- I was in

10  therapy of a total of almost two years.

11  And this is, you know, there were many

12  things that I worked through during, you

13  know, therapy related to anxiety and

14  stress and how to manage those things

15  and how -- how I dealt with them during

16  this time, you know, and how it had such

17  an impact on me.  You know, the stress

18  at work and, you know, the -- the

19  treatment that I was receiving and, you

20  know, just how -- how to manage that

21  stress and anxiety.

22          It impacted my

23  self-confidence, you know, it was

24  something that I tried to work on with

25  my therapist as far as trying to regain

1           P. HARAN

2    my confidence, you know.  I felt like a

3    failure, you know, after this happened,

4    you know, the termination, and I had --

5    I had a preexisting condition with my

6    sinuses and that condition is worsened

7    by the tress and anxiety.  So that

8    caused me more, you know, dealing with

9    that from -- with my ENT to try to work

10   through some of, you know, what I could

11   do to manage that, you know, because the

12   stress impacts inflammation, which

13   impacts the sinus issue and makes it

14   worse.

15           So I mean, there's -- I had

16   lost sleep, insomnia, situations around

17   dealing with the, you know, the --

18   trying to, you know, manage through the

19   situation, you know, with Adam and, you

20   know, with that stonewalling and kind of

21   contempt that I was getting from him,

22   and, you know, how to kind of regain my

23   confidence back again.

24           I mean, going into my new job,

25   you know, I continued to talk to the

1                      P. HARAN

2     therapist, because I felt like I was

3     hyper aware of, you know, of how do I

4     regain trust, you know, for my -- for my

5     manager, for my coworkers, for, you

6     know, just feeling like I was not going

7     to be subject to poor treatment.

8          Q.   And when did you start seeing

9     this therapist?

10         A.   I don't recall the exact dates

11    without looking at the details, but I

12    believe, you know, the records are on

13    file with the court of, you know, when I

14    saw that therapist.

15         Q.   And it was after you were

16    terminated from the Orange, correct?

17         A.   Correct.

18         Q.   You had mentioned insomnia.

19    Were you diagnosed by a medical

20    professional with insomnia?

21         A.   No.

22         Q.   Did you have any other

23    physical manifestations of this

24    emotional distress other than that sinus

25    issue that you referred to?

1              P. HARAN

2      A.   No.

3      Q.   Do you know when you stopped

4  going to this therapist?

5      A.   I don't recall the exact date.

6  It would have been within the HIPAA

7  release documents, I believe.

8      Q.   Would September of last year,

9  2022, sound about right?

10     A.   Yeah.

11     Q.   And that therapist was

12  Ms. Fernandez?

13     A.   Yes.

14     Q.   Anyone else?

15     A.   No.

16     Q.   And what was the nature of the

17  treatment you sought with Ms. Fernandez?

18     A.   It was therapy sessions.

19     Q.   Talk therapy?

20     A.   Yes.

21     Q.   And how often were you meeting

22  with her?

23     A.   Again, I would defer to the

24  records that I -- you know, that HIPAA

25  release records that I signed that show

1                   P. HARAN

2     all of them, but I would say roughly it

3     was like -- it went from weekly, every

4     other weekly, you know, type of cadence,

5     depending on availability and

6     everything.

7          Q.   And did it ever get to

8     monthly?

9          A.   Yes, I believe so at some

10    point.

11         Q.   And did Ms. Fernandez

12    diagnosis you with anything?

13         A.   Not that I know of.  I don't

14    know whether a therapist can diagnose

15    somebody or not.  I don't know what

16    they're -- if they're not like a medical

17    doctor.  Can they diagnosis?  I don't

18    know.

19         Q.   Do you recall reporting to

20    Ms. Fernandez that as early as April 20,

21    2021, that you were doing well?

22         A.   Yeah, I mean, you know, as far

23    as the conversation, you know, every

24    conversation when somebody asks me how

25    I'm doing, I start off and say I'm doing

1                    P. HARAN

2     well.  And then we spend an hour talking

3     about everything.

4          Q.   Were you prescribed any

5     medication?

6          A.   Not -- no, not by the

7     therapist.

8          Q.   By anyone else relating to the

9     damages you're claiming in this case?

10          A.   You know, the ENT, you know, I

11     was seeing you know that.  So I was

12     on -- taking different types of

13     anti-inflammatory type options to manage

14     that situation.

15          Q.   Do you recall what those

16     medications were?

17          A.   I would defer to the

18     documents, you know, I don't want to

19     misquote the names of things and all

20     that, you know.  It would be all in

21     the -- in the release documents.

22          Q.   To the best of your

23     recollection what were the medications

24     you were prescribed by this ENT?

25          A.    I was prescribed steroids as I

1               P. HARAN

2   think I said.  Did I say that?  I

3   think -- and I was also working through

4   getting Dupixent which is another type

5   of anti-inflammatory medication.

6        Q.   Are you still taking those

7   medications?

8        A.   No.

9        Q.   How long did you take those

10  medications for?

11       A.   Well, I mean steroids you

12  can't take for very long, you know, so,

13  but the Dupixent was a longer term.  I

14  would have to, again, defer to the

15  records.

16       Q.   Do you know when you started

17  first taking the Dupixent?

18       A.   I don't recall the date.

19       Q.   Do you have any previous

20  history of mental or emotional stress?

21       A.   No.

22       Q.   Do you have any -- did you

23  have any other stressors in your life

24  following your separation from Orange?

25       A.   Well, finding a new job.  I

1                    P. HARAN

2    mean.

3         Q.   Were there any illnesses in

4    your family that were added stressors in

5    your life?

6         A.   Nothing new.

7         Q.   Any deaths in your family?

8         A.   No.

9         Q.   Any financial hardships?

10        A.   No.

11        Q.   Any loss of friendships?

12        A.   No.

13        Q.   Any stress as a result of from

14   your current job?

15        A.   No.

16        Q.   So if your therapist recorded

17   that you expressed stress and anxiety as

18   a result of your job at T-Mobile, that

19   would be incorrect?

20        A.   So, this is going back to the

21   conversation -- that would not be

22   incorrect, no, to answer your question.

23   And the -- but it's -- it was related to

24   the confidence and working through, you

25   know, the trust and the, you know,

1          P. HARAN

2    getting back to my -- that

3    self-confidence issue that -- stemming.

4    So that was you know self-induced

5    stress, I'll call it.

6         Q.   And that was in connection

7    with how you were dealing with your new

8    job?

9         A.   Yes.

10        Q.   Other than what we've seen

11   here in the Complaint, are you claiming

12   any other damages?

13        A.   Not outside of what's in the

14   Complaint.

15        Q.   If we could turn back to

16   Exhibit 7, your Interrogatory Responses,

17   please?  Interrogatory Number 17.

18        A.   Interrogatory where?

19        Q.   Towards the end.

20   Interrogatory Number 17 asks you to

21   identify all the individuals, employees

22   or agents affiliated with defendant's

23   clients with whom you have

24   communicated --

25        A.   Mh-hm.

1                    P. HARAN

2          Q.    Strike that.  I apologize.

3     Could we turn to Interrogatory Number

4     18.

5                    And this asks you to identify

6     individuals and documents relating to

7     the damages in this matter; do you see

8     that?

9          A.    Yes.  Well, yes, mh-hm.

10          Q.    And you identify your family

11    members and Cassandra Fernandez?

12          A.    Yes.

13          Q.    Is that answer accurate?

14          A.    Yes.

15          Q.    And earlier when we started

16    you had mentioned that you reviewed a

17    timeline you created in preparation for

18    your deposition; do you recall that?

19          A.    Yes.

20          Q.    I'm going to request

21    production of that timeline?

22                    MS. FISHER:  It's a timeline

23    that she did for me, so it's privileged

24    communication.

25                    MR. GUILFOYLE:  Okay.

1                    P. HARAN

2              MS. FISHER:  It was an

3    exchange of correspondence between the two

4    of us.

5              MR. GUILFOYLE:  She referred

6    to a timeline that she reviewed in

7    preparation for this.

8              MS. FISHER:  That was a

9    correspondence.  So we won't be returning

10   that over.

11             MR. GUILFOYLE:  I'll make a

12   request in writing.

13             MS. FISHER:  Okay.

14             MR. GUILFOYLE:  Put it on the

15   privilege log.

16      (Request for production.)

17             MS. FISHER:  Okay.

18             MR. GUILFOYLE:  I think this

19   is a good time for lunch.

20             MS. FISHER:  Sure.

21      (Whereupon, a short recess was taken.)

22   BY MR. GUILFOYLE:

23             Q.   Ms. Haran, you understand

24      you're still under oath, correct?

25             A.   Yes.

1           P. HARAN

2        Q.   Did there come a time after

3    your termination from Orange that you

4    started looking for another job?

5        A.   After my termination from

6    Orange, you said?

7        Q.   Yes.

8        A.   Yes.

9        Q.   And when did you start looking

10   for a new job?

11       A.   I started looking immediately.

12       Q.   What types of jobs did you

13   look for?

14       A.   Sales jobs in technology.

15       Q.   How did you search for jobs?

16       A.   I used LinkedIn.  I had

17   several recruiters that had called me,

18   that I knew from previous -- you know,

19   that I just knew from the industry and

20   friends, yeah.  Primarily company

21   websites that I was interested in maybe

22   looking at -- working for them?

23       Q.   What was the geographic scope

24   of your job search?

25       A.   Primarily jobs where either I

1                    P. HARAN

2    could work in here, in the New York

3    metro area or, you know, work remotely,

4    yeah.  But no, I wasn't really looking

5    to relocate, if that's what you're

6    asking.

7         Q.   That's fair.  I know you

8    mentioned that online MBA program at

9    Purdue; do you recall when you started

10   that program?

11        A.   September of 2022.

12        Q.   Did you seek any additional

13   training or education after your

14   separation from Orange?

15        A.   No.

16        Q.   Was there a certain salary

17   that you were looking for when you were

18   applying for jobs?

19        A.   Yes, I was looking to at least

20   match the salary that I had at Orange.

21        Q.   What do you recall that salary

22   being?

23        A.   I believe that it was -- I

24   don't recall exactly what it was.  I

25   could guess, but I don't know.

```
1                    P. HARAN

2         Q.   I don't want you to guess,

3    if -- do you have any estimate as to

4    generally?

5         A.   So probably -- I mean the base

6    salary was somewhere in the -- maybe

7    128,000-dollar range, total

8    compensation.  So I was looking at

9    comparable, you know, both the base and

10   the total compensation.

11        Q.   Do you recall what your total

12   compensation was at Orange for the

13   last --

14        A.   Maybe 200K.

15        Q.   And do you have any job

16   interviews as a result of your search

17   efforts?

18        A.   Yes.

19        Q.   Where were those interviews?

20   With -- Strike that.

21             With whom were those

22   interviews?

23        A.   Like with people or the

24   companies?

25        Q.   The company, representatives
```

1                    P. HARAN

2   of the company.

3        A.   The names of the

4   representatives?

5        Q.   The names of the companies.

6        A.   The names of the companies.  I

7   don't remember all of them.  It was a

8   flurry, so I don't want to -- I could

9   name obviously T-Mobile, where I wound

10  up working, was one of them.  But there

11  were -- I mean, I did a whole bunch.  It

12  was like a job.  I was trying to manage

13  a bunch.

14           So for -- Verizon I talked to

15  for sure.  I remember that, but I'm sure

16  that there's some that I'm missing

17  because I was entertaining all kinds of

18  conversations at that point.

19           I believe -- I don't know,

20  I -- I would have to go back through my

21  records, you know, of who else it was

22  that I -- I think I had an interview

23  with maybe, I don't know, IBM.  I was

24  looking at them at one point, or

25  Kyndryl, which is the spin off there.

```
1                    P. HARAN

2        Q.   Sitting here today, do you

3   have any specific recollection of other

4   interviews?

5        A.   Not -- you know, again, there

6   were others, but I'm just not

7   remembering exactly everyone that I

8   talked to at that time.

9        Q.   As a result of those job

10  interviews, were any job offers extended

11  to you?

12       A.   Yes.

13       Q.   And who made the -- what

14  companies extend the job offer to you?

15       A.   T-Mobile.

16       Q.   Anyone else?

17       A.   Verizon.

18       Q.   Anyone else?

19       A.   No.

20       Q.   Do you have records verifying

21  your job search after your separation

22  from Orange?

23       A.   I mean, as far as like what

24  kind of records, like?

25       Q.   Job applications?
```

```
 1                    P. HARAN

 2        A.   Emails.

 3   (Simultaneous speaking.)

 4        A.   Yeah, yeah.

 5        Q.   Emails.  Okay.  And do you

 6   know if you produced all of those

 7   documents as part of this litigation?

 8        A.   I do remember producing some

 9   of them and sending some of them to my

10   lawyer.  It's been a while, but I do

11   remember the ones that I had record of.

12   Some of them were different

13   conversations and things, but yeah, I do

14   recall submitting those -- those

15   documents to -- as part of the discovery

16   process.

17        Q.   Okay.  You used the word some.

18   Are there certain documents relating to

19   your job search efforts that you didn't

20   produce?

21        A.   No, no.  I'm just saying that

22   some of those were different

23   conversations and things so I don't --

24   but, yeah, no, there were -- you know,

25   like I said texts or wherever, but those
```

1                    P. HARAN

2    for the most part texts were -- well,

3    not texts.  I mean, it would be

4    different conversations that I had about

5    potential jobs.

6         Q.   Were those conversations in

7    writing?

8         A.   No, I mean, I think I

9    submitted everything that I had to

10   submit at the time, you know, that

11   was -- that I had a record of.

12        Q.   Do you still have a copy of

13   all of those records?

14        A.   I would imagine so.  I haven't

15   looked, you know, lately.  I don't know

16   whether or not there's things, you know,

17   whatever, that go into archive or

18   whatever.  I don't know, because it's

19   old.  Some of this is, you know, two

20   years ago now.

21        Q.   Fair enough.  And do you have

22   any handwritten notes regarding your job

23   search efforts?

24        A.   No.

25        Q.   Have you held any jobs since

1                     P. HARAN

2    your separation from Orange?

3         A.   Yes.

4         Q.   What's the name of that

5    employer?

6         A.   T-Mobile.

7         Q.   And what's your position at

8    T-Mobile?

9         A.   Client partner executive.

10        Q.   And what are your job duties

11   as a client partner executive?

12        A.   I'm responsible for sales

13   quota and selling to business customers,

14   selling our -- to -- T-Mobile's products

15   and services to business customers, I --

16   that I have.

17        Q.   And what types of products and

18   services of T-Mobile's are you selling

19   to businesses?

20        A.   So I'm selling cellular plans,

21   phone plans and connected, like, data

22   plans for laptops.  And I'm selling IOT

23   services, Internet of Things, anything

24   that takes a SIM card and has a cellular

25   connection essentially.  So yeah, that

1                    P. HARAN

2    includes all sorts of devices, including

3    phones and tablets.  And I'm also -- we

4    also have a fixed wireless service,

5    which is like an Internet service that

6    works.  But, yeah it's pretty much all

7    cellular-related, you know,

8    technologies.

9        Q.   When did you obtain that job

10   at T-Mobile?

11       A.   When?

12       Q.   Yes.

13       A.   I believe I started April 4th,

14   I think it was, 2021, but I'm not

15   hundred percent sure.

16       Q.   Okay.  And the termination

17   date at Orange was February 24, 2021?

18       A.   I believe so.

19       Q.   And what's your current salary

20   at T-Mobile?

21       A.   I believe I submitted that

22   with the discovery documents.  I want to

23   say that I believe it's like 150, off

24   the top of my head.  I'd have to look at

25   my records, but -- for the records that

1          P. HARAN

2   were submitted, but I think it was like

3   150.

4          Q.   Do you receive any commissions

5   or other compensations?

6          A.   Yes.  Yeah.

7          Q.   And what do you receive?

8          A.   Well, it depends on what I

9   sell, but.

10         Q.   What forms of compensation,

11  other than the salary, so like

12  commissions and things like that?

13         A.   Yeah, commission.  I mean,

14  depending on what I sell, commission

15  would vary, right?  And then I have -- I

16  don't actually have health insurance

17  through them.  I have that through like

18  my husband's plan, so I have some -- I

19  have like a stock option purchase plan,

20  but it's like I'm paying for it and

21  things.  So I don't know if that counts

22  or not because it's just discounted.  I

23  don't know.  I'm not sure what else I'm

24  missing.

25         Q.   Are you eligible for any sort

1                    P. HARAN

2     of bonuses at T-Mobile?

3          A.   No.

4          Q.   Okay.  And how did you find

5     this job at T-Mobile?

6          A.   A recruiter.

7          Q.   Is that recruiter with a

8     company?

9          A.   He, I think, ran his own --

10    his own firm.  I don't know that he had

11    a company name, that I am aware of.

12         Q.   Are you still employed with

13    T-Mobile?

14         A.   Yes.

15         Q.   Did you receive a W-2 for the

16    tax year 2021 from T-Mobile?

17         A.   Yes.

18         Q.   I'm just going no call

19    production of the 2020 -- strike that.

20              Did you receive a W-2 for 2022

21    from T-Mobile?

22         A.   Yeah.

23              MR. GUILFOYLE:  I'll call for

24    production of the 2022 W-2.

25              MS. FISHER:  Are you going to

1                    P. HARAN

2      put it in writing?

3                    MR. GUILFOYLE:  I could follow

4      up in writing.

5                    MS. FISHER:  Okay.

6                    MR. GUILFOYLE:  That's fine.

7          (Request for production.)

8    BY MR. GUILFOYLE:

9          Q.   After your separation from

10     Orange, did you receive any sort of

11     state benefits such as unemployment

12     benefits?

13         A.   Yes.

14         Q.   Anything else other than

15     unemployment benefits?

16         A.   No.

17         Q.   Okay.  And do you know how

18     much the amount of those unemployment

19     benefits were?

20         A.   I don't recall.

21         Q.   Do you recall when you started

22     receiving those unemployment benefits?

23         A.   It was some time after my

24     termination and I think there's like --

25     I don't know if there's a week gap.  I

1                          P. HARAN

2          don't recall the laws of New York State

3          with unemployment, but whatever I was

4          entitled to, I applied for and received.

5               Q.   And did those benefits cease

6          when you started working at T-Mobile?

7               A.   Yes.

8                    MR. GUILFOYLE:  I'll call for

9          production of any documents relating to

10         New York State Unemployment Insurance

11         benefits.  And I'll follow up in writing.

12         (Request for production.)

13   BY MR. GUILFOYLE:

14               Q.   Did there come a time after

15         you were notified of your termination

16         that you sought to regain access to your

17         Orange account in the Orange system?

18               A.   Orange account, what do you

19         mean?

20               Q.   Your email account?

21               A.   My email account, yes.

22               Q.   Okay.  So let me show you a

23         document.

24               A.   Did you say after --

25               Q.   There's no question pending.

```
 1                    P. HARAN

 2      (Whereupon, Bates OBS910 - 911 was

 3      marked as Exhibit 14 for identification,

 4      as of April 26th, 2023.)

 5               MR. GUILFOYLE:  For the

 6  record, this is a document bearing OBS910

 7  through 911.

 8         Q.   Ms. Haran, I ask that you take

 9      a look at this document, and let me know

10      when you've had the opportunity to do

11      so.

12         A.   Okay.

13         Q.   Do you recognize this

14      document?

15         A.   No.  I mean, I see what it is,

16      but it's not something I've seen before.

17         Q.   Do you see the sender here and

18      the from line of the email is

19      IThelpdesk@Orange.com; is that correct?

20         A.   Yes.

21         Q.   And what date was this sent?

22         A.   It says 2/24/2021.

23         Q.   Who was this email sent to?

24         A.   Looks like my Orange email

25      address Patty Haran@orange.  I think.
```

1                    P. HARAN

2        Q.   So did you contact IT at

3   Orange to unlock your email account

4   after you had been terminated?

5        A.   On the 24th, yeah, the day of,

6   I did.

7        Q.   So after being notified of

8   your termination?

9        A.   Yes.

10       Q.   And why did you do that?

11       A.   Well, I wanted to get the

12   access back into my computer.

13       Q.   And why did you want to get

14   access back into your computer?

15       A.   So, I wanted to obtain

16   documents that I hadn't had a chance to

17   obtain.

18       Q.   Okay.  What are those

19   documents that you wanted to obtain?

20       A.   So, I wanted to get copies of

21   documents that I needed to ensure that I

22   was going to get paid commission on

23   things that were -- that I was eligible

24   to be paid commission on, and so I

25   pulled -- I went in and wanted to pull

1                    P. HARAN

2      those documents.  And I also wanted to

3      communicate any -- any documents that I

4      might have needed for transition

5      activities that were still underway with

6      the accounts that I was transitioning to

7      the people who were, you know, still

8      with the company.

9           Q.   Do you recall any specific

10     documents that you sent to yourself?

11          A.   I would have to refer -- I

12     know I've provided that information.  I

13     don't recall.  I would have to see the

14     documents that I already provided that

15     information on.

16          Q.   You mentioned that --

17     (Simultaneous speaking.)

18          A.   I --

19          Q.   Go ahead I apologize.

20          A.   No, no, go ahead.

21          Q.   You mentioned that one of the

22     purposes that you wanted to have

23     information and the documents regarding

24     the transition of matters after you left

25     Orange; is that correct?

1                    P. HARAN

2          A.    The transition of matters?

3    You mean --

4          Q.    Like accounts?

5          A.    Yes.

6          Q.    Okay.  And -- but at that time

7    you had already been notified of your

8    termination, correct?

9          A.    Yes.

10         Q.    Okay.  And is it your belief

11   that you were still providing services

12   for Orange at that time?

13         A.    I was transitioning with the

14   teams that I had been working with that

15   were -- that I was working on deals that

16   were part of -- so it was a teaming

17   effort, right, with other people.  And

18   so I was doing activities towards the

19   sales effort, and then the people who

20   were still going to be working on those

21   accounts needed to -- they were looking

22   to get the transition activity so that

23   they could pick up where I was leaving

24   off.  It was a transition.

25         Q.    Did anyone instruct you to

1                    P. HARAN

2      take those actions with respect to

3      transitioning accounts?

4           A.   Say the question again.

5           Q.   Did anyone instruct you?

6           A.   Um --

7           Q.   To take those actions with

8      respect to transitioning?

9           A.   No.

10          Q.   Okay.  All right.  Just give

11     me two minutes.  I'm just going to get

12     those emails.

13     (Whereupon, a short recess was taken.)

14   BY MR. GUILFOYLE:

15          Q.   Okay.  I'm going to show you

16     what we've marked as Haran 14.

17               MS. FISHER:  That will be 15.

18               MR. GUILFOYLE:  Fifteen, all

19    right.

20     (Whereupon, Bates OBS821 -  919   was

21     marked as Exhibit 15  for  identification,

22     as of April 26th, 2023.)

23               MR. GUILFOYLE:  And for the

24    record it's a multiple-page document

25    bearing Bates OBS821 through 919.

1                    P. HARAN

2          Q.    Ms. Haran, I ask that you take

3    some time and review the emails within

4    this document and let me know when you

5    had the opportunity to do so.

6          A.    Okay.  There's a lot in here.

7    I don't --

8          Q.    That's fine, if you could just

9    take the time and review them all.

10         A.    Are these all documents that

11   we provided to you or are these a

12   mixture of documents that you all have

13   pulled from the email?

14         Q.    I can't answer your questions,

15   unfortunately, so if you could just take

16   a look and familiarize yourself with

17   them and then I could ask you a few

18   questions?

19         A.    Okay.  Okay.  I think I'm okay

20   to go on here.

21         Q.    Have you ever had the

22   opportunity to review those emails?

23         A.    Briefly.  At a high level,

24   yeah.

25         Q.    Do you recognize those emails?

1                    P. HARAN

2         A.   Some of them, yes.

3         Q.   What do you recognize these

4    emails to be?

5         A.   Emails, looks like, that I

6    wrote.

7         Q.   Are these all emails that you

8    had forwarded from your Orange email

9    account to your personal Gmail account?

10        A.   I don't know if they're all

11   that, it looks like some of them are.

12        Q.   If you could bring my

13   attention to any of that or not.

14        A.   Oh.  Okay.  It looks like they

15   all are.

16        Q.   Have you communicated with any

17   of the companies that are identified in

18   these emails, following your separation

19   from Orange?

20        A.   No.

21        Q.   Have you communicated with any

22   individuals that are identified in these

23   emails, following your separation from

24   Orange?

25        A.   Yeah, I -- just in following

1              P. HARAN

2  up to let them know that I left.  So, I

3  sent some notes to say, Capgemini, to

4  say that I had moved on and that I

5  enjoyed working with them.

6          Q.   Any other companies that

7  you've sent notes to?

8          A.   I believe it was Capgemini.

9  Possible -- I don't recall if I sent

10  them to somebody at Moody's or not.  I

11  don't know if that's in here, that I

12  missed, but I'm pretty sure it was

13  Capgemini primarily.  I believe that was

14  it.

15          Q.   You produced all of those

16  communications as part of this

17  litigation?

18          A.   Yes.

19          Q.   There's nothing you have

20  regarding communications with former

21  Orange employees that you have not

22  produced in this litigation?

23          A.   No.

24          Q.   You mentioned before that

25  you're currently a client partner

1                    P. HARAN

2    executive at T-Mobile; is that correct?

3         A.   Yes.

4         Q.   How are your job duties in

5    that role at T-Mobile different than

6    your job responsibilities were at Orange

7    when you separated?

8         A.   Well, different accounts and

9    different solution set.

10        Q.   When you say solution set what

11   does that mean?

12        A.   That means the things that I

13   was able to sell were different between

14   T-Mobile and Orange.

15        Q.   So like products and services?

16        A.   Correct.

17        Q.   When you say different

18   accounts, what accounts are you

19   currently working with at T-Mobile?

20        A.   So, as of now, I'm working on

21   three accounts, and they are Bank of New

22   York Mellon, Morgan Stanley and Wells

23   Fargo.

24        Q.   Have you worked with any

25   other --

1            P. HARAN

2            MS. FISHER:  Sorry.  I just

3    want to designate this part of this

4    transcript as confidential.

5            MR. GUILFOYLE:  That's fine.

6        Q.    And have you worked with any

7      other accounts with T-Mobile other than

8      the three you just identified?

9        A.    Yes.

10       Q.    And what are those other

11   accounts?

12       A.    I worked on Samsung.  I worked

13     on American Express, Credit Suisse.  I'm

14     trying to think if there's another one

15     I'm missing.  Nope, that was it.  That's

16     all of them.

17       Q.    How is your current job at

18     T-Mobile similar to what you were doing

19   at Orange?

20       A.    Just responsible for sales.

21       Q.    And do you have targets and

22   quotas to meet at T-Mobile?

23       A.    Yes.

24       Q.    Are you aware of Orange's

25   counterclaims against you in this

P. HARAN

1
2      lawsuit?

3            A.    Yes.

4            Q.    Have you reached out to any

5      former or current Orange clients or

6      accounts to see if they'd be interested

7      in utilizing T-Mobile services?

8            A.    Not to my knowledge.  I mean,

9      I don't know whether or not some

10     customers might have been about an

11     Orange account or not, but not to my

12     knowledge.

13           Q.    Have you reached out to any

14     Orange clients or accounts to which you

15     were responsible for?

16           A.    No.

17           Q.    Okay.  Give me five minutes

18     and I think I'll be able to wrap up?

19                 MR. GUILFOYLE:  Off the

20     record.

21        (Whereupon,  a  discussion  was  held  off

22     the record.)

23  BY MR. GUILFOYLE:

24           Q.    Ms. Haran, do you understand

25     you're still under oath?

1                    P. HARAN

2        A.    Yes.

3        Q.    I apologize.

4        A.    Okay.

5        Q.    And you mentioned a recruiter

6   before that you used to get the T-Mobile

7   job; do you recall that testimony?

8        A.    Yes.

9        Q.    Okay.  What is his name?

10       A.    I -- I'm -- his name was --

11  I'm probably pronouncing it wrong, I

12  think it was, like, Shaman Lesterson or

13  something.  I don't know, though.

14       Q.    What was that last name you

15  believe?

16       A.    Lesterson or something.

17       Q.    And did you --

18       A.    I don't know though.  I'm

19  trying to remember and I probably should

20  just say I don't know.

21       Q.    Sure.

22       A.    I think his first name

23  something like Shaman.

24       Q.    And did you have an engagement

25  letter or contract with this recruiter?

1                    P. HARAN

2          A.   No.

3          Q.   Did you correspond with this

4     recruiter at all?

5          A.   It was phone calls primarily.

6     I mean, I sent him a copy of my resume,

7     I'm sure.

8          Q.   Did you email with him at all

9     other than sending him your resume?

10          A.   No, it was pretty much all

11     over the phone.

12          Q.   Okay.

13               MR. GUILFOYLE:  We're just

14     going to call for production of documents

15     relating to Plaintiff's search efforts in

16     connection with this recruiter Shaman.

17     We'll follow up in writing.

18       (Request for production.)

19               MR. GUILFOYLE:  Nothing

20     further.

21

22

23

24

25

```
 1                    P. HARAN

 2            MS. FISHER:  Okay.  Great.

 3            THE COURT REPORTER:  Are you

 4   ordering a copy?

 5            MS. FISHER:  Yes.

 6

 7                    -oOo-

 8     (Whereupon, the  examination  of  PATRICIA

 9     HARAN was concluded at 2:08 p.m.)

10

11

12            _____

13                PATRICIA HARAN

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              C E R T I F I C A T E

2              I, AMBRIA IANAZZI, a Registered

3   Professional Reporter, Certified Realtime

4   Reporter, New York Association Certified Reporter,

5   New York Realtime Certified Reporter, Certified

6   Shorthand Reporter and Notary Public in New York

7   do hereby certify:

8              That PATRICIA HARAN whose

9   examination is hereinbefore set forth, was duly

10  sworn, and that such examination is a true record

11  of the testimony given by PATRICIA HARAN.

12             I further certify that I am not

13  related to any of the parties to this action by

14  blood or marriage; and that I am in no way

15  interested in the outcome of this matter.

16

17         In  witness  whereof,  I   have   hereunto   set

18  my hand this 2nd day of May, 2023.

19

20

21  _____

22        AMBRIA IANAZZI, RPR, CRR, CSR

23

24

25
```

**-**

**-o0o-** 156:7

**0**

**0** 8:2,9

**1**

**1** 25:9 71:24 72:12
**10** 32:14 60:8,10 65:19 92:15 95:6
**11** 23:18 25:12,25 28:21 65:3,7
  109:19
**11741** 9:9
**12** 69:3,5 71:10
**128,000-dollar** 132:7
**12th** 109:21
**13** 28:10 107:10,12
**14** 143:3 147:16
**14th** 109:16
**15** 108:24 109:4,7 147:17,21
**150** 138:23 139:3
**15th** 109:17
**17** 127:17,20
**18** 29:15 48:13 109:19 128:4
**18th** 48:9
**19** 17:22 109:12
**1972** 17:6
**1990** 18:9
**1994** 18:15 19:18
**1995** 21:2
**1997** 21:2,24
**1999** 16:16
**19th** 109:17

**2**

**2** 28:4,6
**2/24/2021** 143:22
**20** 16:17 27:22 83:15 123:20

**2004** 22:4
**2005** 22:11
**2006** 22:11
**200K** 132:14
**2017** 23:18 24:15 26:2 28:22 29:15
**2019** 33:12 92:12
**2020** 27:23 31:15 32:25 33:10,19
  34:12,18,22 48:13 55:4,9 74:25
  82:23,25 83:2,6,11,15,20 86:12 91:14
  103:18 108:2 140:19
**2021** 38:19 54:2 55:12,15 65:19
  89:15 123:21 138:14,17 140:16
**2022** 122:9 131:11 140:20,24
**2023** 25:10 28:7 29:4 30:24 35:20
  44:5 45:5 52:18 56:20 60:11 65:8
  69:6 107:13 143:4 147:22
**24** 12:14 54:2 138:17
**24th** 57:15 67:11,19,25 144:5
**26th** 25:10 28:7 29:4 30:24 35:20
  44:5 45:5 52:18 56:20 60:11 65:8
  69:6 107:13 143:4 147:22
**28th** 109:20
**2:08** 156:9

**3**

**3** 23:15,21 24:2 28:25 29:3
**30** 34:22 109:20
**30th** 34:17
**343** 30:22 31:3
**353** 35:18,25
**383** 56:18,23

**4**

**4** 30:21,23
**40** 48:17
**40-minute** 52:3
**4th** 138:13

**5**

**5** 25:11 35:17,19
**53** 9:8 16:12

**576** 107:11,15

**6**

**6** 44:2,4 116:7

**7**

**7** 45:2,4 52:13 71:6,8 92:15 108:21
  112:12 127:16

**8**

**8** 32:14 52:15,17 110:4 112:13
**8th** 108:2

**9**

**9** 56:17,19 113:5
**90** 20:23
**911** 143:2,7
**919** 147:20,25
**927** 65:5,6
**931** 69:4,9
**94** 20:24
**95** 20:24 21:2
**97** 21:2
**98** 16:17

**A**

**A-END** 27:2,6,13 83:4 86:22
**ability** 12:16
**access** 142:16 144:12,14
**accommodation** 81:15 111:6,18,19
**account** 24:18,21 26:22 41:6,11
  69:25 77:3 81:15 84:20,22 85:4,8
  87:5 88:24 89:9,17,21 90:11 142:17,
  18,20,21 144:3 149:9 153:11
**accounts** 26:14,20,21 27:2,6,13,14
  33:13 40:25 68:8,14 77:13,17,20 78:5
  80:17 83:4,8,9 85:25 86:15,22,23
  87:7,22 91:2,3 97:13 145:6 146:4,21
  147:3 151:8,18,21 152:7,11 153:6,14
**accurate** 44:21 71:24 109:24 110:18
  112:25 113:18 128:13

**accurately** 12:24

**achievement** 55:8

**acknowledgment** 28:15 34:17

**acquired** 22:2 23:15

**acquisition** 22:2,4 23:14,19

**action** 113:8

**actions** 147:2,7

**activities** 40:3,18 68:10,13 80:5
145:5 146:18

**activity** 146:22

**Adam** 29:19,20 30:17 31:19 32:4,11
33:22 36:12 39:7,12,18 53:19 54:3,25
55:10,18 56:6,11 59:20 66:17 68:19
77:9 79:25 80:12 85:20 87:25 93:11,
14 97:17 99:17,23 100:14 102:14
103:5 107:24 110:12 120:19

**Adam's** 95:13

**add** 89:17

**added** 74:23 126:4

**adding** 90:11,15

**additional** 72:3 73:10 83:23 131:12

**address** 9:7 16:13,24 17:2 60:22
143:25

**addresses** 16:20

**adequate** 55:11

**administered** 10:9

**advance** 43:20 101:13 117:18

**advice** 51:17

**affect** 12:15

**affected** 50:10

**affiliated** 127:22

**afraid** 115:13,18

**aftermath** 40:8

**age** 51:19

**agent** 110:7 112:17

**agents** 113:9 127:22

**Agreement** 25:21

**agreements** 25:2

**ahead** 47:5 102:17 145:19,20

**alleged** 109:12

**allowed** 12:2 48:24

**alternatives** 94:23

**amended** 52:8

**American** 152:13

**amount** 141:18

**ample** 33:15

**and/or** 92:17,20 93:22 113:7,10

**announcement** 68:20

**anti-inflammatory** 124:13 125:5

**anxiety** 119:13,21 120:7 126:17

**apartment** 17:3

**apologize** 128:2 145:19 154:3

**apologized** 50:19

**appears** 31:16 65:15,18 107:25

**applications** 134:25

**applied** 142:4

**apply** 10:20

**applying** 131:18

**appointment** 48:11

**appointments** 40:7 74:21 109:11

**approved** 49:8

**April** 25:10 28:7 29:4 30:24 35:20
44:5 45:5 52:18 56:20 60:11 65:8
69:6 107:13 123:20 138:13 143:4
147:22

**architect** 88:7,8

**archive** 136:17

**area** 131:3

**areas** 50:3

**arrange** 48:2

**asks** 72:12 109:9 110:6 113:5 123:24
127:20 128:5

**assessment** 39:24 43:9

**assigned** 34:6 38:18 89:19

**associate** 54:15

**assume** 32:2

**assuming** 118:9

**assumption** 38:21 39:24

**AT&T** 22:3

**attend** 18:16 74:2

**attention** 31:22 32:14,18 36:14 71:5
116:7 149:13

**attorney** 9:16 12:3 13:5,9,14,20
14:16 118:20

**audible** 11:4

**availability** 123:5

**avoid** 46:25

**aware** 74:4,5 75:9,13,18 76:21 77:8,
11 79:16 84:9 85:13,14 86:10 87:20,
23,24 88:4,17 89:5,14 90:5,7,8 93:21
111:15 115:19,23 121:3 140:11
152:24

**awareness** 79:6

**B**

**B-END** 33:13 86:22,23

**BA** 18:10

**Bachelor's** 18:3

**back** 20:24 37:13,15 48:25 52:4
59:18 71:5 85:22 97:25 103:13
108:20 112:11 120:23 126:20 127:2,
15 133:20 144:12,14

**backpay** 118:15,24

**Baker** 9:16

**balance** 22:24 43:18

**Bank** 151:21

**banter** 64:8

**base** 132:5,9

**based** 38:21 112:8

**basic** 10:25

**basis** 116:18,23

**Bates** 25:8 28:5,10 30:22 31:2 35:18
56:18,22 65:5,6 69:4,9 107:11,15
143:2 147:20,25

**bearing** 28:10 31:2 56:22 65:5 69:8
143:6 147:25

**bears** 25:11

**beginning** 83:13

**behavior** 113:8

**belief** 75:15 146:10

**believed** 37:6 82:20 92:19 93:21

**benefits** 141:11,12,15,19,22 142:5,
11

**big** 28:16 29:11

**bit** 47:8 49:10 78:14 79:20

**bits** 74:22

**Blue** 16:25 17:3

**board** 28:18

**boat** 51:20

**bones** 50:3,9

**bonuses** 140:2

**born** 17:5,8,9

**Boudreau** 59:23 66:19 76:7,11 93:2 95:5

**Boudreau's** 96:13

**break** 12:6,11 46:25

**breaks** 12:7

**briefing** 22:16

**Briefly** 148:23

**bring** 31:22 32:13,17 36:13 42:21 71:4 76:16 91:4 116:6 149:12

**bringing** 42:22 85:3 88:2 91:6,21

**Brook** 18:12

**Brookhaven** 17:9

**brought** 27:11 42:3 47:17

**build** 38:24 89:15,20

**bunch** 133:11,13

**business** 9:18 19:7,11 21:8 23:24 24:6,8 41:13 70:4,9 91:4 137:13,15

**businesses** 137:19

---

**C**

**C-A-R** 19:21

**cadence** 123:4

**calculate** 118:23

**calculations** 118:13

**call** 15:3 53:16,18 61:19 62:9 68:20 85:19,21 86:14 127:5 140:18,23 142:8 155:14

**called** 67:2 85:17 130:17

**calls** 38:15,16 63:21 90:19 94:15 95:17 96:12 104:12 155:5

**Capgemini** 85:6 150:3,8,13

**Car** 19:11,21 20:15,18

**card** 137:24

**care** 74:6 81:12 94:11 105:10 111:7 117:9

**careful** 58:21

**caregiver** 111:5

**caregiving** 59:4

**case** 38:6 45:18,24 98:20 108:5 115:21 116:16 124:9

**cases** 68:9

**Cassandra** 92:25 128:11

**categorized** 117:12

**caused** 117:15 120:8

**causing** 75:17

**cease** 142:5

**cellular** 137:20,24

**cellular-related** 138:7

**center** 22:16

**chain** 115:16

**challenge** 33:2 51:4

**challenged** 64:12

**challenges** 51:8

**chance** 144:16

**change** 26:11,13,16 82:4

**changed** 26:8,15 81:11,23 82:20,23, 25

**charity** 47:22

**chat** 60:18,19 65:16

**check** 91:18

**children** 17:15,17 22:20,24 111:23

**Christophe** 67:7 88:22

**Cirrus** 9:8 16:12

**City** 76:2,5 110:22,25

**claim** 38:7 92:17 105:6 108:5 110:20 111:13

**claiming** 119:2 124:9 127:11

**class** 49:3

**client** 22:12,19 137:9,11 150:25

**client-partner** 89:25

**clients** 86:5 127:23 153:5,14

**close** 22:21 51:9 80:3 81:6 82:2 85:16

**closed** 41:13 78:8 80:9

**closely** 84:22

**closer** 51:18

**cloud** 88:7,8,11

**coaches** 40:25

**coffee** 75:25

**coincided** 80:3

**cold** 80:22

**collaboration** 76:8

**college** 19:9 51:19

**combined** 58:23

**comment** 37:21 113:8

**commentary** 43:6 80:15 95:14 97:17

**comments** 32:19,24 36:22,25 40:23 113:23 114:2,4,8,17,23 115:3

**commission** 139:13,14 144:22,24

**commissions** 139:4,12

**common** 61:22 62:16 63:18

**communicate** 12:3 145:3

**communicated** 73:24 127:24 149:16,21

**communication** 94:17 128:24

**communications** 21:19 23:15 150:16,20

**companies** 20:4,5 132:24 133:5,6 134:14 149:17 150:6

**company** 20:17 27:7,17 31:25 43:19 70:13 100:10 130:20 132:25 133:2 140:8,11 145:8

**comparable** 132:9

**compensated** 77:18

**compensation** 132:8,10,12 139:10

**compensations** 139:5

**competing** 51:11

**complained** 92:18

**complaint** 14:7 44:14 71:15 72:4,15, 24 73:11,22 75:8 76:12 77:6 78:2,17 79:22 84:8,12 85:12 86:8 87:10,19 88:14 89:4,13 90:4 109:13 116:8 127:11,14

**complete** 113:2,20

**completed** 18:2 34:21 80:20

**complexities** 101:17

**complies** 34:15

**computer** 144:12,14

**concerned** 93:18

**concerns** 58:9

**concluded** 156:9

**conclusions** 36:22

**condition** 74:4 78:10 80:11 81:22
87:23 120:5,6

**conditions** 73:16,19

**confidence** 120:2,23 126:24

**confidential** 152:4

**Confidentiality** 25:20

**confirmation** 48:12

**conjunction** 86:14

**connected** 137:21

**connection** 37:8 41:17,22 42:18
43:4 75:15 114:9,20 115:4 127:6
137:25 155:16

**constant** 61:9 90:25

**contact** 144:2

**contacted** 96:6

**contacting** 61:16

**contained** 44:20

**contempt** 120:21

**contend** 105:7 108:6 110:23 113:9

**contention** 111:8

**contents** 32:9

**contest** 47:22

**context** 93:24

**continued** 120:25

**contract** 41:8 154:25

**control** 41:20

**conversation** 15:3 38:12 39:15 43:7
52:2 55:14 58:24 59:8 64:10,20 68:25
74:8,10 79:4 90:25 92:5 93:23 97:6,7
103:4,8 123:23,24 126:21

**conversations** 13:19 15:13 59:11
62:19 64:24 67:10 68:4,6,8,16 73:15
75:20,22 78:6 93:13 94:12 95:2,16,20
96:4,8,25 98:6,10,12,23 99:6,21

101:3,19,21,23 102:8 103:21 104:7,
10,19,21 105:3 118:20 133:18
135:13,23 136:4,6

**copiers** 19:25

**copies** 144:20

**copy** 46:16 136:12 155:6 156:4

**Core** 19:20

**corner** 32:15,16

**correct** 16:14 32:8,12 36:23 45:21
55:18,19,21,22 56:14 65:20 70:16
75:2 79:11 84:2 93:6 95:25 109:2
110:15 111:23 112:3 121:16,17
129:24 143:19 145:25 146:8 151:2,16

**correspond** 155:3

**correspondence** 53:7 129:3,9

**counted** 105:12

**counterclaims** 72:18,19 152:25

**counts** 139:21

**court** 9:2,6 10:7,15,22 11:5 14:9
44:15 121:13 156:3

**courtesy** 11:14

**coverage** 103:5

**coworkers** 121:5

**create** 38:20

**created** 31:17,19,24,25 32:6 33:12
128:17

**creating** 40:24

**credit** 100:15,17,19 152:13

**current** 126:14 138:19 152:17 153:5

**customer** 22:10 68:13

**customers** 20:4 137:13,15 153:10

**cycle** 41:4

## D

**damages** 115:20,24 116:3,4,15,19,
23 117:4,19 119:3 124:9 127:12
128:7

**Daniel** 76:23

**Danielle** 59:23 66:21 77:2 93:3 97:4,
5 98:15

**data** 137:21

**date** 46:16 50:21 57:12,15 67:12
74:10,17 75:24 76:3 79:17 83:17

91:8,9,13 103:11,14 122:5 125:18
138:17 143:21

**dated** 28:21 29:14 65:19

**dates** 19:14 67:14,16,23,25 98:10
121:10

**daughter** 40:19 50:23 51:20 73:19
74:14 76:18 78:10 81:12 85:18 93:15
94:11 95:13 99:15 102:15 103:12
104:5 105:11 109:10 111:5 112:2
117:9

**daughter's** 37:8 40:2 41:23 42:7,19
43:5,21 48:20 49:15 73:25 74:4 75:14
76:14 77:12 79:13 80:4,10 81:21 82:5
85:14 87:23 90:7 101:11 105:22
113:24 114:5,10

**day** 57:18 85:17 103:12 109:9,16
144:5

**day-by-day** 50:15

**days** 43:4 105:25 106:7,10,11,15,18,
19,25 107:2,7 114:9,12,18 115:4

**de** 86:24

**deal** 100:16,20

**dealing** 39:25 40:2 42:6,7 49:11
101:18 120:8,17 127:7

**deals** 51:9 101:13 146:15

**dealt** 119:15

**deaths** 126:7

**December** 109:19,20

**decide** 18:24

**decision** 15:24 55:24 56:5,7,9

**defendant** 9:17 110:8 112:18 113:9

**defendant's** 25:7 72:17,18,19 113:9
127:22

**defenses** 72:17,19

**defer** 122:23 124:17 125:14

**degree** 18:3,14

**demands** 51:5

**depending** 123:5 139:14

**depends** 139:8

**deposition** 9:22 10:2,4 11:3,25 13:4,
18,25 14:17,23 15:14 16:3 24:9 46:19
128:18

**Deraedt** 60:3 66:25 84:19 93:4
101:6,25

**describe** 119:6

**designate** 152:3

**designing** 88:10

**details** 111:3 121:11

**developing** 41:10 75:12 80:16

**devices** 138:2

**DGC** 86:15 87:7

**diagnose** 123:14

**diagnosed** 74:15 121:19

**diagnosis** 40:8 49:19 50:2 74:16,20, 24 123:12,17

**difficult** 42:9 49:13 64:7 109:6

**direct** 20:3

**director** 29:22 30:2 56:10 69:25 75:4 84:4 85:8 87:6

**disagreed** 39:23

**disciplined** 20:14 21:13 22:5,25 23:25

**disclosing** 13:8

**discounted** 139:22

**discoveries** 74:20

**discovery** 135:15 138:22

**discriminated** 92:20 93:22 110:23 112:7

**discrimination** 94:6 110:9,21 111:14 112:19 115:9

**discriminatory** 113:7

**discuss** 30:14 42:2 58:4,7,9 62:2 66:12 93:9 95:4 97:3 99:10 101:5 102:10 103:23

**discussed** 13:9 14:16 66:17,18,19, 20,21,22,23,24 72:5,25 73:12 78:18, 22 79:19 93:10,12 95:23 99:12 101:7 102:13,16 104:2,22 118:16

**discussing** 91:6,21

**discussion** 14:24 52:4 97:8 153:21

**discussions** 90:14 96:14 102:19

**disease** 50:5

**disheartening** 96:23

**disparaging** 114:4,8,17,23 115:3

**distress** 117:16 119:3,7 121:24

**DNA** 64:15

**doctor** 49:2,19 50:5 76:5 106:23 107:3 123:17

**doctor's** 109:11

**document** 25:6,13,17 28:9,12,25 29:2,6 30:21 31:2,5,10,12 35:15,22 36:3 43:25 44:3,7,10,13,17,21,24 45:3,7,11,23 46:3,9 52:15,16,20,24 56:16,22 57:2,5 60:7,9,14 65:4,10,13, 14 69:8,12,17,19 99:20 107:17,22 110:5 142:23 143:6,9,14 147:24 148:4

**documenter** 28:4

**documents** 13:24 14:3,7 15:19 29:6 118:4,7,10 122:7 124:18,21 128:6 135:7,15,18 138:22 142:9 144:16,19, 21 145:2,3,10,14,23 148:10,12 155:14

**drugs** 12:14

**due** 37:7 41:7

**duly** 8:5

**Dupixent** 125:4,13,17

**duties** 137:10 151:4

## E

**earlier** 35:11 42:5 55:12 59:20 73:3 80:13 83:5 100:5 128:15

**early** 123:20

**early-october** 74:19

**Eddy** 56:8 73:21 110:13

**educated** 19:6

**education** 18:2 19:5 131:13

**educational** 18:17

**efficient** 52:6

**effort** 146:17,19

**efforts** 86:16 132:17 135:19 136:23 155:15

**Eighteen** 17:24

**elaborate** 40:20

**eligible** 139:25 144:23

**email** 60:22 142:20,21 143:18,23,24 144:3 148:13 149:8 155:8

**emailed** 57:17,18

**emails** 14:13 53:9 91:10,19 135:2,5 147:12 148:3,22,25 149:4,5,7,18,23

**emotional** 117:16 119:3,7 121:24 125:20

**employed** 20:21 61:13 62:6 63:2 67:19 108:18 140:12

**employee** 28:14 34:17 47:9 110:7 112:17

**employees** 65:25 66:4,15 113:10 127:21 150:21

**employer** 70:6,13 137:5

**employment** 19:14 20:10,15 21:9, 14 23:2 24:2 29:18 30:9 53:14 55:24 57:24 58:11 59:13 61:14,17 94:3 115:7

**enabled** 41:2

**end** 20:11 21:9 35:2,7,13 127:19

**engaged** 62:23

**engagement** 154:24

**engineer** 77:23 78:3 87:15,21

**enjoyed** 150:5

**ensure** 144:21

**ENT** 120:9 124:10,24

**entertaining** 133:17

**entire** 26:5 63:12

**entitled** 117:4 118:14 142:4

**environment** 51:8 96:22

**episodes** 81:21

**essentially** 21:22 23:10 137:25

**established** 49:7

**estimate** 132:3

**evaluation** 36:19 38:8 41:25

**evaluations** 30:11,14

**event** 47:22

**events** 42:8

**evidence** 52:9 100:23

**exact** 17:2 62:7 67:13,16,22,25 70:12 74:10,16 75:24 83:17 91:8,9,13 103:11,14 105:3 121:10 122:5

**examination** 9:10 156:8

**examined** 8:6

**examples** 41:15

**exchange** 69:20,21 107:23 129:3

**excuse** 16:9

**executive** 22:16 86:4 137:9,11 151:2

**exhibit** 25:9 28:6 29:3 30:23 35:19 44:4 45:4 46:18 52:8,13,17 56:19 60:10 65:7 69:5 71:6,8 92:15 107:12 108:21 112:12 116:7 127:16 143:3 147:21

**exit** 66:18

**expand** 33:14

**expectation** 81:10 100:12 101:12

**expectations** 33:4 81:18,19 82:3,20 100:4

**experience** 35:3

**experienced** 96:23 97:15

**experiencing** 51:7 81:8 97:16

**explain** 113:25

**explained** 97:7

**exploring** 33:13

**Express** 152:13

**expressed** 126:17

**extend** 134:14

**extended** 134:10

**extensively** 88:19

**eye** 106:23 107:3

F

**fact** 59:3 66:8 80:15 92:19 93:21 100:14 111:9

**factors** 40:16

**failure** 120:3

**fair** 62:22 83:18 96:18 101:14 102:5 131:7 136:21

**familiarize** 148:16

**family** 92:24 126:4,7 128:10

**Fargo** 151:23

**fax** 19:25

**feathers** 115:14

**February** 54:2 65:19 67:11,19 75:23, 25 109:21 138:17

**federal** 71:14

**feedback** 39:6 100:7

**feel** 34:9 57:24

**feeling** 59:12 115:17 121:6

**fell** 33:4

**felt** 41:15 80:12 96:21 120:2 121:2

**Fernandez** 122:12,17 123:11,20 128:11

**Fifteen** 108:25 147:18

**file** 121:13

**filed** 14:8 44:15,18 111:2 118:10

**filings** 14:10

**filled** 31:23

**fills** 32:3

**final** 100:22

**financial** 33:11,20 126:9

**find** 102:25 103:15 140:4

**finding** 100:9 125:25

**fine** 141:6 148:8 152:5

**finish** 11:12

**firing** 108:9

**firm** 140:10

**first-half** 34:25

**FISHER** 39:13 46:20 47:3 52:10 70:20 82:7 116:20 117:7 128:22 129:2,8,13,17,20 140:25 141:5 147:17 152:2 156:2,5

**fit** 61:21

**fixed** 138:4

**flurry** 133:8

**FMLA** 105:6,8,12,18 108:5,8,12,14, 17 117:12

**focus** 37:20,22 38:4,9 39:6,12,18,22 40:5,15,21 43:6,8,13 58:17 80:14 95:11 114:13

**focused** 41:9,16 80:16 81:24

**follow** 11:2 141:3 142:11 155:17

**forecast** 34:3,11 38:17,21 55:11

**forecasts** 34:4

**forget** 19:17

**forgot** 17:2 67:6

**formal** 18:2 44:14

**forms** 139:10

**forwarded** 149:8

**Foulon-belkacemi** 86:3

**found** 50:2

**France** 70:10,12,15 84:21 86:5,15 87:6 88:25 89:10 90:23 92:4,11

**freely** 12:7

**friend** 100:10

**friends** 68:15 130:20

**friendship** 68:15

**friendships** 126:11

**front** 10:21

**frustrating** 49:13

**funnel** 38:24 80:2 89:15,16,20 90:13, 16 91:7,21

**future** 51:17

G

**Gal** 86:24

**gap** 141:25

**gave** 100:5

**gears** 47:8

**general** 49:12

**generally** 132:4

**geographic** 130:23

**German** 59:24 66:20 77:22

**give** 11:13 12:16,20 90:12 100:14,17 147:10 153:17

**global** 18:21 69:25 84:20 85:8 87:5 88:24

**Gmail** 149:9

**good** 9:13,14 22:23 61:21 129:19

**govern** 9:23 10:18

**graduate** 18:4,7

**graduated** 19:8 20:23

**grass** 64:17

**Great** 156:2

**greener** 64:17

**ground** 9:21 10:25 13:17

**group** 21:19 86:18 87:7

**guess** 20:23 23:21 27:22 56:3 62:13 63:3,7 72:9 131:25 132:2

**guessing** 39:3

**Guilfoyle** 9:11,12,15 25:15 28:8
30:25 35:16,24 37:12,18 39:8,16
42:13 44:25 46:24 47:6,7 52:5,12
56:21 65:2 69:7 70:17,21,24 82:8
87:2 107:9,14 116:21 128:25 129:5,
11,14,18,22 140:23 141:3,6,8 142:8,
13 143:5 147:14,18,23 152:5 153:19,
23 155:13,19

**H**

**half** 31:14 32:25 35:7 106:7,11,14
107:2 109:16

**Hames** 84:3

**Handbook** 28:14

**handing** 68:9

**handle** 27:5 85:24

**handwritten** 136:22

**Hang** 104:15

**happened** 49:16 50:14 62:21 67:24
120:3

**happening** 50:13 64:18 102:6 103:2

**Haran** 9:1,5,13 10:1 11:1 12:1 13:1
14:1 15:1 16:1,6 17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1 25:1,16 26:1 27:1
28:1,4,11,25 29:1 30:1,21 31:1,4 32:1
33:1 34:1 35:1,17 36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1 44:1,2,10 45:1,2
46:1 47:1 48:1 49:1 50:1 51:1 52:1,15
53:1 54:1 55:1 56:1,17,24 57:1 58:1
59:1 60:1,8 61:1 62:1 63:1 64:1 65:1,
3 66:1 67:1 68:1 69:1,3 70:1,25 71:1
72:1 73:1 74:1 75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1 97:1 98:1 99:1
100:1 101:1 102:1 103:1 104:1 105:1
106:1 107:1,10 108:1 109:1 110:1
111:1 112:1 113:1 114:1 115:1 116:1
117:1 118:1 119:1 120:1 121:1 122:1
123:1 124:1 125:1 126:1 127:1 128:1
129:1,23 130:1 131:1 132:1 133:1
134:1 135:1 136:1 137:1 138:1 139:1
140:1 141:1 142:1 143:1,8 144:1
145:1 146:1 147:1,16 148:1,2 149:1
150:1 151:1 152:1 153:1,24 154:1
155:1 156:1,9,13

**Haran@orange** 143:25

**hard** 64:13 82:10

**hardships** 126:9

**head** 11:5 29:2 118:5 138:24

**health** 73:16,19 139:16

**hear** 81:5

**heard** 67:3 68:17

**heightened** 81:20

**held** 19:10 98:3 105:14 117:10
136:25 153:21

**helped** 41:11 51:15

**helping** 90:10

**Hernandez** 92:25

**Hey** 58:24 61:20 64:10 67:3

**high** 18:4,7 148:23

**higher** 56:13 115:15

**highest** 17:25

**HIPAA** 122:6,24

**hired** 24:5,12,14,17 111:21,25

**hiring** 47:17

**history** 125:20

**Holbrook** 9:9 16:12

**hold** 20:6 23:11

**Holtsville** 17:4

**home** 22:21 49:17 50:24

**homeschooled** 49:4

**homeschooling** 48:23 49:8

**honestly** 12:24

**hope** 97:19

**hopeful** 49:18

**hoping** 49:22

**hospital** 49:6 50:24 85:18

**Hostetler** 9:16

**hour** 70:18 124:2

**hourly** 106:17

**hours** 12:14 13:16 104:24

**HR** 79:10

**Hubert** 60:6 67:9 89:23 90:18 91:7
93:5 103:24

**human** 11:9 47:14 54:14 110:22,25
115:15

**hundred** 56:4 138:15

**Hunter** 84:5

**husband** 14:20,23

**husband's** 17:13 139:18

**hyper** 121:3

**I**

**IBM** 89:22 90:11,15 91:6,22 133:23

**identification** 25:9 28:6 29:3 30:23
35:19 44:4 45:4 52:17 56:19 60:10
65:7 69:5 107:12 143:3 147:21

**identified** 36:14 110:12 112:22
117:5 149:17,22 152:8

**identifies** 109:16

**identify** 72:13 109:9 110:7 112:16
113:6 127:21 128:5,10

**identifying** 37:23

**illness** 37:9 40:2,8 42:7,19 43:5,22
48:20 74:15 75:14 76:14 79:13 82:5
85:14 90:7 101:11 113:24 114:5,10,
24 115:5

**illnesses** 41:24 126:3

**imagine** 136:14

**immediately** 16:23 130:11

**impact** 119:17

**impacted** 119:22

**impacts** 120:12,13

**impasse** 41:6,7

**improvement** 36:18 37:6

**inability** 74:2

**inaccurately** 63:8

**includes** 138:2

**including** 10:19 138:2

**incorrect** 126:19,22

**incorrectly** 62:13

**increase** 51:6

**increased** 75:10,17 76:15 77:10
78:7 79:24 80:7 85:15 87:24 90:6
93:10 94:7 95:8,10 97:9 99:14 101:10
102:14 104:4

**increasing** 59:2

**individual** 20:4

**individuals** 64:23 71:12 92:16
104:22 127:21 128:6 149:22

**industry** 130:19

**infection** 50:4

**infectious** 50:5

**inflammation** 120:12

**information** 13:19 44:20 51:24
71:13 72:3,14,23 73:7,10,21 74:23
75:6 76:10,14 77:4,24 78:15 79:21,24
84:6 85:10 86:6 87:8,17 89:2,11 90:2
145:12,15,23

**informed** 38:7 82:21 92:18 93:20

**initiative** 38:20

**input** 36:8

**inputted** 32:11

**insomnia** 120:16 121:18,20

**instance** 64:7

**instances** 61:24

**institutions** 18:17

**instruct** 146:25 147:5

**insurance** 139:16 142:10

**integration** 77:3,15 97:23

**Intelenet** 20:19

**interested** 130:21 153:6

**interfered** 105:8,18

**interference** 105:7

**international** 89:24

**Internet** 137:23 138:5

**Interrogatories** 45:15,20 71:7 92:14

**interrogatory** 71:17,24 72:12 78:25
93:19 95:6 108:21 109:4,9 110:4,6
112:12,13,16 113:5,17 127:16,17,18,
20 128:3

**interrupt** 11:10

**interview** 133:22

**interviews** 132:16,19,22 134:4,10

**introduce** 46:18

**investigation** 40:10

**invited** 53:16,19

**involuntary** 68:23

**involved** 47:23 97:13

**IOT** 137:22

**issue** 100:6 120:13 121:25 127:3

**issues** 41:19 48:22

**ITHELPDESK@ORANGE.COM**
143:19

## J

**January** 27:21,23 49:3 83:6,12,14,20
86:12

**Jennifer** 54:12,13 55:2 66:23 78:14

**jeopardy** 57:25 58:10 59:13

**job** 19:9 21:11,17,18 22:8,9,19 23:5
40:5 42:12 61:3,5,20 63:23 64:2
90:20 93:18 94:24 96:19 102:24,25
120:24 125:25 126:14,18 127:8
130:4,10,24 132:15 133:12 134:9,10,
14,21,25 135:19 136:22 137:10 138:9
140:5 151:4,6 152:17 154:7

**jobs** 130:12,14,15,25 131:18 136:5,
25

**joined** 20:18

**judge** 10:15,21

**juggle** 42:10 81:17 90:9 106:9

**juggling** 51:4 59:5 78:11

**Julia** 17:20,23

**July** 34:18,22 35:2,13

**jump** 11:10

**jumped** 55:10

**June** 35:11

**jury** 10:16,22

**Justin** 9:15

## K

**key** 88:24

**kickoff** 86:19

**kid** 104:15

**Kimmick** 29:19 30:17 31:19 36:12
38:7 40:20 41:21 42:17 53:19 55:18
56:6,13 57:21 59:21 66:17 73:9 85:20
110:13 112:22

**Kimmick's** 29:20

**kind** 11:9 15:23 19:5 22:21 26:23
52:4 61:9 64:24 80:22 81:4,22 84:15
86:9 93:15 100:3 104:15 120:20,22
134:24

**kinds** 133:17

**knew** 15:20 47:18 76:17 84:12,25
130:18,19

**knowledge** 45:17 70:5 71:13 72:14,
23 73:17 88:13 110:2 153:8,12

**Kyndryl** 133:25

## L

**lack** 37:20 38:3,9 39:5,12,18,22
40:21 43:8,13 58:17 80:21 114:12

**lacked** 80:13

**Lacosto** 88:6

**lamenting** 68:16,25

**laptops** 137:22

**larger** 34:5 90:12

**late** 35:8

**late-september** 74:18

**Laurie** 86:24

**law** 10:19 110:22,25 111:11

**laws** 142:2

**Lawson** 54:12,13 55:20 57:21 66:23
78:15,16

**lawsuit** 15:25 44:16 105:6 115:20
119:4 153:2

**lawyer** 111:2 118:17 135:10

**leader** 86:17

**leadership** 115:16

**Leading** 98:7

**learn** 53:14

**leave** 23:20 53:10 102:24 108:14,18

**leaving** 146:23

**led** 86:15

**left** 10:8 27:4,7,25 145:24 150:2

**legal** 41:5,6,7,19 100:6,9

**Lesterson** 154:12,16

**letter** 57:9,13,16,20 154:25

**level** 17:25 23:14,15,21 24:2 56:12
148:23

**Liam** 17:20,21

**library** 33:18

**life** 125:23 126:5

**lines** 55:5

**Linkedin** 130:16

**list** 59:18 66:6 70:13 71:11 92:16

**listed** 45:17 84:14

**litigation** 135:7 150:17,22

**live** 16:18

**lived** 16:12,15,25

**LMHC** 92:25

**log** 129:15

**long** 13:13 16:15 20:6,24 21:23 64:10
125:9,12

**longer** 125:13

**looked** 14:6 136:15

**Lorna** 28:2 83:5

**loss** 126:11

**losses** 97:14

**lost** 117:23 118:2 120:16

**lot** 73:14 85:2 97:12 148:6

**Lou** 59:22 66:19 76:7 93:2 95:5,17,23

**lower** 32:15,16

**Lumen** 23:16,22 24:3

**lunch** 129:19

### M

**M-A-T-E-J-O-V-I-C** 16:10

**M.J.** 60:6 67:9 89:23 92:7 93:5
103:23

**M.j.'s** 104:13

**machines** 19:12 20:2

**made** 22:17 55:23 56:5,6 68:19 85:19
93:21 113:10 134:13

**maiden** 16:7

**maintaining** 83:9

**major** 86:5 87:7 89:9

**make** 39:2 41:16,17 50:7 55:4 59:6
62:15 82:17 113:22 114:3,7,16,22
115:2 118:19 129:11

**makes** 42:24,25 43:2 56:3 62:21
120:13

**making** 15:24 75:12

**manage** 43:21 90:21 100:8 119:14,
20 120:11,18 124:13 133:12

**manager** 24:18,22 54:15 76:8 77:3,
15 84:21 87:5 88:24 89:9 97:23 121:5

**manager's** 32:18,23 36:21,25

**managing** 40:7

**manifestations** 121:23

**Marie-cecile** 60:2 66:25 84:19 93:4
101:6,24

**Mark** 28:4

**marked** 25:6,9 28:5,25 29:2 30:21,23
35:19 44:3 45:3 52:15,16 56:16,19
60:8,9 65:3,7 69:3,5 71:5 107:10,12
143:3 147:16,21

**marketing** 22:15

**married** 17:11

**match** 131:20

**Matejovic** 16:10

**matter** 9:18 71:14 72:15 116:8 128:7

**matters** 145:24 146:2

**matured** 33:15

**MBA** 18:20,25 131:8

**means** 33:22,25 151:12

**meant** 40:21 99:4

**medical** 77:12 78:10 80:4 121:19
123:16

**medically** 76:20

**medication** 12:14 124:5 125:5

**medications** 124:16,23 125:7,10

**meet** 30:13 33:10,19 34:11 43:10
48:2 50:20,21 152:22

**meeting** 53:21 54:4,9,19 57:20
122:21

**Melegrito** 60:5 67:6 87:13

**Mellon** 151:22

**member** 79:10

**members** 92:24 128:11

**memory** 48:9

**mental** 125:20

**mentioned** 29:7 38:13 39:12,15,18
41:4 42:4 55:12 80:7,13 82:19 83:5
103:3 111:17 112:6 121:18 128:16

131:8 145:16,21 150:24 154:5

**message** 62:10

**messages** 98:20

**met** 48:6,14,17 73:4 75:22 92:3 93:15

**method** 94:16

**metrics** 100:21

**metro** 131:3

**MFS** 20:19 21:6,16,17

**mh-hm** 10:12 72:16 83:21 103:7
108:3 109:18 110:11 127:25 128:9

**Michel** 67:6 88:6

**Michelle** 47:10,13,14,22 48:2,14
53:8,11 59:19 72:2

**middle** 116:13

**midway** 15:10

**midwest** 30:6

**mind** 46:6

**mine** 22:13

**minutes** 48:18 70:19 147:11 153:17

**misquote** 124:19

**missed** 150:12

**missing** 133:16 139:24 152:15

**mitigating** 40:16

**mixture** 148:12

**module** 83:9 89:18 90:12 91:2

**mom** 107:3

**moment** 9:21 35:22 44:7 45:6 56:25
65:10 69:12 107:16

**monetary** 116:4

**money** 117:22

**month** 19:17

**monthly** 123:8

**Moody's** 77:19 150:10

**Morgan** 151:22

**morning** 9:13,14

**mother** 14:21,25 42:6 73:20 76:4
94:11 105:10 106:22 111:5,22 112:3,
9 117:9

**mother's** 37:9 41:23 42:19 114:24
115:5

**move** 26:22 39:9 42:14 79:25 85:16

114:14

**moved** 150:4

**moving** 37:23 80:9

**multiple-page** 147:24

## N

**NA** 9:18 24:8 70:3

**Nadine** 86:2

**named** 47:9

**names** 16:6 17:19 71:19 87:3 92:21 124:19 133:3,5,6

**Natalie** 67:8 89:8 91:25

**nature** 11:9 63:23 119:7 122:16

**navigate** 41:12

**needed** 36:18 37:6 49:4 74:6 80:18, 19 103:6 144:21 145:4 146:21

**needing** 81:4,11 111:6

**negative** 113:23 114:2,8,16,23 115:3

**neglect** 46:22

**negotiated** 89:16

**network** 88:11

**Nodding** 18:19

**nods** 11:5

**Non-solicitation** 25:21

**nonresponsive** 39:9 42:14

**northeast** 30:6

**Notary** 8:5

**note** 37:4 62:15

**notes** 136:22 150:3,7

**notice** 92:17

**notified** 65:22 67:20 142:15 144:7 146:7

**November** 109:19

**number** 39:3,4 54:24 71:17,24 72:12 92:15,24 95:6 108:24 109:4,7 110:4 112:13 113:5 127:17,20 128:3

**numbers** 75:13 76:16 82:22,24 100:15,18 109:5

## O

**oath** 10:7,9,13,14 71:2 129:24 153:25

**Objection** 82:7 116:20 117:7

**objective** 43:10

**objectives** 33:11,20

**OBS** 24:9 25:11 28:10 85:9 86:5

**OBS11** 25:8

**OBS13** 28:5

**OBS334** 30:22 31:3

**OBS344** 35:18,25

**OBS381** 56:18,23

**OBS5** 25:8

**OBS575** 107:11,15

**OBS821** 147:20,25

**OBS910** 143:2,6

**OBS926** 65:5,6

**OBS930** 69:4,9

**obstacle** 41:12 100:9,11

**obstacles** 41:3

**obtain** 18:11 138:9 144:15,17,19

**occasions** 38:14

**occurrence** 61:23 62:17 63:18

**October** 43:5 48:9,13 74:12 103:18 108:2 109:16,17

**offended** 40:13

**offer** 61:25 134:14

**offered** 105:13

**offers** 134:10

**office** 47:19

**onboard** 47:18

**onboarded** 29:13

**onboarding** 29:8

**one-page** 28:9

**onerous** 41:19

**ongoing** 14:24 15:2 48:21,22 50:4 51:3,11 64:20

**online** 18:22 131:8

**opportunities** 33:12,14,16 34:10 37:23 61:5 95:19

**opportunity** 10:5 20:13 36:21 69:13 107:18 143:10 148:5,22

**option** 105:13 139:19

**options** 124:13

**Orange** 9:17 23:24 24:5,8,9,13,20 25:3,22 26:6,13 29:18 30:10 32:7 36:20 45:21 46:12 47:9 53:14 55:25 60:23 61:2,14 62:6 63:2,25 64:2,5 65:23,25 66:3,10,15 70:2,3,4,9,11,14 75:5 76:9 84:5 87:16 88:7,25 89:10, 25 90:22,23 97:22 105:8,18,21 106:21 108:6,11,15,18 110:23 111:19,22 112:2,7 113:22 114:3,7,16, 22 115:2,8,10 121:16 125:24 130:3,6 131:14,20 132:12 134:22 137:2 138:17 141:10 142:17,18 143:24 144:3 145:25 146:12 149:8,19,24 150:21 151:6,14 152:19 153:5,11,14

**Orange's** 152:24

**Oranges's** 92:14

**order** 50:6 90:12

**ordering** 156:4

**orders** 33:6

**overcome** 100:9

**overlay** 77:14 87:21 88:9

**oversee** 90:21

## P

**p.m.** 156:9

**paid** 106:2,10,19 107:6 144:22,24

**Paine** 28:2 83:6

**paper** 28:17

**papers** 29:12

**paperwork** 49:7

**paragraph** 109:12 116:13

**part** 27:3 38:6,8 47:15,17 56:9 58:20 63:22 64:15 79:3 90:20 98:20 105:4 115:19 135:7,15 136:2 146:16 150:16 152:3

**partial** 106:7

**partner** 137:9,11 150:25

**partnership** 33:13

**parts** 50:9

**pass** 41:18

**past** 41:2,12

**Patricia** 9:5 16:6,9 156:8,13

**Patrick** 17:14

**Patty** 33:2 143:25

**Patty.haran@orange.com** 60:23

**Paul** 60:3 67:4 85:7 93:4 102:10,12 103:4,21

**Paul's** 102:22,23

**pay** 106:14 117:23 118:2

**paying** 139:20

**pending** 12:9 142:25

**people** 45:16 64:4 66:6,8,9,25 68:6, 10,20 93:20 132:23 145:7 146:17,19

**percent** 56:5 138:15

**perception** 58:18

**perform** 76:16

**performance** 30:10,14 31:13,18 32:2,6 34:21,25 36:7 37:5 39:19,20 41:24 58:2,12,13,15,20,25 59:15 81:10 86:11,13 87:12 88:3,16,20 89:6

**perjury** 10:20

**persistent** 81:25

**person** 27:16,24 75:22 88:10,12 109:3

**personal** 149:9

**persons** 72:13

**Perusing** 44:8 45:8 52:21

**Peter** 59:22 60:21 65:16 66:18 67:4 75:3 92:25 93:9,24

**Pfizer** 41:6 77:19 100:6,16,21

**Phillipe** 60:4 67:5 87:13

**phone** 94:15 95:21 96:12 99:19 101:22 104:11,21 137:21 155:5,11

**phones** 138:3

**phrase** 38:3

**physical** 121:23

**Physically** 54:5

**Pichon** 66:24 69:21,24 79:20 93:3 99:10 101:3

**pick** 146:23

**pile** 28:16 29:11

**pipe** 33:18

**pipeline** 33:9 34:3,7,8 37:25 38:25

**pizza** 73:5

**pizzeria** 48:3,15

**place** 67:11,18 73:5 95:16 96:4 103:9 104:23

**Plaintiff's** 155:15

**plan** 32:2 38:17,23 139:18,19

**plans** 137:20,21,22

**point** 15:8 16:25 17:3 47:25 50:25 74:11 76:19 82:23 83:2 91:12 92:4 123:10 133:18,24

**Pons** 86:25

**poor** 121:7

**populated** 32:4

**portfolio** 33:15

**portion** 37:14 39:9

**position** 19:19,24 20:7 21:3 23:12 24:16 62:25 137:7

**positive** 86:10,12 87:12 88:16,20 89:6

**possession** 46:12 72:7,10

**possibility** 92:6

**potential** 27:12 50:3 62:2 91:3 136:5

**praying** 49:22

**preceding** 16:24 42:8

**preexisting** 120:5

**preparation** 13:6,24 128:17 129:7

**prepare** 13:4

**presales** 77:23 87:15

**prescribed** 124:4,24,25

**present** 54:8 94:25 96:24 99:5 101:2 102:7 103:20 104:18

**presented** 38:16,23

**pressing** 59:4

**pressure** 51:6 59:2 75:10,17 76:15 77:10 78:7 79:24 80:7 85:2,15 87:24 90:6 93:11 94:8 95:8 97:10,11,16 99:14 101:10 102:14 104:4

**presume** 11:20

**pretty** 14:8 138:6 150:12 155:10

**previous** 14:9 38:22 125:19 130:18

**previously** 78:13 79:19 83:10,24

**primarily** 130:20,25 150:13 155:5

**prior** 44:18 45:24 57:23 59:10 60:25 63:24 79:5 83:20 92:4 98:15

**priorities** 51:12

**privilege** 129:15

**privileged** 13:21 128:23

**prize** 47:23 48:3,7

**problem** 52:7

**procedure** 105:23

**process** 36:20 51:21 56:10 135:16

**produce** 135:20

**produced** 98:19 135:6 150:15,22

**producing** 135:8

**production** 128:21 129:16 140:19, 24 141:7 142:9,12 155:14,18

**products** 137:14,17 151:15

**professional** 121:20

**program** 18:22 131:8,10

**progressively** 37:24

**prohibit** 105:21 106:21

**promoted** 87:6

**pronouncing** 154:11

**properly** 11:21

**Proprietary** 25:20

**prospect** 91:6

**provide** 54:17

**provided** 54:21 145:12,14 148:11

**providing** 146:11

**PTO** 106:2 107:4

**Public** 8:6

**pull** 144:25

**pulled** 144:25 148:13

**purchase** 139:19

**Purdue** 18:21 131:9

**purport** 110:9 112:18

**purpose** 9:22 68:3

**purposes** 11:2 100:21 118:15 145:22

**pursuing** 18:20

**put** 14:6 92:7 129:14 141:2

## Q

**qualified** 33:9,18

**question** 11:11,12,16 12:9,10 37:10
39:11 42:16 58:8 59:9 66:7 72:11,22
82:18 102:18 114:15 116:5,25 126:22
142:25 147:4

**questions** 10:6,7 11:20 12:2 148:14,
18

**quickly** 76:17 80:2,9,17 101:14

**quota** 34:5,11 38:18,22 55:5,9,13,15
64:19 75:12 82:22 89:18 100:15,18
137:13

**quotas** 152:22

**quote** 55:6

## R

**ran** 140:9

**range** 132:7

**rating** 36:16,17 37:6 43:3,11

**reached** 62:24 153:4,13

**reaching** 62:18

**read** 32:22 37:12,15 71:18 92:21

**real** 80:21

**realistic** 101:15,16

**reason** 12:20,23 46:8,11 54:17,24

**reasons** 54:20,23

**recall** 13:11 16:2 24:25 27:18,20
28:19 34:20 53:23 54:7 55:2 57:12,14
59:10 62:7,11 63:4,14,15 64:7,25
67:13,15,22,25 74:17 83:16 91:8,9,15
92:8 94:14,16 96:3,11 98:9 103:11,13
104:10 118:4 121:10 122:5 123:19
124:15 125:18 128:18 131:9,21,24
132:11 135:14 141:20,21 142:2
145:9,13 150:9 154:7

**receive** 30:10 57:19 139:4,7 140:15,
20 141:10

**received** 57:10,13 142:4

**receiving** 59:2 79:25 85:16 87:25
93:11 119:19 141:22

**recess** 70:23 129:21 147:13

**recognize** 25:16 28:11,13 29:5,9
31:4,9 36:2,5 44:9 45:10,13 52:23
53:2,5,7 57:4,7 60:13,17 65:12 69:16

**recognized** 86:11,18

**recollection** 64:22 124:23 134:3

**recommended** 49:2

**record** 9:3,20 24:7 28:9 31:2 35:17,
25 56:22 65:4 69:8 107:15 135:11
136:11 143:6 147:24 153:20,22

**recorded** 126:16

**records** 46:17 91:19 103:15 121:12
122:24,25 125:15 133:21 134:20,24
136:13 138:25

**recovering** 49:17

**recovery** 40:9 105:23

**recruited** 23:23 47:16

**recruiter** 61:12,15,19,25 62:18,24
140:6,7 154:5,25 155:4,16

**recruiters** 61:8,16 130:17

**refer** 91:10 145:11

**reference** 84:16 86:9 87:11 88:16,21

**referenced** 73:23

**referred** 121:25 129:5

**referring** 24:7 27:25 111:12 118:8

**refresh** 14:10

**regain** 119:25 120:22 121:4 142:16

**regard** 75:7 76:11 77:5,25 78:16 84:7
85:11 86:7 87:9,18 89:3,12 90:3 93:9
95:6,14 97:4 99:11 102:11 103:24

**region** 30:3 91:4

**regions** 30:6

**regular** 78:5 90:19 95:17,19

**regularly** 77:9 79:23 84:24

**related** 40:4,17 45:17 50:17 95:20
111:11 119:13 126:23

**relating** 124:8 128:6 135:18 142:9
155:15

**relation** 50:13

**relations** 90:22

**relationship** 41:10

**release** 15:18 122:7,25 124:21

**released** 85:18

**relocate** 131:5

**remember** 20:20 57:17 63:9 74:9
107:21 143:13 148:25 149:3

**recognized** 86:11,18

**remembering** 134:7

**remotely** 131:3

**removed** 100:11

**rep** 19:22 21:4,6,21 22:18 23:10

**repeat** 37:10 82:17

**repercussions** 117:20

**rephrase** 11:18

**report** 29:17 30:7 115:8

**reported** 29:19 55:17 56:11

**reporter** 9:2,6 10:8 11:6 37:15 156:3

**reporting** 123:19

**represent** 9:17

**representative** 110:8 112:17

**representatives** 113:10 132:25
133:4

**request** 53:10 85:20 108:17 111:18
115:15 128:20 129:12,16 141:7
142:12 155:18

**requested** 15:18 27:9 37:14

**reschedule** 51:2

**resign** 83:11

**resigned** 20:12 21:10 26:19 27:4,16
83:6,22

**resources** 47:15 54:14 115:15

**respect** 86:21 99:24 147:2,8

**respond** 36:21

**responded** 42:22

**response** 11:4 39:17,22 71:16,23
92:15,23 93:16 94:18 96:14 101:25
102:22,23 104:13,14 109:15 110:3
113:13,16,17,20

**responses** 45:19 46:13 71:6,11
92:13 108:21 112:12 127:16

**responsibilities** 19:24 21:5 26:12
27:2 40:6 42:11 59:5 78:9 83:3,20,24
90:9 151:6

**responsibility** 83:7 90:21

**responsible** 30:5 77:16 83:10
137:12 152:20 153:15

**result** 81:11 126:13,18 132:16 134:9

**results** 33:3 88:2

98:16 133:7,15 135:8,11 154:19

**resume** 155:6,9

**retaliated** 92:20 93:22 105:16 108:7,
11

**retaliation** 93:25 94:5 108:5 110:10
111:10,14 112:19 115:9

**retaliatory** 113:7

**Reticker** 60:4 67:4 85:7 93:5 102:11,
12

**return** 49:2

**returning** 129:9

**revenue** 33:3

**review** 13:23 14:12 31:13,18 32:2,6
34:21 36:7,9 37:5 38:12 39:19,21
44:7,17 45:7,23 56:25 65:10 69:12
71:15,20 107:17 148:3,9,22

**reviewed** 14:5 128:16 129:6

**reviews** 34:25

**rights** 25:20 105:8,19 110:22,25

**Road** 9:8 16:12,25 17:3

**Robert** 67:8 88:23 89:3

**Rocco** 47:10 48:2,6 53:8,11 59:19
72:2,6,23

**role** 21:20 22:18 23:8 26:5 62:2 84:18
151:5

**roles** 26:8

**Romero** 59:25 66:21 77:22,25

**roughly** 20:22 123:2

**ruffle** 115:14

**rule** 13:17

**rules** 9:21,23 10:18,25

---

**S**

**Saint** 86:24

**salary** 106:17 131:16,20,21 132:6
138:19 139:11

**sales** 19:21 20:3 21:4,6,21 22:18
23:10 29:22,23 30:2 34:3,4,10 41:3
43:20 51:7 55:7 56:10 61:4 64:15
78:3,7 79:25 80:8,9,20 81:6 82:2,22
84:4 85:3,16 86:16,19 87:6,21 89:16
90:15 91:7,21 95:19 130:14 137:12
146:19 152:20

**salespeople** 61:23

**salesperson** 63:19

**Samsung** 152:12

**scare** 76:20

**scholarship** 51:21

**school** 18:5,8 48:23,25 49:11 51:16

**schools** 49:12

**scope** 130:23

**scrutiny** 75:11 94:8 95:10 100:7
101:9 102:15

**search** 130:15,24 132:16 134:21
135:19 136:23 155:15

**secondary** 18:16

**seek** 18:24 131:12

**seeking** 115:20,24 116:16 117:22,25

**self-confidence** 119:23 127:3

**self-induced** 127:4

**sell** 33:14 139:9,14 151:13

**selling** 19:25 21:7 137:13,14,18,20,
22

**send** 62:9

**sender** 143:17

**sending** 46:23 135:9 155:9

**sense** 42:24,25 56:3 62:21

**sentence** 33:7 37:25

**sentences** 32:23

**separated** 151:7

**separation** 125:24 131:14 134:21
137:2 141:9 149:18,23

**September** 74:12 122:8 131:11

**series** 74:20

**served** 45:24

**serves** 48:9

**service** 138:4,5

**services** 9:18 21:8 23:24 24:6,8
70:4,9 77:3,15,16 97:23 137:15,18,23
146:11 151:15 153:7

**session** 10:11 13:6

**sessions** 15:10 122:18

**set** 83:19 151:9,10

**Shaman** 154:12,23 155:16

**share** 51:23

**shared** 15:19,21 51:25 59:19

**short** 22:10 33:5 70:23 129:21
147:13

**show** 25:5 28:3,24 30:20 35:14 43:24
44:23 52:14 56:15 60:7 65:3 69:2
107:10 122:25 142:22 147:15

**sic** 110:13

**side** 70:11

**sign** 29:12 41:8 46:9,10,16

**signature** 25:25 28:20 29:10,14
46:3,13

**signed** 24:25 25:22 28:17 29:7
100:20 122:25

**SIM** 137:24

**Simal** 22:11

**similar** 76:20 152:18

**simultaneous** 29:25 70:7 135:3
145:17

**Singh** 59:22 60:21 65:16 66:18 75:3,
7,20 93:2,9,24 94:13 95:2

**Singh's** 94:18

**single** 67:24

**sinus** 120:13 121:24

**sinuses** 120:6

**Sitting** 134:2

**situated** 48:24

**situation** 77:12 79:12 81:7 94:21
96:17 102:4 117:21 120:19 124:14

**situations** 120:16

**sleep** 120:16

**small** 22:20,24

**social** 49:5 51:14,15

**sold** 77:18

**solution** 151:9,10

**solutions** 88:11

**son** 51:18

**sort** 14:24 26:18 41:14 47:21 50:15
53:10 58:24 64:20 68:16,24 139:25
141:10

**sorts** 138:2

**sought** 122:17 142:16

**sound** 122:9

**space** 19:6

**speak** 12:3 13:13 14:22 63:25 65:24

**speaking** 29:25 47:19 70:7 135:3 145:17

**specific** 24:19 30:3 32:10 64:23 68:12 98:9 134:3 145:9

**specifically** 28:19 38:3 95:5 112:13 114:11

**specifics** 64:25 92:9 94:14,16 98:16

**speculate** 56:2 82:11,15

**speculating** 33:22

**spend** 124:2

**spin** 133:25

**spoke** 15:7 48:18,19 49:14 67:5,6,7, 8,9,14,16 77:9 79:23

**spoken** 27:12 95:24

**spokesperson** 79:8

**Stanley** 151:22

**start** 91:5 121:8 123:25 130:9

**started** 19:15 25:2,22 26:25 125:16 128:15 130:4,11 131:9 138:13 141:21 142:6

**state** 8:6 9:2 63:7 111:11 141:11 142:2,10

**stated** 16:11

**statement** 42:5 100:22

**States** 28:15 30:4

**status** 112:8

**stay** 64:11,18

**stayed** 22:4

**stemming** 127:3

**step** 22:17 85:24

**steps** 118:23

**steroids** 124:25 125:11

**stock** 139:19

**stonewalled** 93:16

**stonewalling** 81:2 99:25 120:20

**Stony** 18:12

**stop** 88:4

**stopped** 122:3

**stress** 15:23 75:10 119:14,17,21 120:12 125:20 126:13,17 127:5

**stressors** 125:23 126:4

**strike** 39:9 42:14 114:14 128:2 132:20 140:19

**struggle** 50:17 51:12

**stuff** 104:6

**subject** 71:14 72:15 94:9 121:7

**subjected** 110:9 112:18

**submit** 136:10

**submitted** 136:9 138:21 139:2

**submitting** 135:14

**subset** 77:16

**substance** 36:9

**successful** 40:24

**sufficient** 33:10,19 34:9 38:25 39:2

**Suisse** 152:13

**summary** 111:3

**supervisor** 55:21

**support** 88:10

**supported** 78:4 87:22

**supposed** 50:20

**surgery** 40:9 49:16,21,23 73:25 74:13 103:13

**Switching** 47:8

**sworn** 8:5

**sympathetic** 94:20 96:16 97:19 102:3

**system** 106:13 142:17

---

**T**

---

**T-MOBILE** 126:18 133:9 134:15 137:6,8 138:10,20 140:2,5,13,16,21 142:6 151:2,5,14,19 152:7,18,22 153:7 154:6

**T-Mobile's** 137:14,18

**tablets** 138:3

**takes** 137:24

**taking** 26:25 41:22 42:18 50:18 58:17 67:11 94:10,24 95:12 104:23 105:22 106:22 111:10 114:9,11,17 115:4 124:12 125:6,17

**talk** 13:10 48:15 61:22 63:21 66:7 99:13 120:25 122:19

**talked** 15:11 39:21 49:10 50:16 51:3, 5,13,21 59:17,19,20,21,22,23,24 60:2,3,4,5 73:3,14 78:6,8,14 81:3 84:10,23 90:23 93:17 94:4,6,22 95:8, 9 99:13,14 101:8,10,12 133:14 134:8

**talking** 16:3 124:2

**target** 33:5 34:11

**targets** 152:21

**tax** 140:16

**team** 47:17 84:5 86:17,20

**teaming** 68:12 146:16

**teams** 60:18,19 65:16 69:20 75:21 98:21,22 99:3,21 101:23 104:9 107:23 146:14

**technical** 24:24 75:4 88:9,10

**technologies** 22:12 23:17 138:8

**technology** 130:14

**Telecom** 23:7

**telecommunication** 21:7

**Teleport** 21:18,23,24

**templates** 32:5

**ten** 36:15 70:18

**tenure** 26:5,18 63:12

**term** 99:3 125:13

**termed** 39:2

**terminate** 55:24

**terminated** 53:15 55:3 57:11 59:11 66:9,11 67:3 68:21 95:25 105:16 111:9 117:14 121:16 144:4

**termination** 54:18 57:9,23 60:25 63:24 65:23,24 66:13 67:21 68:23 79:3,9,17 94:2,4 95:9,23 98:8 120:4 130:3,5 138:16 141:24 142:15 144:8 146:8

**terms** 51:7 86:15 101:8

**territory** 33:3

**testified** 8:7 55:17

**testify** 12:25

**testimony** 10:19 12:16,21 154:7

**text** 36:9 69:20 98:15,19,25

**texts** 135:25 136:2,3

**that'll** 52:12

**therapist** 14:20 15:6,13 119:25

121:2,9,14 122:4,11 123:14 124:7
126:16

**therapy** 15:9 119:9,10,13 122:18,19

**Theron** 67:8 89:8 91:22,23

**thing** 15:4 26:23 43:19,20 53:21
58:19 63:20 95:7 104:16

**things** 11:6 15:23 22:24 48:19 61:9
64:11,14 68:14 74:22 78:17 80:3
85:17 91:11,19 100:4,5 102:17
103:25 106:8 119:12,14 124:19
135:13,23 136:16 137:23 139:12,21
144:23 151:12

**thinks** 34:7

**thought** 22:22 40:13 43:9 61:10
80:14 81:13 115:16

**thoughts** 15:22

**three-and-a-half** 13:15

**Thursday** 13:12

**tied** 59:3

**time** 12:7 19:16 20:25 21:14 22:6,10
23:21 26:13,24 27:10 31:7 37:7 41:22
42:18 43:14 47:25 49:19 50:18,25
53:11 58:16 61:13 62:5,20 63:5,9
67:20 69:18 74:5 75:24 76:4,19 81:3,
4,12,23 83:12,14 87:25 88:19 93:12
94:10,24 95:12 97:9,18 99:15 102:15
103:6,17 104:4 105:10,11,14,22
106:2,22 111:10,25 117:8,12,17
119:16 129:19 130:2 134:8 136:10
141:23 142:14 146:6,12 148:3,9

**timeframe** 27:23 74:19 103:16

**timeline** 14:5 128:17,21,22 129:6

**times** 26:17 49:13 61:17 62:8 63:11,
15,16,17 80:8 105:3

**title** 24:19,24 29:21 54:16 97:21,24
98:2

**titles** 21:21 26:9,10

**today** 10:20 12:17,21,25 72:5,25
73:12 78:18 134:2

**today's** 10:11 13:4,24 14:16,23 16:3

**Todd** 84:3,4

**told** 48:20,21 49:9,14,21,24 50:11
51:14,23 68:19 73:3,18 79:4,16 85:20
94:19 103:4

**top** 32:19 118:5 138:24

**total** 119:10 132:7,10,11

**training** 74:2 131:13

**transcript** 152:4

**transition** 68:7 145:4,24 146:2,22,24

**transitioning** 145:6 146:13 147:3,8

**travel** 92:10

**treatment** 99:16,23 102:13 104:3
109:12 119:19 121:7 122:17

**tress** 120:7

**trust** 121:4 126:25

**turn** 25:24 34:13 108:20 110:3 113:4
116:10 127:15 128:3

**TW** 23:6,13

**two-page** 69:8

**twofold** 59:8

**type** 15:3 53:21 68:16,25 123:4
124:13 125:4

**types** 124:12 130:12 137:17

**typical** 34:24

**typically** 34:4 35:6

**typo** 76:25

## U

**U.S.** 25:21 90:22

**uh-huhs** 11:5

**ultimately** 23:21 48:6

**unaware** 79:14

**understand** 10:16,23 11:7,17 44:12
70:25 82:6,17 83:19 116:5 117:2
129:23 153:24

**understanding** 9:19 33:25 34:2

**understood** 11:21

**underway** 15:16 68:10 145:5

**unemployment** 141:11,15,18,22
142:3,10

**unfair** 99:18,24 100:3,12 101:8

**United** 28:15 30:4

**University** 18:12,21

**unlock** 144:3

**unrealistic** 100:3

**unsympathetic** 80:23

**urgent** 37:22

**utilizing** 153:7

## V

**Vaguely** 28:13

**varied** 21:22

**vary** 139:15

**venture** 63:7

**verification** 46:22

**verifying** 134:20

**Verizon** 133:14 134:17

**violation** 108:7,12 110:24

**virtual** 53:21

**visits** 50:5

**VP** 86:4

## W

**W-2** 140:15,20,24

**wanted** 15:16 19:4 74:3 144:11,15,
19,20,25 145:2,22

**ways** 105:17 108:10 112:6

**Webex** 53:20

**websites** 130:21

**Wednesday** 13:12

**week** 13:6 85:23 141:25

**weekly** 15:3 38:14,16 53:18 78:6
123:3,4

**Wells** 151:22

**what'll** 65:3

**Willins** 59:24 66:22 76:23 77:2,5
93:3 97:4,5,21 98:6 99:7

**wireless** 138:4

**WITNES** 9:5

**woman** 77:2 83:22

**won** 47:23

**wondering** 70:8

**word** 98:25 135:17

**words** 34:8

**work** 23:23 26:20 27:15 43:17 84:10,
16 85:4,22 86:11,19 87:12 88:16,20

89:6 104:16 109:10 119:18,24 120:9
131:2,3

**worked** 19:11 22:10,11 66:10 70:15
77:13,21 84:21 119:12 151:24 152:6,
12

**worker** 49:5 51:14,15

**working** 25:2 26:15 27:13 50:18
86:20 88:18 89:6,15 90:8 95:18
104:23 125:3 126:24 130:22 133:10
142:6 146:14,15,20 150:5 151:19,20

**works** 97:20 138:6

**worse** 120:14

**worsened** 120:6

**wound** 133:9

**wrap** 153:18

**writing** 10:10 94:13 96:9 98:13,18
101:20 102:20 104:8 129:12 136:7
141:2,4 142:11 155:17

**written** 78:21,23

**wrong** 40:11 154:11

**wrote** 53:6 149:6

---

### X

**Xavier** 66:24 69:21,23 79:20 93:3
99:10

---

### Y

**year** 17:5 18:13 20:9 38:22 64:19
83:13 122:8 140:16

**years** 15:8 16:17 20:20 23:11,18
27:11 47:20 119:10 136:20

**York** 8:6 9:9 17:4,10 75:25 76:5
110:21,24 111:11 131:2 142:2,10
151:22

**Youhanna** 110:13

**Youkhanna** 56:9 73:22 74:8 110:14
112:23

Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICIA HARAN,

Plaintiff,

-against-

Case No.: 1:21-cv-10585 VSB

ORANGE BUSINESS SERVICES INC.,

Defendants.

## PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff Patricia Haran ("Plaintiff") for her Objections and Responses to Defendant's First Set of Interrogatories, by and through her undersigned attorneys, Fisher Taubenfeld LLP, hereby states as follows:

## GENERAL OBJECTIONS, COMMENTS AND QUALIFICATIONS

Plaintiff makes the objections and answers contained herein without waiver of any right or privilege to object to the introduction in evidence, in this or any other action or proceeding, of any information contained herein or in any of the documents or the introduction of any of the documents themselves, upon the grounds of competency, relevancy, hearsay, lack of foundation, authenticity or any other proper ground.

The information contained here in and the documents furnished herewith have been compiled based on information currently known to Plaintiff. Plaintiff reserves the right to supplement these answers if, and when, appropriate.

Plaintiff objects to the voluminous and unduly burdensome nature of Defendants' First Set for Interrogatories and, accordingly, assert that Plaintiff should not be required to answer these Interrogatories unless they have been tailored to elicit information reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff objects to Defendants' First Set for Interrogatories on the grounds that they are overbroad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff objects to Defendants' First Set for Interrogatories to the extent they request information which represents confidential communications between attorney and client and/or materials prepared by counsel in anticipation of litigation which contain the mental impressions, legal theories or conclusions of Plaintiff's counsel on the grounds that said information is protected from disclosure by the attorney/client privilege, the work-product privilege, the self-evaluative privilege, and/or by any other privilege recognized by statute, at common law or by the rules of this court.

Plaintiff objects to Defendants' First Set for Interrogatories to the extent they seek to impose an obligation on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the Local Rules of the District Court of the Eastern District of New York.

Plaintiff objects to Defendants' First Set for Interrogatories to the extent they exceed the number of allowable interrogatories under Fed.R.Civ.P.33.

Plaintiff objects to Defendants' First Set for Interrogatories to the extent they seek legal theories or conclusions rather than factual responses and, therefore, are beyond the permissible scope of discovery.

Plaintiff objects to Defendants' First Set for Interrogatories on the grounds that the timeframe for the Interrogatories is neither reasonable nor appropriate.

The foregoing General Objections, Comments and Qualifications are incorporated as if fully restated in each and every response to Defendants' First Set for Interrogatories.

<u>**INTERROGATORY NO. 1**</u>

Identify each and every person whom you believe may have knowledge or information (whether admissible or inadmissible) concerning the subject matter of the Complaint, Defendant's defenses to the Complaint, Defendant's counterclaims, and/or your defenses to Defendant's counterclaims.

<u>**RESPONSE**</u>

The following persons have knowledge or information regarding this matter:

1) <u>Michelle Rocco</u> – HR Representative at Orange Business Services - <u>michelle.rocco@orange.com.</u> Ms. Rocco may be reached through defense counsel. Ms. Rocco was involved in Ms. Haran's hiring at Orange. Ms. Rocco was aware of the general terms and conditions of Ms. Haran's employment. Ms. Rocco is also aware of Ms. Haran's daughter's illness and Ms. Haran's ongoing need for accommodation due to her daughter's illness.

2) <u>Adam Kimmick - Sales Director at Orange Business Services and Ms. Haran's direct manager.</u> Mr. Kimmick may be reached through defense counsel. Mr. Kimmick was aware of Ms. Haran daughter's serious health condition and the serious health condition of Ms. Haran's mother. Mr. Kimmick was aware that Ms. Haran needed FMLA leave for her daughter and mother's serious health conditions. Mr. Kimmick was aware of the background of Ms. Haran's employment, general terms and conditions of Ms. Haran's employment, and Ms. Haran's job performance. Mr. Kimmick is aware of Defendants' discriminatory and retaliatory conduct as set forth in the complaint.

3) <u>Peter Singh - Sr. Technical Director at Orange Business Services.</u> Mr. Singh may be reached at (917) 494-0903. Ms. Haran does not have possess Mr. Singh's address.

Ms. Haran complained to Mr. Singh about Defendants discriminating against her based on her leave of absences for her daughter's illness. Mr. Singh has knowledge of Ms. Haran's positive work performance.

4) <u>Lou Boudreau - Collaboration Manager at Orange Business Services.</u> Mr. Boudreau may be reached at (917) 691-7488. Ms. Haran does not possess Mr. Boudreau's address. Ms. Haran complained to Mr. Boudreau about Defendants discriminating against her based on her leave of absences for her daughter's illness. Mr. Boudreau has knowledge of Ms. Haran's positive work performance.

5) <u>Eddy Youhanna – Vice President of Sales in North America.</u> Mr. Youhanna may be reached through defense counsel. Ms. Haran informed Mr. Youhanna that she was unable to attend one of the company's trainings due to her daughter's surgery. Upon information and belief, Mr. Youhanna participated in the decision to terminate Ms. Haran based on her leave of absences for her daughter and mother's illnesses.

6) <u>Daniel Willins – Integration Services Account Manager at Orange.</u> Ms. Willins may be reached at (732) 272-2732. Ms. Haran does not possess Ms. Willins' address. Ms. Willins falls outside Ms. Haran's protected group insofar as she did not require FMLA leave for her own serious health condition or the serious health condition of a close family member. She is aware of the velocity of her own sales funnel and that it was below Company expectations, yet she was retained by the Company while Ms. Haran was discharged. Ms. Haran complained to Ms. Willins about Defendants discriminating against her based on her leave of absences for her daughter's illness.

7) <u>German Romero – Sr. Pre-Sales Engineer with OBS until Q4 2021.</u> Mr. Romero may be reached at (551) 482-7449. Ms. Haran does not possess Mr. Romero's address.

Mr. Romero has knowledge of Ms. Haran's positive work performance. Mr. Romero is also aware of Ms. Haran's daughter's disability/serious health condition.

8) <u>Jennifer Lawson – HR Representative OBS.</u>  Ms. Lawson may be reached at (678) 346-3145.  Ms. Haran does not have Ms. Lawson's address. Ms. Lawson is aware of Ms. Haran's general terms and conditions of employment and the circumstances of her termination. Upon information and belief, Ms. Lawson participated in the decision to terminate Ms. Haran.  Ms. Lawson is aware of Defendants' unlawful conduct as set forth in the complaint.

9) <u>Xavier Pichon – Orange team lead for Capgemini account based in France.</u> Mr. Pichon may be reached through defense counsel.  Ms. Haran complained to Mr. Pichon about Defendants discriminating against her based on her leave of absences for her daughter's illness.  Mr. Pichon is also aware of Ms. Haran's positive work performance.

10) <u>Todd Hames – Sales Director, Hunter Team until January 2021.</u>  He can be reached at (571) 888-1308.  Ms. Haran does not possess Mr. Hames' address. Mr. Hames is aware of Ms. Haran's positive work performance.

11) <u>Marie-Cecile Deraedt – Global Account Manager at OBS, France.</u> Ms. Daraedt may be reached through defense counsel. Ms. Haran complained to Ms. Deraedt about Defendants discriminating against her based on her leave of absences for her daughter's illness.  Ms. Daraedt is also aware of Ms. Haran's positive work performance.

12) Paul Reticker – Global Account Director at OBS. Mr. Reticker may be reached through defense counsel. Ms. Haran complained to Mr. Reticker Defendants discriminating against her based on her leave of absences for her daughter's illness.

13) Nadine Foulon Belkacemi – EVP, Major Clients OBS, France. Ms. Foulon Belkacemi may be reached through defense counsel. Ms. Foul Belkacemi is aware of Ms. Haran's positive work performance.

14) Laurie Saint Gal de Pons – Global Account Manager, Capgemini account at OBS until December 2019. Promoted to Sales Director Major Accounts, France to present. Ms. Saint Gal de Pons may be reached through defense counsel. Ms. Saint Gal de Pons is aware of Ms. Haran's positive work performance.

15) Philippe Melegrito – OBS Pre-Sales Engineer. Mr. Melegrito may be reached at (347) 989-4760. Ms. Haran does not possess Mr. Melegrito's address. Mr. Melegrito is aware of Defendants' unlawful conduct as set forth in the complaint.

16) Mikhail Gloukhovstev – Orange Cloud Architect until Q1 2022. Mr. Gloukhovstev may be reached at (215) 687-0504. Mr. Gloukhovstev is aware of Ms. Haran's positive work performance.

17) Christophe Robert – Global Key Account Manager, Sanofi Account, France. Mr. Robert may be reached through defense counsel. Mr. Robert has knowledge of Ms. Haran's positive work performance.

18) Nathalie Thouron – OBS Major Account Manager. Ms. Thouron may be reached at Nathalie.thouron@orange.com. Ms. Haran does not possess Ms. Thouron's telephone number or address. Ms. Thouron has knowledge of Ms. Haran's positive work performance.

19) <u>MJ Hubert – International Client Partner, French MNCs</u>.  Ms. Hubert is aware of Ms. Haran's positive work performance.   Ms. Hubert is also aware of Ms. Haran's daughter's illness and the resulting increased pressure to increase her sales funnel from Mr. Kimmick.

## INTERROGATORY NO. 2

Identify all persons who you believe may have possession, custody, or control of documents or information concerning the subject matter of the Complaint, Defendant's defenses to the Complaint, Defendant's counterclaims, and/or your defenses to Defendant's counterclaims.

## RESPONSE

All persons identified in response to Interrogatory No. 1 may have documents or information relevant to the Complaint, defenses, counterclaims and/or defenses to counterclaims.

## INTERROGATORY NO. 3

Identify all current or former employees, agents, or representatives of Defendant with whom you or any of your attorneys or representatives have communicated or interviewed concerning the allegations in your Complaint, Defendant's defenses to the Complaint, Defendant's counterclaims, and/or your defenses to Defendant's counterclaims.

## RESPONSE

See document bates stamped P49, P70-109, P119-142, 150-161.

Plaintiff's counsel has not communicated with any individuals relating to this matter other than Plaintiff.

Plaintiff has communicated with family members regarding her allegations in this matter.

## INTERROGATORY NO. 4

Identify all oral, written, or recorded statements (including audio and video recordings) you or any representative on your behalf obtained from any person or source concerning the allegations in your Complaint, Defendant's defenses to the Complaint, Defendant's counterclaims, and/or your defenses to Defendant's counterclaims.

## OBJECTIONS

Plaintiff objects to this interrogatory in so far as it requests information that is more appropriately obtained through deposition.

Plaintiff further objects to this interrogatory as it seeks information beyond the scope of the Local Rules.

## RESPONSE

Plaintiff has not obtained any written statements regarding this matter.

## INTERROGATORY NO. 5

Identify each hospital treatment center or healthcare provider from which/whom you have sought consultation or treatment, including, but not limited to, any doctor, nurse, psychiatrist, therapist, psychologist, social worker, physiologist, physical therapist, chiropractor, pharmacist, drug or alcohol counselor, and/or nutritionist in connection with any damages you claim you suffered as a result of any action or inaction taken by Defendant. If you have not already done so, please sign and return a notarized HIPAA-compliant authorized release form for each such health professional, in the form attached as **Exhibit A** to Defendant's First Set of Document Requests.

## OBJECTIONS

Plaintiff objects to Defendants' First Set of Interrogatories to the extent it fails to identify an applicable time period or to the extent the time period is neither reasonable nor appropriate.

## RESPONSE

Subject to and without waiving the foregoing objections, Plaintiff consulted the following treatment providers:

1. Thomas R. O'Donnell, M.D – Otolaryngologist.  2929 Expressway Drive North, Suite 225, Islandia, NY 11749. (877) 354-8490.

2. Darren L. Hirsch, M.D – Allergy doctor.  240 Patchogue Yaphank Rd Suite 1, Patchogue, NY 11772.  (877) 354-8490.

3. Medsolutions, Inc. – Subcontraactor that did remote monitoring of Ms. Haran's daughter's heart, which was covered as part of treatment with Barry Goldberg, cardiologist.  43 Pulaski St, Brooklyn, NY 11206.  (949( 743-4404.

4. Cassandra Fernandes LMHC. 585 Stewart Ave # 700, Garden City, NY 11530-4785. (516) 280-7285.

5. Plaintiff's mother, Rosanne Bradley, saw Stephen H Tsang, MD - 635 West 165th Street, New York, NY 10032.  (212) 305-9535.

## INTERROGATORY NO. 6

Identify each hospital treatment center or healthcare provider from which/whom Julia Haran has sought consultation or treatment, including, but not limited to, any doctor, nurse, psychiatrist, therapist, psychologist, social worker, physiologist, physical therapist, chiropractor, pharmacist, drug or alcohol counselor, and/or nutritionist concerning the tumor in her femur bone. If you have not already done so, please sign and return a notarized HIPAA-compliant authorized release form for each such health professional, in the form attached as **Exhibit A** to Defendant's First Set of Document Requests.

## RESPONSE

See attached HIPAA authorization forms. Julia Haran consulted and/or treated with the following health providers:

1. Barry Goldberg MD – Pediatrician.  1001 Franklin Ave, Suite 110, Garden City, NY 11530.  (631) 539-5400. Mr. Goldberg investigated chest pain Julia Haran was experiencing to see if there was an infection and to determine root cause.

2. Doris Amran LMSW.  269-01 76th Ave New Hyde Park, NY 11040. (718) 470-3000.

3. LIJ Medical Center.  270-05 76th Ave, Queens, NY 11040.  Julia Haran had a hospital stay here. (718) 470-7000.

4. Samuel Kenan, MD – Orthopedic Surgeon.  1001 Franklin Ave Suite 110, Garden City, NY 11530.  (516) 321-7555. Conducted surgery and followup for Julia Haran.

5. Alex K. Williamson MD- Pathologist.  6 Ohio Dr, New Hyde Park, NY 11042. (646) 667-6568. Julia Haran had in-patient care with Dr. Williamson for a diagnosis.

6. Dr. Yelena Melman, MD – Pediatrician.  88 E Main St, East Islip, NY 11730.  (631) 563-2294.  Julia Haran had her annual physical/well visit with Dr. Melman.

7. Dr. Foazia Siddiq, MD – Pediatrician.  88 E Main St, East Islip, NY 11730. (631) 563-2294. Julia Haran had a vist with Dr. Siddiq to discuss her leg pain again and ask for an x-ray.

8. Dr. Richard J. Tabershaw, MD – Orthopedic.  375 E Main St #1, Bay Shore, NY 11706.  (631) 665-8790. Julia Haran had her first consultation after x-ray with Dr. Tabershaw.

9. North Shore University Hospital - 300 Community Dr, Manhasset, NY 11030. Julia Haran had a surgery and recovery at this facility.

10. Coopersmith Helise MD – Radiologist.  300 Community Dr, Manhasset, NY 11030. (516) 562-3560. Dr. Helise provided in-patient care to Julia Haran.

11. John B. Amodio, MD – Radiologist.  269-01 76th Ave, Queens, NY 11040.  (718) 470-7175.  Dr. Amodio provided in-patient care and diagnosis to Julia Haran.

12. Mundeep Kaur Kainth, DO, MPH. Pediatrician. 410 Lakeville Rd Suite 202, New Hyde Park, NY 11042. (866) 945-7291. Dr. Kaur Kainth provided in-patient care and diagnosis to Julia Haran.

13. Dr. Michelle Sewnarine, MD, Pediatrician Infectious Disease. 269-01 76th Avenue, New Hyde Park, NY.  (866) 945-7291. Dr. Sewnarine provided in-patient care and diagnosis to Julia Haran.

14. Dr. Christopher J. Palestro, MD – Nuclear Medicine Specialist. 270-05 76th Ave, Glen Oaks, NY 11004. (718) 470-7144. Dr. Palestro provided in-patient care and diagnosis to Julia Haran.

15. Sunil Kumar Sood, MD – Infectious Disease Physician. 410 Lakeville Rd Suite 202, New Hyde Park, NY 11042.  (631) 539-5400. Dr. Kumar Sood investigated the root cause of Julia Haran's infection.

16. Ralph Anthony Milillo, MD – Radiologist, Musculoskeletal.  611 Northern Blvd Suite 250, Great Neck, NY 11021.  (516) 325-7203. Dr. Milillo provided bone imaging for Julia Haran.

17. Snehal Amin, MD – Dermatologist for scar review and checkup.  309 E Main St Smithtown, NY 11787. (631) 762-3376.  Dr. Amin performed scar review and conducted a checkup for Julia Haran.

## <u>INTERROGATORY NO. 7</u>

Identify each hospital treatment center or healthcare provider from which/whom you have sought consultation or treatment for emotional distress and mental anguish, including, but not limited to, any doctor, nurse, psychiatrist, therapist, psychologist, social worker, physiologist, physical therapist, chiropractor, pharmacist, drug or alcohol counselor, and/or nutritionist for the period of the last ten (10) years. If you have not already done so, please sign and return a notarized HIPAA-compliant authorized release form for each such health professional, in the form attached as Exhibit A to Defendant's First Set of Document Requests.

## <u>OBJECTION</u>

Plaintiff objects to Defendants' First Set of Interrogatories to the extent it fails to identify an applicable time period or to the extent the time period is neither reasonable nor appropriate.

## <u>RESPONSE</u>

Cassandra Fernandes LMHC.

## INTERROGATORY NO. 8

Identify each employee, agent, or representative of Defendant who you purport subjected you to discrimination or retaliation.

### RESPONSE

Adam Kimmick and Eddy Youhanna

## INTERROGATORY NO. 9

Identify each and every discriminatory and/or retaliatory comment, behavior, or action that you contend Defendant or Defendant's agents, representatives, and/or employees made to or concerning you.

## OBJECTIONS

Plaintiff objects to Interrogatory No. 9 on grounds that it seeks information beyond what is required by the Local Rules.

## RESPONSE

Subject to and without waiving the foregoing objections, see Plaintiff's Complaint.

Defendants made unlawful comments to Plaintiff regarding her alleged lack of focus due to her taking time off work for her daughter's illness.

Defendants subjected Ms. Haran to heightened pressure to increase her sales funnel and did not give her a chance to increase her sales funnel for the 2021 fiscal year.

Defendants terminated Ms. Haran based on her taking leave to care for her daughter, Julia Haran, and mother, both of whom suffered from serious health conditions under the FMLA.

Defendants failed to notify Ms. Haran of her rights under the FMLA and discriminated and retaliated against Ms. Haran for exercising her rights under the FMLA.

## INTERROGATORY NO. 10

Identify each employee, agent, or representative of Defendant to whom you gave notice and/or complained, or otherwise informed, either in writing or orally, of the fact that you believed you were discriminated and/or retaliated against.

## RESPONSE

1. Family members

2. Cassandra Fernandes LMHC.

3. Peter Singh

4. Lou Boudreau

5. Daniel Willins

6. Xavier Pichon

7. Marie-Cecile Deraedt

8. Paul Reticker

9. MJ Hubert

## INTERROGATORY NO. 11

Identify all third parties, including government agencies, courts or tribunals, to whom/which you gave notice and/or complained, or otherwise informed, either in writing or orally, of the fact that you believed you were discriminated and/or retaliated against by Defendant.

## RESPONSE

1. Family members

2. Cassandra Fernandes LMHC

3. United States Equal Employment Opportunity Commission.

## <u>INTERROGATORY NO. 12</u>

Identify each employee, agent, or representative of Defendant who you told about your daughter's health issue as alleged in the Complaint.

### <u>RESPONSE</u>

1. Michelle Rocco

2. Adam Kimmick

3. Peter Singh

4. Lou Boudreau

5. Eddy Youhanna

6. Daniel Willins

7. German Romero

8. Xavier Pichon

9. Marie-Cecile Deraedt

10. Paul Reticker

11. Philippe Melegrito

12. MJ Hubert

## INTERROGATORY NO. 13

Identify all individuals who provided you with "positive recognition" as alleged in Paragraph 15 of the Complaint.

### Response:

Please see document bates stamped P000143.

1. Adam Kimmick

2. German Romero

3. Xavier Pichon

4. Todd Hames

5. Marie-Cecile Deraedt

6. Nadine Foulon Belkacemi

7. Laurie Saint Gal de Pons

8. Mikhail Gloukhovstev

9. Christophe Robert

10. Nathalie Thouron

11. MJ Hubert

12. Lou Boudreau

13. Peter Singh

## INTERROGATORY NO. 14

Identify each employee, agent, or representative of Defendant to whom you requested leave to care for your daughter as alleged in Paragraph 17 of the Complaint.

## RESPONSE

1. Adam Kimmick

2. Michelle Rocco

3. Eddy Youhanna

## INTERROGATORY NO. 15

Identify each day off work you took to take your daughter to doctor's appointments and for treatment as alleged in Paragraph 19 of the Complaint.

## RESPONSE

Plaintiff recalls taking time off work on the below-listed days. Plaintiff may have taken additional time off work in connection with her daughter's illness. Some of those days may be recorded in the Company's PTO system and other days may have been approved informally by Adam Kimmick but not recorded.

October 14th – half day

October 15th, 2020 – October 19th 2020 – PTO for Plaintiffs daughter's surgery

November 11th, 2020 – PTO for Ms. Haran's doctor's appointment

December 18th, 2020 – PTO for doctor's appointment

December 28th, 2020 – PTO for Plaintiff's daughters doctor's appointment

December 30th, 2020 - PTO for Plaintiff's daughters doctor's appointment

February 12th, 2021 – PTO for Plaintiffs mother's doctor's appointment

## INTERROGATORY NO. 16

Identify each employee, agent, or representative of Defendant that was aware you had taken FMLA leave as alleged in Paragraph 35 of the Complaint.

### RESPONSE

1. Michelle Rocco

2. Adam Kimmick

3. Peter Singh

4. Lou Boudreau

5. Eddy Youhanna

6. Daniel Willins

7. German Romero

8. Xavier Pichon

9. Marie-Cecile Deraedt

10. Paul Reticker

11. Philippe Melegrito

12. MJ Hubert

## INTERROGATORY NO. 17

Identify all individuals, employees, or agents affiliated with Defendant's clients with whom you have communicated subsequent to the termination of your employment with Defendant.

## RESPONSE

Please see document bates stamped P49.

## INTERROGATORY NO. 18

Identify all documents concerning, and persons you believe may have knowledge of, any damages that you allegedly suffered as a result of any action taken or not taken by Defendant.

## RESPONSE

1.  Plaintiff's family members

2.  Cassandra Fernandes LMHC

## INTERROGATORY NO. 19

Identify each and every expert whom you have consulted and/or whom you expect to call as a witness at trial. As to each: (a) state the subject matter on which the expert is expected to testify, (b) state the substance of the facts and opinions to which each expert is expected to testify, (c) provide a summary of the grounds for each fact and opinion, and (d) identify all documents on which each expert witness relied for the basis of his/her opinion, including, but not limited to, each expert's report, curriculum vitae, and all documents that support each expert's report or are referred to in each expert's report.

## OBJECTION

Plaintiff objects to Request No. 19 as it is premature.

## RESPONSE

Plaintiff will supplement this response at the appropriate time.

## INTERROGATORY NO. 20

Identify each and every e-mail and social media account (e.g., Facebook, Twitter, Instagram, TikTok, LinkedIn, etc.) that you created, accessed, used, and/or maintained between May 2017 to the present, including the identities of each username(s) that you used to activate the account(s) or the username by which you were known when using the account(s).

## OBJECTION

Plaintiff objects to Request No. 20 to the extent it seeks documents and information that are irrelevant and not likely to lead to the discovery of admissible evidence.

Plaintiff further objects to Request No. 20 to the extent it is harassing.

## RESPONSE

Plaintiff never used social media to discuss claims or damages in this case or any other aspect of this case.

## INTERROGATORY NO. 21

Identify all documents concerning, and witnesses with knowledge of, the allegations that Defendant's actions were "willful and intentional" as alleged in paragraphs 40, 44, and 48 of the Complaint.

### Response:

Please see documents bates stamped P1- P207.

1. Adam Kimmick

2. Jennifer Lawson

3. Eddy Youhanna.

Plaintiff reserves the right to amend or supplement these responses up to and including trial.

Dated: July 26, 2022
      New York, New York

By: _____
     Liane Fisher
     FISHER TAUBENFELD LLP
     225 Broadway, Suite 1700
     New York, New York 10007
     (212) 571-0700
     *ATTORNEYS FOR PLAINTIFF*

Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICIA HARAN                    )
                                  )
          Plaintiff,              )
                                  ) Case No.
     -against-                    ) 1:21-cv-10585-VSB
                                  )
ORANGE BUSINESS SERVICES          )
INC.,                             )
                                  )
          Defendant.              )
------------------------------

              Wednesday May 17, 2023
              10:05 a.m.

              Deposition of MICHELLE ROCCO, held
        via Videoconference, New York, pursuant
        to a Notice, before RACHEL WOLVOVSKY, a
        Notary Public of the State of New York.

Reported by:
RACHEL WOLVOVSKY
JOB NO. 6377456

1

2      A P P E A R A N C E S:

3

4          FISHER TAUBENFELD LLP

5          Attorneys for PLAINTIFF

6                225 Broadway Suite 1700

7                New York, New York 10007

8          BY:   LIANE FISHER, ESQ.

9

10         BAKER & HOSTETLER LLP

11         Attorneys for DEFENDANT

12                45 Rockefeller Plaza

13                New York, New York 10111

14         BY:   JUSTIN GUILFOYLE, ESQ.

15                AMY TRAUB, ESQ.

16

17

18

19

20

21

22

23

24

25

1                    Rocco

2               IT IS HEREBY STIPULATED AND AGREED,

3      by and between counsel for the respective

4      parties hereto, that the filing, sealing and

5      certification of the within deposition shall

6      be and the same are hereby waived;

7                  IT IS FURTHER STIPULATED AND AGREED

8      that all objections, except as to the form

9      of the question, shall be reserved to the

10     time of the trial;

11                 IT IS FURTHER STIPULATED AND AGREED

12     that the within deposition may be signed

13     before any Notary Public with the same force

14     and effect as if signed and sworn to before

15     the Court.

16

17

18

19

20

21

22

23

24

25

1                    Rocco

2              THE REPORTER:  The attorneys

3         participating in this deposition

4         acknowledge that I am not physically

5         present in the deposition room and that

6         I will be reporting this deposition

7         remotely.  They further acknowledge that

8         in lieu of an oath administered in

9         person, I will place the witness under

10        penalty of perjury.

11             The parties and their counsel

12        consent to this arrangement and waive

13        any objection to this manner of

14        reporting.  Please indicate your

15        agreement by stating your name and your

16        agreement on the record.

17             MS. FISHER:  Liane Fisher.  Agreed.

18             MR. GUILFOYLE:  Justin Guilfoyle on

19        behalf of defendants.  I agree.

20             MS. TRAUB:  Amy Traub.  Agreed.

21              THE REPORTER:  Will the witness

22        kindly present his/her government-issued

23        identification by holding it up to the

24        camera for verification?

25             (Witness complied.)

```
 1                    Rocco
 2    M I C H E L L E   R O C C O, called as a
 3    witness, having been duly sworn by a Notary
 4    Public, was examined and testified as
 5    follows:
 6             THE REPORTER:  Please state your
 7         full name for the record.
 8             THE WITNESS:  Michelle Rocco.
 9             THE REPORTER:  Please state your
10         full address for the record.
11             THE WITNESS:  9 Bonny Road, Center
12         Reach, New York, 11720.
13    EXAMINATION BY:
14    MS. FISHER:
15         Q.  Good morning, Ms. Rocco.  My name
16    is Liane Fisher.  I represent Patricia Haran
17    in a matter that she's brought against Orange
18    Business Services.  I'm going to be asking
19    you a series of questions here today to which
20    you will respond under oath.  If there's any
21    question that you don't understand, please
22    let me know and I'll be happy to rephrase it
23    for you.  If there's any question that you
24    didn't hear either I will repeat it for you
25    or the court reporter will repeat it for you.
```

```
 1                    Rocco

 2              The court reporter cannot type two

 3      people talking at once, so please wait for me

 4      to finish asking my questions before you

 5      provide responses, and I'll do the same in

 6      turn.

 7              If you answer a question, it's

 8      going to be presumed that you understood the

 9      question and gave your best and most accurate

10      response.

11              If at any time you want to take a

12      break, I'd be happy to accommodate you.  You

13      just have to answer any questions that is

14      pending before we break.  Also, the court

15      reporter cannot type a nod or a shake of the

16      head or "hmm mm" or "uh huh", so please give

17      proper verbal responses to my questions.  Do

18      you understand these procedures?

19           A.   Yes.

20           Q.   Okay.  Great.  Are you suffering

21      from any illnesses that would affect your

22      ability to testify truthfully and accurately

23      here today?

24           A.   No.

25           Q.   Have you ever provided sworn
```

1                          Rocco

2      testimony before?

3           A.    No.

4           Q.    Where do you currently work?

5           A.    Orange Business.

6           Q.    How long have you been working

7      there?

8           A.    20 years.

9           Q.    What was your start date?

10          A.    It was sometime in March 20 years

11     ago.  So 2013.

12          Q.    Okay.  And what was your position

13     when you started?

14          A.    America's projects and programs.

15          Q.    That was your title?

16          A.    Yes.

17          Q.    How long did you hold that title?

18          A.    Approximately seven years.

19          Q.    And what position did you have

20     after that?

21          A.    HR business support for sales of

22     Americas.

23          Q.    How long did you hold that title?

24          A.    Approximately the same number of

25     years.  Seven.

```
 1                    Rocco
 2         Q.   And what title did you hold next?
 3         A.   Americas HR PMO.
 4         Q.   When did you start holding that
 5    title?
 6         A.   I can't confirm the date exactly.
 7         Q.   Do you remember a year?
 8         A.   No.  Not off the top of my head.
 9         Q.   What were your job duties in that
10    capacity?
11         A.   To support the business partner --
12    oh, I'm sorry, for the Americas PMO.  That
13    was to support HR initiatives and projects
14    that were rolled out from group to each of
15    the regiones.
16         Q.   What was the approximate timeframe
17    that you held this position?
18         A.   I'm really not sure.
19         Q.   Okay.  Did you hold any other
20    positions after that?
21         A.   Yes.
22         Q.   What position was that?
23         A.   I was an HR consultant.  I was the
24    HR BP project and program support for
25    international sales.  And those were my prior
```

```
 1                    Rocco

 2      positions to that.

 3           Q.   When did you hold that position?

 4           A.   Which one?

 5           Q.   Well, okay.  So you just gave me

 6      two titles.  Is that right?

 7           A.   Correct.

 8           Q.   Okay.  So the first one.  What was

 9      that title again?

10           A.   HR consultant.

11           Q.   And how long did you hold that

12      position?

13           A.   Approximate five years.

14           Q.   What was the timeframe for that?

15           A.   I really couldn't say.

16           Q.   Okay.  What was the second position

17      that you noted?

18           A.   Americas projects and programs.

19           Q.   When did you hold that position?

20           A.   We're in '23.  So I changed

21      positions in '21.  So '21 and a couple of

22      years prior to that.

23           Q.   What position did you hold in 2020?

24           A.   Americas HR PMO.

25           Q.   What does PMO stand for?
```

1                    Rocco

2          A.    Project management office.

3          Q.    What were your job duties in that

4    capacity?

5          A.    To manage projects and programs

6    within the Americas region.

7          Q.    What types of projects and

8    programs?

9          A.    HR related projects, so things

10   related to compliance or recruitment,

11   directives, new tool rollout.

12         Q.    What is your current position?

13         A.    Head of HR international projects

14   and programs for international HR services.

15         Q.    Have you received any training

16   while working for Orange on the Family

17   Medical Leave Act?

18         A.    Yes.

19         Q.    When did you receive training on

20   the Family Medical Leave Act?

21         A.    When I was an HR consultant.

22         Q.    And again, you don't have an

23   approximate timeframe for that?

24         A.    I really couldn't say.

25         Q.    Was that within the last five

Rocco

1

2     years?

3          A.   I really couldn't say.

4          Q.   Okay.  What did the training on the

5     Family Medical Leave Act consist of?

6          A.   We had to become -- HR consultants

7     have to become familiar with the policy as

8     it's written in the employee handbook, and

9     general reporting.

10          Q.   And again, you held the position of

11     HR consultant prior to your position in 2020

12     as Americas HR PMO?

13          A.   Yes.

14          Q.   What does the Family Medical Leave

15     Act policy for Orange state in general terms?

16               MR. GUILFOYLE:  Objection.  You

17          could answer.

18               THE WITNESS:  The FMLA is a federal

19          policy, not an Orange policy.  So it is

20          on job protection and to take leave for

21          the caring of someone in your home for a

22          medical necessity.

23          Q.   At the time that you held the

24     position on Americas HR PMO you were familiar

25     with the policy on the Family Medical Leave

1                    Rocco

2     Act at Orange?

3          A.   Yes.

4          Q.   Do you know Patrician Haran?

5          A.   Yes.

6          Q.   How do you know her?

7          A.   She worked for Orange.

8          Q.   When did you first become

9     acquainted with her?

10          A.   When she was recruited.

11          Q.   Did you participate in her hiring

12     at Orange in any way?

13          A.   Yes, I was her HR consultant at the

14     time.

15          Q.   Did you participate in the decision

16     to hire her?

17          A.   No, that's between the managers.

18          Q.   How frequently did you interact

19     with Ms. Haran in 2020?

20          A.   Not at all.

21          Q.   Did there come a time when you

22     spoke with Ms. Haran about her daughter being

23     sick?

24          A.   Yes.

25          Q.   When did you first speak with her

1                    Rocco

2    about her daughter being ill?

3        A.   When I met with her to provide a

4    prize that she had won at an event that was

5    held.

6        Q.   Could you explain that a little bit

7    more?

8        A.   Sure.  We held an online event for

9    a bingo where participants had to make a

10   donation to United Way that gained them entry

11   into an online bingo event where we went

12   ahead and divvied up prizes to those who had

13   won the different bingo games that we played.

14       Q.   And Ms. Haran was one of the

15   winners?

16       A.   Yes.

17       Q.   When was this?

18       A.   It was fall of 2020, I believe.

19       Q.   Okay.  I'm going to put a document

20   in the chat.  Just give me one second.

21            Okay.  Do you see a document in the

22   chat?

23       A.   Yes.

24       Q.   Okay.

25            MS. FISHER:  Does everyone see

```
 1                    Rocco

 2         that?

 3              MR. GUILFOYLE:  Yes.

 4              MS. FISHER:  Great.

 5         Q.   So if you could just open that

 6    document, please.  Were you able to open it?

 7         A.   It's asking me to save it.  One

 8    moment.

 9         Q.   Okay.

10         A.   Okay.

11         Q.   Okay.  And were you able to open

12    it?

13         A.   Yes.

14              (Rocco Exhibit 1, Jabber

15         Conversation, marked for identification,

16         as of this date.)

17         Q.   Okay.  Great.  So this document is

18    going to be marked as Rocco Exhibit 1.  And

19    it is bates stamped OBS 918 to 919.

20              Ms. Rocco, would you just take a

21    look at this document, scroll through it, and

22    let me know when you're done reviewing it?

23         A.   Okay.

24         Q.   Do you recognize this document?

25         A.   Yes.
```

1                         Rocco

2          Q.   What do you recognize it to be?

3          A.   It's a jabber conversation between

4     patty and myself.

5          Q.   And what was this conversation

6     regarding?

7          A.   This was to give her the prizes, to

8     meet up so I could give her the prize for

9     winning the bingo game.

10          Q.   Okay.  I'm going to put another

11     document in the chat.  Just give me one

12     second.  Do you see that second document

13     there?

14          A.   Yes.

15          Q.   Okay.  Great.  Let's see if you

16     could open it.

17          A.   Okay.

18               (Rocco Exhibit 2, E-mail, marked

19          for identification, as of this date.)

20          Q.   This document is Rocco Exhibit 2,

21     stamped OBS 404 to 405.  Would you take a

22     look at this document and let me know when

23     you're done reviewing it?

24          A.   Okay.

25          Q.   Do you recognize this document?

Rocco

1

2      A.   Yes.

3      Q.   What do you recognize it to be?

4      A.   It's an e-mail between Patty and I

5   after our meeting.

6      Q.   Also, if you could just scroll to

7   the last page, the bottom portion that starts

8   with "Original appointment from Haran, Patty

9   sent October 13."  Do you see that?

10      A.   Yes.

11      Q.   Okay.  And that e-mail is an e-mail

12   from Patty to you prior to your meeting.  Is

13   that correct?

14      A.   Yes.

15      Q.   Okay.  What day did you meet with

16   Patty?

17      A.   I'm not 100 percent sure.  It looks

18   like we were scheduled to meet, according to

19   this, on October 23 at 11:30.

20      Q.   Okay.  Where did you meet with her?

21      A.   At a pizza place in Holbrook.

22      Q.   Was anyone else present for your

23   meeting with her?

24      A.   No.

25      Q.   How long was your meeting with her?

                    Rocco

     A.   Approximately 30 minutes.

     Q.   Did you give her the prize?

     A.   Yes.

     Q.   During your meeting, what did Ms.
Haran say to you about her daughter's
illness?

     A.   I don't remember exact details.  I
know she had talked about her daughter having
something with her leg, an issue, a medical
issue with her leg.

     Q.   Did she tell you the nature of her
daughter's illness with her leg?

     A.   I don't recall that.

     Q.   What did you say to her in response
to that?

     A.   I remember that we were talking
about our children and surgeries that they
had gone through.  I explained to her that my
son was premature and we spent three months
in the hospital with him and he had multiple
surgeries, so I understood what it was like
to have to deal with your child being sick.

     Q.   Did Ms. Haran tell you that her
daughter had to have surgery?

1                    Rocco

2          A.   I don't recall that.

3          Q.   Did she tell you that her daughter

4    might possibly have any upcoming surgeries?

5          A.   I don't recall that.

6          Q.   Did she tell you that she needed to

7    take time off work to help her daughter given

8    her illness?

9          A.   I don't recall the details, no.

10         Q.   At any time did you inform Ms.

11   Haran about her rights under the Family

12   Medical Leave Act?

13         A.   No, I did not.

14         Q.   Did you notify anyone else within

15   HR or anyone else at Orange about Ms. Haran

16   needing to take time off work or about her

17   daughter being sick?

18              MR. GUILFOYLE:   Objection to form.

19         You could answer.

20              THE WITNESS:   No.

21         Q.   Did you speak to anyone else at

22   Orange about Ms. Haran's daughter's illness?

23         A.   No.

24         Q.   Did you speak to Ms. Haran again

25   after your conversation with her in the pizza

Rocco

1

2    shop about her daughter's illness?

3        A.    No.

4        Q.    Other than the e-mail that I had

5    you review that's up on the screen, have you

6    spoken to Ms. Haran since your conversation

7    with her at the pizza shop?

8        A.    No.

9        Q.    Is it part of your job to

10   administer FMLA leave to any employees at

11   Orange?

12            MR. GUILFOYLE:  Objection.  Just

13        which job are we talking about at this

14        point in time?

15            MS. FISHER:  Sorry.

16       Q.    So in 2020, was it part of your job

17   to administer Family Medical Leave Act leave

18   to any employee of Orange?

19       A.    No.

20       Q.    Who is responsible for, or who was

21   responsible for that in 2020?

22       A.    Her HR consultant.

23       Q.    Do you know who that was?

24       A.    I don't recall who was assigned.

25            MS. FISHER:  Okay.  Just give me

1                    Rocco

2           five minutes.  I think I might be done.

3                 MR. GUILFOYLE:  Okay.

4                 (Recess taken.)

5           Q.   I just have a few more questions

6      for you.  So during your meeting at the pizza

7      shop with Ms. Haran, did she inform you that

8      her daughter Julia would need to be home

9      schooled?

10          A.   I don't recall that.

11          Q.   Did she talk to you about a social

12     worker that was helping to set-up the home

13     schooling for her daughter?

14          A.   I don't recall that.

15          Q.   Okay.  Did she tell you that her

16     daughter might need a repeat surgery?  Do you

17     remember that?

18          A.   No.

19          Q.   Did she tell you what her

20     daughter's diagnosis was?

21          A.   I don't recall that.

22          Q.   Did she tell you about her daughter

23     needing to attend various doctors'

24     appointments?

25          A.   I don't recall that.

1                        Rocco

2          Q.   Is there anything else that you

3    recall about your conversation with Ms. Haran

4    pertaining to her daughter that you recall?

5          A.   No.  It was -- no, I really can't.

6              MS. FISHER:  Okay.  I have no

7          further questions.

8              MR. GUILFOYLE:  No questions for

9          this witness at the time.

10             THE REPORTER:  Mr. Guilfoyle, would

11         you like a copy of this transcript?

12             MR. GUILFOYLE:  Sure.  Electronic

13         is fine.

14             (Time noted:  10:33 a.m.)

15                    _____

16                    MICHELLE ROCCO

17

18    Subscribed and sworn to before me

19    this ___ day of _____, 2023.

20

21    _____

22

23

24

25

1                      Rocco

2                C E R T I F I C A T E

3       STATE OF NEW YORK     )

4                              : ss.

5       COUNTY OF KINGS       )

6

7             I, RACHEL WOLVOVSKY, a Notary

8       Public within and for the State of New

9       York, do hereby certify:

10            That MICHELLE ROCCO, the witness

11      whose deposition is hereinbefore set

12      forth, was duly sworn by me and that

13      such deposition is a true record of the

14      testimony given by the witness.

15            I further certify that I am not

16      related to any of the parties to this

17      action by blood or marriage, and that I

18      am in no way interested in the outcome

19      of this matter.

20            IN WITNESS WHEREOF, I have hereunto

21      set my hand this 17th day of May, 2023.

22                    *Rachel Wolvovsky*

23      _____

24                    RACHEL WOLVOVSKY

25

1                    Rocco

2    --------------- I N D E X --------------------

3

4    WITNESS              EXAMINATION BY          PAGE

5    MS. ROCCO        MS. FISHER                  5

6

7

8    --------------- EXHIBITS --------------------

9

10   ROCCO                                FOR ID.

11   1.............Jabber Conversation..........14

12   2..............E-mail....................15

13

14

15

16

17

18

19

20

21

22

23

24

25

1              Rocco

2   ---------E R R A T A   S H E E T-------------

3

4   CORRECTION              PAGE      LINE

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23

24

25

---

### Exhibits

**Exhibit 1 Michelle Rocco 05.17.23**
  14:14,18
  23:11
**Exhibit 2 Michelle Rocco 05.17.23**
  15:18,20
  23:12

---

### 1

**1**
  14:14,18
**100**
  16:17
**10:33**
  21:14
**11720**
  5:12
**11:30**
  16:19
**13**
  16:9

---

### 2

**2**
  15:18,20
**20**
  7:8,10
**2013**
  7:11
**2020**
  9:23 11:11
  12:19 13:18
  19:16,21
**2023**
  21:19
**21**
  9:21

---

### 23

**23**
  9:20 16:19

---

### 3

**30**
  17:2

---

### 4

**404**
  15:21
**405**
  15:21

---

### 9

**9**
  5:11
**918**
  14:19
**919**
  14:19

---

### A

**a.m.**
  21:14
**ability**
  6:22
**able**
  14:6,11
**accommodate**
  6:12
**accurate**
  6:9
**accurately**
  6:22
**acquainted**
  12:9
**Act**
  10:17,20
  11:5,15 12:2
  18:12 19:17
**address**
  5:10

---

**administer**
  19:10,17
**affect**
  6:21
**ago**
  7:11
**ahead**
  13:12
**America's**
  7:14
**Americas**
  7:22 8:3,12
  9:18,24 10:6
  11:12,24
**answer**
  6:7,13 11:17
  18:19
**anyone**
  16:22 18:14,
  15,21
**appointment**
  16:8
**appointments**
  20:24
**approximate**
  8:16 9:13
  10:23
**Approximately**
  7:18,24 17:2
**asking**
  5:18 6:4
  14:7
**assigned**
  19:24
**attend**
  20:23

---

### B

**bates**
  14:19
**believe**
  13:18
**best**
  6:9
**bingo**

---

  13:9,11,13
  15:9
**bit**
  13:6
**Bonny**
  5:11
**bottom**
  16:7
**BP**
  8:24
**break**
  6:12,14
**brought**
  5:17
**business**
  5:18 7:5,21
  8:11

---

### C

**called**
  5:2
**capacity**
  8:10 10:4
**caring**
  11:21
**Center**
  5:11
**changed**
  9:20
**chat**
  13:20,22
  15:11
**child**
  17:23
**children**
  17:18
**come**
  12:21
**compliance**
  10:10
**confirm**
  8:6
**consist**
  11:5

consultant
  8:23 9:10
  10:21 11:11
  12:13 19:22
consultants
  11:6
conversation
  14:15 15:3,5
  18:25 19:6
  21:3
copy
  21:11
correct
  9:7 16:13
couple
  9:21
court
  5:25 6:2,14
current
  10:12

**D**

date
  7:9 8:6
  14:16 15:19
daughter
  12:22 13:2
  17:9,25
  18:3,7,17
  20:8,13,16,
  22 21:4
daughter's
  17:6,13
  18:22 19:2
  20:20
day
  16:15 21:19
deal
  17:23
decision
  12:15
details
  17:8 18:9
diagnosis
  20:20

different
  13:13
directives
  10:11
divvied
  13:12
doctors'
  20:23
document
  13:19,21
  14:6,17,21,
  24 15:11,12,
  20,22,25
donation
  13:10
duly
  5:3
duties
  8:9 10:3

**E**

e-mail
  15:18 16:4,
  11 19:4
either
  5:24
Electronic
  21:12
employee
  11:8 19:18
employees
  19:10
entry
  13:10
event
  13:4,8,11
everyone
  13:25
exact
  17:8
exactly
  8:6
EXAMINATION
  5:13

examined
  5:4
Exhibit
  14:14,18
  15:18,20
explain
  13:6
explained
  17:19

**F**

fall
  13:18
familiar
  11:7,24
Family
  10:16,20
  11:5,14,25
  18:11 19:17
federal
  11:18
fine
  21:13
finish
  6:4
first
  9:8 12:8,25
Fisher
  5:14,16
  13:25 14:4
  19:15,25
  21:6
five
  9:13 10:25
  20:2
FMLA
  11:18 19:10
follows
  5:5
form
  18:18
frequently
  12:18
full
  5:7,10

**G**

gained
  13:10
game
  15:9
games
  13:13
gave
  6:9 9:5
general
  11:9,15
give
  6:16 13:20
  15:7,8,11
  17:3 19:25
given
  18:7
going
  5:18 6:8
  13:19 14:18
  15:10
Good
  5:15
Great
  6:20 14:4,17
  15:15
group
  8:14
Guilfoyle
  11:16 14:3
  18:18 19:12
  20:3 21:8,
  10,12

**H**

handbook
  11:8
happy
  5:22 6:12
Haran
  5:16 12:4,
  19,22 13:14
  16:8 17:6,24
  18:11,15,24

19:6 20:7
21:3
**Haran's**
18:22
**head**
6:16 8:8
10:13
**hear**
5:24
**held**
8:17 11:10,
23 13:5,8
**help**
18:7
**helping**
20:12
**hire**
12:16
**hiring**
12:11
**hmm**
6:16
**Holbrook**
16:21
**hold**
7:17,23 8:2,
19 9:3,11,
19,23
**holding**
8:4
**home**
11:21 20:8,
12
**hospital**
17:21
**HR**
7:21 8:3,13,
23,24 9:10,
24 10:9,13,
14,21 11:6,
11,12,24
12:13 18:15
19:22

## I

**identificatio
n**
14:15 15:19
**ill**
13:2
**illness**
17:7,13
18:8,22 19:2
**illnesses**
6:21
**inform**
18:10 20:7
**initiatives**
8:13
**interact**
12:18
**international**
8:25 10:13,
14
**issue**
17:10,11

## J

**jabber**
14:14 15:3
**job**
8:9 10:3
11:20 19:9,
13,16
**Julia**
20:8

## K

**know**
5:22 12:4,6
14:22 15:22
17:9 19:23

## L

**leave**
10:17,20
11:5,14,20,
25 18:12
19:10,17
**leg**
17:10,11,13
**Liane**
5:16
**little**
13:6
**long**
7:6,17,23
9:11 16:25
**look**
14:21 15:22
**looks**
16:17

## M

**make**
13:9
**manage**
10:5
**management**
10:2
**managers**
12:17
**March**
7:10
**marked**
14:15,18
15:18
**matter**
5:17
**medical**
10:17,20
11:5,14,22,
25 17:10
18:12 19:17
**meet**
15:8 16:15,

18,20
**meeting**
16:5,12,23,
25 17:5 20:6
**met**
13:3
**Michelle**
5:8 21:16
**minutes**
17:2 20:2
**mm**
6:16
**moment**
14:8
**months**
17:20
**morning**
5:15
**multiple**
17:21

## N

**name**
5:7,15
**nature**
17:12
**necessity**
11:22
**need**
20:8,16
**needed**
18:6
**needing**
18:16 20:23
**nod**
6:15
**Notary**
5:3
**noted**
9:17 21:14
**notify**
18:14
**number**
7:24

## O

oath
  5:20
Objection
  11:16 18:18
  19:12
OBS
  14:19 15:21
October
  16:9,19
office
  10:2
okay
  6:20 7:12
  8:19 9:5,8,
  16 11:4
  13:19,21,24
  14:9,10,11,
  17,23 15:10,
  15,17,24
  16:11,15,20
  19:25 20:3,
  15 21:6
once
  6:3
one
  9:4,8 13:14,
  20 14:7
  15:11
online
  13:8,11
open
  14:5,6,11
  15:16
Orange
  5:17 7:5
  10:16 11:15,
  19 12:2,7,12
  18:15,22
  19:11,18
Original
  16:8

## P

page
  16:7
part
  19:9,16
participants
  13:9
participate
  12:11,15
partner
  8:11
Patricia
  5:16
Patrician
  12:4
patty
  15:4 16:4,8,
  12,16
pending
  6:14
people
  6:3
percent
  16:17
pertaining
  21:4
pizza
  16:21 18:25
  19:7 20:6
place
  16:21
played
  13:13
please
  5:6,9,21
  6:3,16 14:6
PMO
  8:3,12 9:24,
  25 11:12,24
point
  19:14
policy
  11:7,15,19,
  25

portion
  16:7
position
  7:12,19
  8:17,22 9:3,
  12,16,19,23
  10:12 11:10,
  11,24
positions
  8:20 9:2,21
possibly
  18:4
premature
  17:20
present
  16:22
presumed
  6:8
prior
  8:25 9:22
  11:11 16:12
prize
  13:4 15:8
  17:3
prizes
  13:12 15:7
procedures
  6:18
program
  8:24
programs
  7:14 9:18
  10:5,8,14
project
  8:24 10:2
projects
  7:14 8:13
  9:18 10:5,7,
  9,13
proper
  6:17
protection
  11:20
provide
  6:5 13:3
provided
  6:25

Public
  5:4
put
  13:19 15:10

## Q

question
  5:21,23 6:7,
  9
questions
  5:19 6:4,13,
  17 20:5
  21:7,8

## R

Reach
  5:12
recall
  17:14 18:2,
  5,9 19:24
  20:10,14,21,
  25 21:3,4
receive
  10:19
received
  10:15
recess
  20:4
recognize
  14:24 15:2,
  25 16:3
record
  5:7,10
recruited
  12:10
recruitment
  10:10
regarding
  15:6
region
  10:6
regiones
  8:15

**related**
  10:9,10
**remember**
  8:7 17:8,17
  20:17
**repeat**
  5:24,25
  20:16
**rephrase**
  5:22
**reporter**
  5:6,9,25
  6:2,15 21:10
**reporting**
  11:9
**represent**
  5:16
**respond**
  5:20
**response**
  6:10 17:15
**responses**
  6:5,17
**responsible**
  19:20,21
**review**
  19:5
**reviewing**
  14:22 15:23
**right**
  9:6
**rights**
  18:11
**Road**
  5:11
**rocco**
  5:1,8,15 6:1
  7:1 8:1 9:1
  10:1 11:1
  12:1 13:1
  14:1,14,18,
  20 15:1,18,
  20 16:1 17:1
  18:1 19:1
  20:1 21:1,16
**rolled**
  8:14

**rollout**
  10:11

---

### S

**sales**
  7:21 8:25
**save**
  14:7
**scheduled**
  16:18
**schooled**
  20:9
**schooling**
  20:13
**screen**
  19:5
**scroll**
  14:21 16:6
**second**
  9:16 13:20
  15:12
**see**
  13:21,25
  15:12,15
  16:9
**series**
  5:19
**services**
  5:18 10:14
**set-up**
  20:12
**seven**
  7:18,25
**shake**
  6:15
**shop**
  19:2,7 20:7
**sick**
  12:23 17:23
  18:17
**social**
  20:11
**son**
  17:20

**speak**
  12:25 18:21,
  24
**spent**
  17:20
**spoke**
  12:22
**spoken**
  19:6
**stamped**
  14:19 15:21
**stand**
  9:25
**start**
  7:9 8:4
**started**
  7:13
**starts**
  16:7
**state**
  5:6,9 11:15
**Subscribed**
  21:18
**suffering**
  6:20
**support**
  7:21 8:11,
  13,24
**sure**
  8:18 13:8
  16:17 21:12
**surgeries**
  17:18,22
  18:4
**surgery**
  17:25 20:16
**sworn**
  5:3 6:25
  21:18

---

### T

**take**
  6:11 11:20
  14:20 15:21
  18:7,16

**taken**
  20:4
**talk**
  20:11
**talked**
  17:9
**talking**
  6:3 17:17
  19:13
**tell**
  17:12,24
  18:3,6
  20:15,19,22
**terms**
  11:15
**testified**
  5:4
**testify**
  6:22
**testimony**
  7:2
**things**
  10:9
**think**
  20:2
**three**
  17:20
**time**
  6:11 11:23
  12:14,21
  18:7,10,16
  19:14 21:9,
  14
**timeframe**
  8:16 9:14
  10:23
**title**
  7:15,17,23
  8:2,5 9:9
**titles**
  9:6
**today**
  5:19 6:23
**tool**
  10:11
**top**
  8:8

training
    10:15,19
    11:4
transcript
    21:11
truthfully
    6:22
turn
    6:6
two
    6:2  9:6
type
    6:2,15
types
    10:7

---

### U

uh
    6:16
understand
    5:21  6:18
understood
    6:8  17:22
United
    13:10
upcoming
    18:4

---

### V

various
    20:23
verbal
    6:17

---

### W

wait
    6:3
want
    6:11
way
    12:12  13:10
went
    13:11

winners
    13:15
winning
    15:9
witness
    5:3,8,11
    11:18  18:20
    21:9
won
    13:4,13
work
    7:4  18:7,16
worked
    12:7
worker
    20:12
working
    7:6  10:16
written
    11:8

---

### Y

year
    8:7
years
    7:8,10,18,25
    9:13,22  11:2
York
    5:12

Exhibit E

 performance review

  **Completion**

PATTY HARAN, H2 2020, Performance Review from 01-jul-2020 to 31-dec-2020.

**The steps of the review process during the year / semester:**

       

Preparation step
(Employee and Manager)

Self-assessment
(Employee)

Evaluation
(Manager)

Acknowledgement
(Employee)

**Completion**
(Manager)

## Review

| | |
|---|---|
| **Evaluated by :** | ADAM KIMMICK |
| **Department :** | Sales NAM 3 |
| **Date of preparation meeting :** | 04-jan-2021 |
| **Date of review meeting :** | 28-jan-2021 |
| **Attachment(s) :** | -- |

--

## Job description

| | |
|---|---|
| **Job :** | (F00860) |
| **Job starting date :** | 10-apr-2017 |
| **Job title :** | Local account manager (farmer) |
| **Assignment and main activities :** | Develop relationships in support of selling across the OBS portfolio- act as local account manager as part of global team. B End for 3 GAM accounts, develop A end accounts Pfizer and Moody's. |

# Content

The performance review is a privileged time for exchange between the employee and their manager. The dialogue that takes place on this occasion serves three purposes :

- Give a feedback on the action of everyone, in a broader context, that of business and enterprise, but also in the specificity of his job,

- Recognize and develop the performance of everyone,

- Anticipate and prepare the career evolutions.

Competencies..................................................................................................................................3
   Job...............................................................................................................................................3
   Main competencies observed......................................................................................................3
   Main competencies to strengthen...............................................................................................4
   Known languages........................................................................................................................4

Objectives......................................................................................................................................5
   Current objectives, H2 2020.......................................................................................................5

Training..........................................................................................................................................8
   Development needs......................................................................................................................8

Overall rating.................................................................................................................................9
   Overall rating..............................................................................................................................9
   Manager's comments..................................................................................................................9
   Employee's comments................................................................................................................9

Career plan..................................................................................................................................10
   Development wishes..................................................................................................................10
   Action plan................................................................................................................................10
   Manager view............................................................................................................................10

 # Competencies

The dialogue focused on competencies enables the identification of possible development and training activities in line with company operational needs and employee career development aspirations.

The Job has a profile of core competencies which are listed in the section "Job Competencies".

## Job

| Detail (group referential): |
| --- |
| |

## Main competencies observed

### › Strategic approach to customers

| | |
| --- | --- |
| **Comments from preparation step :** | Develop account plans and sales strategies for new A end accounts in module: Moody's and Pfizer. Continue to refine them for existing B end accounts including KPMG, Sanofi & Capgemini. Research business drivers and how Orange solutions can support them. Meet with strategic partners to understand landscape and strategic opportunities to pursue on all accounts. |
| **Comments from self-assessment / evaluation steps :** | Employee, PATTY HARAN : Developed plans for all assigned accounts. Worked to engage with newly identified and existing decision makers. As a result Orange was invited to bid on new projects including: KPMG global FinOps and Canadian member firm security initiative. Capgemini contact center sell to and sell with, Pfizer contact center, Moody's Riverbed refresh, Pfizer Riverbed hw. license & prof. services support. |

### › High level customer relationship

| | |
| --- | --- |
| **Comments from preparation step :** | Create and execute on contact plans for all accounts. Reach out to C levels based on business drivers. Met with VP of Moody's and Pfizer to understand strategic roadmap and communicate OBS value proposition. Hosted workshop for business development on sell with for Capgemini North America. Complete transition for accounts moving to new B end DGC AM: L'Oreal and LVMH brands in Americas. |
| **Comments from self-assessment / evaluation steps :** | Employee, PATTY HARAN : Developed account plans for Pfizer & Moody's. Engaged with ZScaler team on joint pursuit at Moody's. Engaged with Genesys on Pfizer and also with Orange affiliate BlueSoft on discovery for joint development to compliment digital launch platform - such as implementation and cloud hosting support in various regions. Supported L'Oreal transition and supported warm introduction for new LAM with global CIO. |

### › Knows our products & services

| | |
| --- | --- |
| **Comments from preparation step :** | Continue completing solution trainings as assigned. Focus on Altify to support strategic deal development. Understand software and data analytics portfolios and applications within assigned verticals such as pharma and financial. |

| Comments from self-assessment / evaluation steps : | Employee, PATTY HARAN : Participated in contact center trainings with Genesys and in practice to develop solution for client. Engaged with new partner CloudCheckr to introduce service to AME teams FinOps from KPMG oppty. Started utilizing LinkedIn Sales Navigator to identify and engage with new contacts - followed Orange training. ALso participated in several other trainings including UC and conferencing, HR related trainings, OJ calls etc. |
|---|---|

### › Being results oriented

| Comments from preparation step : | Attain sales targets for strategic accounts and execute to further to close revenue gap due to losses on departing accounts such as NBA and Coty. |
|---|---|
| Comments from self-assessment / evaluation steps : | Employee, PATTY HARAN : Pending FT transfer and true-up on $2.3M remaining to reach SCORE in new/get for 2020. |

### › Being creative and innovative

| Comments from preparation step : | Continue to engage with partners and expand reach into assigned accounts utilizing strategic product portfolio, digital & data, Orange Healthcare, wholesale for subsea cable and high capacity connectivity and other divisions to expand our value proposition within assigned accounts. Look for new business units and teaming with other Orange entities. |
|---|---|
| Comments from self-assessment / evaluation steps : | Employee, PATTY HARAN : In addition to previously mentioned areas of FinOps, security, Capgemini sell with areas and engagement with partners, on Sanofi account was able to engage with 3rd party consultant Mobitz and identify activity involving SDWAN pilot with Palo Alto. Meeting in January with Mobitz \, based in CA, to introduce Orange and determine possible joint partnership with them. |

## Main competencies to strengthen

### › Knows our tools and processes

| Comments from preparation step : | Follow DAC processes and engage early. Utilize resources and overlay support such as contact center, IS and software specialists to bring opportunities to closure efficiently. |
|---|---|
| Comments from assessment step : | Employee, PATTY HARAN : Engaged directly on DAC and got Moody's renewal SRB adjustments approved for 2 year term. Working with overlay teams such as contact center on several opptys. Worked with presales consultants and IS overlay on refining sales strategy on Moody's and Pfizer accounts in series of sessions to develop account plan. |

## Known languages

| Language | Proficiency levels |
|---|---|
| English | |

 Objectives

## Current objectives, H2 2020

> **Global Account Teaming**

| | |
|---|---|
| **Objective description :** | Act as a leader of the global team – gain commitment and engagement as required to ensure the right expertise is in place when required by the client to move opportunities to closure, attain CSAT targets and ensure internal and external customer satisfaction. Continue to further develop a leadership role with the global team in order to effect a structure and successful team.  Manage the budget process to ensure AME is recording results commensurate to region anticipation. |
| **Measurement :** | Direct Management of team objectives, subjective and Customer feedback |
| **Due date :** | 31-dec-2020 |
| **Evaluation :** | 3-Achieved |
| **Comments :** | Employee, PATTY HARAN : Acted as a team lead on Moody's, Pfizer. B end for Sanofi & Capgemini. On Capgemini good teaming example is  business development on contact center BsV oppty. I discovered opportunity with client and engaged global DGC team,  BU and Cisco team to develop multifaceted approach to partnership and opportunity development. This continues in 2021. <br>On Pfizer led plan for global team including mgmt, legal and CISO to refresh & update MSA terms. Engaged with partners including new partnership with CloudCheckr. C level meetings with procurement and IT to review areas of business development and renewal of existing EAM and cobrand. On Sanofi made contact and introduction to new consultant Mobiz engaged with Sanofi on SDWAN. Also scheduled meeting with regional IT leaders, BU and I to review SDWAN roadmap and capabilities. Brought in presales support with Ampacet for voice SIP, network monitoring. For L'Oreal handover I arranged warm handover and meeting for new AM to meet with global CIO. |

> **Customer Satisfaction**

| | |
|---|---|
| **Objective description :** | Ensure customer satisfaction rating is high, both in terms of CLI and in general customer loyalty.  Address and resolve key areas of concern.  Manage and grow a leardership and consultative relationship with assigned accounts. |
| **Measurement :** | Meet CSAT objectves for 2020 as defined on goal sheet. |
| **Due date :** | 31-dec-2020 |
| **Evaluation :** | 2-Partially Achieved |

PH_Performance_Review_01-jul-2020_31-dec-2020.pdf
Editing step « Completion ».

P000174

| Comments : | Employee, PATTY HARAN : Moody's: renewal of MSA & BVPN secured for 2 years. Working to rebuild loyalty and develop new relationships in support of earning new business. We have grown voice business in 2020, added new BVPN & have been invited to participate in new bids for ERS/IS space such as Riverbed and Juniper. Working to improve CSAT feedback by ensuring Moody's key contacts are included in ops reviews, and are updated on Orange team resources and processes. Hosted meetings with Moody's key IT and procurement contacts to review network transformation plans and Orange alignment. Developed Zoom Phone BYOC opportunity for 2021 pipeline. |
|---|---|

Capgemini: CSAT result-Myself and IS AA both got called out for kudos from IT procurement contact at Capgemini on good responsiveness and support overall in the space of ERS/ IS. Met with global Procurement and CIS BU executives to expand scope of contacts. Engaged on expansion of Software sales IR prognosis with migration to MS Teams and alignment with BYOC oppty.

Ampacet: SIP opened after negative CSAT review by Dan Batten at Ampacet. I also directly reviewed and clarified with him the features of My Service Space platform including proactive incident notifications. CSM to schedule refresh training and further review of improvement on service delivery and other possible areas of improvement with client experience.

## › Target Achievement

| Objective description : | Achieve order, revenue, strategic orders and profitability targets for 2020 YTD as agreed in 2020 Compensation Plan and Goal Sheet. Ensure a healthy funnel to achieve order target and focus on strategic products. |
|---|---|
| Measurement : | Achieve Revenue, orderbook, strategic orders, AR and profitability targets for second half 2020 |
| Due date : | 31-dec-2020 |
| Evaluation : | 3-Achieved |
| Comments : | Employee, PATTY HARAN : 2020 results (pending December results): expect to be 100% on revenue, order book 100%. Funnel was approximately 4 times quota for 2H '20. As of Oct '20 funnel for 2021 pipeline was in line with target of $22M per person @ $26M.<br>AR: Worked with collections and sales ops to resolved AR issues on Pfizer account (tax exempt) & Sanofi (double billing)<br><br>Although overall pipeline activity is approximately 26M the pipeline velocity needs to improve as does the win rate - especially for renewals. |

## › Sell Strategically

| Objective description : | Use consulative sales technicques to sell services that meet our client's business needs, and also achieve Orange's goal to add uniques value in the marketplace. |
|---|---|
| Measurement : | Meet strategic sales targets, build active and adequate funnel with qualified Create a comprehensive area (account) plan to sell managed services, Security, SDWAN, Cloud services, Voice services and collaboration opportunities that meet client business needs. |
| Due date : | 31-dec-2020 |
| Evaluation : | 3-Achieved |
| Comments : | Employee, PATTY HARAN : Developed plans for all assigned accounts. Worked to engage with newly identified and existing decision makers. As a result Orange was invited to bid on new projects including: KPMG global FinOps and Canadian member firm security initiative. Capgemini contact center sell to and sell with, Pfizer contact center, Moody's Riverbed refresh, Pfizer Riverbed hw. license & prof. services support, Ampacet MS teams DR, Moody's Zoom Phone BYOC and expanded BTALK, Capgemini bid on software subscription for WCC, IR Prognosis, video device deployment, and various software and hardware maintenance renewals. |

## › Maintain Activity level to attain Acquisition Objectives

| | |
|---|---|
| **Objective description :** | Create and develop a healthy pipeline of new business opportunities in line with the achievement of Annual Order goals. Focus should be on New business. |
| **Measurement :** | At least three client meetings per week to discuss and qualify new business opportunities. Partner alignment and opportunity sharing. Two direct partner meetings per month At least one "C" level meeting per month to discuss and develop a new business opportunity. |
| **Due date :** | 31-dec-2020 |
| **Evaluation :** | 2-Partially Achieved |
| **Comments :** | Employee, PATTY HARAN : Moodys: Developing several oppty tracks with leadership and Flint Barber as well as new contact (George Kurion): Palo and/ or ZSCaler interest in micro-segmentation- Orange value add to be developed. Met with Zscaler, Cisco, Fortinet, Zoom teams for Pfizer. On Pfizer worked extensively with Genesys team on contact center oppty. For Sanofi engaged with Cisco & Palo Alto to discuss SDWAN partnering. KPMG engagement with Cisco on development with KPMG US and Canada member firms- met with KPMG Canada on security initiatives, ongoing. ALso proposed to KPMG FinOps with new partner CloudCheckr- provided demo, budgetary pricing. Presented Orange capabilities update to several clients including: Cleary, Ampacet, Pfizer, Capgemini acquisition Altran & IBM as new B end for 2021. As I mentioned above, although Patty is good administratively I'm noting partial attainment here related to pipeline velocity. |

## › Maintain Activity level to attain Acqusition Objectives

| | |
|---|---|
| **Objective description :** | Create and develop a healthy pipeline of new business opportunities in line with the achievement of Annual Order goals. Focus should be on New business as well as strategic products. |
| **Measurement :** | At least three client meetings per week to discuss and qualify new business opportunities. Partner alignment and opportunity sharing. Two direct partner meetings per month At least one "C" level meeting per month to discuss and develop a new business opportunity. |
| **Due date :** | 31-dec-2020 |
| **Evaluation :** | N-Not applicable |
| **Comments :** | Employee, PATTY HARAN : duplicate of above metric |
| | This is a duplicate of the prior objective and should not be considered. |



## Development needs

No written content for this section.



# Overall rating

### ➡️ Overall rating

**Rating :** 2-Improvement Needed

## Manager's comments

I noted the 1H 2020 was a huge challenge for Patty in her newly assigned territory, this remained the case in 2H2020.  She has met her objectives related to her B-end accounts, but the largest A-end accounts (Moody's, COTY and Pfizer) have made decisions to move away from Orange products and services.  These decisions were being fomented before Patty took on responsibility for managing the accounts.  And in the case of Pfizer, Orange was unable to accept some onerous contract terms.  Nevertheless, this difficult situation has created a gap in the business Patty manages.  She has made progress during 2H2020 in building an agreed consensus on her strategy with her team.  However, this strategy has not resulted in an increased in proposed services.  In fact, her pipeline velocity is potentially not sufficient to meet her 2021 financial growth objectives, and this will be a critical discussion as we set targets for 2021. The new opportunities created in 2020 (largely with B-end accounts), are exploring partnership and "sell with" opportunities to expand our portfolio.  These have not matured, and no new deals in this space have been moved through the funnel to negotiation.  I recognize that some of the challenges (and consequences) in building and growing a healthy business were exceptional, especially during the CVD19 crisis.  That said, fragile prospects for stability and growth in Patty's business remain.  Urgent focus needs to be on identifying new opportunities and moving these aggressively through the funnel.

## Employee's comments

We will need to look at account assignment mix for 2021 and discuss to consider adding select targeted A or B end acquisition accounts to augment current deck. Considering in particular Coty, Pfizer accounts currently in inactive status. Overall Moody's was expected to be a loss due to problems with Orange inventory scope on previous renewal.
In 2H delivered increase in SIP voice for Moody's and usage by $ 360K monthly. New BVPN service wins in $120k TCV in H2. $2M BVPN renewal was won and support from new coach sets stage for add l growth. New bids for GigE internet services. New opptys identified with SDWAN with Cloudgenix, new hosted voice solution identified $1M forecasted.
On Pfizer uncovered new contact center oppty with Pfizer valued at $600K and potential to expand voice footprint as well as expanding contact center scope with other BU's with stated support from Pfizer Medical division. Also uncovered, but lost, new scope of professional services and software with Riverbed on Pfizer. Uncovered private cloud oppty to support e-health in regional data centers in Europe.  Pfizer: MS Team DR oppty uncovered. Capgemini I Closed $ 600K in ERS/IS in 2020

Acknowledgement by the employee the : 29-jan-2021.

 # Career plan

Career development plan taking into account competencies, motivation and real career-enhancing opportunities.

## Development wishes

**Expected due date :**   12 months

**Development wishes :**   ■ Stay in my business area

**Specify :**   Manager, ADAM KIMMICK : Manager, ADAM KIMMICK : Employee, PATTY HARAN : Develop new A end accounts globally, continue support on short list of key B end accounts, focus on largest opportunity development in Moody's Pfizer, Capgemini, & Sanofi with additional solutions areas and business units. Look to consider a hybrid sales model with development in select new acquisition accounts Employee, PATTY HARAN : Manager, ADAM KIMMICK : Employee, PATTY HARAN : Develop new A end accounts globally, continue support on short list of key B end accounts, focus on largest opportunity development in Moody's Pfizer, Capgemini, & Sanofi with additional solutions areas and business units. Look to consider a hybrid sales model with development in select new acquisition accounts

## Action plan

| Action | Due date |
|---|---|
| Develop A end accounts existing and new | 31-dec-2020 |

## ➲ Manager view

**View :** 1-Favourable

**Specify :**

Although I agree that additional opportunities need to be generated, and that it might happen through the addition of new accounts, this will require a change in structure to the sales team and sales compensation structure.  I will support the recommendation, but the implementation of this plan is outside my purview.   In the meantime, Patty needs to work within her assigned territory.

Exhibit F

| | |
|---|---|
| **From:** | patty.haran@orange.com |
| **Sent:** | Wednesday, February 24, 2021 11:27 AM |
| **To:** | pattyharan@gmail.com |
| **Subject:** | FW: Moodys & Orange wave request & catch up |



**Patty Haran**
Sr. Acct Manager
Orange Business Services
Phone: +1 5167020769
patty.haran@orange.com
10 E 40th Street
New York, NY 10016
www.orange-business.com



**From:** Bothe, Jason [mailto:Jason.Bothe@moodys.com]
**Sent:** February 17, 2021 12:56 PM
**To:** HARAN Patty OBS/S AME; AGUILAR Frank WIN/IC; KLINGNER Michael WIN/IC; HINKLE Jonathan WIN/IC
**Cc:** Looney, Scott (non-empl)
**Subject:** Re: Moodys & Orange wave request & catch up

Hi team

Following up on this request. Any update?

Cheers

J~

**From:** Patty Haran <patty.haran@orange.com>
**Date:** Wednesday, February 3, 2021 at 9:50 AM
**To:** AGUILAR Frank WIN/IC <frank.aguilar@orange.com>, KLINGNER Michael WIN/IC
<michael.klingner@orange.com>, "Bothe, Jason" <Jason.Bothe@moodys.com>, HINKLE Jonathan WIN/IC
<jonathan.hinkle@orange.com>
**Subject:** RE: Moodys & Orange wave request & catch up

P000150

CAUTION: This email originated from outside of Moody's. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Frank & Michael,

Per Jason's request please also quote below 2 options with 1 Gbps unprotected wave:

1. 21 1-ya Tverskaya-Yamskaya ulitsa Four Winds Plaza-7th floor Moscow, Russian Federation 125047 to Equinix FR5, Kleyerstraße 90, 60326 Frankfurt am Main, Germany
2. 21 1-ya Tverskaya-Yamskaya ulitsa Four Winds Plaza-7th floor Moscow, Russian Federation 125047 to Equinix AM3, Science Park 610, 1098 XH Amsterdam, Netherlands

This is in addition to below quotes. Two and three year term options.

Thank you,



**Patty Haran**
Sr. Acct Manager
Orange Business Services
Phone: +1 5167020769
patty.haran@orange.com
10 E 40th Street
New York, NY 10016
www.orange-business.com



-----Original Appointment-----
**From:** HARAN Patty OBS/S AME
**Sent:** February 2, 2021 3:30 PM
**To:** HARAN Patty OBS/S AME; AGUILAR Frank WIN/IC; KLINGNER Michael WIN/IC; jason.bothe@moodys.com; HINKLE Jonathan WIN/IC
**Subject:** Moodys & Orange wave request & catch up
**When:** February 2, 2021 4:30 PM-5:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** https://orangeamerica.webex.com/join/patty.haran


https://orangeamerica.webex.com/join/patty.haran


Review of 1 G unprotected wave quote, diverse with 2 & 3 year terms.


Site 1

P000151

Exhibit G

| From: | HARAN Patty OBS/S AME [patty.haran@orange.com] |
|---|---|
| Sent: | 2/1/2021 5:33:09 PM |
| To: | SINGH Peter OBS/S EUR [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LJWM0335]; HARAN Patty OBS/S AME [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LNSJ0690] |
| Subject: | Conversation with SINGH Peter OBS/S EUR |

**HARAN Patty OBS/S AME 4:16 PM:**

Hi There

**SINGH Peter OBS/S EUR 4:20 PM:**

Hi Patty - Are you covered in snow ?

**HARAN Patty OBS/S AME 4:22 PM:**

not personally, but yes. Still coming down. No way to escape, right?

**SINGH Peter OBS/S EUR 4:23 PM:**

No.. still coming down in the city as well.  Kids are in the courtyard burying themselves currently.

at least 12 inches

Maybe 14

How are you?  I miss our chats.

**HARAN Patty OBS/S AME 4:26 PM:**

wow! Let them make some snowpeople. Julia is out sledding in the woods w/ friend. A winter baby, she loves the snow. 1st morning all year, she is up, made her bed and all smiles. How are you?

**SINGH Peter OBS/S EUR 4:27 PM:**

Nice.  I'm good, counting the days to when I can get a vaccine.  Sort of focused on work, sort of not.

I'm rolling off 3M.

Transition to the Justin, who I hired in Minneapolis.

3M now a NAM account.  And new CBU Director Ann Lim taking over.

so, until I get assigned, you can have me fully for KPMG ;-)

**HARAN Patty OBS/S AME 4:33 PM:**

wow, interesting on the changes. What do you think you will get assigned next?

I will be in your area I think- my mom is seeing a DR at 167th Street area and I am driving her in a few weeks. where are you?

**SINGH Peter OBS/S EUR 4:35 PM:**

Excellent... can we meet?  Sounds like you're visiting NY Presbyterian.

I'm at 116 close to 5th ave.

But can meet you near 167 also.

**HARAN Patty OBS/S AME 4:37 PM:**

I think so, I don't know if they will let me go in with my mom. most appt's now unless with a minor are just for the patient. so I may have a little time

would be nice. I need to get the name of DR and exact address. I just know its an eye specialist. Friday, 2/12 at 2PM

**SINGH Peter OBS/S EUR 4:39 PM:**

That sounds good.  Hopefully she'll have a good visit, and we can have a good catch up as well.

166-168 and Broadway is the NY P complex.

I know it well, both kids born there :)

**HARAN Patty OBS/S AME 4:42 PM:**

makes sense. I dont think my mom realizes its at NYP. She keeps saying the Dr.'s office.

**SINGH Peter OBS/S EUR 4:45 PM:**

As far as next challenge, dunno... maybe Goodyear or GSK

How is your year starting off?

**HARAN Patty OBS/S AME 4:50 PM:**

Nice to have a little break while it's figured out, right?

I finally closed Moody's renewal, so that helps a bit. But honestly things are intense as far as pressure for more business quickly. Not sure how safe I am

**SINGH Peter OBS/S EUR 4:55 PM:**

Yeah, I know about the heat.  Congrats on Moody's!

**HARAN Patty OBS/S AME 4:58 PM:**

you feeling the heat too?

or just heard from me already about my heat?

**SINGH Peter OBS/S EUR 4:59 PM:**

Whenever I think about you, I start of heat up.... that's what you meant right?

:-)

**HARAN Patty OBS/S AME 5:00 PM:**

that was good

nice pivot

made me smile, which I can use right about now.

thanks

**SINGH Peter OBS/S EUR 5:02 PM:**

I think I'm OK, but if we don't sign GSK things can get a bit dicey for me.

I'm not too worried about it.  If it happens change is good.  And you shouldn't worry either.

**HARAN Patty OBS/S AME 5:05 PM:**

yes, it is good. We can go always go somewhere else- just might take a little longer right now.

**SINGH Peter OBS/S EUR 5:06 PM:**

I think once the economy opens up again, I think lots of people will look to start fresh in new jobs, maybe new geography, etc.  There will be opportunities.

**HARAN Patty OBS/S AME 5:07 PM:**

yes for sure. 2022 will be a big year of job change. i was hoping to hang in here for a bit longer until things open up a bit more

**SINGH Peter OBS/S EUR 5:08 PM:**

Btw, I'm actively looking for a country cabin or cottage.

**HARAN Patty OBS/S AME 5:09 PM:**

really?

SINGH Peter OBS/S EUR 5:09 PM:
I went house viewing upstate recently to look at houses in the Rock Hill area.  Do you know it?

HARAN Patty OBS/S AME 5:09 PM:
i haven't heard of it. NY or CT?

SINGH Peter OBS/S EUR 5:10 PM:
NY, lower Catskills north of Middletown which is the big town in teh area.

Nice lake community

I found a place I really liked, but HOA and taxes were too high, so I passed.

I'm also looking in Poconos.

HARAN Patty OBS/S AME 5:14 PM:
we have stayed near candlewood Lake area in CT (New Fairfield, New Milford). There are a few lake communities there. Not too far from NY. Also Squantz Pond which is nicer than it sounds

if you want to be near a lake.... otherwise lots of other options

SINGH Peter OBS/S EUR 5:16 PM:
I'll take another look.  I haven't come across anything in CT though.  I'd like to stay in NY.  But the market is hot right now.  People leaving the city.

I'm trying to balance lake and mountains, which I like.  Lake community with some amenities is good for the kids.

In Rock Hill, there is a pool, tennis courts, basketball courts, playground, etc.

HARAN Patty OBS/S AME 5:20 PM:
yes same. Candlewood Shores, they all have tennis, bb. not sure on pool. that would be nice through. Lots of options to explore. Now is the time while your kids are young to enjoy

SINGH Peter OBS/S EUR 5:20 PM:
Yeah, before they don't want to be seen with me...lol

I'll check out CS.

HARAN Patty OBS/S AME 5:21 PM:
yep. we waited to o long. too worried about spending the $$. llake houses aren't investments for the most part. but nice to enjoy, you can use it in winter too.

SINGH Peter OBS/S EUR 5:23 PM:
Yeah, I don't think I'll make money as an investment, but this is what working hard is about, right?

HARAN Patty OBS/S AME 5:23 PM:
yes. and if its not too costly, it can stay in the family

SINGH Peter OBS/S EUR 5:23 PM:
To be able to add these things to enjoy life.

yep

Thinking long term as well.

HARAN Patty OBS/S AME 5:24 PM:
I hope you find the right spot. maybe rent for a summer 1st to make sure you like it

the area

SINGH Peter OBS/S EUR 5:25 PM:

Plus I had a banner year in my market investments, and think I should convert to a hard asset. So, good investment from this perspective.

HARAN Patty OBS/S AME 5:26 PM:
yes true. I did well too all things considered.

SINGH Peter OBS/S EUR 5:26 PM:
Yep, lets see. I started literally on Jan 2 thinking about this.

And thought, why not. Now's the time.

Something different in 2021.

HARAN Patty OBS/S AME 5:28 PM:
Good for you. I hope it works out. candlewood Isles is another spot. the real estate lady I spoke with last summer has me on her mailing list :-)

SINGH Peter OBS/S EUR 5:29 PM:
Let's both buy in the same spot... lol

I want dangerous liaisons...

HARAN Patty OBS/S AME 5:30 PM:
sounds like fun

SINGH Peter OBS/S EUR 5:30 PM:
A little distraction., excitment

I can day dream....

And reality will coming storming back soon when they return, so I'll go figure out the dinner menu now.

Wishing you a good evening! ciao ciao bela.

HARAN Patty OBS/S AME 5:32 PM:
yes you too. same here. TTYL

Exhibit H

| | |
|---|---|
| **From**: | HARAN Patty OBS/S AME [patty.haran@orange.com] |
| **Sent**: | 2/24/2021 12:19:55 PM |
| **To**: | PICHON Xavier DGC/IND IT [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=KDSQ7320]; HARAN Patty OBS/S AME [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LNSJ0690] |
| **Subject**: | Conversation with PICHON Xavier DGC/IND IT |

HARAN Patty OBS/S AME 11:59 AM:

Hi Xavier

PICHON Xavier DGC/IND IT 11:59 AM:

Hi Patty

Was thinking about you

can we talk?

HARAN Patty OBS/S AME 12:00 PM:

i have some bad news

sure

PICHON Xavier DGC/IND IT 12:00 PM:

What about?

HARAN Patty OBS/S AME 12:00 PM:

i have been let go, effective today

PICHON Xavier DGC/IND IT 12:01 PM:

Are you kidding?

HARAN Patty OBS/S AME 12:01 PM:

no severance. they say they don't think my module has enough business to support my salary

i wish i was.

you will be hearing from my manager soon I suppose. my email will be cut off soon so you can whatsapp me

PICHON Xavier DGC/IND IT 12:02 PM:

I am so sad to read this Patty

I don't know what to say...

HARAN Patty OBS/S AME 12:02 PM:

me too. i just wanted you to know. this is the down side of life in america. they can let people go at any time with no warning

i can give you a debrief on what i was working on

PICHON Xavier DGC/IND IT 12:04 PM:

Yeah

HARAN Patty OBS/S AME 12:04 PM:

i will forward you a meeting i had lined up for Friday after my effort with Tom Gallagher

PICHON Xavier DGC/IND IT 12:05 PM:

unfortunately I have seen this many times at Dimension DAta

and my wife is working for a US company

she saw that many times with former colleagues which were US based.

They learnt by email after a conference call they were those selected to leave...

HARAN Patty OBS/S AME 12:07 PM:
i feel that due to my daughter's illness in Q4 that I should have taken family medical leave off but I didn't want to let the company down. I cannot believe they gave me no severance. And they didnt pay me my owed commission on capgemini for 2020.

i just forwarded you the invite for friday call with Tom Gallagher's direct report with agenda she would like to discuss

PICHON Xavier DGC/IND IT 12:07 PM:
NOted

can I call you in 10mns?

# Exhibit I

| **From**: | HARAN Patty OBS/S AME [patty.haran@orange.com] |
|---|---|
| **Sent**: | 10/8/2020 3:25:42 PM |
| **To**: | KIMMICK Adam OBS/S AME [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ZRPK4373]; HARAN Patty OBS/S AME [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LNSJ0690] |
| **Subject**: | Conversation with KIMMICK Adam OBS/S AME |

HARAN Patty OBS/S AME 2:58 PM:

Hi Adam

KIMMICK Adam OBS/S AME 2:59 PM:

Hi Patty

HARAN Patty OBS/S AME 3:02 PM:

Eddy had reached out asking me to participate in training 3 days next week.... i said I could but now looks like i iwll need to take a few days off for my daughter's situation

should i let him know directly I won't be able to participate in full session so he can open the spot for someone else

i think it was tuesday-thursday training

tues, wed, thurs

KIMMICK Adam OBS/S AME 3:04 PM:

OK. I haven't told anyone (eddy) yet about your doughter

so if you can't join, I can tell Eddy. He'll certainly understand

I can call him if you want

HARAN Patty OBS/S AME 3:06 PM:

me either. he just needed to fill some training spots so he asked and at time i thought I could participate but today we found out she will need surgery and it will likely be on wed.

KIMMICK Adam OBS/S AME 3:06 PM:

just take the time Patty

I'll let Eddy know

just called Eddy

HARAN Patty OBS/S AME 3:08 PM:

yes. do you want to just select someone else to join? he has Paul renassia and Ken McDonald from your team for differentiated selling 10/13-1/15 9 AM-1 PM

KIMMICK Adam OBS/S AME 3:08 PM:

no problem

HARAN Patty OBS/S AME 3:08 PM:

ok thanks.

KIMMICK Adam OBS/S AME 3:08 PM:

Eddy will find someone else

take care of your daughter Patty. Will think of you!

HARAN Patty OBS/S AME 3:12 PM:

thanks. i will firm up when i will be out once I know. insurance has to approve etc. details but she will be in hospital for 3 days Wed-Fri is the plan

KIMMICK Adam OBS/S AME 3:12 PM:
understand.  Let me know i you need anything.  Eddy offered as well

HARAN Patty OBS/S AME 3:13 PM:
okay thanks. will do.